# EXHIBIT A

# TECHSHOP ARLINGTON, LLC
# CRYSTAL CITY SHOPS @ 2100 &
# CRYSTAL DRIVE SHOPS

# LEASE

## VORNADO/CHARLES E. SMITH L. P.
**2345 Crystal Drive**
**Suite 1000**
**Arlington, Virginia 22202**



U:\DOCS\2013\Leases\TechShop\TechShop Arlington, LLC - Shops at 2100 & Crystal Drive Retail 2031 & 2011-BE V6 with Contingency.doc

Case: 18-50398   Doc# 37-1   Filed: 03/22/18   Entered: 03/22/18 16:29:11   Page 2 of 30

TABLE OF CONTENTS

1.   SPECIFIC PROVISIONS ..................................................................................................1

2.   LEASED PREMISES AND TERM ...................................................................................5
     2.1   Leased Premises Defined ......................................................................................5
     2.2   Possession ..............................................................................................................5
     2.3   Rent Start Date ......................................................................................................5
     2.4   Commencement of Business ..................................................................................5
     2.5   Failure to Do Business ..........................................................................................5

3.   FIXTURING AND ALTERATIONS ................................................................................5
     3.1   Tenant Improvements Prior to Opening for Business .........................................5
     3.2   Alterations by Tenant ...........................................................................................6
     3.3   Trade Fixtures .......................................................................................................7
     3.4   Signs ......................................................................................................................7
     3.5   Mechanic's Liens ...................................................................................................7
     3.6   Excessive Floor Load ............................................................................................7

4.   RENT .................................................................................................................................7
     4.1   Minimum Annual Rent ..........................................................................................7
     4.2   Percentage Rent ....................................................................................................7
           (a) Semi Annual Payment ....................................................................................7
           (b) Gross Sales ....................................................................................................7
           (c) No Partnership ..............................................................................................8
           (d) Lease Year .....................................................................................................8
           (e) Partial Calendar Year ....................................................................................8
           (f) Reconciliation of Percentage Rent ...............................................................8
     4.3   Sales Statements ...................................................................................................8
           (a) Monthly Statements ......................................................................................8
           (b) Annual Statement .........................................................................................8
           (c) Inspection of Records ....................................................................................8
           (d) Violation of Section 4.3(c) ...........................................................................8
           (e) Failure to Deliver Sales Statements .............................................................9
     4.4   Additional Rent .....................................................................................................9
     4.5   Real Estate Taxes .................................................................................................9
     4.6   Operating Expenses ..............................................................................................9
     4.7   Additional Rent Estimates and Adjustments .....................................................10
           (a) Initial Additional Rent Adjustments ..........................................................10
           (b) Annual Budget .............................................................................................10
           (c) Additional Rent Reconciliations .................................................................11
           (d) Verification of Additional Rent ..................................................................11
           (e) Rent Adjustment Limit ................................................................................11
     4.7   Additional Rent Estimates and Adjustments .....................................................11
           (a) Gross-Up .....................................................................................................11
           (b) Payment of Estimated Additional Rent ......................................................11
           (c) Annual Reconciliation of Additional Rent ..................................................11
           (d) Verification of Additional Rent ..................................................................11
           (e) Rent Adjustment Limit ................................................................................11
     4.8   Rent Tax ...............................................................................................................11
     4.9   Place of Payment .................................................................................................11
     4.10  Security Deposit ..................................................................................................11
     4.11  Late Payment Fee ................................................................................................12
     4.12  Prorated Rent ......................................................................................................12
     4.13  Application of Rent ..............................................................................................12
     4.14  Survival of Rent Obligations ..............................................................................12

5.   USE OF LEASED PREMISES AND OPERATION ......................................................12
     5.1   Use .......................................................................................................................12
     5.2   Illegal and Prohibited Uses ................................................................................12
     5.3   Trade Name ..........................................................................................................12
     5.4   Covenant to Stay Open ........................................................................................12
     5.5   Restrictions on Other Operations .......................................................................13
     5.6   Store Operation ...................................................................................................13
     5.7   Building Security ..................................................................................................13
     5.8   Roof and Auxiliary Spaces ..................................................................................13
     5.9   Trash Removal .....................................................................................................13
     5.10  Conditions of Occupancy .....................................................................................13
     5.11  Restrictions on Occupancy ..................................................................................14
     5.12  Relocation ............................................................................................................14
     5.13  Medical Waste ......................................................................................................14
     5.14  Damages ...............................................................................................................14

Case: 18-50398    Doc# 37-1    Filed: 03/22/18    Entered: 03/22/18 16:29:11    Page 3 of
30

6.   UTILITIES, REPAIRS, MAINTENANCE AND CLEANING.................................................15
     6.1   Utilities and Services ......................................................................................15
           (a) Utilities and Services Paid by Tenant.....................................................15
           (b) Equipment Restrictions............................................................................15
           (c) Excessive Heat Generation......................................................................15
           (d) Condenser Water.....................................................................................15
     6.2   Tenant Repairs and Maintenance...................................................................15
     6.3   Structural Repairs..........................................................................................15
     6.4   Emergency Repairs ........................................................................................15
     6.5   Installation of Pipes, Ducts, Conduits, Etc...................................................16

7.   COMMON AREA AND FACILITIES...............................................................................16
     7.1   Landlord Control ...........................................................................................16
     7.2   Changes and Additions...................................................................................16
     7.3   Parking............................................................................................................16

8.   [INTENTIONALLY OMITTED] ......................................................................................16

9.   ACCESS BY LANDLORD ...............................................................................................16

10.  INSURANCE, INDEMNITY AND LIABILITY ................................................................17
     10.1  Tenant Insurance ...........................................................................................17
     10.2  Indemnity by Tenant.......................................................................................17
     10.3  Loss or Damage to Tenant's Property and Business.....................................17
     10.4  Fire Insurance.................................................................................................18
           (a) Increase in Premiums...............................................................................18
           (b) Mutual Waiver of Subrogation ................................................................18
     10.5  Criminal Acts of Third Parties......................................................................18
     10.6  Public Liability ..............................................................................................18
     10.7  Construction on Contiguous Property............................................................18

11.  FIRE AND CASUALTY DAMAGES...............................................................................18
     11.1  Repairs and Rent Abatement..........................................................................18
     11.2  Landlord Options to Terminate......................................................................19
     11.3  Tenant's Duty to Rebuild...............................................................................19
     11.4  Rent Adjustment on Casualty Termination....................................................19

12.  TRANSFERS OF INTEREST...........................................................................................19
     12.1  Consent............................................................................................................19
     12.2  Excess Rent and Other Consideration............................................................20
     12.3  Tenant Liability...............................................................................................20
     12.4  Other Transfers...............................................................................................20
     12.5  Rights on Default.............................................................................................20
     12.6  Assignment and Subletting Fee......................................................................20
     12.7  Limitation on Assignments and Subletting ...................................................20
     12.8  Permitted Licenses .........................................................................................20

13.  DEFAULTS AND REMEDIES..........................................................................................20
     13.1  Default.............................................................................................................20
     13.2  Waiver of Cure Rights ...................................................................................21
     13.3  Non-Waiver.....................................................................................................21
     13.4  Landlord's Rights on Default..........................................................................21
     13.5  Damages Upon Termination...........................................................................22
     13.6  Anticipatory Repudiation ..............................................................................23
     13.7  Tenant Abandonment of Leased Premises......................................................23
           (a) Abandonment............................................................................................23
           (b) Landlord Right to Enter and to Relet.......................................................23
     13.8  Tenant Property to Remain .............................................................................23
     13.9  Payment of Fees and Expenses.......................................................................24
           (a) .....................................................................................................................24
           (b) Right of Distress/Landlord's Lien............................................................24
           (c) UCC Security Interest ..............................................................................24
           (d) UCC Remedies Not Mandatory................................................................24
     13.10 Injunctive Relief.............................................................................................24
     13.11 Waiver of Jury Trial and Statute of Limitations............................................24
     13.12 Independent Covenants...................................................................................24
     13.13 Waiver of Redemption ...................................................................................24
     13.14 Non-Exclusive Remedies...............................................................................24

14.  BANKRUPTCY.................................................................................................................24
     14.1  Events of Bankruptcy......................................................................................24
     14.2  Landlord's Remedies.......................................................................................25
           (a) Termination of Lease.................................................................................25
           (b) Suit for Possession....................................................................................25
           (c) Non-Exclusive Remedies..........................................................................25

Case: 18-50398   Doc# 37-1   Filed: 03/22/18   Entered: 03/22/18 16:29:11   Page 4 of 30

|  |  | (d) Assumption or Assignment by Trustee | 25 |
|  |  | (e) Adequate Assurance of Future Performance | 25 |
|  |  | (f) Failure to Provide Adequate Assurance | 25 |
|  | 14.3 | Guarantors | 25 |
|  | 14.4 | Damages | 25 |
| 15. | | SURRENDER OF LEASED PREMISES AT END OF LEASE TERM | 26 |
|  | 15.1 | Surrender of Leased Premises | 26 |
|  | 15.2 | Holding Over | 26 |
| 16. | | CONDEMNATION | 26 |
|  | 16.1 | Taking | 26 |
|  | 16.2 | Ownership of Award | 26 |
| 17. | | SUBORDINATION | 26 |
|  | 17.1 | Subordination | 26 |
|  | 17.2 | Attornment | 27 |
|  | 17.3 | Mortgagee Rights | 27 |
|  | 17.4 | Estoppel Certificates | 27 |
|  | 17.5 | Subordination and Non-Disturbance Agreement | 27 |
| 18. | | TENANT'S RESPONSIBILITY REGARDING HAZARDOUS SUBSTANCES | 27 |
|  | 18.1 | Hazardous Substances | 27 |
|  | 18.2 | Tenant's Restrictions | 28 |
|  | 18.3 | Environmental Cleanup | 28 |
|  | 18.4 | Tenant's Indemnity | 28 |
| 19. | | FACILITIES NONDISCRIMINATION | 28 |
| 20. | | TRANSFER OF LANDLORD'S INTEREST | 28 |
| 21. | | LIMITATION OF LANDLORD'S LIABILITY | 29 |
|  | 21.1 | Landlord's Consent | 29 |
|  | 21.2 | Individual Liability | 29 |
| 22. | | NOTICE AND CURE PERIOD FOR LANDLORD | 29 |
| 23. | | LIMITATIONS | 29 |
|  | 23.1 | REIT Limitations | 29 |
|  | 23.2 | OFAC Compliance | 29 |
| 24. | | QUIET ENJOYMENT | 30 |
| 25. | | JOINT AND SEVERAL LIABILITY | 30 |
| 26. | | SEVERABILITY | 30 |
| 27. | | MUTUAL MISTAKES | 30 |
| 28. | | AUTHORITY | 30 |
| 29. | | SUCCESSORS | 30 |
| 30. | | NON-EXCLUSIVE AGREEMENT | 30 |
| 31. | | OTHER TENANTS | 30 |
| 32. | | APPLICABLE LAW | 31 |
| 33. | | FORCE MAJEURE | 31 |
| 34. | | CORPORATE TENANTS AND/OR GUARANTORS | 31 |
| 35. | | PRONOUNS | 31 |
| 36. | | NOTICES | 31 |
| 37. | | EXHIBITS AND CONFLICTS | 31 |
| 38. | | CAPTIONS | 31 |
| 39. | | BINDING EFFECT OF LEASE | 31 |
| 40. | | RECORDATION | 31 |

-iv-

| 41. | TIME OF ESSENCE | 32 |
| 42. | BROKERS AND COMMISSIONS | 32 |
| 43. | RELATIONSHIP OF LANDLORD AND TENANT | 32 |
| 44. | ENTIRE AGREEMENT; MODIFICATION | 32 |
| 45. | LANDLORD'S CONTRIBUTION | 32 |
| 46. | RENEWAL OPTION | 33 |
| 47. | ZONING AND PLANNING APPROVAL | 33 |
| 48. | TENANT'S SPECIAL CONSTRUCTION OBLIGATIONS | 34 |
| 49. | CRYSTAL CITY TENANT STORE FRONT AND SIGNAGE GUIDELINES | 34 |
| 50. | PARKING | 34 |
| 51. | DEMOLITION | 34 |
| 52. | PERMITTING CONTINGENCY | 35 |
| 53. | EXCLUSIVES GRANTED TO OTHER TENANTS | 35 |
| 54. | ADDITIONAL LANDLORD'S CONTRIBUTION | 36 |
| 55. | LANDLORD'S BRIDGE LOAN TO TENANT | 36 |
| 56. | CONTINGENCY – INTERCREDITOR AGREEMENT | 37 |

Case: 18-50398    Doc# 37-1    Filed: 03/22/18    Entered: 03/22/18 16:29:11    Page 6 of 30

**THIS DEED OF LEASE,** made this 7ᵗʰ day of October 2013, by and between CESC PLAZA LIMITED PARTNERSHIP, a Virginia limited partnership (hereinafter "Landlord"), and TECHSHOP ARLINGTON, LLC, a Virginia limited liability company (hereinafter "Tenant").

Landlord, for and in consideration of the covenants and agreements set forth hereinafter, leases to Tenant, and Tenant leases from Landlord, the premises described, together with use of the Common Areas subject to the conditions set forth hereafter, for the uses set forth and for the term and at the rent reserved herein.

## SECTION 1. SPECIFIC PROVISIONS

### 1.1 Leased Premises

(a) Store No.: 2031 and 2110-B, outlined on the plan attached hereto as Exhibit A.

(b) Floor Area: Consisting of approximately 18,671 square feet known as Store 2031 in the Crystal City Shops @ 2100, and approximately 3,149 square feet known as Store 2110-B in the Crystal Drive Shops, for a collective total of approximately 21,820 square feet. For the avoidance of doubt Store 2031 as shown on Exhibit A includes the dedicated loading dock which opens into the interior portion of Store 2031. As a part of the Leased Premises Tenant shall have exclusive use of such dock area and shall have the right, subject to all other terms and conditions of this Lease: (i) subject to compliance with applicable laws, ordinances and regulations, to use such area for Tenant's permitted use, including storage of equipment, materials, and supplies and as a fabrication area, and (ii) to alter or enclose said dock area.

(c) Store Address: 2031 Crystal Plaza Arcade and 2110-B Crystal Drive, Arlington, Virginia 22202

(d) Building: In relation to Store 2031 the term "Building" refers to the building known and designated as 2100 Crystal Drive. In relation to Store 2110-B the term "Building" refers to the Building known and designated as 2250/2200/2100/2010 Crystal Drive, containing exclusively the Crystal Drive Shops.

(e) Shopping Center: In relation to Store 2031 the term "Shopping Center" refers to the shopping center known and designated as the Crystal City Shops @ 2100. In relation to Store 2110-B the term "Shopping Center" refers to the shopping center known and designated as the Crystal Drive Shops.

### 1.2 Term of Lease:
Commencing on the date of full execution and delivery of this Lease by both Landlord and Tenant ("Lease Commencement Date"), and expiring at 11:59 P.M. on the day before the tenth (10ᵗʰ) anniversary of the Rent Start Date.

### 1.3 Rent Start Date:
The earlier of (i) One Hundred Eighty (180) days following the Delivery Date (defined in Section 2.2), or (ii) the date Tenant opens for business in the Leased Premises; provided, however, that in the event Tenant has diligently pursued its construction permits, is not otherwise in default of any term or condition of this Lease, and is unable to open for business within One Hundred Eighty (180) days following the Delivery Date through no fault of its own, or through events of force majeure, then the Rent Start Date shall be postponed day for day until the date on which Tenant opens for business in the Leased Premises. Notwithstanding the foregoing, in no event shall the Rent Start Date be more than Two Hundred Seventy (270) days following the Lease Commencement Date. Landlord and Tenant hereby agree to execute a Date Confirmation Certificate, substantially in the form attached hereto and incorporated herein as Exhibit C, to confirm the Lease Commencement Date, the Delivery Date, the Rent Start Date, the expiration date and other matters listed therein. The failure to execute said Date Confirmation Certificate shall not affect the commencement or expiration of the Lease Term.

1

Case: 18-50398    Doc# 37-1    Filed: 03/22/18    Entered: 03/22/18 16:29:11    Page 7 of 30

**1.4  Minimum Annual Rent:**

(a) THREE HUNDRED TWENTY-SEVEN THOUSAND THREE HUNDRED AND 00/100 DOLLARS ($327,300.00), payable in equal monthly installments of TWENTY-SEVEN THOUSAND TWO HUNDRED SEVENTY-FIVE AND 00/100 DOLLARS ($27,275.00), for the period commencing on the Rent Start Date, through the date prior to the first anniversary of the Rent Start Date (the "First Rent Year")(each subsequent, consecutive twelve month period commencing on an anniversary during the Term of this Lease is a "Rent Year"). Thereafter, see Section 1.4(b).

(b)  Beginning on the First day of the Second Rent Year Minimum Annual Rent shall be determined based upon the table below:

| Rent Year | Minimum Annual Rent | Monthly Payment |
|---|---|---|
| Second Rent Year | $327,300.00 | $ 27,275.00 |
| Third Rent Year | $327,300.00 | $ 27,275.00 |
| Fourth Rent Year | $327,300.00 | $ 27,275.00 |
| Fifth Rent Year | $360,030.00 | $ 30,002.51 |
| Sixth Rent Year | $360,030.00 | $ 30,002.51 |
| Seventh Rent Year | $360,030.00 | $ 30,002.51 |
| Eighth Rent Year | $414,580.00 | $ 34,548.34 |
| Ninth Rent Year | $414,580.00 | $ 34,548.34 |
| Tenth Rent Year | $414,580.00 | $ 34,548.34 |

(c)  Provided Tenant is not then in default of any of the terms or conditions of this Lease, then notwithstanding anything to the contrary in Section 1.4(a), Landlord agrees to waive: TWENTY-SEVEN THOUSAND TWO HUNDRED SEVENTY-FIVE AND 00/100 DOLLARS ($27,275.00) of Minimum Annual Rent due for the Leased Premises for each of the first four (4) months commencing on the Rent Start Date totaling ONE HUNDRED NINE THOUSAND ONE HUNDRED AND 00/100 DOLLARS ($109,100.00). The escalation of Minimum Annual Rent calculated pursuant to Section 1.4(b) shall be calculated without giving effect to any waiver of rent or rent credit provided to Tenant

**1.5  Percentage Rent:**  Payable in semi-annual installments:

(a)  Rate:  Six Percent (6%).

(b)  Annual Gross Sales in excess of SIX MILLION AND 00/100 DOLLARS ($6,000,000.00) during each Rent Year.

(c)  Semi-Annual Gross Sales in excess of THREE MILLION AND 00/100 DOLLARS ($3,000,000.00) during each six month period during each Rent Year.

**1.6  Additional Rent,** consisting of each of the following, paid in monthly installments commencing on the Rent Start Date:

(a)  Promotional Fund Contribution: Not Applicable.

(b)  As to Store 2031, Tenant's pro-rata share (being the floor area of Store 2031 as a percentage of the total leasable area of the Shopping Center) of Real Estate Taxes allocated to the Shopping Center; As to Store 2110-B, Tenant's pro rata share ( being the floor area of Store 2110-B as a percentage of the total leasable area of the Shopping Center) of Real Estate Taxes allocated to the Shopping Center; each as specified in Section 1.6(d).

(c)  Tenant shall make a contribution toward the Operating Expenses of the Shopping Center; each as specified in Sections 1.6(d) (iii) & (iv).

(d)  Tenant's pro rata share of Real Estate Taxes and Operating Expenses shall be determined as follows:

-2-

Case: 18-50398   Doc# 37-1   Filed: 03/22/18   Entered: 03/22/18 16:29:11   Page 8 of 30

(i) Tenant's pro rata share of Real Estate Taxes for that portion of the Leased Premises known and designated as Store 2031 shall be Twenty-Four and Twenty-One Hundredths Percent (24.21%);

(ii) Tenant's pro rata share of Real Estate Taxes for that portion of the Leased Premises known and designated as Store 2110-B shall be Five and Thirty-Nine Hundredths Percent (5.39%).

(iii) Tenant's Operating Expense Contribution for that portion of the Leased Premises known and designated as Store 2031 of ONE HUNDRED FIFTY-SEVEN THOUSAND SEVEN HUNDRED SIXTY-NINE AND 95/100 DOLLARS ($157,769.95), payable in equal monthly installments of THIRTEEN THOUSAND ONE HUNDRED FORTY-SEVEN AND 50/100 DOLLARS ($13,147.50) per month, which amount shall be increased at the start of the Second Rent Year and each Rent Year thereafter by the percentage by which the Operating Expenses for the Shopping Center during the current Rent Year shall have increased over the Operating Expenses for the Shopping Center during the previous Rent Year.

(iv) Tenant's Operating Expense Contribution for that portion of the Leased Premises known and designated as Store 2110-B of TWENTY-SIX THOUSAND SIX HUNDRED NINE AND 04/100 DOLLARS ($26,609.04), payable in equal monthly installments of TWO THOUSAND TWO HUNDRED SEVENTEEN AND 42/100 DOLLARS ($2,217.42) per month, which amount shall be increased at the start of the Second Rent Year and each Rent Year thereafter by the percentage by which the Operating Expenses for the Shopping Center during the current Rent Year shall have increased over the Operating Expenses for the Shopping Center during the previous Rent Year.

(e) Notwithstanding the foregoing provisions of this Section 1.6, provided Tenant is not in default, Tenant, Landlord agrees to waive those payments of Additional Rent provided for in this Section 1.6 which are due for each of the first four (4) months following the Rent Start Date.

| 1.7 | Security Deposit: | Tenant hereby pledges to Landlord as security for Tenant's obligations pursuant to this Lease the sum FORTY-EIGHT THOUSAND NINE HUNDRED FOUR AND 72/100 DOLLARS ($48,904.72), which shall be delivered to Landlord by Tenant on or before the first anniversary of the Lease Commencement Date. |
|---|---|---|
| 1.8 | Use of Premises: | For the conduct of the business of a member based do-it-yourself workshop and technology innovation center for (i) design, engineering, machining, fabrication, electronics, prototyping, arts and crafts, textiles, woodworking, metalworking, automotive restoration and similar activities, (ii) providing educational and training classes, (iii) providing tools and equipment, including without limitation, computer numerical control machines (including lathes and milling machines), electronic equipment, fabrication, laser/plasma cutters, water jet cutters, welding equipment, saws, drill presses and other power tools and hand tools, (iv) licensing or rental of portions of the Leased Premises (but not all, or substantially all, in the aggregate, and in no event more than 3,000 square feet to any one member) (including bays, rooms, office, lockers and other designated areas) to provide segregated, secure or private work and ancillary use areas to members, and (v) hosting events and activities, and as ancillary to such use, the operation of a retail store for the sale of tools, materials and equipment, and operation of a small café/coffee shop (and for the operation of hospitality service center (not to exceed 1,000 square feet) for storing, staging, and serving of food and drink for events held at the Leased Premises. The services of any "small café/coffee shop" shall be provided only to persons using the Tenant's services as members , their guests, and attendees at events held at the Leased Premises, and shall not be made available to the general public or as a general retail use.  Microwave ovens, non-oven warming devices customarily used by caterers, and a popcorn popper may be installed therein. Tenant may install a commercial style kitchen for providing culinary education, practicing culinary arts and holding culinary events.  Tenant shall |

-3-

under no circumstances be permitted to use any portion of the Leased Premises for the use of a restaurant, and no cooking may take place in the Leased Premises for purposes of serving food to the general public. Tenant shall under no circumstances be permitted to use any portion of the space for the use of a restaurant. Tenant shall not offer any other goods or services unless previously approved by Landlord in writing. Events held at the Leased Premises shall be purely ancillary to and supportive of the business conducted by Tenant in the Leased Premises.

1.9   **Tenant's Trade Name:**      TechShop

1.10  **Minimum Store Hours:**

    10:00 a.m. to 7:00 p.m. Monday through Friday
    10:00 a.m. to 6:00 p.m. Saturday
    Optional            Sunday

1.11  **Minimum Insurance Limits:**

Commercial General Liability – minimum limits of $1,000,000.00 per occurrence, $2,000,000.00 annual and aggregate, and with not less than $5,000,000.00 umbrella coverage, for bodily injury including death, personal/advertising injury, and property damage.

Worker's Compensation – Statutory limits for the Commonwealth of Virginia

Employer's Liability - $1,000,000 per accident, $1,000,000 disease each employee and $1,000,000 disease policy limit.

Auto Liability - $1,000,000 combined single limit per accident

1.12  **(a) Notices to Tenant:**

    TechShop Arlington, LLC.
    120 Independence Drive
    Menlo Park, CA 94025
    Telephone (650) 521-9207

    **(b) Address for Notices to Landlord:**
       (for notices required by this Lease)

    CESC Plaza Limited Partnership
    c/o Vornado/Charles E. Smith L.P.
    2345 Crystal Drive, Suite 1100
    Arlington, Virginia 22202
    Attn: President

    **and to:**

    CESC Plaza Limited Partnership
    c/o Vornado Realty Trust
    210 Route 4 East
    Paramus, New Jersey 07652
    Attention: Chief Financial Officer

    **With a copy to:**

    CESC Plaza Limited Partnership
    c/o Vornado/Charles E. Smith L.P.
    2345 Crystal Drive
    Suite 1100
    Arlington, Virginia 22202
    Attention: Chief Operating Officer

-4-

Address for Payment of Rent:

CESC Plaza Limited Partnership
c/o Vornado/Charles E. Smith L.P.
P.O. Box 642006
Pittsburgh, Pennsylvania 15264-2006

**1.13 Exhibits to Lease:**

Exhibit A – Plan
Exhibit B – Description of Landlord Work – Retail
Exhibit C – Date Confirmation Certificate
Exhibit D - Building Work Rules and Regulations
Exhibit E - Crystal City Tenant Store Front and Signage Guidelines
Exhibit F - Form of Promissory Note (Additional Landlord's Contribution)
Exhibit G - Form of Promissory Note (Bridge Loan)

**1.14 Special Provisions:**

Section 45. Landlord's Contribution
Section 46. Renewal Option
Section 47. Zoning and Planning Approval
Section 48. Tenant's Special Construction Obligations
Section 49. Crystal City Tenant Store Front and Signage Guidelines
Section 50. Parking
Section 51. Demolition
Section 52. Permitting Contingency
Section 53. Exclusives Granted To Other Tenants
Section 54. Additional Landlord's Contribution
Section 55. Landlord's Bridge Loan to Tenant

**IN WITNESS WHEREOF**, Landlord has caused this Lease, composed of Specific Provisions, General Provisions, Exhibits and Special Provisions, to be signed and sealed by one or more of its officers, general partners, trustees, or agents, and Tenant has caused this Lease, as described above, to be signed in its corporate name by its duly authorized officer and its corporate seal to be hereto affixed and duly attested by its Secretary.

**WITNESS FOR LANDLORD:**          **LANDLORD:**

                                   **CESC PLAZA LIMITED PARTNERSHIP**

                                   By: CESC Plaza Manager L.L.C., General Partner

                                   By: _____ (SEAL)
                                   Name: Mitchell N. Schear
                                   Title: Executive Vice President
                                   Date: 10/7/13

**ATTEST FOR TENANT:**             **TENANT:**

                                   **TECHSHOP ARLINGTON LLC**

                                   By: TechShop, Inc., its sole member

                                   By: _____ (SEAL)
_____            Name: Mark Hatch
Secretary      Corporate Seal      Title: CEO

-5-

Case: 18-50398   Doc# 37-1   Filed: 03/22/18   Entered: 03/22/18 16:29:11   Page 11 of 30

# GENERAL PROVISIONS

2. **LEASED PREMISES AND TERM**

    2.1 **Leased Premises Defined.** The Leased Premises shall be deemed to extend to and include the interior faces of all exterior walls, common area walls and to the center line of any walls separating the Leased Premises from adjacent tenant premises and the line of the storefront as shown on Exhibit A.

    2.2 **Possession**

    (a) Landlord agrees to tender to Tenant possession of the Leased Premises with Landlord's Work (as described on Exhibit B attached hereto) substantially complete (the "Delivery Date"). It is understood and agreed that Tenant has inspected and accepts the Leased Premises in its "as is" condition, subject to Landlord's obligations under Exhibit B. Tenant's taking possession shall be conclusive evidence that the Leased Premises specified in Section 1.1 are in good and satisfactory condition at the time Tenant takes possession, subject to completion of punchlist items relating to Landlord's Work.

    (b) If Landlord shall be unable to tender possession of the Leased Premises within one hundred eighty (180) days following the later of (i) the date Landlord receives any required zoning and planning approval as provided in Section 47 below or (ii) the date Tenant receives all necessary governmental permits approvals, and licenses required under Arlington County, Virginia construction, zoning and land use regulations for its remodeling of the Leased Premises , Landlord shall not be subject to any liability for the failure to tender possession on said date. No such failure to tender possession shall in any other respect affect the validity of this Lease or the obligations of Tenant hereunder, and Landlord shall not be liable to Tenant for damages or any other claim resulting from failure to tender possession. If Landlord does not tender possession of the Leased Premises to Tenant within one hundred eighty (180) days following the later of (i) the date Landlord receives any required zoning and planning approval as provided in Section 47 below or (ii) the date Tenant receives all necessary governmental permits approvals, and licenses required under Arlington County, Virginia construction, zoning and land use regulations for its remodeling of the Leased Premises, then either party may terminate this Lease by giving written notice to the other at any time before Landlord tenders possession of the Leased Premises to Tenant. In such event, Landlord shall reimburse Tenant for any advance rent and deposits actually paid by Tenant, after deducting amount for items accrued and not yet paid, and both parties shall be relieved of all obligations under this Lease.

    (c) The term "substantial completion" of the Landlord's Work shall mean that the Landlord's Work as specified in Exhibit B has been completed to a condition (in Landlord's reasonable judgment) such that Tenant may begin its own improvements as specified in Section 3.1 without any unreasonable interference with the completion of Landlord's Work.

    2.3 **Rent Start Date**

    (a) Rent shall start on the date set forth in Section 1.3 ("Rent Start Date").

    (b) If Tenant is prevented from opening for business by the Rent Start Date due to Force Majeure (other than failure to obtain construction permits), as defined in Section 33, then the Rent Start Date shall be extended for the period of such delay.

    2.4 **Commencement of Business.** Tenant agrees to commence operation of its business in the Leased Premises, fully fixtured and merchandised, not later than the Rent Start Date. Tenant further agrees to promptly apply for an occupancy permit, and any other permits or licenses as required, so that it may lawfully occupy the Leased Premises.

    2.5 **Failure to Do Business.** In the event Tenant (a) fails to take possession and to open for business fully fixtured, stocked and stalled as required by Section 2.4; or (b) should vacate, abandon or desert the Leased Premises; or (c) cease operating its business therein, then, in any such event, Landlord shall have, in addition to all remedies herein provided, the right to collect twice the Minimum Annual Rent for each day that the Tenant fails to do business.

3. **FIXTURING AND ALTERATIONS**

    3.1 **Tenant Improvements Prior to Opening for Business**

    (a) Within fifteen (15) days after execution of this Lease by Tenant, Tenant shall submit to Landlord Preliminary Design Drawings (herein referred to as "PDD") of the Leased Premises including storefront changes, if contemplated. Landlord shall approve or disapprove such PDD within five (5) working days. If Landlord disapproves, Tenant shall have an additional five (5) working days to submit revised PDD, and Landlord shall approve or disapprove such revised PDD within three (3) working days. The PDD shall be certified by the architect or engineer preparing same to be in compliance with applicable building and fire codes, and with The Americans with Disabilities Act and all amendments, modifications, extensions, replacements, regulations, orders and directives in connection therewith (the "ADA"). If the Leased Premises as reflected on Tenant's PDD are not in compliance with applicable building and fire codes, or do not comply with all requirements of the ADA, then Tenant's plans shall not be, nor shall they be deemed to be, acceptable to Landlord. Landlord's approval of Tenant's plans or subsequent work does not constitute certification by Landlord that said plans or work meet the applicable requirements of any building or fire codes, laws or regulations, or the ADA, nor shall it impose any liability whatsoever upon Landlord. PDD shall include:

        (1) Partition and fixture plan,
        (2) New storefront elevation, if changes are contemplated, and
        (3) A sample board indicating proposed interior wall and floor finishes and lighting fixtures.

    (b) Within forty (40) days after approval of PDD by Landlord, Tenant will complete Construction Working Drawings ("CWD") prepared so as to be acceptable to local regulatory agencies for issuance of necessary building permits. CWD shall be submitted for approval simultaneously to Landlord and the appropriate local agencies. It is understood that Landlord's approval will be issued within seven (7) working days, provided that the CWD accurately reflect the approved PDD. Based upon the work to be performed, the set of CWD shall include:

        (1) Architectural Drawings (including finishes),
        (2) Electrical Drawings,
        (3) Any revisions to heating, ventilation and a/c system and plumbing, and

- 5 -

Case: 18-50398    Doc# 37-1    Filed: 03/22/18    Entered: 03/22/18 16:29:11    Page 12 of 30

(4) Fixtures and Equipment Plan (Store Finish Plan)

    (c) Tenant shall cause the Leased Premises as reflected on the PDD and CWD to comply with all requirements of the ADA and shall, at Tenant's sole expense, cause the Leased Premises, including storefront access, to conform at all times during the Term of this Lease with all requirements of the ADA.

    (d) Tenant's failure to comply with the deadlines set forth in (a) and (b) above shall not affect the Rent Start Date or Term of this Lease, as provided in Sections 1.3 and 1.2, respectively. If Tenant delays in providing Landlord with such plans as stipulated, then such delays shall not extend the date by which Tenant is obligated to commence business as set forth in Section 2.4

    (e) By the Rent Start Date, Tenant shall, at its expense, secure all necessary permits, remodel the Leased Premises and install such fixtures as are necessary for its occupancy of the Leased Premises, all in accordance with the PDD and CWD approved by Landlord and Tenant.

    (f) Tenant hereby designates Bill Lloyd ("Tenant's Construction Representative"), whose address is BHL Services, Inc., 1901 Skyhigh Drive, New Brighton, MN 55112, and whose telephone number is 651-636-4292, Ext 14, who may act as its agent for purposes of authorizing and executing any and all documents, work orders or other writings and changes thereto needed to effectuate construction of the Alterations, and any and all changes, additions or deletions to the work contemplated herein. Tenant may designate a substitute or additional Tenant's Construction Representative by written notice thereof to Landlord, however, in the event that more than one person is designated as Tenant's Construction Representative, the act of any one of such persons, acting alone, shall be sufficient to bind Tenant. Tenant's Construction Representative shall have full power and authority to bind Tenant to all actions taken with regard to the Alterations and Landlord shall have the right to rely on any documents executed by such authorized party.

    (g) Landlord hereby designates Michael Kelley ("Landlord's Construction Representative"), whose address is c/o Vornado/Charles E. Smith L.P., 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202, and whose telephone number is (703) 769-8200, who may act as its agent for purposes of granting any approvals requested by Tenant, including approval of Tenant's plans and any change orders. Landlord may designate a substitute or additional Landlord's Construction Representative by written notice thereof to Tenant, however, in the event that more than one person is designated as Landlord's Construction Representative, the act of any one of such persons, acting alone, shall be sufficient to bind Landlord. Landlord's Construction Representative shall have full power and authority to bind Landlord to all actions taken with regard to the Alterations and Tenant shall have the right to rely on any documents executed by such authorized party.

**3.2    Alterations by Tenant**
    (a) After initial improvements by Tenant have been completed, Tenant shall not make any alterations, decorations, installations, additions, improvements or changes to the Leased Premises, including the storefront, without Landlord's prior written consent, which consent shall not be unreasonably withheld. All work performed by Tenant (including the initial improvements) must be done at Tenant's sole cost and expense (except as otherwise provided herein in relation to Tenant's initial improvements), in a good and workmanlike manner, by duly licensed contractors approved by Landlord (which approval shall not be unreasonably withheld), in accordance with the Building Work Rules & Regulations attached hereto as Exhibit D and all applicable laws, ordinances, rules and regulations, and at such times and in such manner as Landlord may from time to time designate.

    (b) All improvements and alterations made to the Leased Premises (including initial improvements) and any equipment installed therein (except for Tenant's trade fixtures) shall immediately become the property of Landlord and shall remain attached to the Leased Premises upon the expiration or other termination of this Lease. None of such improvements, alterations, additions or changes need be insured by Landlord under such insurance as Landlord may carry at the Shopping Center, nor shall Landlord be required under any provisions of this Lease to reconstruct or reinstall any such alterations, additions, changes or improvements in the event of damage or destruction. The term "trade fixtures" as used in this Lease shall refer to any personal property or equipment placed or installed in the Leased Premises by Tenant which is not permanently affixed to the Leased Premises (i.e. do not damage the appearance of the leasehold improvements when removed, absent repair). In order to avoid any possibility of doubt the term "trade fixtures" shall not (among other things) include the following: ventilation and HVAC systems (including any "scrubbers"), exhaust hoods, fire suppression systems, sinks, cabinetry, counters, millwork, floor covering, built-in furnishings, lighting, and walk-in refrigerators (all of which shall be the property of Landlord pursuant to the first sentence of section 3.2(b)).

    (c) As is typical of buildings of comparable age, the Building and/or Shopping Center in which the portion of the Leased Premises known as Store 2031 is located contains certain Asbestos Containing Materials ("ACM"). Tenant may review the Operations and Maintenance Plan ("O&M Plan") with respect to ACM. Tenant shall give the Landlord prior written notice before doing any work in the Leased Premises which might disturb ACM. Tenant shall not, nor shall Tenant permit others to, commence or conduct any activities (including but not limited to alterations, renovations or redecorating) in any manner which will disturb ACM except as hereinafter provided. Tenant shall coordinate all such activities with Landlord. All such activities to be performed by or for Tenant shall be done by a licensed contractor using licensed individuals, all of whom shall be qualified to perform such work, and all such work shall be in compliance with all federal, state and local laws and regulations and the O&M Plan. Prior to commencing any work which may disturb ACM, Tenant shall notify all of its employees, agents, contractors, guests, invitees and visitors of such work. Tenant shall notify all of such persons and entities of the Tenant's obligations hereunder. Tenant hereby agrees to indemnify and hold harmless Landlord, its agents, and their respective employees and contractors and other tenants in the Building and Shopping Center, their employees, agents, contractors, guests, invitees and visitors from and against all claims for damage or loss arising out of any work by Tenant, its employees, contractors and/or agents which disturbs or involves ACM.

    (d) In the event that the floor or ceiling slabs in the Leased Premises or Building must be drilled or penetrated for Tenant's initial remodeling or subsequent alterations, Tenant shall, at its expense, x-ray the slabs and obtain Landlord's prior written consent to the precise location and manner of such drilling or penetration and the manner of protecting the integrity of the slab.

- 6 -

Case: 18-50398    Doc# 37-1    Filed: 03/22/18    Entered: 03/22/18 16:29:11    Page 13 of 30

(e) In the event that Tenant desires to make alterations in the Leased Premises, other than the initial improvements, during the Term of the Lease and such alterations are approved by Landlord, then if Tenant requests that Landlord perform the construction management services for said alterations and, in its sole discretion, Landlord agrees to perform (or causes to be performed) such services, Landlord or an affiliate of Landlord shall provide the construction management services, including the supervision, oversight and coordination of the construction work, and Tenant shall pay Landlord or such affiliate of Landlord a reasonable arm's length coordination fee for its supervision, oversight, and coordination of each such construction project. In the event that Landlord or an affiliate of Landlord is not providing the construction management services for the alteration work, other than the initial improvements, then Tenant shall pay to Landlord or its affiliate a reasonable arm's length coordination fee for the project review and coordination of building access and services during the construction work.

**3.3 Trade Fixtures.** Upon Tenant's taking possession, Tenant at its cost shall install in the Leased Premises those trade fixtures that are listed in its Store Finish Plans. All furniture, furnishings and equipment installed in the Leased Premises must, in the opinion of Landlord, be in keeping with the standards of the Shopping Center of which the Leased Premises are a part. All trade fixtures and apparatus (as distinguished from leasehold improvements) owned by Tenant and installed in the Leased Premises shall remain the property of Tenant and shall be removable at any time, including the expiration of the lease term, provided that with regard to Landlord's Trade Fixtures (defined in Section 13.8) Tenant shall not at any time remove such items regardless of whether or not Tenant is in default of any terms or covenants of this Lease. If Tenant is in default, in addition to Landlord's remedies as set forth in this Lease, including but not limited to Sections 13.4 and 13.8, Landlord shall have the benefit of any applicable lien on Landlord's Trade Fixtures located in or on the Leased Premises as may be permitted under the law.

**3.4 Signs.** Tenant shall furnish and erect a sign on the frontage of the Leased Premises. Tenant shall submit to Landlord for Landlord's written approval shop drawings of the sign before erecting said sign. Tenant shall maintain such sign in good condition at all times. Tenant shall not affix any paper or other type of temporary sign or other form of advertising in or on any show window, storefront, or other exterior portions of the Leased Premises. Landlord reserves and retains the right to remove immediately from the Leased Premises or the front thereof any signage not specifically approved by Landlord and any other signage otherwise prohibited hereunder. In addition to any other right or remedy under the terms of this Lease, after one (1) initial warning of a violation of this provision from Landlord, Tenant shall pay to Landlord liquidated damages of One Hundred Dollars ($100.00) for the first day such violation occurs, which amount shall be increased in One Hundred Dollar ($100.00) increments for each successive day such violation continues. Landlord shall have the right to install directory signs identifying Tenant's name or business where deemed necessary in Landlord's sole discretion. The size, design, and location of such signs shall be determined by Landlord. Subject to the foregoing approval rights of Landlord and subject to the provisions of Section 49 of this Lease, Tenant shall have the right to signage above the storefront on Crystal Drive and at the interior entrance to the Leased Premises from the Crystal City Shops @2100.

**3.5 Mechanic's Liens.** In the event any mechanic's lien shall at any time, whether before, during or after the lease term, be filed against any part of the Shopping Center by reason of work, labor, services or materials performed or furnished to Tenant, Tenant shall forthwith cause the lien to be discharged of record or bonded to the satisfaction of Landlord. If Tenant shall fail to cause such lien to be so discharged or bonded after being notified of the filing thereof, then, in addition to any other right or remedy of Landlord, Landlord may discharge the lien by paying the amount claimed to be due, or, at its option, may bond off the lien. The amount paid by Landlord, and all costs and expenses, including reasonable attorneys' fees, incurred by Landlord in procuring the discharge of the lien or bonding off such lien shall be due and payable by Tenant to Landlord as Additional Rent on the first day of the next following month, or if the Term of this Lease has expired, upon demand.

**3.6 Excessive Floor Load.** Landlord shall have the right to prescribe the weight and method of installation of safes, computer equipment, and other heavy fixtures or equipment. Tenant will not install in the Leased Premises any item of Tenant's property or fixtures that will place a load upon the floor exceeding the lesser of (i) the designed floor load capacity of the floor, the Building and the Shopping Center, or (ii) weights permitted by law. Landlord may prescribe the placement and positioning of all such objects within the Leased Premises and/or Building and/or Shopping Center, and, if necessary, such objects shall be placed upon platforms, plates or footings of such size as Landlord shall prescribe. All damage done to the Shopping Center, the Building or the Leased Premises by installing or removing a safe or any other article of Tenant's property or fixtures, or due to its being in the Leased Premises, shall be repaired at the expense of Tenant.

## 4. RENT

**4.1 Minimum Annual Rent.** Tenant deliver the first monthly installment of Minimum Annual Rent stipulated in Section 1.4 to Landlord simultaneously with delivery by Tenant of the executed Lease to Landlord. Said first monthly payment of Minimum Annual Rent shall be credited against the first monthly payment of Minimum Annual Rent due from Tenant to Landlord. Tenant shall pay the remaining Minimum Annual Rent in advance, without deduction, demand, right of set-off or recoupment, in immediately available funds, in equal monthly installments, on the first day of each and every calendar month during the Term of the Lease.

**4.2 Percentage Rent.**

(a) **Semi-Annual Payment.** In addition to Minimum Annual Rent, Tenant shall pay Landlord Percentage Rent for each Lease Year (as defined below) in an amount equal to the Percentage Rent rate stipulated in Section 1.5(a) multiplied by the amount of annual gross sales (as defined below) made during such Lease Year in excess of the annual gross sales stipulated in Section 1.5(b). Tenant shall pay to the Landlord within thirty (30) days after June 30 and December 31, a preliminary Percentage Rent amount determined by multiplying the gross sales for such semi-annual period in excess of the semi-annual gross sales stipulated in Section 1.5(c) by the Percentage Rent rate stipulated in Section 1.5(a).

(b) **Gross Sales.** The term "gross sales" as used herein means the gross receipts realized by Tenant, and any person operating any department or concession, in, upon or from the Leased Premises, whether for cash or credit, from the sale of merchandise and the performance or rendering of any services, including without limiting the generality of the forgoing, all proceeds from all automatic or coin operated machines, dispensing facilities, or devices, including telephones, whether or not owned and operated by Tenant, if any shall be permitted under the terms of this Lease in the Leased Premises. Each sale made

- 7 -

by charge, upon installment or credit shall be treated as a sale for the full price in the month during which such charge or sale is made, and shall be includible regardless of collection. Notwithstanding the foregoing clause, Tenant shall be entitled to a deduction from gross sales for the amount of any credit sale reasonably determined to be uncollectible at the time of such determination to the extent that such credit sale was previously included in gross sales; provided, however, that to the extent any such "uncollectible" debt is subsequently collected, then it shall be included in Gross Sales at the time of collection. Fees for services (including any membership fees or dues) shall not be considered to be credit sales and shall be included in gross sales. The amount of any deposit on a lay-away sale, or any other deposit not refunded, shall be included within gross sales. Gross sales shall not include sales taxes and/or excise taxes collected from the customers as a separate item and paid to a taxing authority, or refunds to customers, provided the amount was previously included in gross sales.

(c) **No Partnership.** Notwithstanding the agreement made for the payment by Tenant of rent based upon a percentage of sales, it is expressly understood that Landlord is not a partner or associate of Tenant in the conduct of its business. It is further expressly understood and agreed that the relationship between the parties hereto is and at all times shall remain that of Landlord and Tenant.

(d) **Lease Year.** The term "Lease Year" shall mean the calendar year.

(e) **Partial Lease Year.** In any portion of a year less than twelve (12) months, either at the commencement or end of the lease term, or due to rent having been abated for a period of time during a Lease Year, the Gross Sales specified in Section 1.5(b) for such partial Lease Year shall be reduced pro rata on a daily basis based upon a year of 360 days. All other rents and charges for any partial Lease Year shall be apportioned on a monthly or daily basis as appropriate.

(f) **Reconciliation of Percentage Rent.** Notwithstanding the semi-annual payments set forth above, Percentage Rent shall be computed on the basis of the Lease Year as defined in Section 4.2(d) above. Within forty-five (45) days after the end of each Lease Year, provided Landlord has received Tenant's annual sales statement pursuant to Section 4.3(b), Landlord shall determine the amount of Percentage Rent based on the gross sales of Tenant during the Lease Year. If Tenant has paid to Landlord an amount of Percentage Rent greater than the Percentage Rent it is in fact obligated to pay for the Lease Year as determined by Section 4.2(a), the excess so determined shall be applied against the next semi-annual Percentage Rent payment due Landlord, except that if any excess exists at the termination of the term of this Lease, the sum of the unused excess shall be immediately paid by Landlord to Tenant less any other amounts then owed by Tenant to Landlord. If Tenant has paid to Landlord an amount of Percentage Rent less than Tenant is required to pay, Tenant shall immediately pay the difference to Landlord.

**4.3  Sales Statements**

(a) **Quarterly Statements.** Tenant covenants and agrees that, within thirty (30) days following the end of each calendar quarter during the Term of this Lease and on or before the tenth (10th) day following the expiration of this Lease, commencing with the calendar quarter ending next following the Rent Start Date, it will deliver to Landlord a correct statement of all gross sales made, and services rendered in, upon or from the Leased Premises, during the preceding calendar quarter. If Tenant shall be delinquent in furnishing to Landlord any quarterly gross sales statement, Landlord shall have the right, and is hereby authorized, to secure whatever gross sales information Landlord deems appropriate directly from Tenant's store manager at the Leased Premises after five (5) days prior written notice to Tenant.

(b) **Annual Statement.** Within thirty (30) days following the expiration of each Lease Year, Tenant covenants and agrees to deliver to Landlord a statement recapitulating the gross sales made during the Lease Year. At that time, Landlord and Tenant shall adjust the Percentage Rent paid, either by payment of additional rent by Tenant to Landlord, or by refund or credit of excess rent to Tenant. In no event, however, shall the rent paid by Tenant for any Lease Year be less than the Minimum Annual Rent stipulated in Section 1.4. The annual statement of gross sales shall be prepared and certified by Tenant, or the principal financial officer if Tenant is a corporation, to the effect that: (i) the statement of gross sales submitted to Landlord is equal in amount to gross sales reflected on Tenant's books and records and (ii) Tenant's books and records are maintained on a consistent basis and in accordance with generally accepted accounting principles. If Landlord shall make an audit of Tenant's records, and Tenant's gross sales statement should be found to be understated by more than three percent (3%), then Tenant shall be required, at Landlord's option, to have all future annual statements prepared by a Certified Public Accountant. If Tenant is delinquent in delivering annual gross sales statement, Landlord shall have the right to conduct an examination or audit of Tenant's books and records, at Tenant's expense, to be paid to Landlord as Additional Rent upon demand together with any Percentage Rent then due.

(c) **Inspection of Records.** For the purpose of permitting verification by Landlord of any rent due, Tenant will keep and preserve for at least three (3) years a true and accurate record of all sales and business transacted in, upon and from the Leased Premises. Landlord, its agents, employees or representatives, shall have the right, after advance notice to Tenant, at any reasonable time during business days to examine the books and records of Tenant relating to sales and business in the Leased Premises. If, as a result of Landlord's examination of Tenant's books and records, it is determined that the annual statement submitted to Landlord by Tenant has understated Tenant's gross sales, Tenant agrees to pay Landlord promptly the rent deficiency based on the corrected gross sales. In the event that the gross sales were understated by two percent (2%) or more, Tenant shall pay to Landlord in addition to the rent deficiency, the cost of the examination of Tenant's books and records made by Landlord or its representatives. Landlord shall hold all sales figures and related information obtained from Tenant's records in confidence except as may be necessary for the enforcement of Landlord's rights under this Lease or except pursuant to any legal requirements. The failure to furnish an accurate statement or the furnishing by Tenant of any fraudulent or willfully inaccurate statement of gross sales may be deemed, at Landlord's option, a breach and default under this Lease.

(d) **Violation of Section 4.3(c).** In the event Tenant violates the provisions of Section 4.3(c) and as a result of such violation, Landlord, or its duly authorized representative, is unable to conduct a proper examination and/or audit, the parties agree that Landlord shall have been deprived of an important right under this Lease and, as a result thereof, will suffer damages in an amount which is not readily ascertainable and thus, in such event, Landlord, in addition to and not in lieu of any other remedies which Landlord has under this Lease, at law or in equity, shall have the right, at its option, to collect, as liquidated damages and not as a penalty, an amount equal to twenty percent (20%) of the greater of (a) Percentage Rent reported for the period or periods in question, or (b) the Minimum Annual Rent payable for the period or periods in question.

- 8 -

(e) **Failure to Deliver Sales Statements.** If Tenant fails at any time to deliver to Landlord the gross sales statements required pursuant to Section 4.3, then Landlord, in addition to any other remedy provided for herein, shall be entitled to collect liquidated damages in the amount of Fifty Dollars ($50.00) for the first day such statement is past due, which amount shall be increased by Fifty Dollars ($50.00) for each successive day the statement is past due.

4.4 **Additional Rent.** In addition to the Minimum Annual Rent and Percentage Rent, Tenant shall pay as Additional Rent during the term of this Lease, all sums of money or charges required to be paid by Tenant to Landlord pursuant to this Lease, whether or not the same is designated as Additional Rent, including but not limited to: (i) the monthly Promotional Fund Contribution stipulated in Section 1.6(a), and adjustments thereto calculated in accordance with Section 8.2; (ii) Tenant's share of Real Estate Taxes allocated to the Shopping Center stipulated in Section 1.6(b); and (iii) Tenant's pro rata share of Operating Expenses stipulated in Section 1.6(c).

4.5 **Real Estate Taxes.**
(a) Tenant shall pay as Additional Rent its share of Real Estate Taxes allocated to the Shopping Center, as stipulated in Section 1.6(b). Landlord and Tenant agree that Tenant's share represents the ratio that the area of the Leased Premises bears to the total rentable area of the Shopping Center. The term "Real Estate Taxes" shall mean (1) all taxes, assessments (including all assessments for public improvements or benefits, whether or not commenced or completed prior to the date hereof and whether or not to be completed within the Lease Term), water, sewer, transportation or other excises, levies, license fees, permit fees, impact fees, inspection fees, and other authorization fees and other similar charges, in each case whether general or special, levied or assessed, ordinary or extraordinary, foreseen or unforeseen, of every character (including all interest and penalties thereon), which at any time during or in respect of the Lease Term, may, by any governmental or taxing authority, be assessed, levied, confirmed, or imposed on or in respect of, or be a lien upon, the land and the building improvements of which the Leased Premises are a part, and on any land and/or improvements now or hereafter owned by Landlord and/or others that provide the locality or the Leased Premises with other services, programs, amenities or common facilities, together with (2) any other tax imposed on real estate or on owners of real estate generally, including taxes imposed on leasehold improvements which are assessed against the Landlord and taxes upon or with respect to any activity conducted on the land and improvements of which the Leased Premises are a part, upon this Lease or any rent reserved or payable hereunder. The term Real Estate Taxes shall not include: (a) any income, excess profits, or other taxes of Landlord determined on the basis of its income, receipts, or revenues, (b) any estate, inheritance, succession, gift, capital levy, or similar tax of Landlord, (c) any franchise, capital stock, or similar taxes of Landlord and (d) any income, excess profits, or other taxes of Landlord determined on the basis of its income or revenue derived pursuant to this Lease; except to the extent any such taxes described in Section 4.5 (a)(a)-(d) are in lieu of or a substitute for any other taxes which are, or would be, payable by Landlord as Real Estate Taxes. For purposes of calculating the Real Estate Taxes for any year, all special assessments which can be paid in installments over more than one year shall be allocated over the maximum number of years over which such assessments can be repaid, regardless of whether Landlord elects to pay such assessments over time or in one lump sum.

(b) Tenant shall have the right to request copies of Real Estate Tax bills, which shall be supplied to Tenant within a reasonable time after Tenant's written request. A tax bill issued by the appropriate government authorities shall be conclusive evidence of the amount of Real Estate Taxes.

(c) If a Base Year is specified in Section 1.6(b) and if Real Estate Taxes accruing during the Base Year are subsequently reduced by any application or proceeding brought by or on behalf of Landlord for reduction in the amount of Real Estate Taxes payable by Landlord, the Real Estate Taxes deemed to have accrued during the Base Year shall be decreased and Landlord may promptly bill Tenant for the Additional Rent not previously paid by Tenant for any calendar year during the Term of this Lease, based upon the reduced amount of Real Estate Taxes accruing during the Base Year.

(d) In addition to the pro rata share of Real Estate Taxes to be paid by Tenant pursuant to Sections 4.5 (a) and (b) above, Tenant shall reimburse Landlord upon demand for any and all taxes required to be paid by Landlord upon, measured by, or reasonably attributable to the cost or value of Tenant's property or by the cost or value of any leasehold improvements made in or to the Leased Premises by or for Tenant, regardless of whether title to such leasehold improvements shall be in Tenant or Landlord, and for all taxes required to be paid by Landlord upon, measured by, or reasonably attributable to or with respect to the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy by Tenant of the Leased Premises or any portion thereof to the extent such taxes are not included in Real Estate Taxes.

4.6 **Operating Expenses.** Tenant shall pay as Additional Rent its share of Operating Expenses for the Shopping Center, as stipulated in Section 1.6(c). "Operating Expenses" shall mean all costs and expenses incurred by Landlord, or others on Landlord's behalf, in connection with the servicing, insuring, operation, protection, management, equipping, replacing, repair, and maintenance of the Shopping Center, the Common Areas and common facilities, elements appurtenant thereto and serving the Shopping Center, and the retail stores therein. Tenant acknowledges that the building of which the Leased Premises is a part and the Shopping Center are part of a complex among which certain operating expenses are apportioned. Tenant further acknowledges that the annual Operating Expenses of the Shopping Center reflect such apportionment. Without limiting the generality of the forgoing, Operating Expenses shall include the cost of the removal of snow, ice and debris; resurfacing and striping of surface or garage parking areas; garbage and waste removal from central depositories and recycling costs; fire protection systems, sprinkler systems, security alarm systems; storm and sanitary drainage systems and other utility systems; expenses incurred for health, welfare and safety; Shopping Center signs on and off the site; directional signs and markers, on and off-site traffic regulations and control signs and devices; interior and exterior planting, landscaping, and all water used to irrigate the same; music program services and loudspeaker systems (whether rented or purchased) including the electricity therefore, and seasonal holiday decorations; premiums for all insurance maintained by Landlord; cost of all personnel; management fees; cost of all water, lighting, utilities, heating, ventilating and air-conditioning, not separately billed or metered, used in retail stores and Common Areas; cleaning of Common Areas; security services; the cost of any services to achieve a reduction of, or to minimize the increase in, Operating Expenses or Real Estate Taxes; vault rentals; business licenses, personal property and other taxes; capital expenditures and other costs of Landlord for equipment or systems installed to reduce or minimize increases in Operating Expenses or to comply with any governmental or quasi-governmental ordinance or requirement; and maintenance, repair, replacement, inspection and, if not otherwise included above, depreciation of all

- 9 -

machinery and equipment used in the operation and maintenance of the systems serving Common Areas or retail stores, and all personal property taxes and other charges incurred in connection with such equipment. Further, the term "Operating Expenses" shall not include any of the following:

(a)      Rents under any ground lease or any other underlying lease wherein Landlord is the lessee;

(b)      Interest or principal payments on any financing for the Building or Shopping Center;

(c)      Leasing commissions;

(d)      Costs, including permit, license and inspection fees, incurred in renovating, improving, decorating, painting or redecorating vacant tenant space or space of other tenants in the Building or Shopping Center;

(e)      Costs of repairs or maintenance caused or necessitated by the negligence of Landlord, its agents, contractors or employees or due to defects in initial construction of the Building or Shopping Center;

(f)      Any expense resulting from the negligent acts or omissions of Landlord, its agents, servants or employees;

(g)      Advertising and promotional expenditures;

(h)      Any costs for which Landlord received reimbursement from insurance proceeds or condemnation awards;

(i)      Any costs for which Landlord is reimbursed by tenant(s) of the Building or Shopping Center (other than as a part of such other tenant's proportionate share of Landlord's Operating Expenses;

(j)      The cost of any work or alterations performed by Landlord for any other tenant in the Building in connection with preparing space for such other tenant's occupancy;

(k)      Any costs relating exclusively to a tenant in particular as contrasted to tenants in general, such as build-out allowances, rent concessions and brokerage commissions;

(l)      Professional fees incurred by Landlord in the preparation of leases or in disputes with tenants of the Building or Shopping Center;

(m)      Salaries, wages, or other compensation or benefits paid to off-site employees or other employees of Landlord who are not assigned full-time to the operation, management, maintenance, or repair of the Building or Shopping Center; provided however, Operating Expenses shall include Landlord's reasonable allocation of compensation paid for the wages, salary, or other compensation or benefits paid to the individual managers and engineering supervisors, regardless of actual job title (including, but not limited to, Assistant Property Manager, Property Manager, Senior Property Manager, and General Manager), if offsite, who is assigned part-time to the operation, management, maintenance, or repair of the Building or Shopping Center;

(n)      Amounts paid to entities related to Landlord in excess of the cost of the then existing market rate for such services from unrelated entities.

(o)      Depreciation on the Building; and

(p)      Costs arising from the presence of Hazardous Substances (defined in Article 16 below) in, about, or below the Complex or Building (including without limitation, Hazardous Substances in the groundwater or soil) arising from the action or negligence of Landlord; provided, however, that costs related to disturbance of pre-existing ACM by Tenant in violation of Section 3.2(c) may be charged to Tenant as provided in Section 3.2(c) or to Operating Expenses.

The foregoing definition of Operating Expenses is applicable to Tenant only and Landlord is not prohibited from assessing other tenants for any and all other costs and expenses incurred by Landlord in connection with the operation, management, maintenance and repair of the Building, Shopping Center, the land and all easements, rights and appurtenances thereto.

     4.7 Additional Rent Estimates and Adjustments.
         (a) Initial Additional Rent Adjustments. Landlord shall submit to Tenant prior to the Rent Start Date a statement of Landlord's reasonable estimate of the Additional Rent described in Section 1.6, in which event Tenant shall pay such estimated Additional Rent to Landlord in equal monthly installments beginning on the Rent Start Date on the dates and in the manner required for the payment of Tenant's monthly installments of Minimum Annual Rent.

         (b) Annual Budget. Subsequent to the calendar year in which Tenant's obligation to pay each component of Additional Rent pursuant to Section 1.6 commences, Tenant shall thereafter pay each such component of Additional Rent in twelve equal monthly installments based upon Landlord's estimates. In order to provide for the current monthly payment of each component of Additional Rent described herein, Landlord shall submit to Tenant a statement of Landlord's reasonable estimate of the Additional Rent described in Section 1.6 above. Tenant agrees to pay each such estimated component of Additional Rent to Landlord in twelve equal installments beginning on January 1, on the dates and in the manner required for the payment of Tenant's monthly installments of Minimum Annual Rent.

- 10 -

(c) **Additional Rent Reconciliations.** After the end of each calendar year, Landlord will submit to Tenant a financial statement of the actual Real Estate Taxes and Operating Expenses during the previous calendar year. Such statement shall also indicate the amount of Tenant's excess payment or underpayment of Additional Rent based on Landlord's estimate described in Section 4.7(b). If Additional Rent paid by Tenant during the preceding calendar year shall be in excess of, or less than, the aggregate of its share of the actual Real Estate Taxes and Operating Expenses, Landlord and Tenant agree to make the appropriate adjustment following the submission of Landlord's statement. Tenant shall either pay any Additional Rent due with the installment of Minimum Annual Rent due for the month following submission of Landlord's statement, or pay any Additional Rent due within thirty (30) days if the Term of this Lease has expired or has otherwise been terminated. Tenant shall deduct its excess payment, if any, from the installment of Minimum Annual Rent due for the month following submission of Landlord's statement, or following the expiration or earlier termination of the Term of this Lease, Tenant shall be reimbursed for any excess payments made, less any amounts then due Landlord under this Lease, upon demand.

(d) **Verification of Additional Rent.** Unless Tenant asserts specific errors within one hundred twenty (120) days after Landlord has submitted the financial statement for a calendar year to Tenant, Tenant shall have no right to contest the amount of Tenant's pro rata share of Real Estate Taxes and/or Operating Expenses or the statement submitted by Landlord. No such assertion of error by Tenant shall extend the time for payments as set forth above. If Tenant has given a timely assertion of error and if it shall be determined by Landlord there is an error in Landlord's statement, Tenant shall be entitled to a credit for any overpayment, which shall be applied to any sums then due Landlord under this Lease and then to the next installment(s) of Additional Rent until fully credited for the overpayment, or refunded if Tenant has vacated the Leased Premises, or Tenant shall be billed for any underpayment and shall remit any amount owing to Landlord within ten (10) business days of Tenant's receipt of such statement. Notwithstanding the foregoing, provided that Tenant has made all payments that have been invoiced by Landlord and is not otherwise in default beyond the expiration of any applicable notice and cure period, and the Operating Expenses or Real Estate Taxes have increased by more than three percent (3%) in the aggregate over the immediately previous Calendar Year, Tenant shall have the right to audit the books and records of Landlord relating to Landlord's Operating Expenses or Real Estate Taxes provided: (i) Tenant gives Landlord thirty (30) days' prior written notice of its intent to audit; (ii) the audit occurs during Landlord's normal business hours and in Landlord's principal offices; (iii) Tenant may only audit said records and books once during each calendar year; (iv) Tenant may only conduct the audit of a calendar year's books and records within ninety (90) days following delivery of the Financial Statement for the item in question for any calendar year; (v) the auditor shall be a Certified Public Accountant and shall be employed by a firm of Certified Public Accountants of national or regional standing; (vi) the auditor shall not be compensated on a contingency basis; (vii) Tenant provides Landlord with a copy of the auditor's report, within ten (10) days after its receipt by Tenant; and (viii) the auditor agrees to execute a confidentiality agreement with respect to such audit. Neither Tenant nor its auditor shall be entitled to audit or examine any records specifically pertaining to another tenant at the Building or Shopping Center.

(i) <u>Confidentiality of Audit.</u> All of the information obtained through said audit as well as any compromise, settlement, or adjustment reached between Landlord and Tenant relative to the results of the audit shall be held in strict confidence by Tenant and Tenant's officers, agents and employees and shall not be revealed in any manner to any person except upon the prior written consent of Landlord, which consent may be withheld in Landlord's sole discretion, or if required pursuant to any litigation between Landlord and Tenant materially related to the facts disclosed by such audit, or if otherwise required by law. Landlord shall have all rights allowed by law or equity if Tenant, its officers, agents or employees and/or auditor violate the terms of this provision, including without limitation, the right to terminate this Lease or the right to terminate Tenant's future right to audit pursuant to this Section.

(ii) <u>Landlord's Right to Contest Audit.</u> Landlord may contest Tenant's audit results by giving Tenant written notice of protest within thirty (30) days following Tenant's receipt of the audit report. If Landlord's accountant and Tenant's accountant cannot mutually agree as to Tenant's share of Operating Expenses or Real Estate Taxes, as applicable, due within thirty (30) days after Tenant's receipt of Landlord's notice of protest, Landlord's accountant and Tenant's accountant shall jointly choose a third independent Certified Public Accountant, whose determination shall be binding upon the parties hereto. If the accountants fail to agree upon the third accountant, the parties agree to proceed forthwith to arbitrate the issue in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The cost of the third accountant or the cost of arbitration shall be borne equally by the parties.

(e) **Rent Adjustment Limit.** Notwithstanding any deductions from or adjustments to Minimum Annual Rent and Additional Rent as provided for above, in no event shall the total monthly installment of Minimum Annual Rent and Additional Rent to be paid by Tenant in any month during the Term of this Lease or any extension thereof be less than the monthly installment of Minimum Annual Rent stipulated in Section 1.4, except as required as the result of the Landlord's application of a credit due to Tenant pursuant to Section 4.7(c).

**4.8  Rent Tax.** Tenant shall be responsible for the payment of any tax, excise and/or assessment, (including a value-added tax, but excluding an income or franchise tax) levied, assessed, or imposed by any governmental taxing authority acting under any present or future law, ordinance or regulation, upon or against the rent, or any part of it, either by way of substitution (in whole or in part) for or in addition to any existing tax on land and buildings or otherwise. At its election, Landlord may pay such tax, and Tenant shall reimburse Landlord for the amount thereof within fifteen (15) days of demand.

**4.9  Place of Payment.** The Minimum Annual Rent, Percentage Rent, Additional Rent and all other sums provided for herein, shall be payable to Landlord and sent to Landlord at the address for payment of rent set forth in Section 1.12(b), or to such other person or at such other place as Landlord may hereafter designate in writing.

**4.10  Security Deposit.** Tenant shall deposit with Landlord or Landlord's Agent at the date specified in Section 1.7, the amount stipulated in Section 1.7 as a security deposit. Provided Tenant is not in default in the payment of Minimum Annual Rent, Percentage Rent, Additional Rent or any other charges due Landlord, and further provided the Leased Premises are left in good condition, reasonable wear and tear excepted, as described in Section 15.1, said deposit (which shall not bear interest to Tenant) shall be returned to Tenant within sixty (60) days after the termination of this Lease; provided, however, that Landlord may also retain such portion as Landlord reasonably believes will be payable by Tenant in connection with the reconciliation of Operating Expenses and Real Estate Taxes for the calendar year in which the Lease expires. Notwithstanding the foregoing,

Case: 18-50398    Doc# 37-1    Filed: 03/22/18    Entered: 03/22/18 16:29:11    Page 18 of 30

the full or partial return by Landlord to Tenant of the security deposit shall at no time be deemed to constitute a waiver by Landlord of any of Tenant's obligations under this Lease, nor an acknowledgment by Landlord that any such obligations are limited to the amount, if any, of the security deposit retained by Landlord. If Tenant is in default or is otherwise indebted to Landlord hereunder or if the Leased Premises are not left in good condition, or if Tenant has failed or refused to remove Tenant's property after Landlord's request to do so, then the security deposit shall be applied to the extent available on account of sums due Landlord or the cost of repairing damages to the Leased Premises or to remove Tenant's property. In the event the funds deposited with Landlord as security are applied during the Lease Term on account of sums due Landlord or to the cost of repairing damages or removing Tenant's property, then Tenant shall, within fifteen (15) days after demand by Landlord, deposit with the Landlord additional funds to restore the security deposit to its original amount. The failure of Tenant to either deposit with Landlord the security deposit amount stipulated in Section 1.7 and/or restore the security deposit as provided herein shall entitle Landlord to a money judgment against Tenant for the unpaid security deposit amount or the required restored amount. The security deposit amount stipulated in Section 1.7 shall be deemed Additional Rent and all remedies, including but not limited to possession of the Leased Premises, available to Landlord with respect to Additional Rent shall be applicable to the security deposit amount. In the event of the sale or transfer of Landlord's interest in the Building or the Shopping Center, Landlord shall have the right to transfer the security deposit to such purchaser or transferee, in which event Tenant shall look only to the new landlord for the return of the security deposit and Landlord shall thereupon be released from all liability to Tenant for the return of such security deposit.

    4.11 Late Payment Fee. In the event any installment of Minimum Annual Rent, Percentage Rent or Additional Rent due hereunder is not paid within five (5) calendar days after it is due, then Tenant shall also pay to Landlord as Additional Rent a late payment fee equal to five percent (5%) of such delinquent Minimum Annual Rent, Percentage Rent and Additional Rent for each and every month or part thereof that such rent remains unpaid. In the event any check from Tenant is dishonored, Tenant shall pay to Landlord a penalty equal to Fifty Dollars ($50.00) for each check so dishonored.

    4.12 Prorated Rent. Any Minimum Annual Rent or Additional Rent payable pursuant to Sections 1.4 and 1.6 for a portion of a calendar month shall be prorated based upon the number of days in the applicable calendar month.

    4.13 Application of Rent. No payment by Tenant or receipt by Landlord of lesser amounts of Minimum Annual Rent, Percentage Rent or Additional Rent than those required by this Lease shall be deemed to be other than on account of the earliest unpaid stipulated Minimum Annual Rent, Percentage Rent or Additional Rent. No endorsement or statement on any check or any letter accompanying any check or payment as Minimum Annual Rent, Percentage Rent or Additional Rent shall be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Minimum Annual Rent, Percentage Rent and Additional Rent or pursue any other remedy provided in this Lease. Any credit due to Tenant hereunder by reason of overpayment of Minimum Annual Rent, Percentage Rent or Additional Rent shall first be applied to any Minimum Annual Rent, Percentage Rent, Additional Rent or other sums owed to Landlord by Tenant as set forth elsewhere in this Lease or if Tenant shall be in default when said credit shall be owed.

    4.14 Survival of Rent Obligations. The obligation of Tenant with respect to the payment of Minimum Annual Rent, Percentage Rent and Additional Rent shall survive the expiration or termination of this Lease.

5.  USE OF LEASED PREMISES AND OPERATION

    5.1 Use. Tenant shall use and occupy the Leased Premises only for the purposes specified in Section 1.8 and for no other purpose whatsoever, and shall comply, and cause its employees, agents, contractors, invitees and other users of the Leased Premises to comply, with all applicable federal, state and local laws, statutes, ordinances and regulations, including, but not limited to, the ADA, zoning regulations, and smoking regulations. Any variation or deviation from the specific use expressly set forth in Section 1.8 shall be deemed a default of this Lease. Tenant shall pay before delinquency any business, rent and other tax and fee that is now or hereafter assessed or imposed upon Tenant's use or occupancy of the Leased Premises, the conduct of Tenant's business in the Leased Premises or Tenant's property. If any such tax or fee is enacted or altered so that such tax or fee is imposed upon Landlord so that Landlord is responsible for collection or payment thereof, then Tenant shall promptly pay the amount of such tax or fee directly to the taxing authority, or if previously paid by Landlord, to Landlord upon demand.

    5.2 Illegal and Prohibited Uses. Tenant will not use or permit the Leased Premises or any part thereof to be used for any disorderly, unlawful or extra hazardous purpose and will not engage in the business of manufacturing products. Tenant will not use or permit the Leased Premises to be used for any purposes that interfere with the use and enjoyment by other tenants of the Shopping Center, Building or complex or, in Landlord's opinion, impair the reputation or character of the Shopping Center, Building, complex, Landlord or Landlord's Agent. Tenant shall immediately refrain from and discontinue such use after receipt of written notice from Landlord.

    5.3 Trade Name. Tenant will conduct business in the Leased Premises only in Tenant's trade name as specified in Section 1.9, unless the use of some other name is approved in writing by Landlord.

    5.4 Covenant to Stay Open. Tenant covenants and agrees to remain open for business at least during the hours and on the days specified in Section 1.10 (except New Year's Day, Thanksgiving Day, Christmas Day, and such other federal holidays during which other TechShop facilities are not open for business). Nothing contained herein shall prevent Tenant from remaining open for business additional hours subject to the prior written approval of Landlord. If Tenant fails at any time to stay open for business with the public at least during the hours and on the days specified in Section 1.10 (excepting only New Year's Day, Thanksgiving Day and Christmas Day), such failure shall be a default of this Lease and Landlord, in addition to any other remedy provided for herein, shall be entitled to collect liquidated damages in the amount of Fifty Dollars ($50.00), for the first such instance during the Lease Term on which Tenant fails to stay open for business with the public at least during the hours specified in Section 1.10, which amount shall be increased by Fifty Dollars ($50.00) for each subsequent instance (whether or not on days consecutive with the prior instance) during the Lease Term in which Tenant fails to stay open at least during the aforesaid hours. In the event Tenant desires to open for business additional hours, Landlord shall not be obligated to provide any services during any of such additional hours of operation. Landlord shall have the right to make *de minimus*

- 12 -

changes from time to time the minimum store hours set forth in Section 1.10 upon at least two (2) weeks prior written notice to Tenant. Landlord covenants that at least seventy-five percent (75%) of the tenants already in the Shopping Center shall be similarly obligated.

5.5  **Restrictions on Other Operations.** Neither Tenant, nor any other person, firm or corporation that controls or is controlled by Tenant, shall open or operate another store for any similar or competing business within a radius of one (1) mile from the boundaries of the Shopping Center. Landlord, upon breach of this covenant and in addition to any other remedy otherwise available, may require that all sales made from any such other store be included in the computation of the Percentage Rent as though said sales had actually been made from the Leased Premises.

5.6  **Store Operation.** In order to produce the maximum amount of Percentage Rent in the Leased Premises, Tenant shall continuously, actively and diligently conduct and operate its business on the whole of the Leased Premises. Tenant shall conduct its business in all respects in a high grade and reputable manner consistent with the quality of operation of the Shopping Center as determined by Landlord. Tenant shall maintain in the Leased Premises a staff of employees and a stock of merchandise sufficiently adequate and complete enough to fully service the needs of its customers and to maintain the reputation of the Shopping Center. To maximize its business volume and to the end that the Leased Premises shall not appear to be a vacant store, Tenant shall keep Tenant's store signs well lighted during all business hours throughout the term of this Lease. Tenant shall not warehouse, store or stock on the Leased Premises goods, wares and merchandise in excess of those Tenant intends to offer for sale at retail in or from the Leased Premises, and in no event shall space used for warehouse and storage of goods exceed fifteen (15) percent of the floor area of the Leased Premises.

5.7  **Building Security.** Any security system or other security measures (collectively, the "Security System") that Landlord may undertake for protection of the Leased Premises, the Shopping Center, the Building and/or complex (including any parking garages or areas) are for the protection of the physical structures only and shall not be relied upon by Tenant, its agents, employees or invitees to protect Tenant, Tenant's property and leasehold improvements or Tenant's employees, invitees or their property. Tenant shall not do anything to circumvent or allow others to circumvent any Security System. Landlord shall not be liable for any failure of any Security System to operate or for any breach or circumvention of the Security System by others, and Landlord makes no representations or warranties concerning the installation, performance and monitoring of any Security System, or that it will detect or avert the occurrences which any such Security System is intended or expected to detect or avert.

5.8  **Roof and Auxiliary Spaces.** Tenant shall not use the roof, roof utility closets or other auxiliary spaces in the Shopping Center or Building for antennas, condenser coolers, telecommunications and/or data transmission equipment or any other type of equipment or for any other purpose without the prior written consent of Landlord, which consent may be conditioned upon the terms of a separate written agreement and the payment by Tenant of separate consideration for the use of such space.

5.9  **Trash Removal.** Tenant covenants and agrees, at its sole cost and expense, to comply with all present and future laws, orders and regulations of the federal, state, county, municipal and local governments, departments, commissions, agencies and boards regarding the collection, sorting, separation and recycling of trash. Upon request by Landlord, Tenant shall sort and separate its trash into such categories as are provided by law. Each separately sorted category of trash shall be placed in separate receptacles as directed by Landlord. Tenant shall arrange for collection of bulk trash (as defined in Section 5.10 (c)) below at Tenant's sole cost and expense, utilizing a contractor satisfactory to Landlord, as provided in Section 5.10 (c) below Landlord reserves the right to refuse to collect or accept from Tenant any trash that is not separated and sorted as required by law and directed by Landlord, and to require Tenant to arrange for such collection at Tenant's sole cost and expense, utilizing a contractor selected by Tenant which is reasonably satisfactory to Landlord. Tenant shall pay all costs, expenses, fines, penalties and damages that may be imposed on Landlord or Tenant by reason of Tenant's failure to comply with the provisions of this Section, and Tenant, at Tenant's sole cost and expense, shall indemnify, defend and hold Landlord harmless from and against any actions, claims and suits (including legal fees and expenses) arising from such noncompliance, utilizing counsel reasonably satisfactory to Landlord.

5.10  **Conditions of Occupancy.** In regard to use and occupancy of the Leased Premises and common facilities, Tenant will at its own expense:

(a) maintain the interior and exterior of the Leased Premises, including the inside and outside of all glass doors and windows, in a clean, orderly and sanitary condition, and keep the Leased Premises free of insects, rodents, vermin and other pests;

(b) replace promptly any cracked or broken glass of the Leased Premises with glass of like kind, size and quality, and as may be required by then applicable building code;

(c) keep any garbage, trash, rubbish or refuse in proper and rodent proof containers within the interior of the Leased Premises until removed and have such garbage, trash, rubbish and refuse removed on a daily basis to central depositories designated by Landlord; provided, however, that bulk trash (i.e. trash which of a large or unusual size not normally produced by a standard office or retail tenant) shall be removed directly from the Leased Premises on a regular basis (not less than weekly) approved by Landlord at Tenant's sole cost and expense by the Tenant's waste removal contractor. Tenant shall enter into a waste removal contract with a qualified contractor reasonably approved by Landlord, and shall provide Landlord with a copy of such contract prior to opening for business and subsequently upon request by Landlord ;

(d) prevent all mechanical apparatus from generating vibration and noise which may be transmitted beyond the Leased Premises at levels which disturb or disrupt operations of neighboring tenants;

(e) comply with all laws, ordinances, rules and regulations of governmental authorities and all recommendations of the Board of Fire Underwriters or any similar organization relating to Tenant's use of the Leased Premises or operation of Tenant's business, now or hereafter in effect;

- 13 -

(f) immediately discontinue, upon written demand of Landlord, any business conduct or practice which, in the reasonably exercised judgment of Landlord, may impair the business or reputation of Landlord, or which may reflect unfavorably on either the Shopping Center, Landlord, or other tenants or occupants;

(g) observe all additional reasonable rules and regulations of uniform application established by Landlord from time to time for the Shopping Center. In consideration of the health, welfare and the morale of our tenants, the Shopping Center is smoke free. This includes any connecting arcades, concourses and walkways. Smoking is not allowed within twenty-five (25) feet of building and retail entrances or in garages;

(h) IN THE EVENT TENANT IS ENGAGING IN A CULINARY ARTS USE, THEN, notwithstanding anything to the contrary contained herein, in order to eliminate the problem of sewer back-ups and health hazards; Tenant shall install grease traps in the Leased Premises, the type and manner of installation of such grease traps being subject to Landlord's prior written approval; shall contract for full service of repairs, maintenance, and grease removal and cleaning with competent, appropriate contractors reasonably approved by Landlord; and shall establish a bi-monthly cleaning program with respect thereto. In addition to the bi-monthly cleaning of the grease traps, Tenant shall use "Cloroben PT" or a similar type of chemical in all drain lines, in accordance with the manufacturer's recommendations, to help dissolve any grease build-up. Tenant shall provide Landlord with copies of its cleaning contract for its grease traps and its extermination contracts upon execution of this Lease; and

(i) IN THE EVENT TENANT IS ENGAGING IN A CULINARY ARTS USE, THEN, A regular and periodic pest extermination program shall be instituted, and Tenant shall maintain an extermination contract with a competent extermination company, reasonably approved by Landlord. Copies of such extermination contracts shall be delivered to Landlord by Tenant.

**5.11 Restrictions on Occupancy.** In regard to use and occupancy of the Leased Premises and common facilities, Tenant shall not:

(a) place or maintain any merchandise, trash, refuse or other articles in any vestibule or entry of the Leased Premises, in the corridors adjacent thereto or elsewhere on the exterior of the Leased Premises so as to obstruct any driveway, footwalk, parking area or any other common facility.

(b) allow noise or vibrations to emanate from the Leased Premises (including, without limitation, noise from loudspeakers, phonographs, public address systems, or sound amplifiers which are in any manner audible outside of the Leased Premises) at levels which disturb or disrupt operations of neighboring tenants, and shall use best practices to mitigate any disturbance from noise or vibrations to other tenants in the Shopping Center and office buildings above the Leased Premises;

(c) cause or permit objectionable odors to emanate or be dispelled from the Leased Premises;

(d) distribute handbills or other advertising matter in the Shopping Center, parking areas, or any other common facility;

(e) permit the parking of delivery vehicles so as to interfere with the use of any driveway, footwalk, parking area or other common facility in the Shopping Center.

(f) receive or ship articles of any kind except through service facilities provided by Landlord;

(g) use any common area of the Shopping Center or any other common facility adjacent to the Leased Premises for the sale or display of any merchandise or for any other business, occupation or undertaking;

(h) conduct or permit to be conducted any auction, fire, going out of business, bankruptcy, or other similar type sale in the Leased Premises; and

(i) unless otherwise expressly permitted to do so hereunder (and except for vending machines which are part of the standard TechShop facility providing food, drinks, tools, materials and books) use or permit the use of or operate any coin or token operated vending machine, automated teller machine, electronic game, or similar device.

**5.12 Intentional Omitted.**

**5.13 Medical Waste.** In addition to Tenant's obligations with respect to Hazardous Substances set forth in Section 18, Tenant shall be solely responsible for and shall solely provide, at Tenant's sole cost and expense, for the proper treatment, handling, removal and disposal from the Leased Premises, the Building, the Shopping Center and the complex, of all infectious and/or hazardous medical waste as the same may be determined from time to time by applicable federal, state or local laws or regulations. Landlord and Landlord's Agent shall not be responsible for the treatment, handling, removal or disposal of same, nor shall Landlord incur any liability to Tenant or any other parties, or any governmental agency or division thereof, relating to same. Tenant hereby agrees to indemnify, defend and hold Landlord and Landlord's Agent harmless with respect to any suits, debts, expenses, liabilities, alleged violations or non-compliance with any federal, state or local law or regulation, and any other demands of any nature whatsoever, for any violation by Tenant of the provisions of this Section 5.13 and for any harm to others caused or alleged to have been caused by Tenant's medical waste.

**5.14 Damages.** If Tenant violates the provisions of Section 5.11(b), (c), (g) or (h), or Section 5.13, and such violation shall continue after notice (either written or oral) of the same from Landlord, then in addition to all other remedies available to Landlord pursuant to this Lease, for each and every day after receipt of said notice that such violation shall so continue, Tenant shall pay to Landlord, as Additional Rent and on account of the irreparable damage caused to the Shopping Center and the other tenants as a result of Tenant's continued violation, the sum of Five Hundred Dollars ($500.00) per day.

- 14 -

## 6. UTILITIES, REPAIRS, MAINTENANCE AND CLEANING

### 6.1 Utilities and Services.

(a) **Utilities and Services Paid by Tenant.** Tenant shall pay all costs for its use and demand of electricity, water, gas, waste removal, telephone and all other utilities and services either by direct payment to the utility company or other provider thereof, or in the event separate metering of utility services to the Leased Premises is not possible, then by monthly payments to Landlord as Additional Rent (in the later event the cost of use and demand for such utilities not separately metered shall be established by the installation of a sub-meter). Tenant must make all arrangements, including the installation of separate meters or sub-meters, as applicable, and any required deposits for such service. In the event any utility is sub-metered, Tenant shall pay Landlord a reasonable service charge related to administration of meter reading and invoicing. In no event shall Landlord be liable to Tenant for damages due to temporary lack of utilities, heat, air-conditioning or other services due to breakdown or other failure of the public utility lines, building equipment and/or machinery or any other cause whatsoever. In no event shall Landlord be required to provide any cleaning service in the Leased Premises.

(b) **Equipment Restrictions.** Except for the equipment included in the PDD and CWD, Tenant will not install or operate in the Leased Premises any heavy duty electrical equipment or machinery or any other equipment which will require gas, water, sewer service, or electricity in excess of the capacity of the lines serving the Leased Premises as of the Lease Commencement Date, without first obtaining prior written consent of Landlord. Landlord may make periodic inspections of the Leased Premises at reasonable times to determine that Tenant's equipment and machinery comply with the provisions of this Section.

(c) **Excessive Heat Generation.** Landlord shall not be liable for its failure to maintain comfortable atmospheric conditions in all or any portion of the Leased Premises due to heat generated by over-occupancy of the Leased Premises or by any equipment, machinery or additional lighting installed by Tenant (with or without Landlord's consent). If Tenant desires additional cooling to offset excessive heat generated by such over-occupancy, equipment, machinery or additional lighting, Tenant shall pay for auxiliary cooling equipment and the operating, maintenance, repair and replacement costs of such equipment, including without limitation electricity, gas, oil and water.

### 6.2 Tenant Repairs and Maintenance.

(a) Tenant shall at its own expense make all repairs to the non-structural portions of the Leased Premises, including but not limited to storefront, entrance doors, and door closing mechanisms, and will also keep the Leased Premises properly painted and decorated. Tenant shall, at its sole expense maintain, repair and replace all self-contained heating, ventilating and air-conditioning (HVAC) equipment (if any) and all other equipment located in the Leased Premises which is not an integral part of the structural or base building electrical, plumbing or mechanical systems. Tenant shall enter into maintenance contracts for all such equipment, which shall be with reputable contractors approved by Landlord in its reasonable discretion. Copies of all such maintenance contracts shall be delivered to Landlord by Tenant prior to opening for business and subsequently upon request by Landlord. Landlord shall have the right to enter the Leased Premises to inspect such equipment and, in the event maintenance, repairs and replacement are not performed in a first-class manner, then Landlord, at its option, but without obligation to do so, may cause such equipment to be maintained, repaired or replaced at Tenant's expense, and Tenant shall reimburse Landlord the cost of such work within thirty (30) days after demand therefor by Landlord. Tenant shall obtain and keep in effect plate glass insurance for all windows and doors. At its election, Landlord may replace broken or damaged antique glass, if any, in the storefront and charge Tenant the replacement costs. Tenant shall permit no waste, damage or injury to the Leased Premises.

(b) If Tenant shall fail to make any repairs or to perform any maintenance as it is obligated to do, Landlord may make or perform the same for the account of Tenant, after written notice to Tenant of its intention, without liability to Tenant for any loss or damage that may accrue to Tenant's property or to Tenant's business by reason thereof. Tenant shall pay Landlord, as additional rent within five (5) days after Landlord shall have billed Tenant therefor, the sum of Landlord's cost for making such repairs and/or performing such maintenance.

(c) Except as reflected in the PDD and CWD, Tenant shall not install any equipment of any kind or nature whatsoever which will or may necessitate any changes, replacements or additions to the water system, plumbing system, heating system, ventilating system, air-conditioning system, supply, return or control systems, Landlord's data system(s), or the electrical system of the Leased Premises, the Building or the Shopping Center (collectively, the "Systems"), nor install or use any air-conditioning unit, engine, boiler, generator, machinery, heating unit, stove, water cooler, ventilator, radiator or any other similar apparatus, nor modify or interfere with any of the Systems, without the prior written consent of the Landlord, which consent may be granted or withheld in the Landlord's sole and absolute discretion.

### 6.3 Structural Repairs.
Upon written notice from Tenant, Landlord will, at its expense, make necessary structural repairs to the roof (including roofing membrane), exterior walls, structural concrete floor of the Leased Premises (excluding any floor covering, such as carpeting, terrazzo and other special flooring, and excluding walls installed by Tenant, doors, windows, and glass), sprinkler mains, utility pipes, conduits, meters and lines which are outside of the Leased Premises (unless originally installed by the Tenant) or which are inside of the Leased Premises but serve both the Leased Premises and other retail stores or the Common Areas, and the heating, ventilating and air conditioning system installed at Landlord's cost (including ductwork, but specifically excluding any components thereof originally installed by the Tenant). Landlord shall not be required to repair any damage caused by the negligent or wilful act or omission of Tenant, its employees, licensees or contractors; Tenant shall be responsible therefor. Landlord shall be under no liability for repair, maintenance, alteration or any other action with respect to the Leased Premises or any part thereof, or any plumbing, electrical, or other mechanical installations therein, except as may be expressly set out in this Lease.

### 6.4 Emergency Repairs.
With respect to the right of either party to make an emergency repair, prior to the making of any such repairs, the party desiring to make a repair shall give the other party such notice of the need as may be practicable under the circumstances. If, in an emergency, it shall become necessary for Landlord or Tenant to make a repair required to be made by the other party, either party may enter the Leased Premises and proceed forthwith to have the repairs or replacements made

- 15 -

Case: 18-50398    Doc# 37-1    Filed: 03/22/18    Entered: 03/22/18 16:29:11    Page 22 of 30

and pay the cost. Within thirty (30) days after one party renders a bill, the other shall reimburse it for the reasonable cost of making the repairs.

6.5 **Installation of Pipes, Ducts, Conduits, Etc.** Landlord reserves the right to erect, use and maintain all pipes, ducts, conduits and the like in and through the Leased Premises as shall be contemplated by the plans for the Shopping Center and/or Building, including any changes or additions as Landlord may from time to time make thereto. Landlord may install any and all materials, equipment and pipes, ducts, conduits, wires and other mechanical equipment serving other portions, tenants and occupants of the Shopping Center and/or Building, in through, under or above the Leased Premises that Landlord deems desirable, without the same constituting an active or constructive eviction of Tenant. Landlord shall have the right to locate, both vertically and horizontally, utility lines, air ducts, flues, duct shafts, drains, sprinkler mains and valves, and such other facilities within the Leased Premises as may be deemed necessary by engineering design and/or code requirements and to repair alter, replace or remove these items. These shall be installed and located so as to cause the minimum of interference with Tenant's use of the Leased Premises and shall, if possible, be located above Tenant's suspended ceiling, if any, or as close to the concrete slab as possible, below the floor, along column lines or in storage areas. Landlord's right to locate facilities within the Leased Premises shall include facilities required by tenants or occupants in levels above or below the Leased Premises as well as on the same level as said Leased Premises. Landlord shall also have the right to locate mechanical and other equipment on the roof, if any, over the Leased Premises. Tenant shall be entitled to no abatement of rent whatsoever on account of such installation, location, erection, use, entry or maintenance as aforesaid unless the same shall render the Leased Premises substantially untenantable for a period in excess of three (3) business days, in which event Tenant shall be entitled to an equitable abatement of rent thereafter until such time as the Leased Premises are again tenantable.

7. **COMMON AREA AND FACILITIES**

7.1 **Landlord Control.**

(a) All Common Areas and all common facilities which may be furnished by Landlord in or near the Shopping Center and/or Building for the general common use of tenants, their employees and customers shall at all times be subject to the exclusive control and management of Landlord. Landlord may at any time and from time to time during the lease term exclude and restrain any person from use or occupancy thereof, excepting, however, Tenant and other tenants of Landlord and bona fide invitees of either who make use of said Common Areas and facilities in accordance with the rules and regulations established by Landlord from time to time with respect thereto. Landlord may at any time and from time to time close all or any portion of the Common Areas, to make repairs or changes, to prevent a dedication to any person or the public, and to do and perform such other acts in and to said Common Areas as in the exercise of good business judgment, Landlord shall determine to be advisable with a view to the improvement of the convenience and use thereof by tenants, their employees, agents, customers and invitees.

(b) The rights of Tenant in and to the Common Areas shall at all times be subject to the rights of others to use the same in common with Tenant. It shall be the duty of Tenant to keep all of said Common Areas free and clear of any obstructions created or permitted by Tenant or resulting from Tenant's operation.

(c) Landlord hereby reserves the exclusive right with respect to the use of the Common Areas for advertising purposes. Landlord reserves the right at any time to utilize the Common Areas for promotions and exhibits, and any other use which, in Landlord's sole judgment, tends to attract customers to, or benefit the customers of, the Shopping Center.

7.2 **Changes and Additions.** Landlord reserves the right at any time and from time to time:

(a) to change the dimensions, identity and type of any buildings in the complex and to construct additional buildings or other improvements in the complex; and

(b) to change, rearrange, alter, modify, reduce or supplement any or all of the common facilities so long as access to the Leased Premises is not diminished.

7.3 **Parking.**

(a) Landlord shall provide within the Shopping Center or in areas appurtenant thereto, surface and/or garage parking for customers of Tenant. Landlord may elect at its sole discretion to designate certain parking areas for the use of Tenant's customers and to provide such parking free of charge or at parking rates established by Landlord. In those areas where parking charges are imposed by Landlord, Tenant has the right to purchase validation stamps for up to 1,000 hours of customer parking per month. The cost to Tenant of each stamp shall not be more than one-half of the posted rate for hourly parking, and each stamp shall entitle customers to free parking for one hour. Landlord will notify Tenant from time to time of any changes in the parking rates.

(b) Tenant and the employees of Tenant may park only in specified designated areas, if any are provided. Tenant and the employees of Tenant may park in the garage only upon payment of the established charge. Tenant agrees to so notify its employees and to cooperate with Landlord in enforcing this provision. If Landlord notifies Tenant, in writing, that Tenant's employees are violating this provision, and if Tenant's employees continue to park in areas not designated for employee parking, Landlord may fine Tenant One Hundred Dollars ($100.00) per day for each such violation. Tenant's failure to pay such fine shall be a default of this Lease.

8. **INTENTIONALLY OMITTED**

9. **ACCESS BY LANDLORD**

Landlord reserves the right to enter the Leased Premises at all reasonable times for any purpose whatsoever relating to the safety, protection or preservation of the building of which the Leased Premises form a part. Landlord and its authorized representative may enter the Leased Premises at any and all times for purposes of repair and/or maintenance during usual business hours and for the purpose of inspecting the same. Landlord or Landlord's agents shall also have the right to enter upon the Leased Premises at reasonable times to show the same to prospective mortgagees or purchasers or lessees. During the six (6) months prior to the expiration of the Term of this Lease, Landlord may show the Leased Premises to prospective tenants.

- 16 -

## 10. INSURANCE, INDEMNITY AND LIABILITY

### 10.1 Tenant Insurance.

(a)     Tenant will keep in force as long as this Lease remains in effect, at its sole cost, commercial general liability insurance, with limits of at least those set forth in Section 1.11. Policies may be a combination of primary and excess/umbrella liability policies providing that any excess policy is either "follow form" or provides coverage as broad as and no less restrictive than the primary policy. The policies shall provide coverage for premises/operations, products and completed operations with no exclusions or limitations for contractual liability for insured contracts Such policies shall name Landlord, its Agent, and their respective owners, subsidiaries, members, partners, trustees, officers, employees of each of them, any master lessor, and any mortgagee of Landlord and their successors and assigns (collectively Landlord Parties and individually "Landlord Party) as their interests may appear as additional insureds, and Tenant shall obtain a commitment from its insurance agent to provide Landlord with written notice of cancellation as soon as commercially feasible. Tenant agrees not to permit its insurance lapse.

(b)     Tenant shall obtain or cause any contractor or subcontractor to obtain prior to commencement of any permitted alterations or other work, and keep in force during performance of the work, commercial general liability including coverage for products and completed operations, commercial auto liability and worker's compensation including employer's liability insurance to cover every contractor and subcontractor to be employed.  The coverage limits shall be reasonably satisfactory to Landlord. The commercial general liability policies (primary and excess) shall be endorsed to name Landlord Parties as additional insureds.  Tenant shall obtain a commitment from its insurance agent to provide Landlord with written notice of cancellation as soon as commercially feasible. Tenant agrees not to permit its insurance lapse. Before commencement of any such work, Tenant shall deliver certificates of insurance and copies of additional insured endorsements to Landlord showing such insurance to be in effect.

(c)     Tenant will carry property insurance providing coverage as broad as the current edition of the Insurance Service Office (ISO) Special Cause of Loss Form covering all of the fixturing items included in its Store Finish Plans, all other improvements, trade fixtures, equipment and personal property from time to time in, on or upon the Leased Premises and any alterations, improvements, additions or changes made by Tenant, in an amount not less than one hundred percent (100%) of their full replacement cost.

(d)     Notwithstanding the fact that any liability of Tenant to Landlord may be covered by Tenant's insurance, Tenant's liability shall in no way be limited by the amount of its insurance recovery or the amount of insurance in force or required by any provisions of this Lease.

(e)     All insurance policies shall be issued by insurance companies permitted to do business in the State of Virginia, with general policyholder's rating of not less than "A-" and a financial rating not less than "Class VIII" as rated in the most current available "Best's Key Rating Guide" for insurance companies. Each such policy, including plate glass insurance, or a certificate showing the same to be in effect, shall be delivered to Landlord at the commencement of the term, and renewals, thereof shall be delivered to Landlord at least thirty (30) days prior to the expiration of any such policy.

(f)     All insurance coverages maintained by Tenant or any contractor or subcontractor shall be primary insurance as to each Owner Party. Any insurance or self-insurance maintained by Owner or any Owner Party shall be in excess and non-contributory to Tenant's or any contractor's/subcontractor's insurance. Anything to the contrary notwithstanding, the liabilities of the Tenant or any Tenant Parties under this Lease shall survive and not be terminated, reduced or otherwise limited by any expiration or termination of insurance coverage. Neither approval nor failure to disapprove insurance furnished by the Tenant or its contractors/subcontractors shall relieve the Tenant or its contractors/subcontractors from responsibility to provide insurance as required by the Lease.  All limits are considered minimums.

(g)     Landlord, Landlord's agent and their respective employees assume no liability or responsibility with respect to the conduct and operation of the business to be conducted upon the Leased Premises.  Landlord, Landlord's agent and their respective employees shall not be liable for any accident or injury to any person or persons or property in or about the Leased Premises which are caused by the conduct and operation of such business or by virtue of equipment or property of Tenant in the Leased Premises.

### 10.2 Indemnity by Tenant.
To the fullest extent permitted by law, Tenant will indemnify and save harmless Landlord and its Agent and their respective owners, subsidiaries, members, partners, trustees, officers, employees of each of them, any master lessor, and any mortgagee of Landlord against and from all claims, actions, damages, liabilities including but not limited to claims for bodily injury, sickness, disease, death or damage to or the destruction of property (including loss of use thereof) and expenses of any kind or nature (including attorneys' and other professional fees) in connection with or arising from the use and occupancy by Tenant of the Leased Premises, or any part thereof or any other part of Landlord's property, occasioned wholly or in part by any act or omission of Tenant, its officers, agents, contractors, or employees, including claims for mechanic's liens filed against the Building, the Shopping Center, or any part thereof, for labor performed or materials furnished, or claimed to be furnished, to Tenant or due to or arising out of any breach, violation or non-performance of any covenant, condition or agreement in this Lease set forth and contained on the part of Tenant to be kept and performed, unless such damage or injury shall be occasioned by the sole negligence or willful act or omission of Landlord, its servants, agents or employees. Tenant's obligation to indemnify shall not be limited by the provisions of Worker's Compensation or any similar act  Notwithstanding the foregoing, Tenant shall at all times remain liable for, and indemnify and hold harmless Landlord against any damage or injury resulting from perils against which Tenant is required by this Lease to hold Landlord and others harmless and/or to insure, regardless of gross negligence or willful act or omission of others. The provisions of this indemnity shall survive the expiration or termination of this Lease.

### 10.3 Loss or Damage to Tenant's Property and Business.
All personal property belonging to Tenant located in or about the Leased Premises shall be there at the sole risk of Tenant. Neither Landlord nor Landlord's Agent shall be liable for the theft or misappropriation thereof, nor for any damage or injury thereto, nor for damage or injury to Tenant or any of its agents or employees or to other persons or to any property caused by fire, explosion, water, gas, electricity, leaks from the roof or other portions of the Building, the bursting or leaking of pipes, plumbing, electrical wiring and equipment and fixtures of any kind, or

- 17 -

by any act or neglect of other tenants or occupants of the Building, or due to any other cause whatsoever unless caused by the willful or grossly negligent act of Landlord or its servants, agents or employees. Tenant shall give immediate verbal and written notice to Landlord in case of fire or accident in the Leased Premises or of any defects, damages or injury therein or in any fixtures or equipment. In no event shall Landlord be liable for interruption to Tenant's business or for damage to or replacement or repair of Tenant's personal property, including inventory, trade fixtures, floor coverings, furniture and other property removable by Tenant under the provisions of this Lease.

### 10.4 Fire Insurance.

(a) Increase in Premiums. Tenant shall not permit nor do anything in the Leased Premises which would increase the basic rate of the fire insurance as established by the appropriate county, state or municipal agency. For purposes of definition herein, the "basic rate" shall be such rate as published by the said appropriate agency, exclusive, however, of any excess of surcharges appended thereon by virtue of or directly attributable to so-called faults of management. If Tenant's use of the Leased Premises causes an increase in the rate of fire and/or extended coverage insurance of the Leased Premises or of the Building or the Shopping Center of which the Leased Premises form a part, over and above the basic rate for construction of this type occupied for the purposes permitted hereunder, Tenant, upon notice by Landlord or its agent, shall immediately take all necessary steps to eliminate the excess charge attributable to such faults of management. Should Tenant refuse or fail to take such action as may be necessary to eliminate the cause for said excess charges, Tenant shall pay to Landlord on demand, as Additional Rent, that portion of the aforesaid fire and extended coverage insurance premium caused by such excess charge on all outstanding insurance carried on the Leased Premises and the Building and the Shopping Center of which the Leased Premises is a part.

(b) Mutual Waiver of Subrogation. Tenant hereby waives any right it may have against Landlord or against any other tenant or occupants of space in the Shopping Center or the Building on account of any loss or damage occasioned to Tenant, its property, the Leased Premises or its contents arising from any risk generally covered by the Special Form Cause of Loss property insurance, whether or not such a policy shall be in force including any deductibles or self-insured retentions. Landlord hereby waives any rights it may have against Tenant on account of any loss or damage occasioned to Landlord, its property or to the Shopping Center or the Building arising from any risk generally covered by its Special Form Cause of Loss property insurance, whether or not such a policy shall be in force including any deductibles or self-insured retentions. If either Landlord or Tenant shall be unable, after using best efforts, to obtain and/or maintain the waiver of subrogation set forth in the immediately preceding sentence from its insurance carrier(s) (or from any other insurance carrier(s) without substantial increased cost) and shall so notify the other party of such inability within thirty (30) days thereafter, then such waiver of subrogation shall no longer be effective by either party until obtainable by the effecting Party.

### 10.5 Criminal Acts of Third Parties.
Landlord Parties shall not be liable in any manner to Tenant, its agents, employees, invitees or visitors for any injury or damage to Tenant, Tenant's agents, employees, invitees or visitors, or their property, caused by the criminal or intentional misconduct of third parties or of Tenant, Tenant's employees, agents, invitees or visitors on or about the Leased Premises, Building, Shopping Center and/or complex (including any parking garages and parking areas). All claims against Landlord Parties for any such damage or injury are hereby expressly waived by Tenant, and Tenant hereby agrees to hold harmless, defend and indemnify Landlord Parties from all such claims and/or damages and the expenses of defending all claims made by Tenant's employees, agents, invitees, or visitors arising out of such acts.

### 10.6 Public Liability.
Landlord Parties assume no liability or responsibility whatsoever with respect to the conduct and operation of the business to be conducted upon the Leased Premises. Landlord Parties shall not be liable for any accident or injury to any person or persons or property in or about the Leased Premises which are caused by the conduct and operation of said business or by virtue of equipment or property of Tenant in said Leased Premises. Tenant agrees to hold Landlord Parties harmless against all such claims, and indemnify and defend Landlord Parties from all injuries and damages and the expenses of defending such claims. Tenant agrees to accept full responsibility for supplying its own tools and equipment, including ladders and scaffolds, and Tenant represents and warrants that a) all such tools and equipment are i) designed for the required job; and ii) properly maintained and in safe operating order; and b) all employees and customers have received proper training in the safe use of all tools and equipment. Tenant agrees to comply with all Federal, State or local regulations regarding safety and fire protection

### 10.7 Construction on Contiguous Property.
Landlord Parties shall not be liable for damages, nor shall this Lease or any Minimum Annual Rent, Percentage Rent, Additional Rent or other sums due hereunder be affected, for conditions arising or resulting from construction within or around the Leased Premises or Building or Shopping Center or complex or on contiguous or neighboring properties and which affect the complex, the Building, the Shopping Center and/or the Leased Premises; provided, however, that the Leased Premises shall not be rendered untenantable by such construction for more than one (1) business day in any twelve (12) month period.

## 11. FIRE AND CASUALTY DAMAGES

### 11.1 Repairs and Rent Abatement

(a) If the Leased Premises shall be damaged by fire or any other casualty ("Casualty"), but the Leased Premises are not thereby rendered untenantable in whole or in part, subject to Section 11.3 below, Landlord shall promptly at its expense cause such damages to be repaired, without abatement of rent

(b) If, as the result of Casualty, the Leased Premises are rendered untenantable in part, subject to Section 11.3 below, Landlord shall at its expense cause such damage to be repaired, and the Minimum Annual Rent and Additional Rent payable pursuant to Sections 1.4 and 1.6 shall be abated proportionately as to the portion of the Leased Premises rendered untenantable from the date of such Casualty until the end of Tenant's restoration period as set forth in Section 11.3 below.

(c) If, as the result of Casualty, the Leased Premises are rendered wholly untenantable, subject to Section 11.3 below, Landlord shall at its expense cause such damage to be repaired and the Minimum Annual Rent and Additional Rent payable pursuant to Sections 1.4 and 1.6 shall be abated from the date of such Casualty until the end of Tenant's restoration period as set forth in Section 11.3 below. If it shall require more than one hundred twenty (120) days for Landlord to commence its restoration work in the Leased Premises, then either Tenant or Landlord may at its option terminate this Lease by

giving each to the other written notice to that effect at any time prior to commencement of restoration. If it shall require more than two hundred seventy (270) days for Landlord to substantially complete its restoration work in the Leased Premises, then Tenant, provided Tenant is not then in default, may terminate this Lease by giving to Landlord upon thirty (30) days prior written notice to that effect at any time prior to completion of restoration; provided, however, that in the event Landlord shall substantially complete its restoration work prior to the date that Tenant has specified for termination of the Lease, then the Lease shall not terminate.

11.2 **Landlord Options to Terminate.** If the Leased Premises are:

(a) rendered wholly untenantable or damaged as a result of any cause which is not covered by Landlord's insurance;

(b) damaged in whole or in part during the last twenty-four (24) months of the Term and either; (i) the estimated costs of repairs, rebuilding, reconstruction and restoration or replacement shall exceed one-third (1/3) of the then replacement costs, or; (ii) the estimated time required to repair, rebuild, reconstruct, etc., shall exceed one hundred twenty (120) days or the remaining lease term, whichever is less; or

(c) If the Shopping Center of which the Leased Premises are a part is damaged to the extent of fifty percent (50%) or more of the floor area rentable for retail sales; then in any such event, Landlord may terminate this Lease by giving to Tenant notice within 120 days after the occurrence of such event. If the building(s) in which the Leased Premises is located is so substantially damaged that it is reasonably necessary, in Landlord's judgment, to demolish the same for the purpose of reconstruction, Landlord may demolish the same, in which event Landlord may treat such demolition as if it had been caused by the same cause as that which caused the damage.

11.3 **Tenant's Duty to Rebuild.** If any items of the leasehold improvements installed by Tenant or any items of Tenant's fixturing shall be damaged or destroyed or any item of Landlord's work not covered by Landlord's insurance shall be damaged or destroyed, Tenant at its sole expense shall within thirty (30) days commence to repair, reconstruct and restore or replace such work (including leasehold improvements, fixtures, furnishings and merchandise) and prosecute same diligently to completion. Tenant shall be permitted one hundred twenty (120) days for such restoration work, commencing on the later of (i) the date Landlord's restoration work pursuant to Section 11.1 above is substantially completed or (ii) the date all required permits or licenses have been issued for such restoration; provided, however, that Tenant shall not be obligated to restore the Leased Premises if the Leased Premises are materially damaged during the last twenty-four (24) months of the Term (unless such damage was due to the gross negligence or willful misconduct of Tenant).

11.4 **Rent Adjustment on Casualty Termination.** Unless terminated as provided for in Sections 11.1 (c) and 11.2, this Lease shall continue in full force and effect, and Landlord and Tenant shall perform their respective obligations. Upon any termination of this Lease under any of the provisions of this Section 11, the rent shall be adjusted as of the date of such termination and the parties shall be released without further obligations to the other party coincident with the surrender of possession of the Leased Premises to Landlord, except for items which have been theretofore accrued and are then unpaid and except that the Tenant shall not be released from claims for indemnity, personal injury or property damage occurring on the Leased Premises prior to the termination of this Lease for which Tenant is otherwise responsible under this Lease.

## 12. TRANSFERS OF INTEREST

12.1 **Consent.** Subject to Section 12.8, without the prior written consent of Landlord, Tenant will not sublet the Leased Premises or any part thereof or transfer possession or occupancy thereof to any person, firm or entity, or transfer or assign this Lease, and no subletting or assignment hereof shall be effected by operation of law or in any other manner, such as the transfer of all or substantially all of Tenant's assets or voting control of Tenant's stock, partnership interest or other equity, without such prior written consent of Landlord. If Tenant is a partnership, then any sale, conveyance, or other transfer of, or the grant of a security interest in, any partnership interest, or any dissolution of Tenant, or any act which will result in a potential future change in control, or a withdrawal or change, whether voluntary, involuntary or by operation of law, of a partner or partners owning a controlling interest in Tenant, shall be deemed a voluntary assignment of this Lease. If Tenant is a corporation, then any sale, conveyance, or other transfer of, or grant of a security interest in any controlling shares of stock, dissolution, merger, consolidation or other reorganization of Tenant, or any sale or transfer of a controlling interest of its capital stock, or any act which will result in a potential future change in control, or a withdrawal or change, whether voluntary, involuntary or by operation of law, of a shareholder or shareholders owning a controlling interest in Tenant, shall be deemed a voluntary assignment of this Lease. All permitted sublettings and assignments of the Leased Premises and this Lease shall be subject to the provisions of this Lease, including but not limited to Section 12.2. No assignment shall be made except for the entire Leased Premises and Tenant further agrees that any permitted assignment of this Lease or subletting of the Leased Premises may be conditioned upon payment by Tenant of consideration and the delivery of such additional guarantees, collateral and/or other security as determined by Landlord. Any subletting or assignment consented to by Landlord, to be effective, shall be evidenced in writing in a form acceptable to Landlord. Consent by Landlord to any assignment or subletting by Tenant shall not operate as a waiver of the necessity for obtaining Landlord's consent in writing to any subsequent assignment or subletting. The collection or acceptance of rent from any such assignee, subtenant or other occupant shall not constitute a waiver of or release of Tenant from any covenant or obligation contained in this Lease, nor shall such acceptance of rent be deemed to create any right to the Leased Premises in such assignee, subtenant or other occupant, nor any legal or other relationship between the Landlord and any such assignee, subtenant or other occupant. Landlord's acceptance of any name for listing on the Shopping Center or Building directory shall not be deemed, nor will it substitute for, Landlord's consent as required by this Lease, to each sublease, assignment and any other occupancy of the Leased Premises. In the event that Tenant defaults under this Lease in the payment of Minimum Annual Rent, Percentage Rent or Additional Rent, Tenant hereby assigns to Landlord the rent and other sums due from any subtenant, assignee or other occupant and hereby authorizes each such subtenant, assignee and other occupant to pay said rent and other sums directly to Landlord upon demand. Any transfer of this Lease or the Leased Premises, or any transfer of any interest in Tenant restricted pursuant to this Section 12.1, without the prior written consent of Landlord pursuant to this Section 12.1 shall be void. By taking a transfer of this Lease by assignment, transfer of interest in Tenant, or by any other manner described in this Section 12.1, or otherwise with Landlord's consent to the transfer, the transferee shall be bound by all provisions of this Lease, which shall be binding upon the transferee as if the transferee had signed this Lease in lieu of the original Tenant named herein.

- 19 -

Case: 18-50398    Doc# 37-1    Filed: 03/22/18    Entered: 03/22/18 16:29:11    Page 26 of 30

**12.2 Excess Rent and Other Consideration.** Any rent and other consideration accruing to Tenant as the result of any sublease or any assignment of this Lease (other than pursuant to Permitted Licenses (defined below)), which is in excess of the pro rata share of Minimum Annual Rent, Percentage Rent and Additional Rent then being paid by Tenant for all or a portion of the Leased Premises being sublet or assigned, shall be paid by Tenant to Landlord monthly as Additional Rent. Any consideration accruing to Tenant as the result of any transfer of interest in Tenant restricted pursuant to Section 12.1, which is paid or deemed paid in regard to the value of this Lease and which is in excess of the pro rata share of the Minimum Annual Rent, Percentage Rent and Additional Rent which would have been paid by Tenant during the Term of this Lease for such space, shall be paid by Tenant to Landlord promptly as Additional Rent.

**12.3 Tenant Liability.** In the event of any subletting of the Leased Premises or assignment of this Lease by Tenant or transfer of an interest in this Lease or in Tenant, Tenant shall remain liable to Landlord for payment of the Minimum Annual Rent, Percentage Rent and Additional Rent stipulated herein and all other covenants and conditions contained herein. No subletting of the Leased Premises or assignment of this Lease or transfer of an interest in this Lease or in Tenant shall operate to release, discharge or otherwise affect the liability of any guarantors, co-signers or other parties liable to Landlord pursuant to the terms of any guaranty or otherwise for the obligations of Tenant under this Lease.

**12.4 Other Transfers.** Notwithstanding anything herein to the contrary, Tenant shall not pledge, assign, transfer, encumber or otherwise convey its interest in the Leased Premises conditionally or as security for any obligations of Tenant to any third party, or otherwise. Any such transfer in violation of this provision shall be void.

**12.5 Rights on Default.** In the event Tenant defaults under this Lease, in addition to the rights and remedies of Landlord outlined in Section 13, Landlord, at its option, may elect to recognize any sublease between Tenant and any subtenant, or any agreement by which Tenant has granted any leasehold estate or interest in the Leased Premises, as a direct lease or agreement between Landlord and such subtenant or other grantee, upon written notice to Tenant and such subtenant or other grantee, without releasing or affecting the liability of Tenant to Landlord under this Lease, and Tenant shall be deemed to have assigned its interest in such sublease or other agreement to Landlord (without the need for executing any further documentation evidencing same) and such subtenant or other grantee shall attorn to and recognize the rights of Landlord under such sublease or other agreement, as the case may be. Notwithstanding Tenant's consent or acquiescence in the termination of this Lease and/or Tenant's voluntary surrender of the Leased Premises (or any portion thereof), Landlord may consider any sublease or other agreement transferring a leasehold estate or interest in the Leased Premises, and/or any right to use or possess the Leased Premises (or any portion thereof) by any subtenant or other grantee, terminated as of the date Landlord terminates this Lease and/or Tenant's right to possession of the Leased Premises, it being the intention of the parties that any leasehold estate or other interest in the Leased Premises shall be subject to the terms and conditions of this Lease, including all rights and remedies of Landlord outlined herein, notwithstanding anything to the contrary contained in such sublease or other agreement.

**12.6 Assignment and Subletting Fee.** In the event Tenant elects to assign this Lease or sublet the Leased Premises, or in the event of any transfer of any interest in Tenant, Tenant will pay Vornado/Charles E. Smith L.P. ("Landlord's Agent"), a reasonable review fee, determined by Landlord's Agent in its sole discretion, to be submitted with the executed assignment, sublease or transfer agreement submitted for review pursuant to this Section.

**12.7 Limitation on Assignments and Subletting.** Tenant shall not assign this Lease or sublet the Leased Premises more than once during the term of this Lease.

**12.8 Permitted Licenses.** The licensing, temporary subleasing or rental of bays, lockers and other designated areas (including offices or rooms) to provide segregated, secure or private work and ancillary use areas to Tenant's members in the ordinary course of Tenant's business, and the licensing or rental of the Leased Premises for purposes of hosting events and activities in the ordinary course of Tenant's business ("Permitted License" or "Permitted Licenses") shall be permitted without consent of Landlord; provided, however, that the licensing, subleasing, or rental of any portion, or portions, of the Leased Premises to any one entity (including affiliates) or individual (or affiliated group of individuals) which in the aggregate constitute 1,000 or more square feet shall not be a Permitted License, with the exception of one license in excess of 1,000 square feet but not more than 3,000 square feet to one Permitted Licensee. Notwithstanding the foregoing, Landlord shall not unreasonably withhold its consent to licensing or subleasing of a portion of the Leased Premises in excess of the foregoing limitations to a member or third party consistent with TechShop's business model.

13. **DEFAULTS AND REMEDIES**

    **13.1 Default.** Tenant shall be in default hereunder if:

        (a) Tenant fails to pay any part of the Minimum Annual Rent, Percentage Rent or Additional Rent, or any installment thereof, within five (5) days after the same shall be due and payable, whether or not Tenant shall have received notice of the same;

        (b) Tenant fails to observe or perform any of the covenants and conditions of Section 5 (Use of Premises and Operation), or is otherwise in violation thereof, whether or not Tenant shall have received notice of the same;

        (c) Tenant fails to observe or perform any of its other covenants, agreements or conditions provided for in this Lease (whether or not the time period within which such failure may be cured shall be extended for such period as may be necessary to complete the curing of the same with diligence);

        (d) Tenant fails to accept possession of the Leased Premises when tendered by Landlord;

        (e) Tenant fails to apply promptly for an occupancy permit, and any other permits or licenses as required so that it may lawfully occupy the Leased Premises, or fails to take all steps and do all work which may be necessary to enable Tenant to commence operation of its business within the time it is required to do so in Section 2.4 of this Lease;

- 20 -

Case: 18-50398   Doc# 37-1   Filed: 03/22/18   Entered: 03/22/18 16:29:11   Page 27 of 30

(f) Tenant fails to open the Leased Premises for business to the public within the time provided therefore in Section 2.4;

(g) Tenant fails, after once being open for business in the Leased Premises, to be open for business to the public for more than three (3) consecutive days when required by this Lease to be so open or for more than an aggregate of five (5) such days in any one Rent Year, except to the extent due to a force majeure event as described in Section 33 below;

(h) Tenant is a corporation and fails to remain in good standing in the Commonwealth of Virginia or the state of its incorporation or, if a foreign corporation, fails to maintain a duly registered agent in the Commonwealth of Virginia;

(i) Tenant assigns its interest in this Lease without Landlord's consent;

(j) Tenant makes any substantial adverse changes in the quality of merchandise or services being offered without obtaining Landlord's prior written consent;

(k) Any event expressly designated or deemed a default elsewhere in this Lease;

(l) Tenant's abandonment or surrender of the Leased Premises prior to the expiration of the Term of this Lease; and/or

(m) Tenant's committing or permitting waste to occur to the Leased Premises.

In each and every such case, Landlord shall be entitled to avail itself of the remedies hereinafter set forth in Section 13.4.

In the event that Tenant defaults in the payment of Minimum Annual Rent, Additional Rent, Percentage Rent, or any other sum required to be paid by Tenant, or if Tenant defaults in the performance of or compliance with any other covenant, condition, agreement, rule or regulation herein contained, Landlord shall give Tenant written notice of such default. If Tenant fails to cure any default in the payment of Minimum Annual Rent, Additional Rent, Percentage Rent, or any other sum required to be paid by Tenant within ten (10) days after the effective date of such notice, or fails to cure any other default within twenty (20) days after the effective date of such notice (or if such other default is of such nature that it cannot be completely cured within said twenty (20) days, if Tenant fails to commence to cure within said twenty (20) days and thereafter proceed with reasonable diligence and in good faith to complete the cure), then Landlord shall be entitled to all rights and remedies available to Landlord pursuant to Section 12 in the event of Tenant's default. Nevertheless, in the event Tenant defaults in the payment of Minimum Annual Rent, Percentage Rent, Additional Rent or any other sum required to be paid by Tenant or if Tenant otherwise defaults in the performance of or compliance with any other covenant, condition, agreement, rule or regulation herein contained, two (2) times in any twelve (12) month period, Landlord shall not be required during the remainder of the Lease Term to send notice of any default hereunder before proceeding with its remedies under Section 12. Tenant acknowledges that the purpose of the preceding sentence is to prevent repetitive defaults by Tenant under this Lease, which work a hardship upon Landlord and deprive Landlord of the timely performance by Tenant of its obligations hereunder this Lease. Notwithstanding anything in the foregoing which might be interpreted to the contrary, Tenant shall immediately upon receipt of notice from Landlord cease any conduct which violates Sections 5.10(d) or 5.11(b) as such conduct by Tenant will place Landlord in violation of Landlord's leases with other Tenants in the Building or Shopping Center.

13.2 **Waiver of Cure Rights.** Notwithstanding anything to the contrary set forth elsewhere in this Lease, if Tenant defaults (a) in the timely payment of Minimum Annual Rent, Percentage Rent, Additional Rent or in the timely reporting of gross sales and any such default shall be repeated two (2) times in any period of twelve (12) months; then, notwithstanding that such defaults shall have been cured within the period of notice as above provided, upon the occurrence of any further similar default within such twelve (12) month period, Landlord, without giving Tenant any notice and without affording Tenant any opportunity to cure the default (Tenant hereby expressly waiving any right of tender or cure), may exercise any and all rights under this Lease in addition to those it may have at law or in equity.

13.3 **Non-Waiver.** The failure of Landlord to seek redress for violation of, or to insist on the strict performance of, any covenant of this Lease or any of the rules and regulations in effect from time to time, whether by express waiver or otherwise, shall not prevent a subsequent action, which would have originally constituted a violation, from having all the force and effect of any original violation. Receipt and acceptance by Landlord of any rent or other charges with knowledge of the breach of any covenant or condition of this Lease by Tenant shall not be deemed a waiver of such breach. Failure of Landlord to enforce any of the rules and regulations against Tenant or any other tenant in the Shopping Center shall not be deemed a waiver of any such rule or regulation. No payment by Tenant or receipt by Landlord of a lesser amount than the rent herein stipulated shall be deemed to be other than on account of the stipulated rent. No endorsement or statement on any check or any letter accompanying any check or payment of rent shall be deemed a settlement of a legal dispute or an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy provided in this Lease. Landlord's consent to, or approval of, any act by Tenant requiring Landlord's consent or approval shall not be deemed to waive or render unnecessary Landlord's consent to or approval of any subsequent act by Tenant.

13.4 **Landlord's Rights on Default.** Landlord shall have the following rights or remedies in addition to any remedies in this Lease or now or later allowed by law or in equity, without further notice or demand of any kind to Tenant or any other person. If Tenant commits a default:

(a) Landlord can terminate Tenant's right to possession of the Leased Premises at any time by giving notice to Tenant of its intention. Landlord shall re-enter the Leased Premises and take possession thereof and remove all persons therefrom, and Tenant shall have no further claim or right hereunder.

(b) Landlord can continue this Lease in full force and effect, as long as Landlord does not terminate Tenant's right to possession, and Landlord shall have the right to bring suit for collection of rent as it accrues pursuant to the terms of this Lease.

- 21 -

Case: 18-50398    Doc# 37-1    Filed: 03/22/18    Entered: 03/22/18 16:29:11    Page 28 of 30

(c) Landlord can retake the Leased Premises by summary proceedings or otherwise and remove, or cause to be removed, Tenant or any other occupants from the Leased Premises in such manner as Landlord shall deem advisable with or without legal process and using self-help if necessary, and relet them, or any part of them, to third parties for Tenant's account. Landlord shall in no event be liable in any way whatsoever for failure to relet the Leased Premises, or in the event that the Leased Premises are relet, for failure to collect the rent thereof under such reletting. Tenant shall be liable immediately to Landlord for all costs Landlord incurs in reletting the Leased Premises, including, without limitation, reasonable attorneys' fees, and brokers' commissions, expenses of remodeling the Leased Premises required by the reletting and like costs. Reletting can be for a period shorter or longer than the remaining term of this Lease. Tenant shall pay to Landlord the rent due under this Lease on the dates the rent is due. The rent received by Landlord from any reletting shall be applied: (i) to the payment of any indebtness other than the rent due hereunder from Tenant to Landlord; (ii) to the payment of any cost of such reletting (including without limitation the making of any alterations, repairs or decorations in the Leased Premises which Landlord deems advisable); (iii) to the payment of the cost of any alterations and repairs to the Leased Premises; (iv) to the payment of rent due and unpaid hereunder; and (v) the residue, if any, shall be held by Landlord and applied in payment of future rent as the same may become due and payable hereunder. Should that portion of rentals received from such reletting during any month, which is applied to the payment of rent hereunder be less than the rent payable during that month by Tenant hereunder, then Tenant shall pay such deficiency to Landlord. Such deficiency shall be calculated and paid monthly. Tenant shall have no right to any excess. In the event of any entry or taking possession of the Leased Premises as aforesaid, Landlord shall have the right, but not obligation, to remove all or any personal property located therein and may place the same in storage at a public warehouse at the expense and risk of the owner. The terms "re-enter" or "re-entry" as used in this Lease are not and shall not be restricted to their technical meaning but are used in their broadest sense. It is agreed that the commencement and prosecution of any action by landlord in unlawful detainer, ejectment or otherwise, or any execution of any judgment or decree obtained in any action to recover possession of the Leased Premises or any other re-entry and removal shall not be construed as an election to terminate this Lease and shall not absolve or discharge Tenant from any of its obligation or liabilities for the remainder of the term. No act by Landlord allowed by this section shall terminate this Lease unless Landlord notifies Tenant that Landlord elects to terminate this Lease.

**13.5 Damages Upon Termination.** If Landlord elects to terminate this Lease under the provisions set forth in Section 13.4, Landlord may recover from Tenant as damages (all of which shall be immediately due and payable from Tenant to Landlord), in addition to its other remedies:

(a) Any unpaid Minimum Annual Rent, Percentage Rent and Additional Rent, including interest thereon, which is due and owing at the time of such termination; plus

(b) That Minimum Annual Rent, Percentage Rent and Additional Rent, including interest thereon, which would have been earned after termination until the time of judgment; plus

(c) A sum representing liquidated damages, and not penalty, in an amount equal to the excess of:

(i) The sum of the monthly installment of Minimum Annual Rent, doubled to represent Minimum Annual Rent plus lost Percentage Rent, and the monthly installment of Additional Rent provided for in Section 1.6 of this Lease applicable to the month in which this Lease shall be terminated, all multiplied by the number of months then constituting the unexpired portion of the Lease term, over

(ii) The rental value of the Leased Premises at the time of termination for the unexpired lease term, discounted at a rate of three percent (3%) per annum to present value.

(Nothing herein contained shall limit or prejudice the right of Landlord to prove and obtain as liquidated damages in any bankruptcy, insolvency, receivership, reorganization or arrangement proceeding an amount equal to the maximum allowed by any statute or rule of law governing such proceedings and in effect at the time when such damages are to be proved, whether or not such amount be greater, equal to or less than the amount of the excess referred to in the preceding sentence. In determining the rental value of the Leased Premises, the rent realized by any reletting accomplished or accepted by Landlord within a reasonable time after termination of this Lease, shall be deemed, prima facie, to be the rental value.)

(d) In addition to all of the rights of the Landlord to recover damages herein provided, Tenant shall immediately reimburse Landlord for, and Landlord may recover, the unamortized portion of all contributions and other concessions (hereinafter "Landlord Concessions"), if any, provided by Landlord to Tenant as an inducement to enter into this Lease and any amendment, modification or extension hereof and/or pursuant to the terms of this Lease or any amendment, modification or extension hereof, including, but not limited to, (i) any abatements or waivers of Minimum Annual Rent, Percentage Rent, Additional Rent or other sums due under this Lease, (ii) costs incurred by Landlord in making the Leased Premises ready for Tenant's occupancy, including the cost of improvements made at Landlord's expense, any monetary contribution by Landlord for any leasehold improvements made by Tenant and any other contributions by Landlord with respect to any construction within or relating to the Leased Premises, (iii) moving expenses, (iv) brokerage fees, (v) allowances for telephone and computer systems and other equipment and supplies, (vi) design, architectural and engineering fees and expenses, and (vii) any other direct or indirect expenses incurred by Landlord in conjunction with obtaining and/or entering into this Lease and any amendment, modification and extension hereof, and placing and/or retaining Tenant in possession of the Leased Premises. For purposes hereof, the amount of any Landlord Concessions provided in connection with the initial Lease Term shall be deemed to be amortized (using a straight-line method) on a monthly basis over the initial Term of this Lease (excluding any extension or renewal terms) in which Tenant is required to pay all or any portion of any installment of Minimum Annual Rent under the terms of this Lease. The amount of any Landlord Concessions provided in connection with any amendment or modification of this Lease during the initial Term of this Lease shall be deemed to be amortized (using a straight-line method) on a monthly basis over the remaining months in the initial Term of this Lease (excluding any extension or renewal terms) in which Tenant is required to pay all or any portion of any installment of Minimum Annual Rent under the terms of this Lease. The amount of any Landlord Concessions provided in connection with any renewal or extension of the Term of this Lease shall be deemed to be amortized (using a straight-line method) on a monthly basis over the months in the extension period (excluding any subsequent extension or renewal terms) in which Tenant is required to pay all or any portion of any installment of Minimum Annual Rent under the terms of said extension or renewal of the Term of this Lease.

- 22 -

(e) Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom including without limitation, the cost of renovating the Leased Premises, reasonable attorneys' fees, commissions and advertising; plus

(f) At Landlord's election, such other amounts, in addition or in lieu of the foregoing, as may be permitted from time to time by applicable law.

**13.6 Anticipatory Repudiation.** If Tenant unequivocally informs or demonstrates to Landlord its intent to repudiate this Lease by refusing to take possession of the Leased Premises, Landlord may, at its option, consider such anticipatory repudiation a breach of this Lease. Landlord may immediately seek a new tenant, but Tenant shall remain liable for rent at the double rate specified in Section 2.5 from the Rent Start Date until a new tenant is occupying and paying rent. Landlord, moreover, will keep any rent and security deposited upon execution of this Lease to be applied to Landlord's damages and expenses resulting from Tenant's repudiation.

**13.7 Tenant Abandonment of Leased Premises.**

(a) Abandonment. If the Leased Premises or a substantial portion thereof shall be deserted or vacated by Tenant for thirty (30) consecutive days or more, Landlord may deem the Tenant to have abandoned the Leased Premises, notwithstanding the fact that Tenant may have left all or some part of Tenant's property thereon. Landlord may consider Tenant in default under this Lease and may pursue all remedies available to it under this Lease or otherwise as may be available in equity or at law.

(b) Landlord Right to Enter and to Relet. If Tenant abandons the Leased Premises as set forth in subsection (a) above, Landlord may, at its option, enter into the Leased Premises without being liable for any prosecution therefor or for damages by reason thereof. In addition to any other remedy elsewhere provided in this Section 13 or at law or in equity, Landlord, as agent of Tenant, may relet the whole or any part of the Leased Premises for the whole or any part of the then unexpired Lease Term. For the purposes of such reletting, Landlord may make any alterations or modifications of the Leased Premises considered desirable in its sole judgment.

**13.8 Tenant Property to Remain.**

(a) In the event of default, all of Tenant's fixtures, furniture, equipment, improvements, additions, alterations and other personal property (including, without limitation, trade fixtures) shall remain on the Leased Premises, subject to the rights of all holders of a security interest therein (including the right of such security interest holders to remove and sell such collateral). Subject to the right of all holders of a security interest therein, Landlord shall have the right to take exclusive possession of same and to use the same, rent or charge free, until all defaults are cured or, at its option, at any time during the Lease Term, to require Tenant to forthwith remove same. In connection with the foregoing, Landlord shall have, and Tenant hereby grants, a first priority lien upon the Landlord's Trade Fixtures (defined below) located in the Leased Premises during the Lease Term for the amount of any unpaid rent or other sums due from Tenant hereunder. Tenant shall not remove any of the Landlord's Trade Fixtures from the Leased Premises without the prior written consent of Landlord other than pursuant to sale thereof in the regular course of its business, and Landlord shall have the right and privilege at its sole option and discretion, to take possession of all property of Landlord's Trade Fixtures in the Leased Premises, to store the same on said Leased Premises, or to remove it therefrom and store it in such place as may be selected by landlord, at Tenant's risk and expense. In accordance with such lien and of any rights of distraint it may possess against Landlord's Trade Fixtures. Under no circumstances shall Tenant place, suffer or permit any lien to be placed upon Landlords Trade Fixtures, other than liens in favor of Landlord; nor shall Tenant place an lien upon any property, improvements, equipment, or fixtures which are the property of Landlord as defined under other provisions of this Lease. The term "trade fixtures" as used in this Lease shall be as defined in Section 3.2(b). Notwithstanding the foregoing Landlord shall have a first and sole lien on any trade fixtures or other goods purchased with the proceeds of the Landlord's Contribution (defined in Section 45 below), the Additional Landlord's Contribution (defined in Section 54 below) (or any subsequent replacements of such trade fixtures or goods) ("Landlord's Trade Fixtures") and in no circumstance shall Tenant be permitted to place any lien in favor of any party other than Landlord upon any Landlord's Trade Fixtures.

(b) Right of Distress/Landlord's Lien. To secure the payment of all Minimum Annual Rent, Percentage Rent, Additional Rent and all other charges and sums that may become due to Landlord under the terms of this Lease, Landlord shall have and is hereby granted by Tenant a right of distress for rent, and a contractual first lien and security interest upon all of the Landlord's Trade Fixtures and also upon all proceeds from the sale, transfer or other disposition of any such property, and any replacements and substitutions thereof, and proceeds thereof, and all proceeds of any insurance which may accrue to Tenant by reason of damage to or destruction of any such property. All exemption laws are hereby waived by Tenant. This lien is given in addition to Landlord's statutory and common law liens and shall be cumulative thereto.

(c) UCC Security Interest. This Lease shall also constitute a security agreement under the Uniform Commercial Code of the Commonwealth of Virginia. Upon the occurrence of an event of default by Tenant under this Lease, Landlord shall have the option, in addition to any other remedies provided herein or by law or at equity, to enter the Leased Premises with or without the permission of Tenant and take possession of any and all of the Landlord's Trade Fixtures situated in or related to the Leased Premises, without liability for trespass or conversion, and to enforce the lien and security interest hereby granted in any manner provided by law. Tenant agrees that Landlord may execute and file or record UCC Financing Statements to evidence the above-described lien in favor of Landlord, and that Tenant's signature shall not be required upon any such UCC Financing Statement, or upon any extensions, renewals, assignments, transfers, releases and terminations relating thereto. Landlord shall be permitted from time to time to file such statements in the appropriate City, County, District, State and/or Commonwealth offices to perfect such lien. All expenses incurred by Landlord, including attorneys' fees, to prepare and file such statements (and any extensions, renewals, assignments, transfers, releases and terminations relating thereto) shall be immediately reimbursed by Tenant upon demand.

- 23 -