# EXHIBIT A

1   David Balter, State Bar No. 212027
    Marissa E. Buck, State Bar No. 293373
2   DICKENSON, PEATMAN & FOGARTY
    A Professional Corporation
3   1455 First Street, Suite 301
    Napa, California 94559
4   Telephone: (707) 252-7122
    Facsimile: (707) 255-6876
5   dbalter@dpf-law.com
    mbuck@dpf-law.com
6
    Chris Kuhner, State Bar No. 173291
7   Kornfield, Nyberg, Bendes, Kuhner & Little, P.C.
    1970 Broadway, Suite 225
8   Oakland, California 94612
    Telephone: (510) 763-1000
9   Facsimile: (510) 273-8669
    c.kuhner@kornfieldlaw.com
10
    Attorneys for Creditor and Interested Party
11  Wantin Living Trust, dated March 2, 1999

12                  UNITED STATES BANKRUPTCY COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14

15

16  In re                              Case No. 18-50398 MEH

17  TECHSHOP, INC.,                    Chapter 7

18              Debtor.                **MEMORANDUM OF POINTS AND
                                       AUTHORITIES IN SUPPORT OF
19                                     MOTION FOR AN ORDER
                                       CONFIRMING NO STAY IS IN EFFECT,
20                                     OR ALTERNATIVELY RELIEF FROM
                                       THE AUTOMATIC STAY**

21                                     Date:
                                       Time:
22                                     Place:   Courtroom 3020
                                                280 S. 1st Street
23                                              San Jose, CA
                                       Judge:   Hon. M. Elaine Hammond
24

25

26          Creditor Wantin Living Trust, dated March 2, 1999 ("Creditor,") respectfully submits the

27  following memorandum of points and authorities in support of its Motion for an Order

28  Confirming no Stay is in Effect, or Alternatively for Relief From Automatic Stay (the "Motion.")

MEMORANDUM OF POINTS AND AUTHORITIES                                                    1

# I.  FACTUAL BACKGROUND

Creditor owns the commercial real property commonly known as 2415 Bay Rd., Redwood City, California 94063 (the "Property,") which is managed by CDI Development and Realty, Inc. (Declaration of Harry Price ("Price Decl.,") ¶¶ 1-2.)  Debtor is Techshop, Inc. and according to Section 15.1 of Debtor's Schedule A/B, Debtor owns 100% of the membership interest in TechShop Menlo Park, LLC, also known as TechShop Mid-Peninsula, LLC ("Tenant.")

In on around January 2015, Creditor and Tenant entered into a written lease for the Property.  (Price Decl., ¶ 3, Exh. A.)  Creditor has never had a direct contractual relationship with Debtor and there was no guaranty signed by Debtor, or any individual principal of the Tenant or Debtor.  (Price Decl., ¶ 3.)

In or around January 2016, Tenant began having issues paying rent and continued to have issues making complete, timely rent payments throughout 2016 and 2017.  (Price Decl., ¶ 4.)  By September 2017, Tenant owed Creditor approximately $300,000.00 in unpaid rent, late fees, and interest.  (Id.)  In exchange for Creditor agreeing to terminate the lease and forgive the amount due, Tenant entered into a new month-to-month lease that would terminate upon non-payment of rent for any month.  (Id.)  Tenant paid rent for October 2017 in full but failed to pay rent for November 2017, thus the lease was terminated.  (Price Decl., ¶¶ 4-5.)  Shortly thereafter, Tenant vacated the Property and Creditor received notice from Debtor that all TechShop locations were closing and the company was going out of business.  (Price Decl., ¶ 5.)

After Creditor took back possession of the Property, Creditor discovered Tenant had abandoned most of its fixtures and various other items of personal property, including: metal and wood working equipment and supplies; computers, servers, printers, phones, and other electronic equipment; various hand tools, nuts, bolts, and screws; 3D printers; desks, chairs, filing cabinets, and other storage cabinets; and various vehicles and automobile parts including a "TechShop" pick-up truck. (Price Decl., ¶ 6.) ("Abandoned Property")  Creditor created a photo inventory of the Abandoned Property.  (Id.)

On January 29, 2018, pursuant to California law, Creditor sent Tenant a letter and Notice

of Abandonment of Personal Property ("Notice") and also posted the Notice at the Property.[1]
(Price Decl., ¶ 8, Exh. C.)  The Notice gave Tenant until February 18, 2018 to claim the
Abandoned Property and pay the reasonable costs of storage.  (Id.)

Some of Tenant's employees claimed small personal items left in lockers on the Property,
and Debtor's Chairman, James Newton, requested a key to the Property in order to assist
employees in recovering their personal property.  (Price Decl., ¶ 9-10.)  However, after certain
items went missing from the Property that were not accounted for, Creditor was unable to contact
Mr. Newton and thus changed the locks in an abundance of caution.  (Price Decl., ¶ 10.)

On February 26, 2018, Debtor filed a voluntary petition under Chapter 7 of the United
States Bankruptcy Code and initiated the above-titled bankruptcy case.  As of the date of the
bankruptcy filing, reasonable storage costs in the amount of approximately $90,500.00 had
accrued and are secured by the Abandoned Property.  (Price Decl., ¶ 11.)  Reasonable storage
costs continue to accrue in the amount of $22,642.00 per month and will total $158,494.00 as of
May 31, 2018.  (Id.)

After Debtor filed for bankruptcy, Creditor's attorney discovered three potential lien
holders that have filed UCC Financing Statements naming Tenant as the debtor and claiming an
ownership in certain property.  Declaration of Marissa Buck ("Buck Decl.,") ¶ 3, Exhs. B-D.)
Creditor has not yet sent a copy of the Notice to these lien holders because to the extent there is
currently a stay in place, Creditor does not wish to violate such stay.  (Buck Decl., ¶ 4.)

Both Creditor and its attorney reached out to the Chapter 7 Trustee and her attorney
regarding the Abandoned Property and discussed alternatives to motion practice and the instant
Motion.  (Price Decl., ¶ 12; Buck Decl., ¶ 2.)  The Trustee is aware of this Motion and Creditor is
informed and believes that the Trustee does not oppose this Motion.  (Buck Decl., ¶ 2.)

Creditor cannot, at reasonable cost, dismantle, move and store the many tools, equipment
and machinery abandoned at the Property, many of which are large, heavy and fragile enough to

---

[1] Although the Tenant vacated the Property in November, Creditor did not send the Notice until the end of January
because Creditor had entered into negotiations regarding the possible sale of TechShop's interest, along with the
lease of the Property, at Debtor's request to try to find someone to lease the Property along with the Abandoned
Property left by Tenant.  However, such negotiations were not successful.  (Price Decl., ¶ 7.)

require specialized expertise and equipment to safely uninstall and remove. Creditor also cannot lease the entire Property while the Abandoned Property is inside as it takes up approximately 60% of the space inside the Property. Given the foregoing, Creditor has suffered and continues to suffer damages arising from and relating to its inability to re-let the Property. (Price Decl., ¶ 13.) Creditor has also had to incur additional costs to install an alarm system to protect the Property and the Abandoned Property therein. (Price Decl., ¶ 14.)

Although the Abandoned Property appears not to be property of this bankruptcy estate, in order to mitigate any further losses and out of an abundance of caution, Creditor seeks permission from the Court to re-locate certain items of the Abandoned Property consisting of hardware supplies and miscellaneous equipment to the east side of the Property, in order to do repairs on the approximately 67,000 square feet on the west end of the Property to prepare that space for lease to a new tenant while awaiting completion of the sale of the Abandoned Property by public auction. (Price Decl., ¶ 15.)

Creditor has taken no further action to dispossess itself of the Abandoned Property and continues to store it all at the Property, which imposes substantial burden on Creditor as it is unable to re-let the entire Property costing Creditor tens of thousands of dollars per month. (Price Decl., ¶ 16.) Accordingly, Creditor seeks relief to continue the process of dispossessing itself of the Abandoned Property by turnover to secured lien holders, public auction or disposal pursuant to applicable law.

## II. ARGUMENT

### A. Creditor Has No Facts That Suggest or Evidence Debtor's Legal Interest in the Personal Property Abandoned by Tenant

The bankruptcy estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). However, the bankruptcy estate does <u>not</u> include any property in which the debtor has no equitable or legal interest. March, Ahart, & Sharpiro, Cal. Prac. Guide: Bankruptcy (The Rutter Group 2014), ¶ 6:41.

As mentioned above, Creditor's lease was with Tenant, not Debtor; Creditor and Debtor had no direct contractual relationship. Moreover, the following information obtained from

MEMORANDUM OF POINTS AND AUTHORITIES                                    4

Debtor's schedules suggests that Debtor has no legal or equitable interest in the Abandoned Property:

- Section 15.1 of Debtor's Schedule A/B states that Debtor's interest in Tenant is valueless in that Tenant's liabilities exceed its assets and is valueless;

- Sections 39-50 of Debtor's Schedule A/B does not identify any particular furniture, equipment or machinery in which it purports to have an interest that is located at the Property. Creditor has no information that suggests Debtor, as opposed to Tenant, has any interest in any of the Abandoned Property;

- Debtor's only real assets are software and intellectual property, as well as a lawsuit arising out of a dispute over said intellectual property;

- Neither Tenant nor any other "subsidiary" of Debtor is listed as a co-debtor in Schedule H, and no motion has been brought to extend co-debtor protection to any subsidiary entity.

Additionally, each UCC lien discovered by Creditor during its investigation names Tenant, not Debtor, as the organization responsible for the secured debt, which also evidences that it was Tenant who financed acquisition of, and holds ownership to, the Abandoned Property listed in the liens. (See Buck Decl., Exhs. B-D.)

Therefore, all available information and evidence supports a finding that Tenant, not Debtor, owns the Abandoned Property. Additionally, Debtor received the Notice from Creditor and has not claimed any of the Abandoned Property in response. Debtor's CEO, Dan Woods, and its Chairman, James Newton, were both in communication with Creditor regarding the Abandoned Property, thus Debtor is fully on notice and has not claimed any legal interest in the Abandoned Property. Debtor merely assisted with allowing employees of Tenant to retrieve personal belongings from lockers on the Property, but has not claimed that any of the AbandonedProperty belonged to Debtor. (See Price Decl., ¶¶ 5, 7 ,8-10.) Finally, Creditor has communicated with the Chapter 7 trustee and her counsel and believes that the trustee will not oppose this Motion.

MEMORANDUM OF POINTS AND AUTHORITIES 5

Accordingly, Creditor respectfully submits that the stay does not apply to the Abandoned Property and requests the Court enter an order confirming the same.

//

//

//

**B.** **In the Event the Court Finds the Stay Applies, Relief From Stay is Appropriate to Permit Creditor to Complete the Process of Dispossessing Itself of the Abandoned Property**

1. California Civil Code Section 1993, et seq. Governs a Landlord's Lawful Disposition of Abandoned Personal Property

California landlord-tenant law governs the duties of a landlord regarding a commercial tenant's abandoned personal property. Creditor was in the process of complying with the statutory procedure outlined in California Civil Code Section 1993 et seq. when the bankruptcy case was filed. Creditor seeks relief from the automatic stay so that it may complete this process free from any risk that doing so will violate the automatic stay.

Civil Code section 1993 et seq. provides an "optional procedure for the disposition of property that remains on the premises after a tenancy of commercial real property has terminated and the premises have been vacated by the tenant." (Cal. Civ. Code, § 1993.02.) Landlords who comply with this procedure are not liable with respect to that property as to any person to whom notice was given. (Cal. Civ. Code, § 1993.08.) The optional procedure is outlined in Sections 1993.03-1993.06, and includes providing written notices to the tenant and possible owners and lien holders discovered by the landlord after completing a reasonable investigation. The notices, if mailed, give the notified persons 18 days to contact the landlord regarding reclamation. (Cal. Civ. Code §1993.03(b).)

Generally, a landlord may recover reasonable storage costs of the property abandoned upon the landlord regaining possession of commercial premises. If the landlord stores the personal property on the premises, the cost of storage is the fair rental value of the space reasonably required for the storage for the term of the storage. (Cal. Civ. Code § 1990(c).) Any

MEMORANDUM OF POINTS AND AUTHORITIES                        6

person that makes claim to the abandoned property is required to pay the reasonable storage cost for that property as a condition to its release. (Cal. Civ. Code §1993.05.)

In the event no person makes claim to the abandoned property, and assuming the value of the property exceeds certain limits, the landlord is required to sell the property at public auction. (Cal. Civ. Code §1993.07.) Certain notice procedures apply prior to auctioning the abandoned property. (Id.) Ultimately, a commercial landlord may elect to follow this procedure in order to avail itself of the liability shield provided by California Civil Code Section 1993.08, which protects the landlord against liability for its disposition or release of the abandoned property as against the tenant, all parties that received notice, and all other parties absent exceptional circumstances. (Cal. Civ. Code §1993.08.)

> 2. Creditor Elected to Follow the Procedure Under California Civil Code Section 1993 et seq.

Creditor elected to avail itself of the liability shield available under California Civil Code Section 1993.08. Creditor took several steps in accordance with this procedure prior to the Debtor's bankruptcy filing, including: (a) completing an inventory of the Abandoned Property; (b) sending notice to reclaim the Abandoned Property to Tenant on January 29, 2018; (c) posting the Notice on the Property on January 29, 2018; (d) releasing certain items of personal property to claimants, namely Tenant's former employees; (e) communicating with Debtor with regarding to the Abandoned Property; and (f) investigating the existence of owners other than the Tenant and possible lien holders.

The time for Tenant and Debtor to notify Creditor of an intent to reclaim any of the Abandoned Property expired on February 18, 2018. (Price Decl., ¶ 8, Exh. C.) Creditor has not yet sent the Notice to the lien holders discovered in its investigation due to the bankruptcy stay, but will do so as soon as the stay is no longer in effect, to the extent it applies here. (Buck Decl., ¶ 4.)

Creditor has taken no further action to dispossess itself of the Abandoned Property and continues to store it all at the Property, which imposes substantial burden on Creditor as it is

unable to re-let the entire Property costing Creditor tens of thousands of dollars per month. (Price Decl., ¶ 16.)

>    3.    Creditor Has an Involuntary Lien on the Abandoned Property Which Arises by Operation of Law

California courts have construed a landlord's entitlement to reimbursement of storage costs as a "special lien on the property dependent on possession." The lien is discharged by payment of reasonable storage charges and may be enforced after the time period for reclamation has run. *See Gray v. Whitmore,* 17 Cal.App.3d 1, 16-17 [citing Code of Civil Procedure §1774]; *see also In re Kaufman,* 315 B.R. 858, 863-64, fn. 7 (Bankr. N.D. Cal. 2004).

Here, Creditor has a pre-petition storage lien. It is noteworthy that Creditor, as a holder of a valid prepetition possessory lien, does not violate the automatic stay by refusing to return possession of the encumbered property to Debtor without receiving a tender of the accrued storage costs. *In re Kaufman, supra,* at 863.

There is now due and owing to Creditor pre-petition reasonable storage costs of at least $90,500.00, which continue to accrue in the amount of $22,642.00 per month. (Price Decl., ¶ 11.) To the extent bankruptcy estate or the Debtor claim an ownership interest in the Abandoned Property located at the Property, the bankruptcy estate or the Debtor will be required to tender payment of the reasonable storage costs prior to Creditor having any turnover obligation, with the only exception being a court order instructing such a turnover. Given the substantial expense in removing the large machinery and other items, the bankruptcy estate or the Debtor will have to fund the expense of removal as well, which is unlikely given the lack of liquid resources listed in the Debtor's schedules.

>    4.    Sufficient Cause Exists for the Court to Lift the Automatic Stay and Relief is Otherwise Appropriate Under 11 U.S.C. § 362(d)(2)

Under 11 U.S.C. § 362(d)(2), the Court has the authority to terminate or modify the automatics stay for "cause," which includes but is not limited to "lack of adequate protection." Other grounds constituting cause are determined on a case-by-case basis. See March, Ahart & Shapiro, Cal. Prac. Guide: Bankruptcy (The Rutter Group 2017) Part II: Relief From Automatic Stay, ¶¶ 8:1060-8:1061.

MEMORANDUM OF POINTS AND AUTHORITIES

As stated above, Creditor has a pre-petition possessory lien in the amount of at least $90,500.00. All the evidence and known facts establish that the Debtor has no interest in the Abandoned Property. However, if Debtor has some interest in the Abandoned Property, a review of the scheduled values of Debtor's assets clearly shows that the furniture, equipment and machinery listed are worth less than the amount of the pre-petition storage costs. Debtor's total assets, including the speculative intellectual property, is greatly exceeded by the stated secured liabilities, all of which suggests that this will be a case where no assets are available for liquidation and distribution to unsecured creditors. The equipment is also subject to numerous UCC liens that exceed the value of the collateral as stated by Debtor.

Therefore, there is sufficient cause to grant relief from stay, as well as sufficient evidence to find that the Debtor has no legal interest or equity in the AProperty. Thus, relief is appropriate under 11 U.S.C. § 362(d)(2).

Furthermore, granting the relief requested will not prejudice Debtor or the bankruptcy estate. If the bankruptcy estate or the Debtor does have any residual interest in the Abandoned Property, it will be protected. After Creditor receives all reasonable storage costs and the costs of sale, any excess amounts from the public auction will be deposited with the County Treasurer as required by the California Civil Code. (See Cal. Civ. Code § 1993.07(c)(1).) The owner of the Abandoned Property may apply to the County for the remaining balance within a year. (Id. at (c)(2).) Thus, the Trustee or the Debtor (if abandoned) can apply to the County for this balance if necessary.

As an alternative to the procedure outlined in Cal. Civ. Code §1993.07(c)(l), and if so ordered by the Court, Creditor is willing to deposit any excess proceeds over and above the amount of the pre-petition storage lien with the Trustee for administration consistent with the Bankruptcy Code and further orders of the Court.

MEMORANDUM OF POINTS AND AUTHORITIES

### C. Cause Exists to Waive The Stay Provisions of Federal Rule of Bankruptcy Procedure 4001(a)(3)

Federal Rule of Bankruptcy Procedure ('FRBP") 4001(a)(3) provides as follows:

> **(3) Stay of Order.** An order granting a motion for relief an automatic saty made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise.

As described in detail above, cause exists to waive the stay provisions of FRBP 4001(a)(3) based on the ongoing damages accruing to Creditor relating to the storage and maintenance of the Abandoned Property and the fact that neither the Debtor or the bankruptcy estate has an interest in the Abandoned Property. Furthermore, if the bankruptcy estate does have an interest in the Abandon Property, waiving the stay provisions of FRBP 4001(a)(3) will result in expediting the disposition of the Abandoned Property and reduce and mitigate the claim Creditor has against the bankruptcy estate.

### III.    CONCLUSION

Based on the foregoing, Creditor respectfully requests that the Court enter an order confirming that no stay is in effect, or alternatively, an order granting Creditor relief from the stay to proceed with disposing of the Abandoned Property.

Dated: June 1, 2018                                    KORNFIELD, NYBERG, BENDES,
                                                                    KUHNER & LITTLE, P.C.


                                                   BY: /S/ CHRIS D. KUHNER
                                                            Chris Kuhner
                                                            Attorneys for Creditor

David Balter, State Bar No. 212027
Marissa E. Buck, State Bar No. 293373
DICKENSON, PEATMAN & FOGARTY
A Professional Corporation
1455 First Street, Suite 301
Napa, California 94559
Telephone: (707) 252-7122
Facsimile: (707) 255-6876
dbalter@dpf-law.com
mbuck@dpf-law.com

Chris Kuhner, State Bar No. 173291
Kornfield, Nyberg, Bendes, Kuhner & Little, P.C.
1970 Broadway, Suite 225
Oakland, California 94612
Telephone: (510) 763-1000
Facsimile: (510) 273-8669
c.kuhner@kornfieldlaw.com

Attorneys for Creditor and Interested Party
Wantin Living Trust, dated March 2, 1999

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 18-50398 MEH |
| TECHSHOP, INC., | Chapter 7 |
| Debtor. | **DECLARATION OF MARISSA E. BUCK IN SUPPORT OF MOTION FOR AN ORDER CONFIRMING NO STAY IS IN EFFECT, OR ALTERNATIVELY FOR RELIEF FROM THE AUTOMATIC STAY** |
| | Date:<br>Time:<br>Place:  Courtroom 3020<br>         280 S. 1st Street<br>         San Jose, CA<br>Judge:   Hon. M. Elaine Hammond |

I, Marissa E. Buck, hereby declare as follows:

1.     I am an attorney at law, duly licensed to practice before all courts of the State of

California, including the United States Bankruptcy Court, Northern District of California.  I am

an associate at Dickenson, Peatman & Fogarty, counsel of record herein for Creditor and interested party, Wantin Living Trust, dated March 2, 1999 ("Creditor.")  I make this declaration in support of the Creditor's Motion for Order Confirming No Stay is in Effect, or Alternatively for Relief From the Automatic Stay (the "Motion.")  The following facts are true of my own personal knowledge and if called to testify as a witness, I could and would competently testify thereto.

2.      On April 25, 2018, I contacted the Chapter 7 Trustee's attorney, Gregg Kleiner, to discuss the bankruptcy case for TechShop, Inc. ("Debtor") as it relates to Creditor and the personal property that was abandoned at the commercial real property commonly known as 2415 Bay Rd., Redwood City, California 94063 (the "Property,") which is owned by Creditors and had been leased to TechShop Menlo Park, LLC, now known as TechShop Mid-Peninsula ("Tenant"). A true and correct copy of our email exchange is attached hereto as **Exhibit A.**  We discussed alternatives to motion practice as well as the motion for relief from stay.  The Trustee is aware of the instant motion and does not oppose it.

3.      After Creditor regained possession of the Property and discovered the substantial abandoned personal property, I assisted Creditor in researching other owners and lien holders, aside from Debtor and employees of Tenant, which may have an interest in the personal property.  Through my research, I discovered three UCC Financing Statements naming Tenant as the debtor, which are listed below.  True and correct copies of the UCC Financing Statements are attached hereto as **Exhibits B-D**.

    a.      Autodesk, Inc. filed a UCC Financing Statement on January 5, 2018, claiming an ownership interest in, among other property, "all equipment," "all goods," and "all instruments" belonging to TechShop;

    b.      FirstLease, Inc. filed a UCC Financing Statement on April 14, 2015, claiming an ownership interest in laser cutters and other related software and equipment; and

    c.      Stratasys, Inc. filed a UCC Financing Statement on August 28, 2015, claiming an ownership interest in a 3D printer and a support cleaning

1    apparatus.

2    4.    The liens described above were not discovered until after the bankruptcy action
3    had been initiated, thus Creditor has not yet sent a copy of the Notice of Abandonment of
4    Personal Property to the lien holders listed above due to the automatic stay.  However, Creditor
5    seeks leave from the automatic stay in part to allow such notices to be sent out and the public
6    auction of the abandoned personal property to proceed after the required notice period has
7    passed.

8

9    I declare under penalty of perjury under the laws of the United States of America that the
10   foregoing matters are true and correct to the best of my knowledge and that this declaration was
11   executed on May 29, 2018 at Napa, California.

12

13   _____
14                Marissa Buck

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF MARISSA E. BUCK

# EXHIBIT A

## Marissa Buck

| | |
|---|---|
| **From:** | Marissa Buck |
| **Sent:** | Tuesday, May 15, 2018 4:36 PM |
| **To:** | 'Gregg Kleiner' |
| **Cc:** | Doris; WANR001.00001.email.ATTORNEY@longfin.dpfnapa-int.net |
| **Subject:** | RE: Techshop, Inc. - Case No. 18-50398 Redwood City |

Gregg,

When you and I spoke on the phone it was my understanding that we needed to file a RFS motion either way – is that not correct? We are in the process of preparing that motion, however, I will check with my client to see if he has a turnkey tenant that would work. If we were able to find such a tenant (I believe my client was in contact with a potential tenant who was interested) and structure a no reps or warranty sale agreement with the trustee, would that avoid the need for the RFS motion? I assume the trustee would still file a stipulation or something reflecting any agreement we reach with the court.

Thank you for clarifying.

Best,
**MARISSA E. BUCK, ESQ.**
**707.261.7074 | MBUCK@DPF-LAW.COM**

**From:** Gregg Kleiner [mailto:gkleiner@rinconlawllp.com]
**Sent:** Friday, May 11, 2018 5:43 PM
**To:** Marissa Buck
**Cc:** Doris; WANR001.00001.email.ATTORNEY@longfin.dpfnapa-int.net
**Subject:** RE: Techshop, Inc. - Case No. 18-50398 Redwood City

Marissa,

When we spoke with your client last month we left things with him (i) that he would file a RFS motion or (ii) that if he located a turnkey tenant, he would work with the trustee to try and structure an "as is" no reps or warranty sale agreement.

I assume no tenant has been located.

Gregg

Gregg S. Kleiner
Rincon Law LLP
(415) 840-6385 (Direct)
(415) 672-5181 (Main)
(415)-996-8180 (Cell)
gkleiner@rinconlawllp.com

**From:** Marissa Buck <mbuck@dpf-law.com>
**Sent:** Monday, April 30, 2018 4:44 PM
**To:** Gregg Kleiner <gkleiner@rinconlawllp.com>
**Cc:** Doris <dktrustee@gmail.com>; WANR001.00001.email.ATTORNEY@longfin.dpfnapa-int.net
**Subject:** RE: Techshop, Inc. - Case No. 18-50398 Redwood City

Gregg,

Below is the information from Harry regarding the storage costs for the abandoned personal property in the building.

As of the date the bankruptcy case was filed, the lease had been terminated and TechShop Mid-peninsula (or TechShop Menlo Park as it is referred to in the bankruptcy schedules) had vacated the building. TechShop, Inc. was not a co-signer or guarantor of the lease. However, TechShop. Inc. does list the Wantin Living Trust (our client) as an unsecured creditor in its schedules for various rental amounts and insurance on that building in 2017. It is my understanding that TechShop Mid-peninsula failed to pay the November 2017 rent in the amount of $37,737.00, which triggered the termination of their month-to-month lease. They vacated the building by the end of October 2017.

The storage costs have accrued from November 1, 2017 through April 30, 2018, and will continue to accrue until the date we can sell the abandoned property at auction. The personal property is currently being stored in the building itself, and accounts for 60% of the square footage of the building. Thus, consistent with Civil Code section 1993, the cost for storage is the fair rental value of the space reasonably required for storage, which is equal to 60% of the rental value of the building, or 60% of $37,737.00 – which equals $22,642.20 per month. Multiplied by six months, the current storage fees equal $135,853.20 as of today's date.

There are also two additional items I wanted to inform the Trustee of: .

1. Prior to the bankruptcy filing, we served and posted the notice of abandonment of personal property and some former employees and members of the company came to claim small personal items that were kept in lockers on the premises. At one point Mr. James Newton of TechShop, Inc. had a key to the building in order to coordinate with employees who needed to come pick up personal belongings. He informed my client that he also gave a copy of the key to a "trusted employee" to assist in the process. However, my client noticed a few weeks later that some large items were missing and when he tried to contact Mr. Newton to inquire about the items he could not locate him. Out of an abundance of caution, my client changed the locks on the building. My client took photos of all the items in the building prior to this incident, thus it appears there are missing: two welding machines, a box that contained approximately 15 laptop computers, and a large printer. Since we have been unable to reach Mr. Newton, I thought it best that the Trustee be informed of this. My client has not yet filed a police report. Please advise if these items that were removed belonged to TechShop, Inc. and/or Mr. Newton and were properly removed or if we should assume such items were stolen and proceed with filing a police report.

2. We also discovered three lien holders that filed UCC financing statements naming TechShop Mid-peninsula as the debtor, and plan to send them the notice of abandoned property in case they have a right to any of the items and would like to claim such items prior to the auction (it is unclear from the UCC filings). The creditors are FirstLease, Inc., Stratasys, Inc., and AutoDesk, Inc.

Please let me know if you have any questions.

Best,
**MARISSA E. BUCK, ESQ.**
**707.261.7074 | MBUCK@DPF-LAW.COM**

**From:** Gregg Kleiner [mailto:gkleiner@rinconlawllp.com]
**Sent:** Wednesday, April 25, 2018 1:17 PM
**To:** Marissa Buck
**Cc:** Doris
**Subject:** RE: Techshop, Inc. - Case No. 18-50398 Redwood City

Marissa,

Look forward to getting the info from Harry.

Gregg

Gregg S. Kleiner
Rincon Law LLP
(415)-996-8180
gkleiner@rinconlawllp.com

**From:** Marissa Buck <mbuck@dpf-law.com>
**Sent:** Wednesday, April 25, 2018 11:12 AM
**To:** Gregg Kleiner <gkleiner@rinconlawllp.com>
**Cc:** WANR001.00001.email.ATTORNEY@longfin.dpfnapa-int.net
**Subject:** Techshop, Inc. - Case No. 18-50398

Hi Gregg,

Thank you again for speaking with me about the TechShop bankruptcy case this morning. My contact information is below.

As discussed, I will ask Harry to send you the information Doris requested and we will prepare and file a motion for relief from the automatic stay. After Harry sends you those numbers, let me know if you have any questions or if you need anything else from us.

Best,
**MARISSA E. BUCK, ESQ.**
DICKENSON, PEATMAN & FOGARTY
1455 FIRST STREET, STE. 301 | NAPA, CA 94559
T: 707.252.7122 | F: 707.255.6876
D: 707.261.7074
MBUCK@DPF-LAW.COM | WWW.DPF-LAW.COM

For current wine industry news, visit www.lexvini.com

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply e-mail, by forwarding this to dpf@dpf-law.com or by telephone at (707) 252-7122, and destroy the original transmission and its attachments without reading or saving in any manner. Thank you.

# EXHIBIT B

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**18-7626032227**

**01/05/2018 12:03**

**FILED**

CALIFORNIA
SECRETARY OF STATE

SOS

66827520003    UCC 1 FILING

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
WILSON SONSINI GOODRICH & ROSATI, P.C.    (415) 947-2000

**B. E-MAIL CONTACT AT FILER (optional)**
qlu@wsgr.com

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

COGENCY GLOBAL INC
1325 J Street, Suite 1550
Sacramento, CA 95814
P6-75981393    *LQC2927-2*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| TechShop Mid-Peninsula, LLC | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 120 Independence Drive | Menlo Park | CA | 94025 | | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Autodesk, Inc. | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 111 McInnis Parkway | San Rafael | CA | 94903 | | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

The collateral as set forth in that certain Second Amended and Restated Security Agreement, dated as of March 12, 2013 by and between Debtor and Secured Party (the "Security Agreement"), including all right, title, interest, claims and demands of Debtor in and to the following property: (i) All Accounts; (ii) All Chattel Paper; (iii) All Commercial Tort Claims; (iv) All Deposit Accounts and cash; (v) All Documents; (vi) All Equipment; (vii) All General Intangibles; (viii) All Goods; (ix) All Instruments; (x) All Intellectual Property, including without limitation, all Trademarks together with all goodwill of the business symbolized by and conducted therewith and all Trademark Licenses; (xi) All Inventory; (xii) All Investment Property, including, without limitation, securities; (xiii) All Letter-of-Credit Rights; (xiv) To the extent not otherwise included, all Proceeds and products of any and all of the foregoing, and all accessions to, substitutions and replacements for, and rents and profits of each of the foregoing.

The collateral covered by this financing statement is further described on the attached Exhibit A.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, Item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
Filed with: CA - Secretary of State

F#612524
A#845489

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

## Exhibit A

Description of Collateral Covered by Financing Statement (Item 4):

The collateral as set forth in that certain Second Amended and Restated Security Agreement, dated as of March 12, 2013 by and between Debtor and Secured Party (the "Security Agreement"), including all right, title, interest, claims and demands of Debtor in and to the following property: (i) All Accounts; (ii) All Chattel Paper; (iii) All Commercial Tort Claims; (iv) All Deposit Accounts and cash; (v) All Documents; (vi) All Equipment; (vii) All General Intangibles; (viii) All Goods; (ix) All Instruments; (x) All Intellectual Property, including without limitation, all Trademarks together with all goodwill of the business symbolized by and conducted therewith and all Trademark Licenses; (xi) All Inventory; (xii) All Investment Property, including, without limitation, securities; (xiii) All Letter-of-Credit Rights; (xiv) To the extent not otherwise included, all Proceeds and products of any and all of the foregoing, and all accessions to, substitutions and replacements for, and rents and profits of each of the foregoing.

The term "Intellectual Property" means all intellectual and similar property of every kind and nature now owned or hereafter acquired by Debtor, including inventions, designs, patents (whether registered or unregistered), copyrights (whether registered or unregistered), Trademarks, trade secrets, domain names, confidential or proprietary technical and business information, know how, methods, processes, drawings, specifications or other data or information and all memoranda, notes and records with respect to any research and development, software and databases and all embodiments or fixations thereof whether in tangible or intangible form or contained on magnetic media readable by machine together with all such magnetic media and related documentation, registrations and franchises, and all additions, improvements and accessions to, and books and records describing or used in connection with, any of the foregoing.

The term "Trademark" means all trademarks whether registered or unregistered, trademark registrations, trade names and trademark applications for any of the foregoing in the United States Patent and Trademark Office or in any other office or with any other official anywhere in the world or which are used in the United States or any state, territory or possession thereof, or in any other place, nation or jurisdiction anywhere in the world, including, without limitation, the trademarks, trademark registrations, service marks, service mark registrations and applications listed on Schedule A to the Security Agreement and (i) all renewals thereof, (ii) all income, royalties, damages and payments now and hereafter due and/or payable with respect thereto, including, without limitation, payments under all licenses entered into in connection therewith and damages and payments for past or future infringements thereof, (iii) the right to sue for past, present and future infringements thereof, and (iv) all other rights corresponding thereto throughout the world.

The term "Trademark License" means any agreement, written or oral, providing for the grant by or to Debtor of any right to use any Trademark, including, without limitation, any such agreement referred to in Schedule A of the Security Agreement as such Schedule shall be amended from time to time, and the right to prepare for sale, sell and advertise for sale, all of the inventory now or hereafter owned by a Company Party and now or hereafter covered by such license agreements.

All capitalized terms used in this Financing Statement and not otherwise defined herein shall have the respective meanings given to such terms in the Uniform Commercial Code of the State of California as in effect from time to time.

# EXHIBIT C

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>Corporation Service Company<br>800-858-5294 | |
| **B. E-MAIL CONTACT AT FILER (optional)** | |
| **C. SEND ACKNOWLEDGMENT TO: (Name and Address)**<br>Corporation Service Company<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62703<br>USA | **DOCUMENT NUMBER: 48300920002**<br>**FILING NUMBER: 15-7459651821**<br>**FILING DATE: 04/14/2015 07:31**<br><br>IMAGE GENERATED ELECTRONICALLY FOR XML FILING<br>THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY |

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| OR | **1a. ORGANIZATION'S NAME**<br>Techshop Mid-Peninsula, LLC | | | | |
| | **1b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| **1c. MAILING ADDRESS**<br>2415 Bay Road | **CITY**<br>Redwood City | **STATE**<br>CA | **POSTAL CODE**<br>940633032 | | **COUNTRY**<br>USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| OR | **2a. ORGANIZATION'S NAME** | | | | |
| | **2b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| **2c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | | **COUNTRY** |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | | | |
|---|---|---|---|---|---|
| OR | **3a. ORGANIZATION'S NAME**<br>FirstLease, Inc. | | | | |
| | **3b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| **3c. MAILING ADDRESS**<br>1300 Virginia Drive Suite 450 | **CITY**<br>Fort Washington | **STATE**<br>PA | **POSTAL CODE**<br>19034 | | **COUNTRY**<br>USA |

4. COLLATERAL: This financing statement covers the following collateral:
Contract between FirstLease, Inc. and Techshop Mid-Peninsula, LLC and Equipment as more fully described below, together with all substitutions, replacements, and accessions thereto and insurance thereon and all proceeds of any nature thereof.

(1) Universal Laser Systems VLS 4.60 Platform Laser
Includes: Universal Control Panel Software
(1) ULS Focusing Lens Kit 2.0" for VLS-Platform
(1) ULS 60 Watt CO2 Laser
(1) ULS Downdraft Cutting Table for VLS4.60
(1) ULS Coaxial Air Assist For VLS Platform (1.5" and 2.0" Lens)

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box: |
|---|---|
| ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien  ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
3739 [98464664]

**FILING OFFICE COPY**

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

| | |
|---|---|
| 9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because individual Debtor name did not fit, check here ☐ | |

| OR | 9a. ORGANIZATION'S NAME<br>Techshop Mid-Peninsula, LLC | |
| | 9b. INDIVIDUAL'S SURNAME | |
| | FIRST PERSONAL NAME | |
| | ADDITIONAL NAME(S)/INTITAL(S) | SUFFIX |

**DOCUMENT NUMBER: 48300920002**

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| OR | 10a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| | 10b. INDIVIDUAL'S SURNAME | | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| 10c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| OR | 11a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| | 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 11c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (collateral):
(1) ULS High Value Materials Package
(1) ULS Direct Import Software Feature

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT:<br>☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing. |
|---|---|
| 15. Name and address of RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

17. MISCELLANEOUS:

**FILING OFFICE COPY**

**EXHIBIT D**

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br><br>952-906-2294 | |
| **B. E-MAIL CONTACT AT FILER (optional)** | |
| **C. SEND ACKNOWLEDGMENT TO: (Name and Address)**<br>Stratasys Inc.<br>7665 Commerce Way<br>Eden Prairie, MN 55344<br>USA | **DOCUMENT NUMBER:** 50176110002<br>**FILING NUMBER:** 15-7477050450<br>**FILING DATE:** 07/28/2015 10:25<br><br>IMAGE GENERATED ELECTRONICALLY FOR WEB FILING<br>THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY |

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| OR | 1a. ORGANIZATION'S NAME<br>TechShop Mid Peninsula | | | | |
|---|---|---|---|---|---|
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | 1c. MAILING ADDRESS<br>2415 Bay Rd | CITY<br>Redwood City | STATE<br>CA | POSTAL CODE<br>94063-3032 | COUNTRY<br>USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| OR | 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| OR | 3a. ORGANIZATION'S NAME<br>Stratasys Inc. | | | | |
|---|---|---|---|---|---|
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | 3c. MAILING ADDRESS<br>7665 Commerce Way | CITY<br>Eden Prairie | STATE<br>MN | POSTAL CODE<br>55344 | COUNTRY<br>USA |

4. COLLATERAL: This financing statement covers the following collateral:
680-50100 uPrint SE 3D Printer
570-10006 SCA 1200HT Sation, 110/220V

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions)   ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box: |
|---|---|
| ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien  ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
US30438

FILING OFFICE COPY

David Balter, State Bar No. 212027
Marissa E. Buck, State Bar No. 293373
DICKENSON, PEATMAN & FOGARTY
A Professional Corporation
1455 First Street, Suite 301
Napa, California 94559
Telephone: (707) 252-7122
Facsimile: (707) 255-6876
dbalter@dpf-law.com
mbuck@dpf-law.com

Chris Kuhner, State Bar No. 173291
Kornfield, Nyberg, Bendes, Kuhner & Little, P.C.
1970 Broadway, Suite 225
Oakland, California 94612
Telephone: (510) 763-1000
Facsimile: (510) 273-8669
c.kuhner@kornfieldlaw.com

Attorneys for Creditor and Interested Party
Wantin Living Trust, dated March 2, 1999

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 18-50398 MEH |
| TECHSHOP, INC., | Chapter 7 |
| Debtor. | **DECLARATION OF HARRY PRICE IN SUPPORT OF MOTION FOR AN ORDER CONFIRMING NO STAY IS IN EFFECT, OR ALTERNATIVELY FOR RELIEF FROM THE AUTOMATIC STAY** |
| | Date:<br>Time:<br>Place:  Courtroom 3020<br>            280 S. 1st Street<br>            San Jose, CA<br>Judge:   Hon. M. Elaine Hammond |

I, Harry Price, hereby declare as follows:

1.    I am the President of CDI Development and Realty, Inc., which is the property manager for the Wantin Living Trust, dated March 2, 1999 ("Creditor"). I make this declaration in support of the Creditor's Motion for Order Confirming No Stay is in Effect, or Alternatively

for Relief From the Automatic Stay (the "Motion.")  The following facts are true of my own personal knowledge and if called to testify as a witness, I could and would competently testify thereto.

        2.      Creditor owns the commercial real property commonly known as 2415 Bay Rd., Redwood City, California 94063 (the "Property.")

        3.      In on around January 2015, Creditor entered into a written lease for the Property with TechShop Menlo Park, LLC, now known as TechShop Mid-Peninsula ("Tenant"). TechShop, Inc. ("Debtor") did not guaranty the lease and there was no guaranty signed by the Debtor, or any individual principal of the Tenant or Debtor.  However, the lease was signed by James Newton as Chairman of TechShop, Inc., sole member of TechShop Menlo Park, LLC.  A true and correct copy of the lease is attached hereto as **Exhibit A**.

        4.      In or around January 2016, Tenant stopped paying rent on time and continued to have issues paying rent throughout 2016 and 2017.  By September 2017, Tenant owed Creditor approximately $300,000.00 in unpaid rent, late fees, and interest.  After many discussions with the Tenant's CEO and CFO, Creditor and Tenant agreed to terminate the lease and enter into a new month-to-month lease that would terminate upon non-payment of rent for any month.  The parties entered into the new lease on September 30, 2017 and Tenant paid rent in full for the month of October 2017.

        5.      Tenant failed to pay rent when due on November 1, 2017, thus the lease was terminated.  Shortly thereafter, on November 15, 2017, I received an email from Debtor's CEO, Dan Woods, informing me that Debtor was going out of business and all TechShop locations would be closing.  I understood from Mr. Woods' email that Tenant was abandoning the Property and planned to vacate the Property immediately.  A true and correct copy of the November 15, 2017 email is attached hereto as **Exhibit B**.

        6.      After the Tenant vacated the Property, Creditor discovered Tenant had abandoned most of its fixtures and various other items of personal property, including: metal and wood working equipment and supplies; computers, servers, printers, phones, and other electronic equipment; various hand tools, nuts, bolts, and screws; 3D printers; desks, chairs, filing cabinets,

DECLARATION OF HARRY PRICE        2

and other storage cabinets; and various vehicles and automobile parts including a "TechShop" pick-up truck. My assistant, John Bennett, took photos of the abandoned personal property to create an inventory. Such photos are quite voluminous and are thus not attached hereto.

7. On or around November 18, 2018, Mr. Woods contacted me and requested that I reach out to Dan Rasure regarding a possible sale of TechShop's interest, along with the lease of the Property. I contacted Mr. Rasure as requested, but after a couple months of negotiations we were unable to come to an agreement regarding the sale of Debtor's interest and the lease of the Property.

8. Pursuant to California law, on January 29, 2018, Creditor sent Tenant a letter and Notice of Abandonment of Personal Property, and also posted the Notice on the door of the Property where it was easily visible to those outside the building. The Notice is still posted on the Property. Pursuant to California law, the Notice required that all personal property must be claimed and storage fees paid by February 18, 2018. A true and correct copy of my letter and Notice of Abandonment are attached hereto as **Exhibit C**.

9. Over the next few weeks, some of Tenant's employees came to the Property to claim small personal items left in lockers on the Property. Mr. Bennett and I allowed the employees to recover the items from the lockers upon proof of possession of the key to such locker, and required that the employees show a valid form of identification and sign a waiver and acknowledgment of receipt upon taking the personal property from their lockers. One individual also informed me that he owned an automobile hoist located on the Property, but I have not released it as he was unable to provide proof of ownership.

10. In addition to Tenant's employees, I was also contacted by Debtor's Chairman, James Newton, who requested a key to the building in order to assist employees in recovering items left in the Property. I gave him the code to the lock box that contained the key to the Property. However, sometime thereafter Mr. Bennett and I noticed that several large items were missing from the Property including: two welding machines, a box that contained approximately 15 laptop computers, and one large printer. I have been unable to reach Mr. Newton since then

DECLARATION OF HARRY PRICE                                                                 3

to confirm whether he removed the items, gave them to their owner, or if such items were stolen. In an abundance of caution, Creditor changed the locks on the building following this incident.

11. On February 26, 2018, Debtor filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code and initiated the above-titled bankruptcy case. As of the date of the bankruptcy filing, reasonable storage costs in the amount of approximately $90,500.00 had accrued and are secured by the abandoned property. Reasonable storage costs continue to accrue in the amount of $22,642.00 per month and total $158,494.00 as of May 31, 2018.

12. I received an email on February 27, 2018 from Debtor's counsel giving notice of the bankruptcy filing, which provided contact information for the Chapter 7 Trustee, Doris Kaelin. In the following weeks, I contacted Ms. Kaelin by phone to try to determine what assets in the Property belong to the Debtor and if there were any liens against those assets. Ms. Kaelin and I exchanged emails on March 30, 2018, which also included her counsel, Gregg Kleiner. A true and correct copy of the March 30, 2018 email chain is attached hereto as **Exhibit D**. I had my counsel, Marissa Buck, follow-up with Mr. Kleiner and such discussions are included in her declaration filed concurrently herewith.

13. Creditor cannot, at reasonable cost, dismantle, move and store the many tools, equipment and machinery abandoned at the Property, many of which are large, heavy and fragile enough to require specialized expertise and equipment to safely uninstall and remove. Creditor also cannot lease the entire Property while the abandoned property is inside as it takes up approximately 60% of the space inside the Property. Given the foregoing, Creditor has suffered and continues to suffer damages arising from and relating to its inability to re-let the Property.

14. On May 3, 2018, Creditor discovered that the Property had been broken into and some of the smaller items that were easy to carry off had been removed. The burglars also vandalized the inside of the Property. Creditor immediately repaired the broken doors and windows and is in the process of installing an alarm system on the Property that Tenant was supposed to install but never did. There was a second break-in at the Property that was discovered on May 8, 2018, and Creditor again boarded of the windows to protect the personal property inside. Both incidents were reported to the police.

DECLARATION OF HARRY PRICE                                                                 4

1      15.    Creditor would like to re-locate certain personal property consisting of hardware

2  supplies and miscellaneous equipment to the east side of the Property, in order to do repairs on

3  the approximately 67,000 square feet in the west end of the Property, which was previously

4  leased to a different tenant. Creditor would like to prepare this space for lease to a new tenant to

5  mitigate any further losses while waiting for the completion of the sale of the personal property

6  by public auction.

7      16.    Creditor has taken no further action to dispossess itself of the abandoned property

8  and continues to store it all at the Property, which imposes substantial burden on Creditor as it is

9  unable to re-let the entire Property costing Creditor tens of thousands of dollars per month.

10

11      I declare under penalty of perjury under the laws of the United States of America that the

12  foregoing matters are true and correct to the best of my knowledge and that this declaration was

13  executed on May 29, 2018 at _____ Napa _____, California.

14

15  _____ Harry Price _____

16            Harry Price

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF HARRY PRICE        5

# EXHIBIT A

# AIR COMMERCIAL REAL ESTATE ASSOCIATION
## STANDARD INDUSTRIAL/COMMERCIAL SINGLE-TENANT LEASE – NET
### (DO NOT USE THIS FORM FOR MULTI-TENANT BUILDINGS)

**1. Basic Provisions ("Basic Provisions").**

1.1 Parties: This Lease ("Lease"), dated for reference purposes only December 17, 2014 _____ _____
is made by and between Mangan Living Trust _____ _____ _____ ("Lessor")
and TechShop Menlo Park LLC _____ _____ _____ _____ ("Lessee"),
(collectively the "Parties," or individually a "Party").

1.2 Premises: That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease,
and commonly known as 2415 Bay Road, Redwood City, containing 21,564 square feet _____ .
located in the County of San Mateo _____ , State of California _____ .
and generally described as (describe briefly the nature of the property and, if applicable, the "Project", if the property is located within a Project)
a single story R&D building and 54 parking spaces as shown on the attached site plan.
_____ _____ _____ _____ _____ _____
_____ _____ _____ ("Premises"). (See also Paragraph 2)

1.3 Term: 10 years and 0 months ("Original Term") commencing January 1, 2015 _____
("Commencement Date") and ending 10 years following Commencement Date ("Expiration Date"). (See also Paragraph 3)

1.4 Early Possession: If the Premises are available Lessee may have non-exclusive possession of the Premises commencing ("Early Possession Date"). (See also Paragraphs 3.2 and 3.3)

1.5 Base Rent: $ _____ per month ("Base Rent"), payable on the 1st _____ day of
each month commencing upon Lease Commencement (see paragraph 51 of Addendum) _____ . (See also Paragraph 4)

☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph _____

1.6 Base Rent and Other Monies Paid Upon Execution:

  (a) Base Rent: $24,500.00 _____ for the period of the first month's base rent _____

  (b) Security Deposit: $37,737.00 _____ ("Security Deposit"). (See also Paragraph 5)

  (c) Association Fees: $ _____ for the period _____

  (d) Other: $ _____ for _____

  (e) Total Due Upon Execution of this Lease: $62,237.00 _____ .

1.7 Agreed Use: Member based do it yourself workshop and technology center and any
related lawful use _____ . (See also Paragraph 6)

1.8 Insuring Party: Lessor is the "Insuring Party" unless otherwise stated herein. (See also Paragraph 8)

1.9 Real Estate Brokers: (See also Paragraph 15 and 25)

  (a) Representation: The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check applicable boxes):

☑ Matt Germano of CBRE _____ represents Lessor exclusively ("Lessor's Broker");
☑ Kevin Delehanty & Jon Mackey of Newmark C&C _____ represents Lessee exclusively ("Lessee's Broker"); or
☐ _____ represents both Lessor and Lessee ("Dual Agency").

  (b) Payment to Brokers: Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers for the brokerage services rendered by the Brokers the fee agreed to in the attached separate written agreement or if no such agreement is attached, the sum of
_____ or _____ % of the total Base Rent payable for the Original Term, the sum of _____ or _____ of the total Base Rent payable during any period of time that the Lessee occupies the Premises subsequent to the Original Term, and/or the sum of _____
or _____ % of the purchase price in the event that the Lessee or anyone affiliated with Lessee acquires from Lessor any rights to the Premises.

1.10 Guarantor. The obligations of the Lessee under this Lease are to be guaranteed by _____ _____ ("Guarantor"). (See also Paragraph 37)

1.11 Attachments. Attached hereto are the following, all of which constitute a part of this Lease:
☑ an Addendum consisting of Paragraphs 51 _____ through 55 _____ ;
☐ a plot plan depicting the Premises;
☐ a current set of the Rules and Regulations;
☐ a Work Letter;
☐ other (specify): _____ _____ _____ _____
_____ _____ _____ _____ _____

**2. Premises.**

2.1 Letting. Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and

*R W*

**PAGE 1 OF 17**

**INITIALS**        **INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION      FORM STN-13-3/10E

upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different. Note: Lessee is advised to verify the actual size prior to executing this Lease.

    2.2    **Condition.** Lessor shall deliver the Premises to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading doors, sump pumps, if any, and all other such elements in the Premises, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of any buildings on the Premises (the "Building") shall be free of material defects, and that the Premises do not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. If a non-compliance with said warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Building. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense.

    2.3    **Compliance.** Lessor warrants that to the best of its knowledge the improvements on the Premises comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("Applicable Requirements") that were in effect at the time that each improvement, or portion thereof, was constructed. Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 50), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. NOTE: Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning, are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed. If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense. If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

        (a) Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and an amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

        (b) If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date that on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises. Lessee shall pay interest on the balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

        (c) Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not, however, have any right to terminate this Lease.

    2.4    **Acknowledgements.** Lessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises made by Brokers or Lessor, (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein, and (f) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

    2.5    **Lessee as Prior Owner/Occupant.** The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective work.

$\mathcal{R}\mathcal{W}$
**INITIALS**

$\textcircled{N}$
**INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

Case: 18-50398   Doc# 111-1   Filed: 06/01/18   Entered: 06/01/18 15:37:45   Page 34 of 62

3. **Term.**

3.1   Terms. The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2   Early Possession. Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date. Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises. If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession. All other terms of this Lease (including but not limited to the obligations to pay Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period. Any such Early Possession shall not affect the Expiration Date.

3.3   Delay In Possession. Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or change the Expiration Date. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, as the same may be extended under the terms of any Work Letter executed by Parties, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

3.4   Lessee Compliance. Lessor shall not be required to deliver possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

4.   **Rent.**

4.1.   Rent Defined. All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("Rent").

4.2   Payment. Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar. In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent, Insurance and Real Property Taxes, and any remaining amount to any other outstanding charges or costs.

4.3   Association Fees. In addition to the Base Rent, Lessee shall pay to Lessor each month an amount equal to any owner's association or condominium fees levied or assessed against the Premises. Said monies shall be paid at the same time and in the same manner as the Base Rent.

5.   Security Deposit. Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease.

6.   **Use.**

6.1   Use. Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles. Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements on the Premises or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Premises. If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

6.2   Hazardous Substances.

(a) Reportable Uses Require Consent. The term "Hazardous Substance" as used in this Lease shall mean any product,

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-13-3/10E

Case: 18-50398   Doc# 111-1   Filed: 06/01/18   Entered: 06/01/18 15:37:45   Page 35 of 62

substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any Applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substance without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. "Reportable Use" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b) Duty to Inform Lessor. If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c) Lessee Remediation. Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d) Lessee Indemnification. Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from adjacent properties not caused or contributed to by Lessee). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

(e) Lessor Indemnification. Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which result from Hazardous Substances which existed on the Premises prior to Lessee's occupancy or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f) Investigations and Remediations. Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of a Hazardous Substances on the Premises prior to Lessee's occupancy, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g) Lessor Termination Option. If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3 Lessee's Compliance with Applicable Requirements. Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the such Requirements, without regard to whether such Requirements are now in effect or become effective after the Start Date. Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any

RW
INITIALS

© 2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM STN-13-3/10E

**7. Maintenance; Repairs; Utility Installations; Trade Fixtures and Alterations.**

**7.1 Lessee's Obligations.**

(a) In General. Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fire protection system, fixtures, walls (interior and exterior), foundations, ceilings, roofs, roof drainage systems, floors, windows, doors, plate glass, skylights, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks and parkways located in, on, or adjacent to the Premises. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below. Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair. Lessee shall, during the term of this Lease, keep the exterior appearance of the Building in a first-class condition (including, e.g. graffiti removal) consistent with the exterior appearance of other similar facilities of comparable age and size in the vicinity, including, when necessary, the exterior repainting of the Building.

(b) Service Contracts. Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler, and pressure vessels, (iii) fire extinguishing systems, including fire alarm and/or smoke detection, (iv) landscaping and irrigation systems, (v) roof covering and drains, and (vi) clarifiers. However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c) Failure to Perform. If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof.

(d) Replacement. Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (ie. 1/144th of the cost per month). Lessee shall pay interest on the unamortized balance but may prepay its obligation at any time.

**7.2 Lessor's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 9 (Damage or Destruction) and 14 (Condemnation), it is intended by the Parties hereto that Lessor have no obligation, in any manner whatsoever, to repair and maintain the Premises, or the equipment therein, all of which obligations are intended to be that of the Lessee. It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises, and they expressly waive the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

**7.3 Utility Installations; Trade Fixtures; Alterations.**

(a) Definitions. The term "Utility Installations" refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "Trade Fixtures" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "Alterations" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "Lessee Owned Alterations and/or Utility Installations" are defined as Alterations and/or Utility Installations made by Lessee that are not owned by Lessor pursuant to Paragraph 7.4(a).

(b) Consent. Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Alterations or Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year. Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-13-3/10E

INITIALS
INITIALS

Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c) Liens; Bonds. Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4    Ownership; Removal; Surrender; and Restoration.

(a) Ownership. Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b) Removal. By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c) Surrender; Restoration. Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if this Lease is for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall completely remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Premises) even if such removal would require Lessee to perform or pay for work that exceeds statutory requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8.    Insurance; Indemnity.

8.1    Payment For Insurance. Lessee shall pay for all insurance required under Paragraph 8 except to the extent of the cost attributable to liability insurance carried by Lessor under Paragraph 8.2(b) in excess of $2,000,000 per occurrence. Premiums for policy periods commencing prior to or extending beyond the Lease term shall be prorated to correspond to the Lease term. Payment shall be made by Lessee to Lessor within 10 days following receipt of an invoice.

8.2    Liability Insurance.

(a) Carried by Lessee. Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000. Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b) Carried by Lessor. Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

8.3    Property Insurance - Building, Improvements and Rental Value.

(a) Building and Improvements. The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee not by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $5,000 per occurrence, and Lessee shall be

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-13-3/10E

liable for such deductible amount in the event of an Insured Loss.

(b) Rental Value. The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value Insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period. Lessee shall be liable for any deductible amount in the event of such loss.

(c) Adjacent Premises. If the Premises are part of a larger building, or of a group of buildings owned by Lessor which are adjacent to the Premises, the Lessee shall pay for any increase in the premiums for the property insurance of such building or buildings if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

6.4    Lessee's Property; Business Interruption Insurance; Worker's Compensation Insurance.

(a) Property Damage. Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations. Lessee shall provide Lessor with written evidence that such insurance is in force.

(b) Business Interruption. Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c) Worker's Compensation Insurance. Lessee shall obtain and maintain Workers' Compensation insurance in such amount as may be required by Applicable Requirements.

(d) No Representation of Adequate Coverage. Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

6.5    Insurance Policies. Insurance required herein shall be by companies maintaining during the policy term a "General Policyholders Rating" of at least A-, VII, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates with copies of the required endorsements evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "Insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

6.6    Waiver of Subrogation. Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

6.7    Indemnity. Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

6.8    Exemption of Lessor and its Agents from Liability. Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the building of which the Premises are a part, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom. Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 6.

6.9    Failure to Provide Insurance. Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

9      Damage or Destruction.

9.1    Definitions.

(a) "Premises Partial Damage" shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total. Notwithstanding the

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

foregoing, Premises Partial Damage shall not include damage to windows, doors, and/or other similar items which Lessee has the responsibility to repair or replace pursuant to the provisions of Paragraph 7.1.

(b) "Premises Total Destruction" shall mean damage or destruction to the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c) "Insured Loss" shall mean damage or destruction to improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d) "Replacement Cost" shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e) "Hazardous Substance Condition" shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance , in, on, or under the Premises which requires remediation.

9.2      Partial Damage - Insured Loss.  If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds (except as to the deductible which is Lessee's responsibility) as and when required to complete said repairs.  In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor.  If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect.  If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to:  (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter.  Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction.  Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3      Partial Damage - Uninsured Loss.  If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either:  (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage.  Such termination shall be effective 60 days following the date of such notice.  In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment.  In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available.  If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4      Total Destruction.  Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction.  If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5      Damage Near End of Term.  If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage.  Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires.  If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect.  If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6      Abatement of Rent; Lessee's Remedies.

(a) Abatement.  In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance.  All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b) Remedies.  If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice.  If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice.  If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect.  "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-13-3/10E

beginning of the actual work on the Premises, whichever first occurs.

9.7    **Termination; Advance Payments.** Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

10.    **Real Property Taxes.**

10.1    **Definition.** As used herein, the term "Real Property Taxes" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Premises or the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Building address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Premises are located. Real Property Taxes shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Premises, and (ii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.

10.2    **Payment of Taxes.** In addition to Base Rent, Lessee shall pay to Lessor an amount equal to the Real Property Tax installment due at least 20 days prior to the applicable delinquency date. If any such installment shall cover any period of time prior to or after the expiration or termination of this Lease, Lessee's share of such installment shall be prorated. In the event Lessee incurs a late charge on any Rent payment, Lessor may estimate the current Real Property Taxes, and require that such taxes be paid in advance to Lessor by Lessee monthly in advance with the payment of the Base Rent. Such monthly payments shall be an amount equal to the amount of the estimated installment of taxes divided by the number of months remaining before the month in which said installment becomes delinquent. When the actual amount of the applicable tax bill is known, the amount of such equal monthly advance payments shall be adjusted as required to provide the funds needed to pay the applicable taxes. If the amount collected by Lessor is insufficient to pay such Real Property Taxes when due, Lessee shall pay Lessor, upon demand, such additional sum as is necessary. Advance payments may be intermingled with other moneys of Lessor and shall not bear interest. In the event of a Breach by Lessee in the performance of its obligations under this Lease, then any such advance payments may be treated by Lessor as an additional Security Deposit.

10.3    **Joint Assessment.** If the Premises are not separately assessed, Lessee's liability shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be conclusively determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.

10.4    **Personal Property Taxes.** Lessee shall pay, prior to delinquency, all taxes assessed against and levied upon Lessee Owned Alterations, Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee. When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11.    **Utilities and Services.** Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. If any such services are not separately metered or billed to Lessee, Lessee shall pay a reasonable proportion, to be determined by Lessor, of all charges jointly metered or billed. There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

12.    **Assignment and Subletting.**

12.1    **Lessor's Consent Required.**

(a) Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "assign or assignment") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

(b) Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

(c) The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. "Net Worth of Lessee" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

(d) An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(c), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

(e) Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

f) Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

(g) Notwithstanding the foregoing, allowing a de minimis portion of the Premises, ie. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

12.2    **Terms and Conditions Applicable to Assignment and Subletting.**

(a) Regardless of Lessor's consent, no assignment or subletting shall: (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

R W
**INITIALS**

**PAGE 9 OF 17**

JN
**INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION    **FORM STN-13-3/10E**

(b) Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c) Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d) In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

(e) Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

(f) Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g) Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)

12.3    Additional Terms and Conditions Applicable to Subletting. The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent. In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b) In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c) Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d) No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e) Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice. The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

13.    Default; Breach; Remedies.

13.1    Default; Breach. A "Default" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease. A "Breach" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a) The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b) The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee. THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c) The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee.

(d) The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 42, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e) A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 40 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f) The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. §101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at

$\mathcal{RW}$
**INITIALS**

**INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION        FORM STN-13-3/10E

the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g) The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h) If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2    **Remedies.** If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor. In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor. In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent. Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover damages under Paragraph 12. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b) Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3    **Inducement Recapture.** Any agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "Inducement Provisions," shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4    **Late Charges.** Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater. The Parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5    **Interest.** Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due as to scheduled payments (such as Base Rent) or within 30 days following the date on which it was due for non-scheduled payment, shall bear interest from the date when due, as to scheduled payments, or the 31st day after it was due as to non-scheduled payments. The interest ("Interest") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6    **Breach by Lessor.**

(a) Notice of Breach. Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-13-3/10E

an obligation required to be performed by Lessor.  For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b) Performance by Lessee on Behalf of Lessor.  In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided, however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to seek reimbursement from Lessor for any such expense in excess of such offset.  Lessee shall document the cost of said cure and supply said documentation to Lessor.

14.     Condemnation.  If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "Condemnation"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs.  If more than 10% of the Building, or more than 25% of that portion of the Premises not occupied by any building, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession.  If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation.  Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph.  All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor.  In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

15.     Brokerage Fees.

15.1    Additional Commission.  If a separate brokerage fee agreement is attached then in addition to the payments owed pursuant to Paragraph 1.9 above, and unless Lessor and the Brokers otherwise agree in writing, Lessor agrees that:  (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires any rights to the Premises or other premises owned by Lessor and located within the same Project, if any, within which the Premises is located, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then,  Lessor shall pay Brokers a fee in accordance with the schedule attached to such brokerage fee agreement.

15.2    Assumption of Obligations.  Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder.  Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.9, 15, 22 and 31.  If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue interest.  In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent.  In addition,  Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.

15.3    Representations and Indemnities of Broker Relationships.  Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith.  Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

16.     Estoppel Certificates.

(a) Each Party (as "Responding Party") shall within 10 days after written notice from the other Party (the "Requesting Party") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "Estoppel Certificate" form published by the AIR Commercial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b) If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that:  (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance.  Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.

(c) If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years.  All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17.     Definition of Lessor.  The term "Lessor" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease.  In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor.  Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor.  Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

18.     Severability.  The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity

R W

**INITIALS**

**INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-13-3/10E

Case: 18-50398    Doc# 111-1    Filed: 06/01/18    Entered: 06/01/18 15:37:45    Page 44 of 62

of any other provision hereof.

19. **Days.** Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20. **Limitation on Liability.** The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

21. **Time of Essence.** Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22. **No Prior or Other Agreements; Broker Disclaimer.** This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

23. **Notices.**

    23.1 **Notice Requirements.** All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice. A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

    23.2 **Date of Notice.** Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier. Notices transmitted by facsimile transmission or similar means shall be deemed delivered upon telephone confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24. **Waivers.**

    (a) No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.

    (b) The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of moneys or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

    (c) THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

25. **Disclosures Regarding The Nature of a Real Estate Agency Relationship.**

    (a) When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

        (i) **Lessor's Agent.** A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only. A Lessor's agent or subagent has the following affirmative obligations: To the Lessor: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor. To the Lessee and the Lessor: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

        (ii) **Lessee's Agent.** An agent can agree to act as agent for the Lessee only. In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor. An agent acting only for a Lessee has the following affirmative obligations. To the Lessee: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee. To the Lessee and the Lessor: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

        (iii) **Agent Representing Both Lessor and Lessee.** A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee. In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee. b. Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii). In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered. The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-13-3/10E

protect their own interests. Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

        (b)    Brokers have no responsibility with respect to any default or breach hereof by either Party. The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

        (c)    Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

26.    **No Right To Holdover.** Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27.    **Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.    **Covenants and Conditions; Construction of Agreement.** All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

29.    **Binding Effect; Choice of Law.** This Lease shall be binding upon the Parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30.    **Subordination; Attornment; Non-Disturbance.**

      30.1    **Subordination.** This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "Security Device"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "Lender") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

      30.2    **Attornment.** In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new owner.

      30.3    **Non-Disturbance.** With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "Non-Disturbance Agreement") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

      30.4    **Self-Executing.** The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

31.    **Attorneys' Fees.** If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

32.    **Lessor's Access; Showing Premises; Repairs.** Lessor and Lessee's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect to Lessee's use of the Premises. All such activities shall be without abatement of rent or liability to Lessee.

33.    **Auctions.** Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34.    **Signs.** Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of

Case: 18-50398   Doc# 111-1   Filed: 06/01/18   Entered: 06/01/18 15:37:45   Page 46 of 62

the term hereof. Except for ordinary "for sublease" signs, Lessee shall not place any sign upon the Premises without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

35.    Termination; Merger. Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.    Consents. Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

37.    Guarantor.

37.1    Execution. The Guarantors, if any, shall each execute a guaranty in the form most recently published by the AIR Commercial Real Estate Association, and each such Guarantor shall have the same obligations as Lessee under this Lease.

37.2    Default. It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

38.    Quiet Possession. Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

39.    Options. If Lessee is granted an Option, as defined below, then the following provisions shall apply:

39.1    Definition. "Option" shall mean: (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

39.2    Options Personal To Original Lessee. Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.

39.3    Multiple Options. In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4    Effect of Default on Options.

(a) Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b) The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c) An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.

40.    Multiple Buildings. If the Premises are a part of a group of buildings controlled by Lessor, Lessee agrees that it will abide by and conform to all reasonable rules and regulations which Lessor may make from time to time for the management, safety, and care of said properties, including the care and cleanliness of the grounds and including the parking, loading and unloading of vehicles, and to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessee also agrees to pay its fair share of common expenses incurred in connection with such rules and regulations.

41.    Security Measures. Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

42.    Reservations. Lessor reserves to itself the right, from time to time, to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate any such easement rights, dedication, map or restrictions.

43.    Performance Under Protest. If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay. A Party who does not initiate suit for the recovery of sums paid "under protest" with 6 months shall be deemed to have waived its right to protest such payment.

44.    Authority; Multiple Parties; Execution.

*R W*

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-13-3/10E

(a) If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

(b) If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.

(c) This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

45. Conflict. Any conflict between the printed provisions of this Lease and typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

46. Offer. Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

47. Amendments. This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

48. Waiver of Jury Trial. THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

49. Arbitration of Disputes. An Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☐ is not attached to this Lease.

50. Americans with Disabilities Act. Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1. SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.

2. RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

WARNING: IF THE PREMISES IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES IS LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| Executed at: | San Carlos | Executed at: | Resorwood City |
| Date: | 12.26.19 | Date: | 12-24-19 |

| By LESSOR: | Wantin Living Trust | By LESSEE: | TechShop Menlo Park LLC |
| | | | By: TechShop, Inc., its sole member |

| By: | Reino J. Wantin | By: | |
| Name Printed: | Reino Wantin | Name Printed: | JAMES NEWTON |
| Title: | | Title: | CHAIR MAN |
| By: | Barbra R. Wantin | By: | |
| Name Printed: | Barbara R. Wantin | Name Printed: | |
| Title: | | Title: | |
| Address: | | Address: | |

| Telephone:( ) | | Telephone:( ) | |
| Facsimile:( ) | | Facsimile:( ) | |
| Email: | | Email: | |
| Email: | | Email: | |
| Federal ID No. | | Federal ID No. | |

| BROKER: | Cbre | BROKER: | Newmark Cornish & Carey |
| | Matt Green | | Kevin Delehanty |
| Attn: | Matt Green | Attn: | Kevin Delehanty |
| Title: | Senior Associate | Title: | Senior Vice President |

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-13-3/10E

| Address: _____ | Address: _____ |
|---|---|
| Telephone:(___) _____ | Telephone:(___) _____ |
| Facsimile:(___) _____ | Facsimile:(___) _____ |
| Email: _____ | Email: _____ |
| Federal ID No. _____ | Federal ID No. _____ |
| Broker/Agent DRE License #: _____ | Broker/Agent DRE License #: _____ |

NOTICE: These forms are often modified to meet changing requirements of law and industry needs. Always write or call to make sure you are utilizing the most current form: AIR Commercial Real Estate Association, 800 W 6th Street, Suite 800, Los Angeles, CA 90017. Telephone No. (213) 687-8777. Fax No.: (213) 687-8616.

© Copyright 2001 - By AIR Commercial Real Estate Association. All rights reserved.

No part of these works may be reproduced in any form without permission in writing.

$\mathcal{R}\omega$

**INITIALS**

**INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-13-3/10E

## ADDENDUM TO STANDARD INDUSTRIAL/COMMERCIAL SINGLE-TENANT LEASE – NET AGREEMENT

This Addendum to Standard Industrial/Commercial Single-Tenant Lease – Net Agreement ("Addendum") is attached to and is an integral part of that certain Standard Industrial/Commercial Single-Tenant Lease – Net Agreement (the "Lease") dated December 17, 2014 between Wantin Living Trust ("Lessor") and TechShop Menlo Park LLC ("Lessee") for the Premises commonly known as 2415 Bay Road, Redwood City, California. Capitalized terms used herein without definition will have the same meanings as in the Lease. In the event of any conflict between this Addendum and the remainder of the Lease, this Addendum shall control. Lessor and Lessee hereby agree that the terms of the Lease are amended and supplemented as follows:

### 51. NNN Base Rent Schedule:

| Year 1* | $24,500.00 p/mo. |
|---------|------------------|
| Year 2* | $24,500.00 p/mo. |
| Year 3  | $37,737.00 p/mo. |
| Year 4  | $37,737.00 p/mo. |
| Year 5  | $37,737.00 p/mo. |
| Year 6  | $39,893.00 p/mo. |
| Year 7  | $39,893.00 p/mo. |
| Year 8  | $39,893.00 p/mo. |
| Year 9  | $39,893.00 p/mo. |
| Year 10 | $39,893.00 p/mo. |

*Notwithstanding Sec. 1.5 of the Lease, during the first two (2) years of the Lease Term, Lessee shall only be responsible for paying Base Rent on 14,000 SF.

### 52. Options to Extend:

So long as Lessee is not in default of the Lease, Lessee shall have two (2) five (5) year Options to Extend the Term. Under the first Option period, the rate shall be flat and equal to 90% of the FMV for buildings of a similar Class in the submarket; or equal to the previous month's rent; whichever is greater. In no event shall the rent be more than 125% of the prior year's rate.

If exercised, the flat pricing over the second Option period shall be increased 10% over the previous month's rent.

### 53. Operating Expenses:

Notwithstanding anything to the contrary in the Lease (including, without limitation, the provisions of Section 10 of the Lease), Lessee shall not be obligated to pay any increase in Real Property Taxes over the first two years of the Lease Term. If there is an increase in Real Property Taxes due to the transfer of the Property during the Lease Term, then Lessee shall pay 20% of any such increase then in effect during the third year of the Lease, 40% of any such increase then in effect during the fourth year of the Lease, 60% of any such increase in effect during the fifth year of the Lease, 80% of any such increase in effect during the sixth year of the Lease and 100% of any such increase in effect during the seventh year of the Lease and thereafter.

### 54. Maintenance:

Notwithstanding anything to the contrary in the Lease (including, without limitation, the provisions of Sections 2.2 and 7 of the Lease), Lessor, at its sole cost and expense, shall replace any HVAC unit that fails during the Lease Term. The HVAC units will be replaced with 'like' product type, brand and tonnage of the existing units. The Lessor shall not be responsible for any duct work or relocation of the units. The Lessor shall only replace each unit once during the Lease Term and any extension thereafter.

Notwithstanding anything to the contrary in the Lease (including, without limitation, the provisions of Section 7 of the Lease), the Lessor, at its sole cost and expense, shall repair and maintain the foundation, structural portions of the Premises, the roof and the roofing membrane.

DB04/0830929.0004/11590824.4 MD22





**55. Payment of Rent:**

The initial payment of rent and Security Deposit may be made via check, but subsequent rent payments shall be paid via wire transfer or direct deposit to the Account of Wantin Living Trust per Lessor's instructions.

**56. Agreed Use:**

The Agreed Use of the Premises as a member based do-it-yourself workshop and technology innovation center shall include, without limitation, use of the Premises for (i) design, engineering, machining, fabrication, electronics, prototyping, arts and crafts, textiles, woodworking, metalworking, automotive restoration and similar activities, (ii) providing educational and training classes, (iii) providing tools and equipment, including without limitation, computer numerical control machines (including lathes and milling machines), electronic equipment, fabrication, laser/plasma cutters, water jet cutters, welding equipment, saws, drill presses and other power tools and hand tools, (iv) licensing or rental of portions of the Premises (but not all, or substantially all, in the aggregate), including bays, rooms, office, lockers and other designated areas, to provide segregated, secure or private work and ancillary use areas, (v) hosting events and activities, (vi) the operation of a retail store for the sale of tools, materials and equipment, and (vii) operation of a hospitality service center for storing, staging, and serving of food and drink at the Premises. Lessor acknowledges that the Agreed Use involves use of certain materials which might be considered Hazardous Substances under Section 6 of the Lease. Lessor further acknowledges that Lessee has provided Lessor with a list of materials used in the normal operation of Lessee's business, and Lessor hereby consents to the use of such materials in the Premises.

**57. Permitted Licenses:**

Notwithstanding anything to the contrary in the Lease, including, without limitation, the provisions of Section 12 of the Lease, Lessor and Lessee agree that Lessee may license, or rent bays, lockers and other designated areas (including offices or rooms) to provide segregated, secure or private work and ancillary use areas to Lessee's members and other users in the ordinary course of Tenant's business (herein individually a "Permitted License" and collectively "Permitted Licenses" ) without further consent of Lessor, and such Permitted Licenses shall not be subject to the provisions of Section 12 of the Lease.

**58. Early Occupancy:**

The Lease Term shall commence on January 1, 2015, and Lessee's initial payment of Base Rent shall be for the month of January. The initial Lease Term shall terminate on December 31, 2024. Notwithstanding the foregoing, Lessee shall have the right, commencing on the later of December 23, 2014, or the full execution of the Lease by Lessor and Lessee, to take possession of the Premises to begin moving into the Premises.

**59. Alterations:**

Lessor acknowledges that Lessee intends to move into the Premises and make certain alterations after commencement of Lessee's business operations therein. Lessee's intended alterations include alterations similar to those in place at other TechShop locations which may, include roof and/or wall penetrations for HVAC and venting, and Lessor agrees that it will not unreasonably withhold or delay its consent for such alterations provided the same do not affect the structural portions of the building and such work is done in a good and workmanlike manner. Notwithstanding anything to the contrary in Section 7.3 of the Lease, Lessee shall not be required to provide a lien and completion bond with respect to the alterations to be made by Lessee; so long as the total estimated cost of the Alterations are less than $100,000.00. If total estimated costs of Alterations are greater than $100,000.00, than Lessee shall establish a bank account or bond, to be used exclusively for the payment of the improvements. Lessee shall provide Lessor written proof when moneys are withdrawn to make payment. Lessor further agrees that the construction drawings for alterations shall be sufficient and Lessee shall not be required to provide "as-built" drawings of any non-structural alterations.

DB04/0830929.0004/11590824.4 MDZ2



**60. Signage:**

Notwithstanding anything in the Lease to the contrary, Lessor agrees that Lessee may place signs on the Premises identifying Lessee's business thereon provided such signs comply with all Applicable Requirements.

**61. Partial Uninsured Damage:**

Notwithstanding anything in Section 9.3 of the Lease to the contrary, Lessor agrees that in the event of an uninsured Partial Damage which costs $100,000.00 or less to repair, Lessor shall repair the damage and the cost thereof shall be prorated between the Parties on the basis of a 144 month period in the same manner as for replacements under the terms of Section 7.1(d) of the Lease.

**62. Taxes/Special Assessments:**

Notwithstanding anything to the contrary in Section 10.2, Lessee shall pay estimated Real Property Taxes in monthly installments at the same time as payments of Base Rent are due, and Lessor shall pay such Real Property Taxes when due. Lessor shall refund any excess estimated payments and Lessee shall pay to Lessor any deficiency in estimated payments on demand. Lessor and Lessee agree that any Real Property Taxes which may be paid over an extended period of time shall be repaid over the longest period permissible without accruing a penalty for non-payment, and Lessee shall be responsible for those installments which are payable during the Lease Term.

IN WITNESS WHEREOF, Lessor and Lessee have executed this Addendum to be effective as of the date first set forth above.

Lessor:

Wantin Living Trust

By: _Reino S. Wantin_

Printed Name: Reino Wantin, Trustee

By: _Barbara R. Wantin_

Printed Name: Barbara Wantin, Trustee

Lessee:

TechShop Menlo Park LLC

By: TechShop, Inc., its sole member

By: _____

Printed Name: JAMES NEWTON

Title: CHAIRMAN

DB04/0830929.0004/11590824.4 MD22

RW



TechShop
Allocation
54 Spaces Total
Shown in Red

**2415 BAY ROAD**

(E) PARKING

36 STD  Next
1   Hc  to
———      building
37  SPACES TOTAL

17 Spaces
54 opposite
Total  Building

MAIN ENTRY

72'  PROP LINE

# EXHIBIT B



**From:** Daniel Woods [mailto:daniel.woods@techshop.ws]
**Sent:** Wednesday, November 15, 2017 6:17 AM
**To:** Harry Price <harry@cdidev.com>
**Cc:** Mike Hilberman <mhilberman@earlygrowthfinancialservices.com>
**Subject:**

Harry,

I know you, Mike and I discussed this last week, but I wanted to make sure we shared our communications with you, as we are officially closing our doors this morning.

By the way, I have the documents and will sign and drop in the mail today.

Very Truly Yours,


Dan


******


Message From Dan Woods


It is with a very sad heart and deep disappointment that I announce that TechShop is shutting down its operations effective November 15 and will file for bankruptcy under Chapter-7. In spite of many months of effort to restructure the company's debt and raise new capital to fund our recently announced strategic pivot, we have depleted our funds. We are left with no other options.


We are closing all of our ten U.S. locations and small corporate group effective 8AM November 15. The TechShop Global locations will not be effected as they are all owned by overseas licensees. We will announce dates and times for members to come in a remove their personal materials and projects as soon as we can coordinate with the bankruptcy Trustee.

1

As dark a moment as this is, I also want to acknowledge the enormous impact TechShop has had on our members and their communities over the past ten years.

I first met our Founder, Jim Newton, when I was at Make: Magazine. We were setting up for our very first Maker Faire in 2006. From his small maker table, Jim spent that entire weekend sharing his vision for an open access community makerspace where anyone could build their dreams. By the end of that year Jim opened the very first TechShop location in Menlo Park. It was a scrappy space filled with used equipment and wildly creative makers. It quickly leveraged the ideas, operational know-how, people, and community to bring TechShop to other cities.

The essence of the TechShop vision was to develop a network of makerspaces, members, curriculum, standards, instructors, and learning that would fuel the birth of new technologies, products, jobs, and companies. TechShop has accomplished much of this vision.

We have inspired thousands of youth to view themselves as inventors, problem solvers, creators, and makers. As a veteran myself, I'm proud to say that TechShop also provided membership and training to over three thousand returning veterans. This program enabled veterans to develop skills and experience—preparing them for jobs in advanced manufacturing and helping dozens of vets to launch their own companies.

TechShop employees, investors, and Jim, can hold their heads high in the knowledge that their vision, perseverance, and hard work produces great results. Together, the TechShop community inspired and transformed tens of thousands of people and dozens of neighborhoods; led directly to the creation of thousands of new jobs; and helped generate billions in net worth and new technologies—some of them life-saving.

As we examine our success, we must also examine what didn't work. A for-profit network of wholly owned makerspaces is impossible to sustain without outside subsidy from cities, companies and foundations, often in the form of memberships, training grants, and sponsored programs. This kind of funding is readily available to non-profits, and very rarely an option for for-profit enterprises. This is why we announced a pivot—to leverage our know-how, experience, systems and processes. The goal of TechShop 2.0 was to help non-profits, corporations and universities launch and operate their own makerspaces. We would get out of the business of owning makerspaces and instead focus on enabling other entities to build and operate makerspaces.

Jim Newton, TechShop employees, members, and investors will go forward with their experience. Many will find a way to collaborate and work together again. The world will be a far better place for TechShop's experience.

If I can ever find a way to reward your loyalty, hard work and commitment to TechShop, I will.

2



--
Dan Woods
CEO
TechShop
daniel.woods@techshop.com

3

# EXHIBIT C

## NOTICE OF RIGHT TO RECLAIM ABANDONED PROPERTY

TO:     TECHSHOP, MENLO PARK, LLC
        38 South 2nd Street
        San Jose, CA 95113

PLEASE TAKE NOTICE, when you vacated the premises at 2415 Bay Road, Redwood City, CA 94063, the following personal property remained:

- Woodworking equipment and supplies;
- Metalworking equipment and supplies;
- Computers, servers, printers, 3D printers, Wi-Fi routers and devices, phones, and other electronic equipment;
- AV equipment;
- Various hand tools for work with wood, metal, and plastic;
- Desks, chairs, counters;
- Storage cabinets and filing cabinets, and any contents thereof;
- Prototype materials and parts, including screws, bolts, nuts, etc.;
- Automobiles and other auto parts.

You may claim this property at 2415 Bay Road, Redwood City, CA 94063. Unless you pay the reasonable cost of storage for all of the above-described property, and take possession of the property which you claim, not later than February 18, 2018, this property may be disposed of pursuant to Section 1993.07 of the Civil Code.

If you fail to reclaim the property, it will be sold at a public sale after notice of the sale has been given by publication. You have the right to bid on the property at this sale. After the property is sold and the cost of storage, advertising, and sale is deducted, the remaining money will be paid over to the county. You may claim the remaining money at any time within one year after the county receives the money.

Dated: January 29, 2018

_Harry Price_
Harry Price

955 Franklin St., Napa, CA 94559
Telephone: (707) 224-7135, Ext. 5
Email: harry@cdidev.com

TECHSHOP, MENLO PARK, LLC
c/o Dan Woods, CEO
38 South 2nd Street
San Jose, CA 95113

Re: <u>Abandoned Personal Property at 2415 Bay Road, Redwood City, CA 94063
Remaining After Lease Termination and Abandonment</u>

Dear Mr. Dan Woods,

Please find attached to this letter a Notice of Abandonment of Personal Property for the items that were left at 2415 Bay Road in Redwood City, CA 94063 (the "Property") after your company, TechShop, Menlo Park, LLC ("TechShop,") vacated the Property on or around November 15, 2017.

As you know, TechShop entered into a month-to-month lease (the "Lease Agreement") for the property located at 2415 Bay Road in Redwood City, CA 94063 on or about September 30, 2017. As stated in the Lease Agreement, any failure by TechShop to pay rent on the first of the month when due would cause the Lease Agreement to terminate automatically. TechShop failed to pay rent when due on November 1, 2017, thus the Lease Agreement has been terminated.

On November 15, 2017, you sent me an email giving notice that you were abandoning the Property, and planned to vacate the Property immediately. I understand that since that date, your business has not operated at the Property and no employees or any other agents of TechShop are currently using the Property.

On November 18, 2017, you requested by email that we contact Mr. Dan Rasure regarding a possible sale of TechShop's interest, along with a lease of the Property. We did so, but it has now been more than two and a half months and no deal has been made.

There still remain at the Property various items of personal property, which I reasonably believe belong to TechShop. Please retrieve such items of personal property, as identified in the Notice below, as soon as possible, but no later than February 18, 2018.

Thank you for your consideration.

Sincerely,

*Harry Price*

Harry Price

Enclosure

# EXHIBIT D

## Harry Price

| | |
|---|---|
| **From:** | Harry Price |
| **Sent:** | Friday, March 30, 2018 4:25 PM |
| **To:** | 'Doris Kaelin' |
| **Cc:** | 'Gregg Kleiner' |
| **Subject:** | RE: TechShop, Inc.; Case No. 18-50398 |

Doris, thanks for your prompt response. I will provide the information you have requested next week. However, since there is an issue of whether or not TechShop, Inc. owns the abandoned property, why not consider allowing the Wantin Living Trust to proceed with the prior Noticed Sale of abandoned property, which would result in all net proceeds, after recovery of storage and expenses of sale (which could be agreed upon in advance), being paid to San Mateo County. If it is determined that the Bankruptcy estate is the owner, you could then attach such funds with a lot less trouble and less storage expense. Respectfully, Harry

**From:** Doris Kaelin <dktrustee@gmail.com> a the
**Sent:** Friday, March 30, 2018 3:41 PM
**To:** Harry Price <harry@cdidev.com>
**Cc:** 'Gregg Kleiner' <gkleiner@rinconlawllp.com>
**Subject:** TechShop, Inc.; Case No. 18-50398
n
Dear Mr. Price,

I received your message in follow-up to the Redwood City location and the disposition of the property located in the facility. Unfortunately I do not have much more information than when we last spoke as I continue to try to get information from the Debtor to determine what assets are in the facility that belong to TechShop, Inc. and the liens against those assets to assess possible equity for creditors. However, as part of my analysis it would be helpful to obtain from you the amounts the landlord claims are owing by TechShop, Inc., as follows:

1. Please provide the amount that was owing under the lease as of February 26, 2018 (the date the bankruptcy case was filed). If TechShop, Inc. guaranteed the lease or co-signed the lease, please provide a copy of the underlying lease reflecting the obligation of TechShop, Inc.
2. Separately, please provide a calculation of what the landlord believes its reasonable storage costs to be, on a monthly basis, and the time period those charges commenced.

If you have any questions or need clarification of these requests, please let me know.

I have copied my counsel here, Gregg Kleiner, and included his contact information so you have that for your records.

Gregg S. Kleiner
Rincon Law LLP
(415)-996-8180
gkleiner@rinconlawllp.com

Regards,

Doris A. Kaelin
Bankruptcy Trustee
P.O. Box 1582
Santa Cruz, CA 95061

1