1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**

**LEASE**

4

DECLARATION OF KATHY MULKERN IN SUPPORT
OF LA FRONTERA VILLAGE, L.P.'s MOTION TO CONFIRM ABSENCE OF THE AUTOMATIC STAY OR,
ALTERNATIVELY, FOR RELIEF FROM THE AUTOMATIC STAY

Case: 18-50398    Doc#: 132-2    Filed: 07/20/18    Entered: 07/20/18 12:17:59    Page 1
of 89

# LEASE

*BY AND BETWEEN*

## LA FRONTERA VILLAGE, L.P.

*("Landlord")*

*AND*

## TECHSHOP AUSTIN, LLC

## ("Tenant")

# LEASE
# LA FRONTERA VILLAGE
### PROPERTY NAME

## TABLE OF CONTENTS

| I. | BASIC LEASE PROVISIONS | 3 |
|---|---|---|
| II. | PREMISES | 4 |
| III. | TERM | 4 |
| IV. | RENT | 4 |
| | A. Minimum Rent | 4 |
| | B. Intentionally Omitted | 4 |
| V. | TAXES | 5 |
| | A. Real Estate Taxes and Assessments | 5 |
| | B. Rental Taxes | 5 |
| | C. Impact Fees | 5 |
| VI. | CONSTRUCTION | 5 |
| | A. Landlord's Work | 5 |
| | B. Landlord's Work/Construction of Shopping Center | 6 |
| | C. Delivery of Premises | 6 |
| | D. Tenant's Construction | 6 |
| | E. Miscellaneous | 6 |
| VII. | COMMON AREAS | 6 |
| | A. Common Area | 6 |
| | B. Common Area Charge | 7 |
| | C. Reserve Account | 7 |
| | D. Management Fee | 7 |
| VIII. | UTILITIES AND RUBBISH DISPOSAL | 7 |
| | A. Utility Charges | 7 |
| | B. Rubbish Disposal | 8 |
| IX. | USE OF PREMISES BY TENANT | 8 |
| | A. Tenant's Use of Premises | 8 |
| | B. Operation of Business | 8 |
| X. | TENANT'S COVENANTS WITH RESPECT TO OCCUPANCY | 8 |
| XI. | REPAIRS AND ALTERATIONS | 10 |
| | A. Repairs by Landlord | 10 |
| | B. Repairs by Tenant | 10 |
| | C. Alterations or Improvements by Tenant | 11 |
| | D. Removal of Improvements | 11 |
| XII. | INDEMNITY AND INSURANCE | 11 |
| | A. Indemnification by Tenant | 11 |
| | B. Public Liability Insurance | 11 |
| | C. Landlord's Liability | 11 |
| | D. Fire and Extended Coverage Insurance | 11 |
| | E. Mutual Waiver of Subrogation | 12 |
| XIII. | DAMAGE AND DESTRUCTION | 12 |
| XIV. | ASSIGNING AND SUBLETTING | 12 |
| XV. | EMINENT DOMAIN | 13 |

FRONTIER VILLAGE

| | | |
|---|---|---|
| XVI. | DEFAULT BY TENANT | 13 |
| XVII. | NOTICES | 14 |
| XVIII. | SECURITY DEPOSIT | 14 |
| XIX. | MORTGAGE SUBORDINATION | 15 |
| XX. | ESTOPPEL CERTIFICATES | 15 |
| XXI. | QUIET ENJOYMENT | 15 |
| XXII. | LIABILITY OF LANDLORD | 15 |
| XXIII. | MISCELLANEOUS PROVISIONS | 15 |
| | A. Accord and Satisfaction | 15 |
| | B. Waiver | 16 |
| | C. Broker's Commission | 16 |
| | D. No Partnership | 16 |
| | E. Lease Inures to the Benefit of Assignees | 16 |
| | F. Entire Agreement | 16 |
| | G. Abandonment, Surrender and Holding Over | 16 |
| | H. No Option | 16 |
| | I. Additional Rent | 16 |
| | J. Power of Attorney | 17 |
| | K. Financial Statements | 17 |
| | L. Severability | 17 |
| | M. Option to Renew | 17 |
| | N. Net Rent | 17 |
| | O. Counterparts | 17 |
| | P. Consents | 17 |
| | Q. Force Majeure | 17 |
| | R. Joint and Several Liability | 17 |
| | S. Right to Relocate | 18 |
| | T. Payment Under Protest | 18 |
| | U. Components of Lease | 18 |
| | V. Owner's Joinder in this Lease | 18 |
| | W. Ground Tenant's Joinder in this Lease | 18 |
| | X. Pylon Sign | 18 |

| | |
|---|---|
| *RENT SCHEDULE* | *SCHEDULE A* |
| *SITE PLAN* | *EXHIBIT A* |
| *LEGAL DESCRIPTION* | *EXHIBIT B* |
| *CONSTRUCTION STANDARDS AND ALLOWANCES* | *EXHIBIT C* |
| *SIGN CRITERIA* | *EXHIBIT D* |
| *EXISTING SHOPPING CENTER EXCLUSIVE USES & RESTRICTIONS* | *EXHIBIT E* |

D\04/830929.0006/62103741.3  TD09

Case: 18-50398    Doc# 132-2    Filed: 07/20/18    Entered: 07/20/18 12:17:59    Page 4
of 89

## LA FRONTERA VILLAGE

**THIS LEASE**, entered into this _____ day of _____, 2012 by, between and among: **LA FRONTERA VILLAGE, L.P.** ("Landlord"); **BALTGEM DEVELOPMENT CORPORATION, BARGET DEVELOPMENT CORPORATION, KARJOY DEVELOPMENT CORPORATION, MAXLAND DEVELOPMENT CORPORATION, JOPAT BUILDING CORPORATION, NATURAL BRIDGE DEVELOPMENT CORPORATION D/B/A NATBRIDGE DEVELOPMENT CORPORATION, PAJIA REALTY CORPORATION, THIRD CREEK L.L.C. D/B/A DENVER THIRD CREEK, L.L.C. and DELMAR PROPERTIES** (collectively, "Owners"); **FRONTIER VILLAGE, L.P.** ("Ground Tenant") and TechShop Austin, LLC, a Texas Limited Liability Company("Tenant").

### WITNESSETH:

**WHEREAS**, Owners are the fee owners of the Shopping Center depicted on Exhibit "A" attached hereto, but not including any outlots or other parcels illustrated on Exhibit "A"

**WHEREAS**, pursuant to a Ground Lease dated 6/30/03 (the "Ground Lease"), Owners leased to Landlord a portion of the Shopping Center more particularly described on Exhibit "B", attached hereto ("Landlord's Property"); and

**WHEREAS**, pursuant to another ground lease dated 6/30/03, Owners leased to Ground Tenant the remainder of the Shopping Center ("Ground Tenant's Property"); and

**WHEREAS**, Tenant desires to lease a portion of Landlord's Property from Landlord, and Landlord is willing to lease and demise the same to Tenant, upon all of the terms, covenants and provisions of this lease (this "Lease").

**IN CONSIDERATION** of the mutual covenants hereinafter contained, and each act performed hereunder by either of the parties, Landlord and Tenant agree as follows:

### I. BASIC LEASE PROVISIONS

A. This Article I is an integral part of this Lease and all of the terms hereof are incorporated into this Lease in all respects. In addition to the other provisions which are elsewhere defined in this Lease, the following, whenever used in this Lease shall have the meanings set forth in this Article I:

1. Shopping Center: La Frontera Village, situated in the City of Round Rock, State of Texas (Article II).

2. Premises: Unit No. 120 Sundance Parkway, Suites 300 & 350, containing approximately 21,530 square feet of gross floor area (Article II), together with a non-exclusive right to use the sidewalk area in front of the Premises for a seating area, provided such use does not interfere with the operation of the Shopping Center and as outlined in Exhibit "A," and the exclusive right to use the area in the rear of the Premises as shown on the Site Plan attached hereto and incorporated herein as Exhibit A (as such Site Plan may be amended from time to time with the consent of Landlord, which consent shall not be unreasonably withheld), provided (i) such use does not interfere with the use of the Common Areas, (ii) such use does not hinder access to any building in the Shopping Center, and (iii) during such time as Tenant uses any such area, Tenant assumes all of Landlord's obligations under the Lease, including repair and maintenance, for the area used by Tenant, except that Tenant shall not be required to repair any damage caused by any persons other than Tenant, its agents, representatives, members, contractors, licensees or guests, or other persons who are on the Premises or in the Shopping Center at the request of Tenant.

3. Tenant's Trade Name: TechShop.

4. Permitted Use: Subject to existing Shopping Center exclusive uses and restrictions listed in Exhibit E, Tenant shall use and occupy the Premises for purposes of operating a workshop and technology innovation center for (i) design, engineering, machining, fabrication, electronics, prototyping, arts and crafts, textiles, woodworking, metalworking, automotive restoration and similar activities, (ii) providing educational and training classes, (iii) providing tools and equipment, including without limitation, computer numerical control machines (including lathes and milling machines), electronic equipment, fabrication, laser/plasma cutters, water jet cutters, welding equipment, saws, drill presses and other power tools and hand tools, and (iv) hosting events and activities, and as ancillary to such use, the operation of a retail store for the sale of tools, materials and equipment, and operation of a small café/coffee shop (with a catering service), subject to the consent of Lowe's Home Centers, Inc.

3

FRONTIER VILLAGE

Tenant's use of the Premises may include the licensing or rental of bays, lockers and other designated areas (including offices or rooms) to provide segregated, secure or private work and ancillary use areas. Landlord, to the best of its knowledge and subject to the aforementioned consent from Lowe's Home Centers, Inc., represents that the Tenant's Permitted Use as set forth herein does not violate any exclusive uses or restrictions applicable to the Premises.

5.     Lease Term: Five (5) years (Article III).
6.     Rent Commencement Date: The earlier of (i) the Outside Opening Date, or (ii) the date Tenant initially opens for business to the public in the Premises (Article III).
7.     Expiration Date: Five (5) years following the Rent Commencement Date (Article III).
8.     Minimum Rent during Lease Term: See Rent Schedule A (Article IV).
9.     Annual Percentage Rent during Lease Term: NOT APPLICABLE.
10.    Delivery of Possession Date: Within seven (7) days after full Lease execution (Article VI).
11.    Outside Opening Date: One hundred twenty (120) days after the occurrence of the completion of the earlier of all of the following conditions: (i) Sixty (60) days after the date of delivery of possession of the Premises to Tenant or (ii) Tenant's receipt of all permits and approvals required by the applicable governing authorities for Tenant to construct its interior improvements to the Premises and for signage. (Article VI).
12.    Common Area Maintenance (CAM) Charge: (Article VII). Proportionate share shall be determined by dividing the gross leasable area of the Premises by gross leasable area of the Shopping Center, and then multiplying the resulting quotient by total CAM expenses, including a 10% administrative fee.
          Initial Estimate: $2.36 per foot, $4,234.23 per month, $50,810.76 per year
13.    Insurance: Proportionate share shall be determined by dividing the gross leasable area of the Premises by gross leasable area of the Shopping Center, and then multiplying the resulting quotient by total insurance cost. Initial Estimate: $.15 per foot, $269.13 per month, or $3,229.56 per year.
14.    Real Estate Tax Charge: (Article V).Proportionate share determined by dividing the gross leasable area of the Premises by the gross leasable area of the Shopping Center tax parcel, and then multiplying the resulting quotient by the total Real Estate Taxes, less any costs incurred by Landlord in accordance with Article V.
          Initial Estimate: $3.44 per foot, $6,171.99 per month, $74,063.88 per year
15.    Merchants Association Dues/Promotional Fund Contribution: N/A
16.    Security Deposit: $28,616.96 (Article XVIII).
17.    Options to Renew: Two (2) option periods containing five (5) lease years ("Renewal Term"). Six (6) months prior written notice to exercise required. See Rent Schedule A (Article XXIII).
18.    Landlord: La Frontera Village, L.P., c/o Sansone Group, 120 S. Central, Suite 500, St. Louis, MO 63105.
19.    Tenant:: TechShop Austin, LLC
                c/o TechShop, Inc.
                120 Independence Drive
                Menlo Park, CA 94025
                Federal I.D. # 37-1664467
20.    Guarantor(s): N/A

## II.     PREMISES

A.     Landlord leases to Tenant, and Tenant leases from Landlord, the premises described in Article I, Section 2 ("Premises"), as improved by the improvements which constitute the Tenant's Work (as described in Article XI and Exhibit C). Tenant shall also have the non-exclusive right to use that portion of the sidewalk in front of the Premises for a seating area, provided such use does not interfere with the operation of the Shopping Center and as outlined in Exhibit "A," and the exclusive right to use the area in the rear of the Premises as outlined on Exhibit "A (as such Site Plan may be amended from time to time with the consent of Landlord, which consent shall not be unreasonably withheld), provided (i) such use does not interfere with the use of the Common Areas, (ii) such use does not hinder access to any building in the Shopping Center, and (iii) during such time as Tenant uses any such area, Tenant assumes all of Landlord's obligations under the Lease, including repair and maintenance, for the area used by Tenant, except that Tenant shall not be required to repair any damage caused by any persons other than Tenant, its agents, representatives, members, contractors, licensees or guests, or other persons who are on the Premises or in the Shopping Center at the request of Tenant.

B.     Tenant shall have the right to lease the vacant space containing approximately 3,100 square feet, as shown on the attached Exhibit A, for storage or future expansion, by providing Landlord one hundred and eighty (180) days advance written notice ("expansion notice") of its intent to

4                              FRONTIER VILLAGE

expand and whether Tenant intends to use the vacant space for storage or future expansion. In the event Tenant exercises its right to expand into such vacant space, then Landlord and Tenant shall commence negotiations concerning the amount of Minimum Rent which shall be payable during the remaining term of the Lease. The Parties shall have sixty (60) days after the date of Landlord's receipt of the expansion notice in which to agree on the Minimum Rent for the vacant space. Among the factors to be considered shall be the net effective rent for comparable properties in the area in which the Premises are located and the rental rates then being quoted by Landlord to prospective tenants for comparable space in the Shopping Center. If the Parties mutually agree on the Minimum Rent which shall be payable during the remaining term of the Lease, Landlord and Tenant shall promptly execute an amendment to the Lease stating the amount of Minimum Rent so determined for the vacant space. If, at the end of such sixty (60) day period, Landlord and Tenant are unable after a reasonably good faith effort to agree on the Minimum Rent payable during the remaining term of the Lease, Tenant shall notify Landlord of its desire to use qualified real estate brokers to determine the fair market rental pursuant to this paragraph and in such notice Tenant shall designate the broker appointed by Tenant. Within twenty (20) days thereafter, Landlord shall, by notice to Tenant, designate a second broker. Each broker shall make an independent determination of the fair market rental for the Premises. If the two brokers so appointed agree upon a fair market rental within fifteen (15) days after the appointment of the second broker, the Minimum Rent payable during the remaining term of the Lease shall be the amount so determined by the two brokers. If the two brokers so appointed do not agree on the fair market rental for the vacant space within fifteen (15) days after the appointment of the second broker, but if the difference between the fair market rental determined by each broker is not more than Fifty Cents ($0.50) per square foot, the Minimum Rent payable during the remaining term of the Lease shall be an amount equal to the quotient obtained by dividing the sum of the fair market rental determined by each broker by two (2). If the two brokers so appointed do not agree on the fair market rental for the vacant space and if the difference between the fair market rental determined by each broker is more than Fifty Cents ($0.50) per square foot, the two brokers shall jointly appoint a third broker and the Minimum Rent payable during the remaining term of the Lease shall be determined by taking the sum of the fair market rental determined by the two brokers who are closest and dividing that sum by two (2). In addition to the Minimum Rent payable for the vacant space, the vacant space shall be included in calculating Tenant's pro-rata share of Common Area Charges, Insurance and Taxes.Landlord and Tenant shall promptly execute an amendment to the Lease stating the amount of Minimum Rent so determined by the brokers for the vacant space.

C. Landlord reserves the right to maintain, repair, and replace utility lines under, over, upon or through the Premises as may be reasonably necessary or advisable for the servicing of the Premises or other portions of the Shopping Center.

## III. TERM

The Term of this Lease shall commence upon the Rent Commencement Date and shall expire on the last day of the last consecutive full lease year set forth in Article I, Section 7 following the Rent Commencement Date established pursuant to Article I, Section 6, unless sooner terminated. The term "lease year" shall mean a period of twelve (12) consecutive full calendar months. If the Rent Commencement Date does not occur on the first day of a calendar month, the first lease year shall include any partial calendar month.

## IV. RENT

A. **Minimum Rent.** Tenant shall pay to Landlord, at its office or other place as Landlord may from time to time designate, as "Minimum Rent" for the Premises during the term of this Lease, without any deduction or setoff, the amount(s) set forth in Article I, Section 8, above, in advance, on the first day of each calendar month. Minimum Rent and the amounts to be paid by Tenant pursuant to Articles V, VII, and VIII hereof shall be prorated on a per diem basis (based upon a thirty (30) day calendar month) for any partial month included in the first lease year.

B. **Intentionally Omitted.**

## V. TAXES

A. **Real Estate Taxes and Assessments.** Tenant agrees to pay Tenant's proportionate share of all real estate taxes and assessments, together with any and all expenses incurred by Landlord in negotiating, appealing or contesting such taxes and assessments, both general and special,

levied and assessed against the land, buildings, and all other improvements which may be added thereto, or constructed within the Shopping Center ("Taxes"). The term Taxes shall be further defined as the amount stated on the tax bill for the Shopping Center from the taxing authority which is due and payable by Landlord in the calendar month prior to the accrual of any penalties and/or interest. Tenant's proportionate share shall be the total amount of the Taxes, multiplied by a fraction, the numerator of which shall be the number of square feet of gross leasable area within the Premises, and the denominator of which shall be the gross leasable area of the existing buildings within the Shopping Center at the time the Taxes were levied or assessed, but excluding the gross leasable area of (i) any buildings within the Shopping Center which are separately assessed for tax purposes and billed to an entity other than Landlord or paid directly by an entity other than Landlord, even though billed to Landlord.

Tenant shall pay to Landlord, monthly in advance, an amount equal to one-twelfth (1/12th) of Tenant's proportionate share of Landlord's estimate of Taxes for the current tax year. If Tenant's proportionate share of Taxes with respect to any tax year is less than the total amount paid by Tenant for such period the excess shall be credited against the payments with respect to Taxes next becoming due. If Tenant's proportionate share of Taxes for any tax year exceeds the total amount paid by Tenant for such period, Tenant shall pay the difference to Landlord upon demand.

Landlord represents and warrants that (i) the estimated Real Estate Tax Charge set forth in Article I.A.14 includes all current taxes, assessments and other charges and impositions (including all special assessments) presently imposed or levied against the Shopping Center by governmental or quasi-governmental authorities, and Landlord is not aware of any anticipated additional or increased taxes, assessments or other charges or impositions, (ii) except as disclosed in writing by Landlord to Tenant, no tax abatement or other temporary reduction in taxes, assessments or other charges or impositions is in place with respect to the Shopping Center which will result in an increase in the amount thereof upon expiration, and (iii) except as disclosed in writing by Landlord to Tenant, Tenant shall not be subject to any reporting requirements or obligations to collect sales taxes relating to any special improvement district or other development incentive program applicable to the Shopping Center. Notwithstanding the foregoing to the contrary, the parties hereto understand that the Real Estate Tax Charge is subject to change based on the assessed/appraised value of the Shopping Center as determined by the pertinent taxing authorities.

B.  **Rental Taxes.** If any governmental taxing authority shall levy, assess, or impose any tax, excise or assessment (other than income or franchise tax) upon or against the rents payable by Tenant to Landlord ("Rent Tax"), either by way of substitution for or in addition to any existing tax on land, buildings or otherwise, Tenant shall directly pay, or reimburse Landlord for, the Rent Tax, as the case may be.

C.  **Impact Fees. Intentionally Deleted.**

## VI.  CONSTRUCTION

A.  **Landlord's Work.** Landlord agrees to perform or cause to be performed such work in the construction of the Premises as may be set forth as Landlord's work in Exhibit "C" attached hereto and made a part hereof, such work to be substantially in accordance with the specifications set forth in said Exhibit "C" (Premises delivered in "as is" condition).

B.  **Delivery of Premises.** Subject to paragraph A above, Landlord shall deliver the Premises to Tenant, with Landlord's work substantially complete, on or before the date set forth in Article I, Section 10 herein, subject to delays caused by acts of God, government or public enemy, labor disputes, inability to obtain material or labor on reasonable terms, failure of Tenant to perform Tenant's obligations with respect to construction, or other cause beyond the control of Landlord. Under no circumstances shall Landlord be liable for any delay or failure to commence or complete its construction or deliver possession of the Premises to Tenant; and Landlord may, at its option, declare this Lease null and void should construction not be commenced or completed, and thereafter all parties shall be released from all liability whatsoever. Upon substantial completion of its construction, Landlord shall deliver the Premises to Tenant for the commencement of Tenant's work. In the event that a dispute shall arise as to whether or not Landlord's construction of the Premises is substantially completed, a certification of Landlord's architect that such construction is substantially completed in accordance with plans and specifications therefor shall be conclusive and binding upon the parties hereto. If Tenant has taken possession of the Premises as substantially completed, Landlord agrees that it will diligently carry forward its construction of the Premises to final completion in accordance with its obligations.

FRONTIER VILLAGE

DB04/830929.0006/6210741.3 TD09

C.    **Tenant's Construction**. To the extent not approved prior to or contemporaneously with the execution of this Lease, then within fifteen (15) days from the date of this Lease, Tenant shall prepare and deliver to Landlord detailed plans and specifications of the improvements to the Premises to be constructed by Tenant in compliance with Exhibit C attached hereto and made a part hereof. Within fifteen (15) days following Landlord's receipt of Tenant's plans and specifications Landlord shall notify Tenant whether Tenant's plans and specifications are acceptable to Landlord; provided that Landlord shall not unreasonably withhold or delay its approval. If Tenant's plans and specifications are not acceptable to Landlord, Landlord will advise Tenant of the required modifications to Tenant's plans and specifications. Tenant shall modify and deliver to Landlord its revised plans and specifications within five (5) days from receipt of Landlord's required modifications. Landlord and Tenant will continue this process until Landlord has approved Tenant's plans and specifications ("Tenant's Work"). Within ten (10) days from receipt of Landlord's approval of Tenant's plans and specifications, Tenant shall apply for any and all permits and other governmental approvals necessary to perform Tenant's work and Tenant shall diligently prosecute such application until approved. Tenant shall not modify the plans and specifications approved by Landlord without Landlord's prior written consent. Tenant shall commence construction of Tenant's improvements to the Premises in accordance with the plans and specifications approved by Landlord within five (5) days following Landlord's approval of Tenant's plans and specifications. Tenant shall complete construction of Tenant's improvements, fixture and stock the Premises and initially open for business to the public on or before the Outside Opening Date provided in Section 11 of the Basic Lease Provisions. In no event shall the Outside Opening Date be extended as a result of Tenant's failure to (i) deliver plans and specifications and any revisions thereto, (ii) file for permits or applications and/or (iii) to commence construction in accordance with the timetables set forth in this paragraph. Tenant shall not commence any work in the Premises until Tenant delivers to Landlord a policy of public liability and property damage insurance in accordance with the requirements of Article XII of this Lease. Subject to Landlord's approval rights herein and the terms of Exhibit C, Landlord acknowledges that Tenant intends for the Tenant's Work to include, without limitation, installation of skylights and solar tubes in the roof/ceiling of the Premises, modifications to the store front, the location of a seating area on part of the sidewalk in front of the Premises and fencing an area in the rear of the building for Tenant's exclusive use.

D.    **Miscellaneous**. Tenant shall be required to control and retain noise, dust or other materials within the Premises, subject to directives from Landlord. Tenant shall be required to clean all H.V.A.C. filters clogged with dust, or other materials resulting from its construction activities.

VII.    **COMMON AREAS**

A.    **Common Areas**. Landlord grants to Tenant and Tenant's customers and invitees the non-exclusive right to use the areas designated by Landlord from time to time as Common Areas. The term "Common Areas" shall mean the parking areas, roadways, pedestrian sidewalks, loading docks, delivery areas, exterior surfaces of Shopping Center buildings, landscaped areas, service courts, open and enclosed courts and malls, fire corridors, meeting areas and public restrooms, and all other areas or improvements which may be provided by Landlord for the common use of the tenants of the Shopping Center. Landlord hereby reserves the following rights with respect to the Common Areas:

1.    To establish reasonable rules and regulations for the use thereof;

2.    To use or permit the use by others to whom Landlord may have granted such rights for promotional activities;

3.    To close all or any portion thereof as may be deemed necessary by Landlord to prevent a dedication thereof or the accrual of any rights to any person or the public herein;

4.    To change the layout of such Common Areas, including the right to reasonably add to or subtract from their shape and size, whether by the addition of building improvements or otherwise, and shall have the right to retain revenue from income producing events whether or not conducted for promotional purposes; and

5.    To operate, manage, equip, light, repair and maintain said Common Areas for their intended purposes in such manner as Landlord shall in its sole discretion from time to time determine.

7                                    FRONTIER VILLAGE

B.    **Common Area Charge.** Tenant shall pay to Landlord as a "Common Area Charge" a proportionate share of all costs and expenses of every kind and nature paid or incurred by Landlord in operating maintaining, repairing and managing the Common Areas, including but not limited to, cleaning, lighting, repairing, painting, maintaining, and replacing all Common Area improvements including the roofs of all buildings within the Shopping Center; snow removal, landscaping, security, public liability, property damage, fire and extended coverage and such other insurance as Landlord deems appropriate, including, but not limited to, the cost of Landlord's insurance provided for in Article XII, herein; total compensation and benefits (including premiums for Worker's Compensation and other insurance) paid to or on behalf of employees (other than administrative employees); personal property taxes, supplies, fire protection, utility charges, licenses and permit fees; reasonable depreciation of equipment used in operating and maintaining the Common Areas and rent paid for leasing such equipment, and administrative costs equal to ten percent (10%) of the total cost of all the foregoing items. Tenant's Common Area Charge shall be determined by multiplying the total cost incurred by Landlord by the ratio of the square feet within the Premises to the gross leasable area within all of the buildings in the Shopping Center existing at the time of such calculation, excluding the square footage of any tenant in the Shopping Center which provides at its own expense maintenance for the portion of the Common Areas within such tenant's demised premises.

Tenant's Common Area Charge shall be paid in monthly installments on the first day of each month in an amount to be estimated by Landlord. Subsequent to the expiration of the period used by Landlord in estimating Landlord's cost, Landlord shall furnish to Tenant a statement of the actual amount of Tenant's proportionate share of such Common Area Charge for such period and within fifteen (15) days, Tenant shall pay to Landlord or Landlord shall remit to Tenant, as the case may be, the difference between the estimated amounts paid by Tenant and the actual amount of Tenant's Common Area Charge for such period as shown by such statement.

C.    **Common Area Charge Records.** Landlord shall provide to Tenant on an annual basis a written report showing all costs and expenses included in the Common Area Charge.

D.    **Limitations.** Notwithstanding anything herein to the contrary, Common Area Charges shall not include: (i) expenses for legal services incurred in connection with disputes with tenants or licensees of the Shopping Center or with prospective tenants; (ii) real estate brokerage and leasing commissions; (iii) the cost of tenant improvements; (iv) Landlord's income taxes or franchise taxes; (v) income tax accounting costs; (vi) interest, principal or other debt service relating to Landlord's loans (including any reserve requirements); (vii) depreciation; (viii) general corporate overhead or administrative costs not specifically incurred in the management and operation of the Shopping Center; (ix) costs of remediating environmental contamination or encapsulating asbestos, (x) third party management fees, costs or expenses, (xi) wages and salaries of administrative personnel employed by Landlord, (xii) advertising and marketing fees, costs or expenses, (xiii) the cost of any work or service performed in any instance for any tenant (including the Tenant) at the cost of such tenant, (xiv) repairs, replacements and general maintenance paid by insurance proceeds or condemnation proceeds, or from any source other than Landlord, or reimbursed pursuant to warranties or service contracts (xv) services provided by Landlord's affiliates to the extent such costs are in excess of that which would be incurred in an arm's length transaction, (xvi)    costs in connection with services or other benefits which are not provided to Tenant but which are exclusively provided to other tenants or occupants of the Shopping Center and not otherwise included in Common Area Charge as defined in Article VII. B., (xvii) costs incurred due to violation by Landlord or any tenant of the terms and conditions of any lease of space in the Shopping Center, (xviii) costs attributable to faulty, defective or improper construction or design of the Premises or the Shopping Center, (xix) costs or expenses attributable to the negligent or willful acts or omissions of Landlord, its agents, employees or contractor, (xx) costs arising from Landlord's charitable or political contributions, (xxi) wages, salaries, or other compensation paid to any executive employees of Landlord or the managing agent of the Building above the grade of building manager or officers, directors, or partners of Landlord or the managing agent above the grade of building manager, (xxii) fines, penalties and late payment charges incurred by Landlord due to violations of law or violations of permits by Landlord pertaining to the Shopping Center, (xxiii) the costs of items classified as capital improvements in accordance with generally accepted accounting principles, except such capital improvements are designed to reduce energy expenses or other expenses otherwise included in Common Area Charges, provided that notwithstanding anything herein to the contrary, any capital improvements included in Common Area Charges shall be amortized over the useful life of such improvements determined in accordance with generally accepted accounting principles or (xxiv) the amount of any deductible or self-insured retention costs incurred by Landlord in connection with any damage or casualty loss to the Premises or the Shopping Center (including any Common Areas).    For purposes of calculating the administrative fee only, Common Area Charges shall not include any payments made to any

FRONTIER VILLAGE

DB04/830929.0006/6210741.3 TD09

tenant of the Shopping Center to reimburse such tenant for expenses paid in exercising its self help rights, real or personal property taxes or assessments, and the administrative fee itself.

VIII.    **UTILITIES AND RUBBISH DISPOSAL**

A.    **Utility Charges.** Commencing on the date Landlord delivers the Premises to Tenant, Tenant shall pay for all utilities provided to or for the benefit of the Premises, including but not limited to water/sewer, demand or reservation fees, gas, electricity, fuel, light, heat, power, telephone, cable, and trash and garbage removal, together with all taxes levied or other charges on such utilities and governmental charges based on utility consumption. Tenant shall, at its sole cost and expense, pay for the cost of installation of meters for the Premises and any and all related costs and expenses if such meters do not already exist at the Premises.

If any utilities are not separately metered or are only partly separately metered and are used in common with other tenants of the Shopping Center, Tenant shall pay to Landlord its prorata share of such charges computed by multiplying such charges by the ratio of the square feet within the Premises to the square feet of all tenants using such common facilities.

Notwithstanding the foregoing, Landlord shall have the right, but not the obligation, to supply Tenant with any or all utility services provided to or for the benefit of the Premises and Tenant shall pay the cost of such utility service(s) to Landlord. In the event Landlord supplies any such utility service(s), Tenant shall reimburse Landlord within ten (10) days after the delivery by Landlord to Tenant of a statement for the cost of any such utility service(s) supplied by Landlord. In no event, however, shall the cost of such utility service(s) supplied by Landlord exceed a rate which Tenant would otherwise pay for such utility service(s) if Tenant obtained such utility service(s) directly from the applicable utility supplier. Landlord and Tenant further agree that Landlord shall have the right to discontinue supplying such utility service(s) upon ten (10) days prior written notice to Tenant, provided Landlord shall not discontinue such utility service(s) until Tenant has obtained the discontinued utility service(s) from the applicable utility supplier and Tenant has provided Landlord with written notice thereof.

Landlord and Tenant hereby acknowledge that electrical service to the Premises may be furnished by one or more companies providing electrical generation, transmission and/or distribution services. Landlord hereby reserves the right to charge Tenant for the cost of electrical service to the Premises as a single charge or divided into and billed in a variety of categories such as distribution charges, transmission charges, generation charges, public good charges or other similar categories. Landlord further reserves the right, at its sole discretion, to select the company(ies) providing electrical service(s) to the Shopping Center, including the Premises, to aggregate the electrical service for the Premises and other premises within the Shopping Center, to purchase electricity for the Shopping Center, including the Premises, through a broker and/or buyers group and to change the providers and/or manner of purchasing electricity from time to time. Landlord shall be entitled to receive a reasonable fee (if permitted by law) for the services provided by Landlord in connection with the selection of utility companies and the negotiation and administration of contracts for the generation of electricity to the Shopping Center. In addition, if Landlord bills Tenant directly for the cost of electricity service to the Premises, the cost of electricity service may include (if permitted by law) an administrative fee to reimburse Landlord for the cost of reading meters, preparing invoices and related costs.

B.    **Rubbish Disposal.** Landlord reserves the right to implement a uniform program of rubbish removal that shall be applicable to all tenants in the Shopping Center, exclusive of major tenants. Landlord shall implement such program by (i) the initial acquisition by purchase or lease of disposal facilities, including but not limited to, compactor(s), baling machine(s) and/or incinerator(s), and the cost of initial acquisition and installation of such equipment or facilities (based on a straight line amortization of the cost over the useful life of such equipment or facilities) shall be reimbursable to Landlord as part of the Common Area Charge based upon a proration from each tenant according to the projected use of such facilities, (ii) the implementation of uniform and objective rules and regulations for the storage, separation and disposal of rubbish, and (iii) establishment of guidelines for the scheduled and permitted uses of any such facilities, alternate methods of disposing of any rubbish which is not compatible with the facility, and a schedule of costs and fees to each tenant for the use of said facilities (inclusive of the cost of any required maintenance of such facilities and the cost of removal of the by-product from the Shopping Center). Landlord, in its sole discretion, shall have the right to retain the services of an independent consultant, the cost of which shall be included in the total cost of the program. Landlord reserves the right to utilize the facilities to dispose of Common Area rubbish and such cost, if any, shall be included in the Common Area charge.

DB04/830929.0006/6210741.3 TD09

In no event shall Landlord be liable for the quality, quantity, failure, or interruption of the foregoing utility and rubbish disposal services to the Premises.

IX. **USE OF PREMISES BY TENANT**

    A.     **Tenant's Use of Premises**. Tenant shall use the Premises only for the uses set forth in Article I, Section 4, of this Lease and for no other purpose. Landlord represents and warrants that Exhibit E contains a true, complete and accurate recitation of all contractual use restrictions relating to the Premises (whether deed restrictions, lease restrictions or otherwise), other than the restrictions set forth in this Lease.

    B.     **Operation of Business**. Tenant agrees to use reasonable efforts to open its facitliy for business on or before the Outside Opening Date and to continuously operate from 9:00 A.M. to 8:00 P.M. on all business days during the Term of this Lease and any renewal or extension thereof, except where Tenant is prevented from doing so by strikes, casualty or other causes beyond Tenant's control. Landlord acknowledges that Tenant may elect to operate its facilities on a 24 hour basis, and that Tenant intends to use an access card or access badge system to control entry into Tenant's Premises with the understanding that any services provided by Landlord exclusively to Tenant to allow Tenant to operate its extended hours shall be reimbursed exclusively by Tenant to Landlord.

X.     **TENANT'S COVENANTS WITH RESPECT TO OCCUPANCY**

    Tenant agrees:

    1.     To occupy the Premises in a safe and careful manner and in compliance with all laws, ordinances, rules, regulations and orders of any governmental bodies having jurisdiction over the Premises and without committing or permitting waste;

    2.     To neither do nor suffer anything to be done or kept in or about the Premises which contravenes Landlord's insurance policies or increases the premiums therefor;

    3.     To keep its show or display windows, canopy and electric signs lighted until at least 9:30 P.M. local time of each day or until time thirty (30) minutes after the close of each business day, whichever is the later;

    4.     To permit no reproduction of sound which is audible outside the Premises nor permit odors to be unreasonably dispelled from the Premises;

    5.     To place no sign on the exterior of the Premises or on the interior surface of any windows of the Premises without Landlord's prior written consent and in accordance with the requirements of Exhibit "D" attached hereto. Tenant shall maintain all signs placed upon the Premises by Tenant in good condition and repair. Tenant agrees not to display any banners, pennants, searchlights, window signs, balloons, or similar temporary advertising media on or about the Premises. Upon vacating the Premises, Tenant agrees to remove all signs installed by Tenant and repair all damage caused by such removal;

    6.     To place no merchandise, sign or other thing of any kind in the vestibule or entry of the Premises or on the sidewalks or other Common Areas adjacent thereto;

    7.     To park Tenant's vehicles and to require all employees to park only in such places as may be designated from time to time by Landlord for the use of Tenant and its employees (which places shall be within a reasonable walking distance of the Premises), and specifically not to permit parking of any Tenant or employee vehicles in any service court area. Landlord reserves the right to impose fines against Tenant for any violation of these parking restrictions by Tenant and/or Tenant's employees and to have towed, at Tenant's cost and expense, any automobile parked in violation of this Section;

    8.     To keep any rubbish, garbage and waste generated by Tenant from the Premises in proper dumpsters provided by Tenant adjacent to the Premises or such other reasonable area designated by Landlord from time to time until such rubbish, garbage and waste is removed from the Shopping Center and to permit no refuse to accumulate around the exterior of the Premises;

DB04/830929.0006/6210741.3 TD09

9. To neither load nor unload or permit the loading or unloading of merchandise, equipment or other property from any doors of the Premises that open onto the front sidewalk areas, nor from any other doors except from the rear of the Premises and to use its best efforts to prevent the parking or standing of vehicles and equipment upon Shopping Center land except when actually engaged in loading or unloading;

10. To conduct no auction, fire, bankruptcy, liquidation or going-out-of-business sale without the prior written consent of Landlord;

11. To permit Landlord free access to the Premises at all reasonable times for the purpose of examining or making repairs to the Premises that Landlord may deem necessary or desirable for the safety or preservation thereof;

12. To permit no lien, notice of intention to file lien or other charge which might be or become a lien or encumbrance or charge upon the Premises or any part thereof;

13. To solicit no business in the Common Areas, nor distribute handbills or other advertising matter to customers, nor place the same in or on automobiles in the Common Areas;

14. To comply with all reasonable rules and regulations which Landlord may from time to time establish for the use and care of the Premises and the Common Areas;

15. Intentionally Deleted.

16. To shut off all exhaust fans, if any, servicing the Premises at all times when Premises are closed; shall keep the Premises heated or air conditioned, as the case may be, to at least the same minimum temperature (in the case of heat) or at the same maximum temperature (in the case of air-conditioning) as Landlord shall reasonably require;

17. To participate in any reasonable window cleaning and exterminating programs that may be established by Landlord;

18. Intentionally Deleted;

19. To permit Landlord or its agents, during the ninety (90) day period preceding the expiration of the Term of this Lease, to show the Premises to potential tenants, and to place on the Premises notices offering the Premises for lease or sale;

20. Except as set forth in the plans and specifications for the Tenant's Work (which are to include skylights, ventilation shafts and solar tubes) and pursuant to the terms of Exhibit C, to not make any penetrations through the roof of the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld;

21. To defend, protect, indemnify and hold Landlord harmless from and against any and all claims, causes of action, liabilities, damages, costs and expenses, including, without limitation, attorney fees, arising because of any alleged personal injury, property damage, death, nuisance, loss of business or otherwise by Landlord, any employee of Landlord, or from and against any governmental act or enforcement, arising from or in any way connected with conditions existing or claimed to exist with respect to Hazardous Materials (as hereinafter defined) within the Shopping Center which are the result of Tenant's use, occupancy or operation of the Premises. As used herein the term "Hazardous Materials" shall be defined as any hazardous substance, contaminant, pollutant or hazardous release (as such terms are defined in any federal, state or local law, rule, regulation or ordinance, including without, limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended) and other said wastes.

22. In the event Tenant shall cause or permit the presence of Hazardous Materials in, on or under the Premises or any other portion of the Shopping Center, Tenant shall promptly, at Tenant's sole cost and expense, take any and all action necessary (as required by appropriate government authority or otherwise) to return the areas affected thereby to the condition existing prior to the presence of any such Hazardous Materials thereon, subject to Landlord's prior written consent. The foregoing covenants shall survive termination of this Lease.

11

23. In the event Landlord elects to make any additions or changes to the Premises and/or Shopping Center, Tenant shall, at its sole cost and expense, upon Landlord's request: (i) temporarily relocate and/or remove Tenant's signage; and/or (ii) modify Tenant's signage to conform to Landlord's signage criteria then in effect, that applies to the Shopping Center, provided such requirements are uniformly applied and enforced.

XI. **REPAIRS AND ALTERATIONS**

A. **Repairs by Landlord.** Landlord shall keep the foundations, roof, roofing membrane, downspouts, Common Areas, structural portions of the Premises (including the structural integrity of the floor), and outer walls of the Premises in good repair, except for repairs required thereto by reason of the acts of Tenant, Tenant's employees, agents, invitees, licensees, or contractors. Notwithstanding the foregoing, Tenant understands that the Premises are designed for a retail store and that any structural damages caused by Tenant's heavy machinery and equipment shall be repaired by Tenant. Tenant shall give Landlord written notice of the necessity for repairs coming to the attention of Tenant following which Landlord shall have a reasonable time to undertake and complete such repairs. The provisions of this Article shall not apply in the case of damage or destruction by fire or other casualty or by Eminent Domain, in which events the obligations of Landlord shall be controlled by either Article XIII or Article XV hereof.

It is expressly understood that Landlord shall not be responsible for any portions of the Premises constructed by Tenant or any prior occupant of the Premises.

B. **Repairs by Tenant.** Except as provided in Article XI, Section A, Tenant shall keep the Premises and any fixtures, facilities, signs or equipment contained therein, in good condition and repair, including, but not limited to, exterior and interior portions of all doors, door checks and operations, windows, plate glass, and showcases surrounding the Premises, the heating, air conditioning, electrical, plumbing and sewer systems, the exterior doors, window frames, and all portions of the store front area, and shall make any replacements thereof and of all broken and/or cracked plate and window glass which may become necessary during the term of this Lease, and any renewals thereof, excepting any repairs to items of Landlord's original construction made necessary by reason of damage due to fire or other casualty covered by standard fire and extended coverage insurance. In connection with Tenant's obligation to maintain the HVAC system servicing the Premises, Tenant shall, during the Term of this Lease, and any renewals thereof, at its sole cost and expense, maintain a service contract for the routine performance of standard HVAC system maintenance, including but not limited to, periodic replacement of filters, oiling of mechanical components and inspection for wear and tear. If Tenant fails to properly maintain a service contract as required hereby, Landlord may engage an HVAC contractor and charge Tenant for the cost thereof. If Tenant fails to commence or complete repairs promptly and adequately, Landlord may make or complete said repairs and Tenant shall pay the cost thereof to Landlord upon demand, together with the sum of fifteen percent (15%) of said costs for overhead and an additional sum equal to ten percent (10%) of said amount for profit.

C. **Alterations or Improvements by Tenant.** Except for minor changes which are not structural in nature and do not change the square footage of the Premises (which Tenant may make without prior consent of Landlord), Tenant shall not, without Landlord's prior written consent (which consent Landlord shall not be unreasonably withheld), make, nor permit to be made, any alterations, additions or improvements to the Premises; provided that installation of Tenant's tools, machinery and equipment shall not require Landlord's approval, so long as the installation of Tenant's tools, machinery and equipment do not pose a threat to the structural integrity of the Premises. Any alterations which may be permitted by Landlord shall be based upon plans and specifications submitted by Tenant and approved by Landlord and upon the condition that Tenant shall promptly pay all costs, expenses, and charges thereof, shall make such alterations and improvements in accordance with applicable laws and building codes and ordinances and in a good and workmanlike manner, and shall fully and completely indemnify Landlord against any mechanic's lien or other liens or claims in connection with the making of such alterations, additions, or improvements. Tenant shall promptly repair any damages to the Premises, or to the buildings of which the Premises are a part, caused by any alterations, additions or improvements to the Premises by Tenant.

D. **Removal of Improvements.** All items of Landlord's construction, all heating and air conditioning equipment, and all alterations, additions and other improvements by Tenant (specifically excluding Tenant's tools, machinery, equipment and trade fixtures) shall become the property of landlord and shall not be removed from the Premises. All trade fixtures, furniture, furnishings, and signs installed in the Premises by Tenant and paid for by Tenant

D004/830929.0006/6210741.3 TD09

shall remain the property of Tenant and may be removed upon the expiration of the term of this Lease; provided (i) that any of such items as are affixed to the Premises and require severance may be removed only if Tenant repairs any damage caused by such removal and (ii) that Tenant shall have fully performed all of the covenants and agreements to be performed by Tenant under the provisions of this Lease. If Tenant fails to remove such items from the Premises prior to the expiration or earlier termination of this Lease, all such trade fixtures; furniture, furnishings, and signs shall become the property of Landlord unless Landlord elects to require their removal, in which case Tenant shall promptly remove same and restore the Premises to its prior condition. In the event Tenant fails to remove all such trade fixtures, furniture, furnishings and signs within ten (10) days after Landlord elects to require their removal, Landlord shall have the right to remove same and sell such trade fixtures, furniture, furnishings, and signs to pay for the cost of removal.

XII.    **INDEMNITY AND INSURANCE**

A.      **Indemnification by Tenant.** Tenant will indemnify and hold Landlord harmless from and against all loss, cost, expense and liability whatsoever (including Landlord's cost of defending against the foregoing, such cost to include attorney's fees) resulting or occurring by reason of Tenant's construction, use or occupancy of the Premises.

B.      **Public Liability Insurance.** Tenant agrees to carry public liability insurance covering the Premises and Tenant's use thereof, together with contractual liability insurance endorsements covering Tenant's obligations set forth in Article XII, Section A, above, in companies and in a Form satisfactory to Landlord, with a minimum limit of One Million and 00/100 Dollars ($1,000,000.00) on account of bodily injuries to or death or property damage for each occurrence and a minimum limit of Two Million Dollars ($2,000,000.00) general aggregate. Such insurance shall also provide that the general aggregate limits apply separately to each insured location, if applicable. Tenant shall deposit with Landlord prior to the date of any use or occupancy of the Premises by Tenant certificates evidencing the required coverages. Tenant's insurance policy shall name Landlord and such other parties as Landlord may from time to time designate in writing to Tenant as additional insureds under Tenant's insurance policy and shall bear endorsements to the effect that the insurer agrees to notify all additional insureds not less than thirty (30) days in advance of any modification or cancellation thereof.

C.      **Landlord's Liability.** Landlord shall not be liable (i) for any damage to Tenant's property located in the Premises, regardless of the cause of such damage, (ii) for any acts or omissions of other tenants of the Shopping Center, nor (iii) for any condition of the Premises whatsoever unless Landlord is responsible for the repair thereof, and has failed to make such repair after notice from Tenant of the need therefor, and expiration of a reasonable time for the making of such repair.

D.      **Fire and Extended Coverage Insurance.** Landlord agrees to carry policies insuring the improvements on the Shopping Center constructed by Landlord against fire and such other perils as are normally covered by extended coverage endorsements in an amount equal to at least eighty percent (80%) of the insurable value of such improvements, together with insurance against such other risks (including earthquake, flood, loss of rent, environmental risk and such other coverages as Landlord, in its reasonable discretion, deems appropriate) and in such amounts as Landlord deems appropriate. Tenant agrees that the total cost of the foregoing insurance shall be included in the Common Area charge as provided for in Article VII, Section B, of this Lease and that Tenant shall pay its proportionate share of the foregoing insurance per said Subsection; provided, however, that Tenant shall have no rights in said policy or policies maintained by Landlord and shall not, by reason of such reimbursement, be entitled to be a named insured thereunder. In the event any of Landlord's policies insures the Premises or risks other than the Shopping Center or the rents therefrom, the statement of the insurer shall be conclusive as to the portion of the total premium attributable to the Shopping Center. Tenant shall carry insurance against fire and such other risks as are, from time to time, included in standard extended coverage endorsements, insuring Tenant's stock-in-trade, trade fixtures, furniture, furnishings, special equipment, floor and wall coverings, and all other items of personal property of Tenant located on or within the Premises, such coverage to be in an amount equal to at least eighty percent (80%) of the replacement cost thereof. Prior to the Commencement Date of this Lease, Tenant shall furnish Landlord with a certificate evidencing such coverage.

E.      **Mutual Waiver of Subrogation.** All insurance policies carried by either party covering the Premises, including but not limited to contents, fire, and casualty insurance, shall to the extent permitted by law expressly waive any right on the part of the insurer against the other party. The failure of any insurance policy to include such waiver clause or endorsement shall not

DB04/830929.0006/6210741.3 TD09

affect the validity of this Lease. Tenant and Landlord further agree to waive all claims, causes of action and rights of recovery against the other, and their respective agents, officers, and employees, for any injury to or death of persons or any damage or destruction of persons, property or business which shall occur on or about the Premises originating from any cause whatsoever including the negligence of either party and their respective agents, officers, and employees to the extent such injury, death or property damage is required to be covered by a policy or policies maintained by either Landlord or Tenant pursuant to this Lease.

XIII. **DAMAGE AND DESTRUCTION**

In the event the Premises are damaged by any peril covered by standard policies of fire and extended coverage insurance, the damage shall, except as hereinafter provided, promptly be repaired by Landlord at Landlord's expense but, in no event shall Landlord be required to repair or replace Tenant's stock-in-trade, trade fixtures, furniture, furnishings, equipment or personal property, which shall be the obligation of Tenant to replace to at least equal condition immediately prior to such damage. In the event (a) the Premises are damaged to the extent of twenty-five percent (25%) or more of the cost of replacement of the Premises, (b) the buildings on the Shopping Center are damaged to the extent of fifty percent (50%) or more of the cost of replacement, notwithstanding the extent of damages to the Premises, or (c) any damage to the Premises occurs during the last three (3) years of the term of this Lease, either Landlord or Tenant may elect to terminate this Lease upon giving notice of such election in writing to the other within ninety (90) days after the event causing the damage to repair, and if neither party so elects to terminate this Lease, then Landlord shall rebuild the Premises or the buildings on the Shopping Center, as the case may be. If the casualty, repairing, or rebuilding shall render the Premises untenantable, in whole or in part, a proportionate abatement of the Minimum Rent shall be allowed until the date Landlord completes the repairs or rebuilding. Anything to the contrary set forth in this Article XIII notwithstanding, in the event that the necessary repairs cannot be completed within one hundred eighty (180) days after the date of such damage or destruction, Tenant shall have the right to terminate this Lease (whether or not Landlord has decided to repair the Premises or such portion of the Shopping Center) by delivery of written notice to Landlord within ninety (90) days after the event causing the damage. Any termination of this Lease effected pursuant to the provisions of this Article XIII shall be effective upon the date of the termination notice given by the applicable party. If this Lease shall not be terminated as provided in this Article XIII, then Landlord expeditiously shall rebuild and restore the Premises as nearly as practicable to the condition existing immediately prior to such damage or destruction.

XIV. **ASSIGNING AND SUBLETTING**

Tenant's use of the Premises may include (i) the licensing or rental of designated areas (including offices or rooms) to provide segregated, secure or private work and ancillary use areas ("Operating Subleases") for TechShop Members or for typical TechShop subtenants whose uses are complimentary to, or synergistic with TechShop ("Operating Licensees/Sublessees") and (ii) so long as the sublessee's use does not violate any of the exclusive uses or restrictions set forth in Exhibit E, Tenant shall be permitted to sublease (an "Excess Space Sublease") up to 7,500 square feet of the Premises to any sublessee. For purposes hereof Excess Space Sublessee(s) and Operating Licensees/Sublessees shall collectively be referred to as the "Permitted Licensees/Sublessees". Except for Permitted Licensees/Subleases, Tenant shall not sublet the Premises or any part thereof nor assign this Lease without, in each case, the prior written consent of Landlord, which consent Landlord shall not unreasonably withhold. Except for Permitted Licensees/Sublesees, Tenant shall not permit any business to be operated in or from the Premises by any concessionaire or licensee without the prior written consent of Landlord, which consent Landlord may withhold in its sole discretion. In the event Tenant shall request Landlord's consent to an assignment of this Lease or subletting of the Premises, Tenant shall pay Landlord, as a condition to obtaining Landlord's consent the reasonable costs and expenses incurred by Landlord to review and/or prepare documents in connection with such assignment or sublease (including Landlord's reasonable attorneys' fees) and, in addition, a consent fee of One Thousand and 00/100 Dollars ($1,000.00) per request, regardless of whether such assignment or sublease is consummated by Tenant. No consent by Landlord shall operate to relieve Tenant from primary liability for the performance of Tenant's obligations under this Lease.

Any sale, assignment, bequest, inheritance, transfer or other disposition of shares of Tenant's corporate stock which shall result in a change in the effective voting control of Tenant by the person or persons owning a majority of said corporate shares on the date of this Lease shall be deemed an assignment of this Lease requiring Landlord's prior written consent, which consent shall not be unreasonably withheld.

XV. **EMINENT DOMAIN**

In the event the Shopping Center or any part thereof shall be taken or condemned either permanently or temporarily for any public or quasi-public use or purpose by any authority in appropriate proceedings or by any right of eminent domain, the entire compensation award thereof, including, but not limited to, all

14                                                                                          FRONTIER VILLAGE

damages as compensation for diminution in value of the leasehold, reversion and fee, shall belong to Landlord, without any deduction therefrom for any present or future estate of Tenant, and Tenant hereby assigns to Landlord all of its right, title, and interest to any such award. Tenant shall have the right to recover from the condemning authority, but not from Landlord, such compensation as may be separately awarded to Tenant.

In the event of a taking under the power of eminent domain of (i) more than twenty-five percent (25%) of the Premises or (ii) a sufficient portion of the Shopping Center so that after such taking less than fifty percent (50%) of the leasable floor area within all buildings located on the Shopping Center (as constituted prior to such taking) are occupied by tenants, either Landlord or Tenant shall have the right to terminate this Lease by notice in writing given within ninety (90) days after the condemning authority takes possession, in which event all rents and other charges shall be prorated as of the date of such termination.

In the event of a taking of any portion of the Premises not resulting in a termination of this Lease, Landlord shall use so much of the proceeds of Landlord's award for the Premises as is required therefor to restore the Premises to a complete architectural unit and this Lease shall continue in effect with respect to the balance of the Premises, with a reduction of Minimum Rent in proportion to the portion of the Premises taken.

XVI.    **DEFAULT BY TENANT**

If Tenant defaults in the payment of Minimum Rent or other charges and such payment is not made within five (5) days following Landlord's written notice that same is due, or if Tenant shall default in the performance of any other of Tenant's obligations hereunder and Tenant fails to remedy such default within thirty (30) days after written notice from Landlord, provided that in no event shall Landlord be obligated to provide Tenant with written notice of any default, monetary or otherwise, more than twice per calendar year, or if a receiver of any property of Tenant on the Premises is appointed, or Tenant's interest in the Premises is levied upon by legal process, or Tenant be adjudged bankrupt and Tenant fails within thirty (30) days to cause the vacation of such appointment, levy or adjudication, or if Tenant files a voluntary petition in bankruptcy, disposes of all or substantially all of its assets in bulk, or makes an assignment for the benefit of its creditors, then and in any such instance, without further notice to Tenant, Landlord shall have the right to exercise any and all rights or remedies available to Landlord at law in equity or otherwise, arising from such default, including but not limited to the right to (i) terminate this Lease, or (ii) enter upon the Premises without terminating this Lease and relet the Premises in Landlord's name for the account of Tenant for the remainder of the term upon terms and conditions reasonably acceptable to Landlord and immediately recover from Tenant any deficiency for the balance of the term, plus expenses of reletting. In addition to the foregoing, any time after such default and the lapse of any applicable notice period, to make such payments in default or perform such act in default for the account and at the expense of Tenant, and all unpaid Minimum Rent or other charges which are not paid when due and all sums paid by Landlord pursuant to this sentence, including reasonable attorneys' fees, shall accrue interest at the annual rate of (i) fifteen percent (15%) or (ii) five percent (5%) above the prime lending rate of Bank of America, St. Louis, Missouri, whichever is greater (but in no event greater than the highest lawful rate), which shall constitute additional rent under this Lease and shall be payable upon demand. If Tenant shall issue a check to Landlord which is dishonored by Tenant's depository bank and returned unpaid for any reason including without limitation, due to insufficient funds in Tenant's checking account, Tenant shall pay to Landlord in addition to any other rights or remedies available to Landlord at law, the sum of Seventy-five and 00/100 Dollars ($75.00) for Landlord's administrative expense in connection therewith.

In addition to Landlord's remedies set forth above, in the event of Tenant's default, which is not cured within any applicable notice and cure period, Landlord may alter locks and other security devices at the Premises, to deprive Tenant of access thereto, and Landlord shall not be required to provide a new key or right of access to Tenant. No such alteration of security devices and no removal or other exercise of dominion by Landlord over the property of Tenant or others at the Premises shall be deemed unauthorized or constitute a conversion, Tenant hereby consenting, after any default by Tenant, to the aforesaid exercise of dominion over Tenant's property within the Premises. All claims for damages by reason of such re-entry and/or possession and/or alteration of locks or other security devices are hereby waived, as are all claims for damages by reason of any distress warrant, forcible detainer proceedings, sequestration proceedings or other legal process. Tenant agrees that any re-entry by Landlord may be pursuant to judgment obtained in forcible detainer proceedings or other legal proceedings or without the necessity for any legal proceedings, as Landlord may elect, and Landlord shall not be liable in trespass or otherwise.

Tenant's failure to pay Rent, Additional Rent, or any other Lease costs when due under this Lease may cause Landlord to incur unanticipated costs, the exact amount of such costs being impractical or extremely difficult to ascertain. Such costs may include, but are not limited to, processing and accounting

<center>15</center>

DB04/830929.0006/9210741.3 TD69

charges and late charges that may be imposed on Landlord by any ground lease, mortgage, or deed of trust encumbering the Shopping Center. Therefore, if Landlord does not receive the Rent, Additional Rent, or any other Lease costs in full on or before the fifth (5th) day of the month it becomes due, Tenant shall pay Landlord a late charge, which shall constitute liquidated damages, equal to Fifty Dollars ($50.00) a day for each day rent is late after the first of the month ("Late Charge"), which shall be paid to Landlord together with such Rent, Additional Rent, or other Lease costs then in arrears. The parties agree that such Late Charge represents a fair and reasonable estimate of the cost Landlord will incur by reason of such late payment. All Late Charges and any returned check charges shall then become Additional Rent and shall be due and payable immediately along with such other Rent, Additional Rent, or other Lease costs then in arrears. Money paid by Tenant to Landlord shall be applied to Tenant's account in the following order: (i) to any unpaid Additional Rent, including, without limitation, Late Charges, returned check charges, legal fees and/or court costs legally chargeable to Tenant, and Common Area Maintenance Charges, and then (ii) to unpaid Minimum Rent. Nothing herein contained shall be construed so as to compel Landlord to accept any payment of Rent, Additional Rent, or other Lease costs in arrears or Late Charges or returned check charges should Landlord elect to apply its rights and remedies available under this Lease or at law or equity in the event of default hereunder by Tenant. Landlord's acceptance of Rent, Additional Rent or other Lease costs in arrears or Late Charges or returned checks charge pursuant to this clause shall not constitute a waiver of Landlord's rights and remedies available under this Lease or at law or equity.

Tenant agrees to pay to Landlord upon demand, as additional rent, a sum equal to all costs and expenses (including attorney fees, professional fees, costs of investigation and disbursements) incurred by Landlord in enforcing any or all of its rights hereunder, specifically including the cost of collecting sums due, whether or not an action or proceeding is commenced, or levying and collecting on any judgment or arbitration award in Landlord's favor.

All rights and remedies of Landlord herein enumerated shall be cumulative, and none shall exclude any other remedies allowed at law or in equity.

Tenant acknowledges that Landlord has entered into this Lease in reliance upon, among other matters, Tenant's agreement and continuing obligation to pay all rental due throughout the Lease Term. As a result, Tenant hereby knowingly and voluntarily waives, after advice of competent counsel, any duty of Landlord (and any affirmative defense based upon such duty) following any default to relet the Premises or otherwise mitigate Landlord's damages arising from such default. If such waiver is not effective under then applicable law or Landlord otherwise elects, at Landlord's sole option, to attempt to relet all or any part of the Premises, Tenant agrees that Landlord has no obligation to: (i) relet the Premises prior to leasing any other space within the Shopping Center; (ii) relet the Premises (A) at a rental rate or otherwise on terms below market, as then determined by Landlord in its sole discretion; (B) to any entity not satisfying Landlord's then standard financial credit risk criteria; (C) for a use (1) not consistent with Tenant's use prior to default; (2) which would violate then applicable law or any restrictive covenant or other lease affecting the Shopping Center; (3) which would impose a greater burden upon the Shopping Center's parking or other facilities; and/or (4) which would involve any use of hazardous substances; (iii) pay any leasing or other commissions arising from such reletting, unless Tenant unconditionally delivers Landlord, in good and sufficient funds, the full amount thereof in advance; (iv) pay, and/or grant any allowance for, tenant finish or other costs associated with any new lease, even though same may be amortized over the applicable lease term, unless Tenant unconditionally delivers Landlord, in good and sufficient funds, the full amount thereof in advance; and/or (v) relet the Premises, if to do so, Landlord would be required to alter other portions of the Shopping Center or make ADA-type modifications. Tenant further acknowledges that if Tenant, notwithstanding Tenant's waiver above, raises Landlord's mitigation as an affirmative defense to a claim made by Landlord prior to any actual reentry of the Premises by Landlord then, in such event, Tenant will be deemed to have automatically waived, and released and discharged Landlord from and against, any and all other claims and defenses to the payment of rental.

## XVII.   **NOTICES**

Any notice or consent required to be given by or on behalf of either party to the other shall be given in writing and mailed by certified mail, return receipt requested, or by overnight courier service which provides a receipt, at the addresses stated on Article I, Sections 18 and 19, of this Lease, or at such other address as may be specified, from time to time, by notice in the manner herein set forth. Notices shall be deemed given upon actual receipt or first rejection. In addition, any notices permitted by law to be made by Landlord by posting upon the Premises may be so posted by Landlord and shall be deemed made when posted.

DR04/830929.0006/6210741.3 TD09

## XVIII.   SECURITY DEPOSIT

Tenant has deposited with Landlord the amount set forth in Article I, Section 16, herein (the "Security Deposit"), receipt of which is hereby acknowledged. The Security Deposit shall be held by Landlord, without liability for interest, as security for the timely performance by Tenant of all the terms of this Lease that are to be observed and performed by Tenant. Landlord shall not be obligated to hold the Security Deposit as a separate fund and may commingle the Security Deposit with other funds. If any sum payable by Tenant to Landlord shall be unpaid or if Landlord makes payments on behalf of Tenant, or performs any of Tenant's obligations under this Lease, then Landlord may, at its option and without prejudice to any other remedy which Landlord may have on account thereof, apply the Security Deposit as may be necessary to compensate Landlord toward the payment of the sum payable by Tenant to Landlord for loss or damage sustained by Landlord due to such breach on the part of Tenant, and Tenant shall, upon demand, restore the Security Deposit to the original sum deposited. If Tenant complies with all of the terms of this Lease, the Security Deposit shall be returned in full to Tenant at the expiration or termination of this Lease. In the event of bankruptcy or other debtor/creditor proceedings against Tenant, the Security Deposit shall be deemed to be applied first to the payment of rent and other charges due Landlord for all periods prior to the filing of such proceedings. Landlord may deliver the Security Deposit to the purchaser of Landlord's interest in the Premises in the event that such interest is sold, and thereupon Landlord shall be discharged from any further liability with respect to the Security Deposit and this provision shall also apply to any subsequent transferees.

## XIX.   MORTGAGE SUBORDINATION

This Lease, and Tenant's rights hereunder shall be subject and subordinate to the lien of any mortgages or deeds of trust or other similar instrument that may now exist or may hereafter be placed upon the Shopping Center and all renewals, replacements, and extensions thereof without further notice or action on the part of Landlord or Tenant. Tenant shall, within twenty (20) days following the request of Landlord, execute and deliver such instruments (including but not limited to a Memorandum of Lease and/or a Subordination, Non-Disturbance and Attornment Agreement in recordable form) which may be required by Landlord's mortgagee or trustee to evidence such subordination; provided, however, that any such instrument evidencing the subordination of this Lease and the estate hereby granted to any such mortgage, deed of trust or other lien shall provide that, so long as Tenant shall not be in default under this Lease beyond any applicable notice, cure or grace period, this Lease and the estate hereby granted shall not be terminated, and Tenant's possession of the Premises shall not be interfered with in any foreclosure or other action or proceeding instituted under or in connection with such mortgage, deed of trust or other lien instrument.  Contemporaneously with the execution of this Lease, Landlord shall provide to Tenant a non-disturbance agreement pursuant to which each holder of an existing mortgage, deed of trust or other lien instrument agrees that, so long as Tenant shall not be in default under this Lease beyond any applicable notice, cure or grace period, this Lease and the estate hereby granted shall not be terminated, and Tenant's possession of the Premises shall not be interfered with in any foreclosure or other action or proceeding instituted under or in connection with such mortgage, deed of trust or other lien instrument.

## XX.   ESTOPPEL CERTIFICATES

At any time and from time to time, Tenant shall, upon request in writing from Landlord, execute and deliver to Landlord, for the benefit of such persons as Landlord names in such request a statement in writing and in substance satisfactory to Landlord certifying to such of the following information as Landlord shall request: (i) that this Lease constitutes the entire agreement between Landlord and Tenant and is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications); (ii) the dates to which the Minimum Rent, and other charges hereunder have been paid, and the amount of any security deposited with Landlord; (iii) that the Premises have been completed on or before the date of such letter and that all conditions precedent to the Lease taking effect have been carried out; (iv) that Tenant has accepted possession, that the Lease Term has commenced, that Tenant is occupying the Premises, that Tenant knows of no default under the Lease by Landlord and that there are no defaults or offsets which Tenant has against enforcement of this Lease by Landlord; (v) the actual commencement date of the Lease and the expiration date of the Lease; and (vi) that Tenant's Premises is open for business, provided such facts are true and ascertainable.

## XXI.   QUIET ENJOYMENT

Landlord hereby covenants and agrees that if Tenant shall perform all the covenants and agreements herein stipulated to be performed on Tenant's part, Tenant shall at all times during the continuance hereof have the peaceable and quiet enjoyment and possession of the Premises without any hindrance from Landlord or any person or persons lawfully claiming the Premises.

D\B04/830929,0006/6210741.3  TD09

XXII.    **LIABILITY OF LANDLORD**

Notwithstanding anything to the contrary provided in this Lease, it is specifically understood and agreed, such agreement being a primary consideration for the execution of this Lease by Landlord, that if Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed and, as a consequence of such default, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levy thereon against the right, title, and interest of Landlord in the Shopping Center, as the same may then be encumbered, and neither Landlord nor any of its officers or shareholders shall be liable for any deficiency. It is understood that in no event shall Tenant have any right to levy execution against any property of Landlord other than its interest in the Shopping Center as hereinbefore expressly provided. In the event of the sale or other transfer of Landlord's right, title and interest in the Premises or the Shopping Center, Landlord shall be released from all liability and obligations under this Lease arising from and after the date of such sale or other transfer.

XXIII.    **MISCELLANEOUS PROVISIONS**

A.    **Accord and Satisfaction.**  No payment by Tenant, or anyone occupying the Premises by, through or under Tenant, or receipt by Landlord of a lesser amount than the rents stated herein shall be deemed to be other than on behalf of Tenant and on account of the next due rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy provided for in this Lease or available at law or in equity.

B.    **Waiver.**  No waiver of any condition or legal right or remedy shall be implied by the failure of Landlord to declare forfeiture, or for any other reason, and no waiver of any condition or covenant shall be valid unless it be in writing signed by Landlord. No waiver by Landlord with respect to one or more tenants or occupants of the Shopping Center shall constitute a waiver in favor of any other tenant, nor shall the waiver of a breach of any condition be claimed or pleaded to excuse a future breach of the same condition or covenant.

C.    **Broker's Commission.**  Tenant warrants that, except for any amounts payable by Landlord to its agent, Providence Commercial Real Estate Services, Inc., and to Tenant's agent, United Commercial Realty, there are no claims for broker's commissions or finder's fees in connection with its execution of this Lease, and Tenant agrees to indemnify and save Landlord harmless from any liability that may arise from such claims, including reasonable attorney's fees.

D.    **No Partnership.**  Landlord does not, in any way or for any purpose, become a partner of Tenant in the conduct of its business, or otherwise, or a joint venturer or a member of a joint enterprise with Tenant.

E.    **Lease Inures to the Benefit of Assignees.**  This Lease and all of the covenants, provisions, and conditions herein contained shall inure to the benefit of and be binding upon the heirs, personal representatives, successors and assigns respectively, of the parties hereto, provided, however, that no assignment by, from, through, or under Tenant in violation of the provisions hereof shall vest in the assigns any right, title, or interest whatever.

F.    **Entire Agreement.**  This Lease and the exhibits attached hereto set forth the entire agreement between Landlord and Tenant, and all prior promises and agreements, oral or written, between them are merged into this Lease.  No amendment to this Lease shall be binding upon Landlord or Tenant unless in writing.

G.    **Abandonment, Surrender and Holding Over.**  Tenant shall deliver up and surrender to Landlord possession of the Premises upon the expiration of the Lease Term, or its prior termination for any reason, in as good condition and repair as the same shall be at the commencement of said term (damage by fire and other perils covered by standard fire and extended coverage insurance and ordinary wear and tear only excepted). At the time Tenant shall deliver and surrender possession of the Premises to Landlord, Tenant shall provide Landlord with a written statement from an HVAC contractor reasonably acceptable to Landlord who shall certify that the HVAC system servicing the Premises has been properly maintained and is in good working order. In the event Tenant shall fail to provide such statement to Landlord, Landlord shall have the right, but not the obligation to retain an HVAC contractor of Landlord's choosing who shall inspect the HVAC system servicing the Premises and report to Landlord as to the condition of said HVAC system. If such report discloses the need for repair or maintenance, Landlord shall have the right, but not the obligation, to cause such repairs or

DE04/830929.0006/6210741.3  TD09

maintenance. Tenant shall reimburse Landlord for all costs and expenses so incurred by Landlord in performing the inspection, maintenance and/or repairs plus an additional ten percent (10%) of such cost for and as Landlord's overhead. If Tenant remains in possession of the Premises after any termination of this Lease, no tenancy or interest in the Premises shall result, but such holding over shall be an unlawful detainer and all such parties shall be subject to immediate eviction, and Tenant shall pay to Landlord as rent for the period of holdover, a sum equal to two hundred percent (200%) of the Minimum Rent. If Tenant vacates the Premises prior to the scheduled expiration of the Lease Term, Tenant shall be in default of this Lease, and if Tenant has not re-entered the Premises and resumed the operation of the business set forth in Article IX, Section B, of this Lease for a period of thirty (30) consecutive days, Tenant shall be deemed to have abandoned the Premises and Landlord shall have the right, but not the obligation, to take sole possession of the Premises on or after the tenth (10th) day following the expiration of said thirty (30) day period and Landlord may relet said Premises in accordance with the terms in Article VI hereof.

H.     **No Option**.  The submission of this Lease by Landlord for review by Tenant does not constitute a reservation of or option for the Premises, and shall vest no right in Tenant. This Lease becomes effective as a Lease only upon execution and delivery thereof by the parties hereto.

I.     **Additional Rent**.  Any amounts to be paid by Tenant to Landlord pursuant to the provisions of this Lease, whether such payments are periodic or recurring, shall be deemed to be "Additional Rent" and otherwise subject to all provisions of this Lease and of law as to the default in the payment of rent.

H.     **Power of Attorney**.   In the event Tenant fails to deliver any documents required to be delivered to Landlord under the terms of Articles XIX and XX of this Lease within ten (10) days after Landlord's written request, Tenant does hereby make, constitute, and irrevocably appoint Landlord as its attorney-in-fact and in its place and stead to do so.

K.     **Financial Statements**.  Tenant shall, within ten (10) days after receipt of a written request from Landlord, furnish to Landlord Tenant's current financial statement and such other financial information as Landlord may request. Landlord covenants that the financial information provided by Tenant shall be treated as confidential, except that Landlord may disclose such information to any prospective purchaser, prospective or existing lender or prospective or existing ground or underlying lessor upon the condition that the prospective purchaser, prospective or existing lender or underlying lessor shall also covenant to treat such information as confidential.

L.     **Severability**.  In the event that any provision or section of this Lease is rendered invalid by the decision of any court or by the enactment of any law, ordinance or regulation, such provision of this Lease shall be deemed to have never been included therein, and the balance of this Lease shall continue in effect in accordance with its terms.

M.     **Option to Renew**. Provided this Lease is in full force and effect and Tenant is not in default under any of the terms and provisions herein contained, Landlord hereby grants to Tenant the option to renew this Lease for the periods set forth in Article I, Section 17, commencing on the day following the expiration of the original term. Any such Renewal Term shall be upon all the terms and conditions as the original Lease Term except that the Minimum Rent shall be increased in accordance with the terms of Article I, Section 17.  It shall be a condition to Tenant's right to renew this Lease pursuant to this Section (M) that Tenant provide Landlord Tenant's current financial statement within thirty (30) days following the date Tenant shall exercise the foregoing option to renew this Lease.

The foregoing option to renew shall be exercised by written notice to Landlord given not less than the number of months set forth in Article I, Section 17, above prior to the expiration of the original term of this Lease, or any renewal thereof.

N.     **Net Rent**. It is the intention of Landlord and Tenant that the rent herein specified shall be net to Landlord in each year of the term hereof, and that all costs, expenses and obligations relating to the Premises (except as herein specifically provided) shall be paid by Tenant.

O.     **Counterparts**. This Lease may be executed in multiple counterparts, each of which shall constitute an original and all of which shall constitute one document.

P.     **Consents**.  With respect to any provision of this Lease which provides or infers, in effect, that Landlord shall not unreasonably withhold or unreasonably delay its consent or approval, in no

DD04/830929.0006/6210741.3 TD09

event shall Tenant be entitled to make, nor shall Tenant make, any claim against Landlord for money damages, and Tenant hereby waives any claim or assertion by Tenant that Landlord has unreasonably withheld or unreasonably delayed any consent or approval, but Tenant's sole remedy shall be an action or proceeding to enforce any such provision of this Lease, or for specific performance, injunction or declaratory judgment.

Q.     **Force Majeure.** In the event Landlord or Tenant is prevented or delayed in the performance of any improvement or repair or fulfilling any other obligation required under this Lease, other than the payment of rent, due to delays caused by fire, catastrophe, strikes or labor trouble, civil commotion, acts of God, governmental prohibitions or regulation, inability or difficulty to obtain materials or other causes beyond the performing party's reasonable control, the performing party shall, within five (5) days of the event causing such delay, provide written notice to the other party of the event causing the delay and the anticipated period of delay, and the period of such delay shall be added to the time for performance thereof. The performing party shall have no liability by reason of such permitted delays. In the event the performing party fails to provide notice to the other party of the force majeure delay within such five (5) day period, the performing party shall not be excused from the timely performance of such obligation regardless of the cause.

R.     **Joint and Several Liability.** In the event Tenant shall be comprised of more than one (1) individual or business entity, each such individual or business entity comprising Tenant shall be jointly and severally liable for each and every obligation of Tenant under the terms of this Lease.

S.     **Intentionally Deleted.**

T.     **Payment Under Protest.** All rent and other amounts payable hereunder shall be payable without demand, offset or deduction. If at any time a dispute shall arise as to any amount or sum of money to be paid by Tenant to Landlord under the provisions hereof, Tenant shall make such payment "under protest" and under no circumstances shall Tenant be entitled to withhold any payment due hereunder. If Tenant makes a payment "under protest" and it is subsequently determined that Tenant was not obligated to pay all or a portion of an amount paid "under protest," Landlord shall refund to Tenant the portion of the payment made "under protest" which Tenant was not obligated to pay.

U.     **Components of Lease.** This lease consists of 23 Articles, Schedule A, Exhibits A, B, C, D and E.

V.     **Owners' Joinder in this Lease.** By joining in this Lease, Owners agree that so long as Tenant is not in default under the provisions of this Lease beyond any applicable grace periods, Owner shall not disturb Tenant's possession of the Premises nor interfere with Tenant's rights under this Lease. Tenant agrees that, in the event of termination of the Ground Lease, Tenant will promptly attorn to Owner as Landlord under this Lease and Owners shall assume all of Landlord's obligations under this Lease. To the extent of any conflict between the provisions of the Ground Lease and the provisions of this Lease, this Lease shall control.

W.     **Ground Tenant's Joinder in this Lease.** By joining in this Lease, Ground Tenant agrees that as long as Tenant is not in default under the provisions of this Lease beyond any applicable grace periods, Tenant, its employees, concessionaires, agents, customers and invitees shall have an easement to use all Common Area of the Shopping Center located on Ground Tenant's Property.

X.     **Pylon Sign and Storefront Sign.** Tenant shall have the right, at Tenant's expense, to have its sign included on pylon sign #2 serving the Shopping Center and to have a storefront sign which is consistent in size and character with other storefront signs within the Shopping Center, subject to the sign criteria set forth in Exhibit D. Landlord acknowledged that it has received an example of Tenant's standard signage and agrees to work with Tenant in good faith to approve signage for the Premises and the Shopping Center which is similar to Tenant's standard signage.

D804/830929.0006/6210741.3 TD09

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be signed, in triplicate, as of the date and year first above written.

TENANT:

**TECHSHOP AUSTIN, LLC**

By: TechShop, Inc., its sole member

By: _____ CEO
Name: Mark Hatch
    Dated: _____6/19/12_____

Title: CEO

LANDLORD:

**LA FRONTERA VILLAGE, L.P.,**
a Texas limited partnership
by its general partner
LFVMGMT, INC.,
a Texas corporation
    Dated: _____5/30/12_____

By: _____
Name: THOMAS R. GREEN
Title: President

OWNERS:

**BALTGEM DEVELOPMENT CORPORATION,**
a Missouri corporation
    Dated: _____5/30/12_____

By: _____
Name: THOMAS R. GREEN
Title: President

**BARGET DEVELOPMENT CORPORATION,**
a Missouri corporation
    Dated: _____5/30/12_____

By: _____
Name: THOMAS R. GREEN
Title: President

**KARJOY DEVELOPMENT CORPORATION,**
a Missouri corporation
    Dated: _____5/30/12_____

By: _____
Name: KAROLE R. GREEN
Title: President

**MAXLAND DEVELOPMENT CORPORATION,**
a Missouri corporation
    Dated: _____5/30/12_____

By: _____
Name: THOMAS R. GREEN
Title: President

**JOPAT BUILDING CORPORATION,**
a Missouri corporation
    Dated: _____5/30/12_____

By: _____
Name: THOMAS R. GREEN
Title: President

DB04/830929.0006/6210741.3 TD09

Case: 18-50398    Doc# 132-2    Filed: 07/20/18    Entered: 07/20/18 12:17:59    Page 23 of 89

**NATURAL BRIDGE DEVELOPMENT CORPORATION,** Dated: _____5/30/12_____
a Missouri corporation

By: _____
Name: THOMAS R. GREEN
Title: President

**PAJIA REALTY CORPORATION,**      Dated: _____5/30/12_____
a Missouri corporation

By: _____
Name: THOMAS R. GREEN
Title: President

**THIRD CREEK L.L.C.,**      Dated: _____5/30/12_____
a Missouri limited liability company

By: _____
Name: MATTHIAS D. RENNER
Title: Manager

**DELMAR PROPERTIES,**      Dated: _____5/30/12_____
a Missouri general partnership

By: _____
Name: THOMAS R. GREEN
Title: General Partner

GROUND TENANT:

**FRONTIER VILLAGE, L.P.,**      Dated: _____5/30/12_____
a Texas limited partnership
by its general partner
FVMGMT, INC.,
a Texas corporation

By: _____
Name: THOMAS R. GREEN
Title: President

22

FRONTIER VILLAGE

DB04/830929.0006/6210741.3 TD09

# SCHEDULE A

## LA FRONTERA VILLAGE

### Minimum Rent Schedule

| LEASE YEARS | $PSF | PER MONTH | PER ANNUM | | |
|:---:|:---:|:---:|:---:|---|---|
| 1 | $10.00 | $17,941.67 | $215,300.04 | | |
| 2 | $10.60 | $19,018.17 | $228,218.04 | | |
| 3 | $11.25 | $20,184.38 | $242,212.56 | | |
| 4 | $11.90 | $21,350.58 | $256,206.96 | | |
| 5 | $12.60 | $22,606.50 | $271,278.00 | | |

### Option Minimum Rent Schedule

| LEASE YEARS | $PSF | PER MONTH | PER ANNUM | | |
|:---:|:---:|:---:|:---:|---|---|
| 6 – 10 | $13.75 | $24,669.79 | $296,037.48 | | |
| 11 – 15 | $15.15 | $27,181.63 | $326,179.56 | | |

23

DB04/830229.0006/6210741.3 TD09



EXHIBIT A

Premises 21,530 SF

Indicates property owned by others

La Frontera Village

N

# EXHIBIT A



2.002 Acres
Jacob M. Harrell, A-284
Williamson County, Texas

LAI Job No. 020604
FN0361(wdo)R1
Page 1 of 17

## EXHIBIT B (1 of 6)
## LEGAL DESCRIPTION
## ALTA/ACSM LAND TITLE SURVEY OF LA FRONTERA TRACTS
## TRACT 5 (AS SHOWN ON LAI PLAN NO. 3111)

DESCRIPTION OF 2.002 ACRE TRACT OF LAND IN THE JACOB M. HARRELL SURVEY, A-284, WILLIAMSON COUNTY, TEXAS; BEING ALL OF LOT 6, BLOCK B, LA FRONTERA SECTION IIIB, A SUBDIVISION ACCORDING TO THE PLAT OF RECORD IN PLAT CABINET S, SLIDES 69-76, PLAT RECORDS OF WILLIAMSON COUNTY, TEXAS, SAID LOT 6 CONVEYED FROM DDR DB DEVELOPMENT VENTURES LP TO BALTGEM DEVELOPMENT CORPORATION ET AL. BY DEED EXECUTED DECEMBER 12, 2002, OF RECORD IN DOCUMENT NO. 2002099605, OFFICIAL PUBLIC RECORDS OF WILLIAMSON COUNTY, TEXAS; SAID 2.002 ACRE TRACT OF LAND, AS SHOWN ON "LOOMIS AUSTIN, INC" PLAN NO. 3111, BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

**BEGINNING** at a ½-inch iron rod with plastic cap stamped "LAI" set in the north right-of-way line of Hesters Crossing, a 100 foot wide right-of-way, for the southwest corner of said Lot 6, same being the southeast corner of Lot 1, Block B of said La Frontera Section IIIB and being the southwest corner and **POINT OF BEGINNING** of the tract described herein;

**THENCE**, departing the north right-of-way line of said Hesters Crossing, with the east line of said Lot 1, same being the west line of said Lot 6, the following three (3) courses and distances:

1. N 21° 00' 30" W, a distance of 191.87 feet to a ½-inch iron rod with plastic cap stamped "LAI" set;

2. N 68° 41' 15" E, a distance of 34.99 feet to a ½-inch iron rod with plastic cap stamped "LAI" set;

3. N 21° 00' 30" W, a distance of 169.97 feet to a ½-inch iron rod with plastic cap stamped "LAI" set in the south line of Lot 10, Block B, George Blessing's Mobile Home Park, a subdivision according to the plat of record in Cabinet B, Slide 208 of the Plat Records of said County and being the northeast corner of said Lot 1, same being, the northwest corner of said Lot 6, for the northwest corner of the tract described herein;

**THENCE,** N 68° 41' 15" E, with the north line of said Lot 6 and in part the south line of said Lot 10, Block B and the south line of Lot 9, Block C, of said George Blessing's Mobile Home Park, a distance of 99.98 feet to a 1-3/4-inch iron pipe found for an angle point in the north line of the tract described herein

**THENCE,** N 69° 17' 55" E, with the north line of said Lot 6 and in part the south line of said Lot 9, Block C and the south line of Lot 10, said Block C, a distance of 130.18 feet to a ½-inch iron rod found, being the northeast corner of said Lot 6, same being the northwest corner of Lot 2, Block B, of said La Frontera Section IIIB, for the northeast corner of the tract described herein;

**THENCE,** S 20° 59' 38" E, with the east line of said Lot 6, same being the west line of said Lot 2, a distance of 340.38 feet to a ½-inch iron rod with plastic cap stamped "LAI" set in the north right-of-way line of said Hesters Crossing, and being the southeast corner of said Lot 6, same being the southwest corner of said Lot 2, for the southeast corner of the tract described herein;

Case: 18-50398   Doc# 132-2   Filed: 07/20/18   Entered: 07/20/18 12:17:59   Page 28 of 89

2.002 Acres
Jacob M. Harrell, A-284
Williamson County, Texas

LAI Job No. 020604
FN0361(wdo)R1
Page 2 of 17

**THENCE,** S 64° 21' 28" W, a distance of 265.93 feet to the **POINT OF BEGINNING** and containing 2.002 acres of land, more or less.

**BEARING BASIS:** Texas Coordinate System, Central Zone, NAD83, Grid. Based on survey ties from published City of Round Rock G.P.S. Control Points RR-01-001 and RR-001-017.

### EXHIBIT B (2 of 6)
### LEGAL DESCRIPTION
### ALTA/ACSM LAND TITLE SURVEY OF LA FRONTERA TRACTS
### TRACT 6 (AS SHOWN ON LAI PLAN NO. 3111)

DESCRIPTION OF 1.561 ACRE TRACT OF LAND IN THE JACOB M. HARRELL SURVEY, A-284, WILLIAMSON COUNTY, TEXAS; BEING ALL OF LOT 1, BLOCK L, LA FRONTERA SECTION IIIA, A SUBDIVISION ACCORDING TO THE PLAT OF RECORD IN CABINET S, SLIDES 370-374, PLAT RECORDS OF WILLIAMSON COUNTY, TEXAS, SAID LOT 1 DESCRIBED IN A DEED DATED DECEMBER 12, 2002, FROM DDR DB DEVELOPMENT VENTURES LP TO BALTGEM DEVELOPMENT CORPORATION ET AL. OF RECORD IN DOCUMENT NO. 2002099605, OFFICIAL PUBLIC RECORDS OF WILLIAMSON COUNTY, TEXAS; SAID 1.561 ACRE TRACT OF LAND, AS SHOWN ON "LOOMIS AUSTIN, INC" PLAN NO. 3111, BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

**BEGINNING** at a ½-inch iron found in the south right-of-way line of Hesters Crossing, a right-of-way of varying width, for the northeast corner of said Lot 1, Block L, same being the northwest corner of Lot 1, Chisholm Valley South, Section 10, Resub of Lots 1,2,3,4,5, a subdivision according to the plat recorded in Cabinet G, Slide 359 of the Plat Records of said County, and being the northeast corner and **POINT OF BEGINNING** of the tract described herein;

**THENCE,** S 06° 53' 46" W, with the east line of said Lot 1, Block L same being the west line of said Lot 1, a distance of 176.38 feet to a ½-inch iron rod with plastic cap stamped "LAI" set in the north line of Lot V, Resubdivision of La Frontera Sections I & II (Replat), a subdivision according to the plat recorded in Cabinet R, Slides 290-295 of the Plat Records of said County, and being the southeast corner of the tract described herein

**THENCE,** S 85° 16' 12" W, with the south line of said Lot 1, Block L, same being, in part, the north line of said Lot V and, in part, the north line of Lot 1, Block A, Replat of Lot VI, Resubdivision of La Frontera Sections I & II, a subdivision according to the plat recorded in Cabinet V, Slides 41-43, pass at a distance of 166.90 feet, a ½-inch iron rod with plastic cap stamped "LAI" set, being the northwest corner of said Lot V, same being the northeast corner of said Lot 1, Block A, continuing for a total distance of 531.11 feet to a ½-inch iron rod found, being the southwest corner of said Lot1, Block L, same being an angle point in the north line of said Lot 1, Block A, and being the southwest corner of the tract described herein;

**THENCE,** N 17° 22' 19" W, with the west line of said Lot 1, Block L, same being the north line of said Lot 1, Block A, a distance of 12.51 feet to a ½-inch iron rod found in the south right-of-way line of said Hester's Crossing, being the northwest corner of said Lot 1, Bock L, same being an angle point in the north line of said Lot 1, Block A, and being the northwest corner of the tract described herein;

Case: 18-50398    Doc# 132-2    Filed: 07/20/18    Entered: 07/20/18 12:17:59    Page 29 of 89

2.002 Acres
Jacob M. Harrell, A-284
Williamson County, Texas

LAI Job No. 020604
FN0361(wdo)R1
Page 3 of 17

**THENCE**, with the south right-of-way line of said Hester's Crossing, the following two (2) courses and distances:

1.    with the arc of a curve to the right, having a radius of 950.00 feet, an arc length of 555.57 feet and a chord which bears N 68° 14' 09" E, a distance of 547.69 feet to a ½-inch iron rod found at the end of said curve in the north line of the tract described herein;

2.    N 85° 07' 26" E, a distance of 45.73 feet to the **POINT OF BEGINNING** and containing 1.561 acres of land, more or less.

**BEARING BASIS**: Texas Coordinate System, Central Zone, NAD83, Grid. Based on survey ties from published City of Round Rock G.P.S. Control Points RR-01-001 and RR-001-017.

<div align="center">

**EXHIBIT B (3 of 6)**
**LEGAL DESCRIPTION**
**ALTA/ACSM LAND TITLE SURVEY OF LA FRONTERA TRACTS**
**TRACT 2 (AS SHOWN ON LAI PLAN NO. 3111)**

</div>

DESCRIPTION OF 3.639 ACRES OF LAND IN THE JACOB M. HARRELL SURVEY, A-284, WILLIAMSON COUNTY, TEXAS; BEING ALL OF LOT 5 (1.784 ACRES) AND LOT 6 (1.855 ACRES), RESUBDIVISION OF LOT IX LA FRONTERA SECTIONS I & II, A SUBDIVISION ACCORDING TO THE PLAT OF RECORD IN CABINET S, SLIDES 319-320, PLAT RECORDS OF WILLIAMSON COUNTY, TEXAS, SAID LOT 5 AND SAID LOT 6 DESCRIBED IN A DEED DATED DECEMBER 12, 2002, FROM DDR DB DEVELOPMENT VENTURES LP TO BALTGEM DEVELOPMENT CORPORATION ET AL. OF RECORD IN DOCUMENT NO. 2002099605, OFFICIAL PUBLIC RECORDS OF WILLIAMSON COUNTY, TEXAS; SAID 3.639 ACRES OF LAND, AS SHOWN ON LOOMIS AUSTIN, INC PLAN NO. 3111, BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

<div align="center">

**LOT 5**

</div>

**BEGINNING** at a ½-inch iron rod with plastic cap stamped "LAI" set in the north right-of-way line of State Highway No. 45, a varying width right-of-way, for the southwest corner of said Lot 5, same being the southeast corner of said Lot 6, and being the southwest corner and **POINT OF BEGINNING** of the tract described herein;

**THENCE**, leaving the north right-of-way line of said State Highway No. 45 with the west line of said Lot 5, same being the east line of said Lot 6, the following six (6) courses and distances:

4.    N 05° 33' 18" W, a distance of 68.93 feet to a nail with washer stamped "LAI" set in an asphalt parking lot for an angle point,

5.    S 84° 26' 42" W, a distance of 47.78 feet to a nail with washer stamped "LAI" set in an asphalt parking lot for an angle point,

6.    N 05° 33' 18" W, a distance of 154.52 feet to a nail with washer stamped "LAI" set in an asphalt parking lot for an angle point,

C:\Documents and Settings\TimC.SANSONEGROUP\Local Settings\Temporary Internet Files\Content.Outlook\VE9SOAQT\Exhibit B - (1 through 6 of 6).doc

Case: 18-50398    Doc# 132-2    Filed: 07/20/18    Entered: 07/20/18 12:17:59    Page 30 of 89

2.002 Acres
Jacob M. Harrell, A-284
Williamson County, Texas

LAI Job No. 020604
FN0361(wdo)R1
Page 4 of 17

7.    N 84° 26' 42" E, a distance of 30.36 feet to a nail with washer stamped "LAI" set in an asphalt parking lot for an angle point,

8.    N 05° 33' 18" W, a distance of 80.59 feet to a nail with washer stamped "LAI" set in an asphalt parking lot for an angle point, and

9.    N 31° 17' 10" W, a distance of 32.65 feet to a PK-nail found in the south line of Lot 2A Second Amending Plat of Lots 2 & 8 Resubdivision of Lot IX of La Frontera, Sections I & II Subdivision, a subdivision according to the plat of record in Cabinet W, Slides 346-348 of said Plat Records, for the northwest corner of said Lot 5 and of the tract described herein, from which a PK-nail found for the northeast corner of said Lot 6 bears N 31° 17' 10" W a distance of 6.48 feet;

**THENCE,** with the north line of said Lot 5, same being the south line of said Lot 2A, the following three (3) courses and distances:

a.    N 84° 25' 25" E, a distance of 88.22 feet to a ½-inch iron rod found at a point of curvature,

b.    with the arc of a curve to the left, having a radius of 135.00 feet, an arc distance of 14.72 feet and a chord bearing N 81° 16' 07" E, a distance of 14.71 feet to a ½-inch iron rod found at a point of tangency, and

c.    N 78° 09' 08" E, a distance of 123.56 feet to a ½-inch iron rod found in the west right-of-way line of Parker Drive, a 100-feet wide right-of-way, for the northeast corner of said Lot 5 and of the tract described herein;

**THENCE** with the west right-of-way line of said Parker Drive, same being the east line of said Lot 5, the following two (2) courses and distances:

1.    with the arc of a curve to the right having a radius of 1,950.00 feet, an arc distance of 207.03 feet and a chord bearing S 08° 13' 10" E a distance of 206.93 feet to a ½-inch iron rod with plastic cap stamped "LAI" set at a point of tangency, and

2.    S 05° 10' 35" E, a distance of 116.30 feet to a ½-inch iron rod with aluminum cap stamped "TXDOT" found for the north corner of a called 131 square feet tract designated as Parcel No. 119 in a deed to the State of Texas for State Highway No. 45 right-of-way and being a point of curvature at the intersection of the west right-of-way line of said Parker Drive with the north right-of-way line of said State Highway No. 45;

**THENCE** with the west line of said Parcel No. 119, being the arc of a curve to the right having a radius of 25.00 feet, an arc distance of 39.11 feet and a chord bearing S 39° 37' 34" W a distance of 35.24 feet to a ½-inch iron rod with plastic cap stamped "LAI" set in the north right-of-way line of said State Highway No. 45 for the southeast corner of the tract described herein, same being the southwest corner of said Parcel No. 119;

C:\Documents and Settings\TimC.SANSONEGROUP\Local Settings\Temporary Internet Files\Content.Outlook\VE9SOAQT\Exhibit B - (1 through 6 of 6).doc

Case: 18-50398   Doc# 132-2   Filed: 07/20/18   Entered: 07/20/18 12:17:59   Page 31 of 89

2.002 Acres
Jacob M. Harrell, A-284
Williamson County, Texas

LAI Job No. 020604
FN0361(wdo)R1
Page 5 of 17

**THENCE** S 84° 26' 43" W, with the north right-of-way line of said State Highway No. 45, same being the south line of said Lot 5, a distance of 177.98 feet to the **POINT OF BEGINNING** and containing 1.784 acres of land, more or less.

## LOT 6

**BEGINNING** at a ½-inch iron rod with plastic cap stamped "LAI" set in the north right-of-way line of State Highway No. 45, a varying width right-of-way, for the southwest corner of said Lot 5, same being the southeast corner of said Lot 6, and being the southeast corner and **POINT OF BEGINNING** of the tract described herein;

**THENCE** S 84° 26' 43" W, with the north right-of-way line of said State Highway No. 45, same being the south line of said Lot 6, a distance of 266.74 feet to a ½-inch iron rod with plastic cap stamped "LAI" set for the southwest corner of said Lot 6 and of the tract described herein, same being the southeast corner of Lot 7, said Resubdivision of Lot IX La Frontera Sections I & II;
**THENCE** N 05° 33' 00" W, with the west line of said Lot 6, same being the east line of said Lot 7, at 333.33 feet pass a PK-nail found on a point being the northeast corner of said Lot 7, same being an angle point in the south boundary line of Lot 8A Second Amending Plat of Lots 2 & 8 Resubdivision of Lot IX of La Frontera, Sections I & II Subdivision, a subdivision according to the plat of record in Cabinet W, Slides 346-348 of said Plat Records, continuing for a total distance of 339.38 feet to a PK-nail found, for the northwest corner of said Lot 6 and of the tract described herein;

**THENCE** N 84° 28' 04" E, with the north line of said Lot 6, same being, in part, the south line of said Lot 8A, and, in part, the south line of Lot 2A said Second Amending Plat of Lots 2 & 8 Resubdivision of Lot IX of La Frontera, Sections I & II Subdivision, a distance of 232.31 feet to a PK-nail found for the northeast corner of said Lot 6;

**THENCE** S 31° 17' 10" E, with the east line of said Lot 6, at a distance of 6.48 feet pass a PK-nail found for the northwest corner of said Lot 5, same being an angle point in the south line of said Lot 2A, continuing for a total distance of 39.13 feet to a nail with washer stamped "LAI" set in an asphalt parking lot for an angle point hereof;

**THENCE** continuing with the east line of said Lot 6, same being the west line of said Lot 5, the following five (5) courses and distances:

1.  S 05° 33' 18" E, a distance of 80.59 feet to a nail with washer stamped "LAI" set in an asphalt parking lot for an angle point,

2.  S 84° 26' 42" W, a distance of 30.36 feet to a nail with washer stamped "LAI" set in an asphalt parking lot for an angle point

3.  S 05° 33' 18" E, a distance of 154.52 feet to a nail with washer stamped "LAI" set in an asphalt parking lot for an angle point

4.  N 84° 26' 42" E, a distance of 47.78 feet to a nail with washer stamped "LAI" set in an asphalt parking lot for an angle point, and

5.  S 05° 33' 18" E, a distance of 68.93 feet to the **POINT OF BEGINNING** and containing 1.855 acres of land, more or less.

C:\Documents and Settings\TimC.SANSONEGROUP\Local Settings\Temporary Internet Files\Content.Outlook\VE9SOAQT\Exhibit B - (1 through 6 of 6).doc

Case: 18-50398   Doc# 132-2   Filed: 07/20/18   Entered: 07/20/18 12:17:59   Page 32 of 89

2.002 Acres
Jacob M. Harrell, A-284
Williamson County, Texas

LAI Job No. 020604
FN0361(wdo)R1
Page 6 of 17

**BEARING BASIS**: Texas Coordinate System, Central Zone, NAD83, Grid. Based on survey ties from published City of Round Rock G.P.S. Control Points RR-01-001 and RR-001-017.

### EXHIBIT B (4 of 6)
### LEGAL DESCRIPTION
### ALTA/ACSM LAND TITLE SURVEY OF LA FRONTERA TRACTS
### TRACT 3 (AS SHOWN ON LAI PLAN NO. 3111)

DESCRIPTION OF 1.964 ACRE TRACT OF LAND IN THE JACOB M. HARRELL SURVEY, A-284, WILLIAMSON COUNTY, TEXAS; BEING ALL OF LOT 8A, SECOND AMENDING PLAT OF LOTS 2 AND 8, RESUBDIVISION OF LOT IX, LA FRONTERA SECTIONS I & II, A SUBDIVISION ACCORDING TO THE PLAT OF RECORD IN CABINET W, SLIDES 346-348, PLAT RECORDS OF WILLIAMSON COUNTY, TEXAS, SAID LOT 8A BEING A PORTION OF A CALLED 40.625 ACRE TRACT OF LAND CONVEYED TO DDR DB DEVELOPMENT LP ACCORDING TO THE WARRANTY DEED RECORDED IN DOCUMENT NO. 9923859, OFFICIAL RECORDS OF WILLIAMSON COUNTY, TEXAS, SAID LOT 8A ENCOMPASSING LOT 8 AMENDING PLAT OF LOTS 2 AND 8, RESUBDIVISION OF LOT IX, LA FRONTERA SECTIONS I & II, A SUBDIVISION ACCORDING TO THE PLAT OF RECORD IN CABINET V, SLIDES 211-213, PLAT RECORDS OF WILLIAMSON COUNTY, TEXAS, SAID LOT 8 DESCRIBED IN A DEED DATED DECEMBER 12, 2002, FROM DDR DB DEVELOPMENT VENTURES LP TO BALTGEM DEVELOPMENT CORPORATION ET AL. OF RECORD IN DOCUMENT NO. 2002099605, OFFICIAL PUBLIC RECORDS OF WILLIAMSON COUNTY, TEXAS; SAID 1.964 ACRE TRACT OF LAND, AS SHOWN ON "LOOMIS AUSTIN, INC" PLAN NO. 3111, BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

**BEGINNING** at a ½-inch iron rod found in the east right-of-way line of Kouri Drive, an 80 foot wide right-of-way, for the northwest corner of said Lot 8A, same being the southwest corner of Lot 1, Resubbdivision of Lot IX, La Frontera Sections I & II, a subdivision according to the plat recorded in Cabinet S, Slides 319-320 of the Plat Records of said County, and being the northwest corner and **POINT OF BEGINNING** of the tract described herein;

**THENCE**, with the south line of said Lot 1, same being the north line of said Lot 8A, the following three (3) courses and distances:

1. N 66° 42' 49" E, a distance of 64.37 feet to a ½-inch iron rod found being an angle point in the north line of the tract described herein;

2. N 23° 18' 36" W, a distance of 7.49 feet to a ½-inch iron rod found being an angle point in the north line of the tract described herein;

3. N 66° 55' 14" E, a distance of 169.64 feet to a P.K. nail found in the west line of Lot 2A of said Second Amending Plat of Lots 2 and 8, Resubdivision of Lot IX, La Frontera Sections I & II, same being the northeast corner of said Lot 8A, and being the northeast corner of the tract described herein;

**THENCE**, with the common line of said Lot 8A and said Lot 2A, the following three (3) courses and distances:

Case: 18-50398   Doc# 132-2   Filed: 07/20/18   Entered: 07/20/18 12:17:59   Page 33 of 89

2.002 Acres
Jacob M. Harrell, A-284
Williamson County, Texas

LAI Job No. 020604
FN0361(wdo)R1
Page 7 of 17

1. S 23° 16' 04" E, a distance of 99.03 feet to a P.K. nail found, being an angle point in the east line of the tract described herein;

2. N 66° 52' 55" E, a distance of 55.83 feet to a P.K. nail found, being an angle point in the east line of the tract described herein;

3. S 22° 42' 52" E, a distance of 255.88 feet to an "X" chiseled in the top of a concrete curb found on a point in the northerly boundary line of Lot 6, Resubdivision of Lot IX La Frontera Sections I & II, a subdivision according to the plat of record in Cabinet S, Slide(s) 319-320 of the Plat Records of Williamson County, Texas, being the southwest corner of said Lot 2A, for the southeast corner of the tract described herein;

**THENCE**, with the northerly boundary line of said Lot 6, same being the southerly boundary line of said Lot 8A, the following two (2) courses and distances:

1. S 84° 28' 04" W, a distance of 48.08 feet to a P.K. nail found, being the northwest corner of said Lot 6, for an angle point in the south line of the tract described herein;

2. S 5° 33' 00" E, a distance of 6.05 feet to a P.K. nail found, being the northeast corner of Lot 7 of said Resubdivision of Lot IX La Frontera Sections I & II, for an angle point in the east line of the tract described herein;

**THENCE**, with the northerly boundary line of said Lot 7, same being the southerly boundary line of said Lot 8A, the following three (3) courses and distances:

1. S 84° 22' 47" W, a distance of 182.53 feet to a ½-inch iron rod found on a point of curvature in the south boundary line of the tract described herein;

2. With the arc of a curve to the left having a radius of 145.00 feet, an arc length of 41.59 feet and a chord which bears S 76° 15' 49" W, a distance of 41.45 feet to a ½-inch iron rod found on a point of tangency in the south boundary line of the tract described herein;

3. S 68° 02' 27" W, a distance of 27.03 feet ½-inch iron rod found on a point in the curving east right-of-way line of the aforementioned Kouri Drive, for the southwest corner of the tract described herein;

**THENCE**, with said east right-of-way line, along the arc of a curve to the left having a radius of 1040.00 feet, an arc length of 39.59 feet and a chord which bears N 21° 54' 37" W a distance of 39.59 feet to a ½-inch iron rod with plastic cap stamped "LAI" set, for a point of tangency in the west boundary line of the tract described herein;

**THENCE**, N 22° 59' 02" W, with the east right-of-way line of said Kouri Drive, same being the west line of said Lot 8A, at a distance of 0.41 feet pass a ½-inch iron rod found, continuing for a total distance of 236.81 feet the **POINT OF BEGINNING** and containing 1.964 acres of land, more or less.

**BEARING BASIS**: Texas Coordinate System, Central Zone, NAD83, Grid. Based on survey ties from published City of Round Rock G.P.S. Control Points RR-01-001 and RR-001-017.

C:\Documents and Settings\TimC.SANSONEGROUP\Local Settings\Temporary Internet Files\Content.Outlook\VE9SOAQT\Exhibit B - (1 through 6 of 6).doc

Case: 18-50398   Doc# 132-2   Filed: 07/20/18   Entered: 07/20/18 12:17:59   Page 34 of 89

2.002 Acres
Jacob M. Harrell, A-284
Williamson County, Texas

LAI Job No. 020604
FN0361(wdo)R1
Page 8 of 17

### EXHIBIT B (5 of 6)
### LEGAL DESCRIPTION
### ALTA/ACSM LAND TITLE SURVEY OF LA FRONTERA TRACTS
### TRACT 4 (AS SHOWN ON LAI PLAN NO. 3111)

DESCRIPTION OF 15.759 ACRES OF LAND IN THE JACOB M. HARRELL SURVEY, A-284, WILLIAMSON COUNTY, TEXAS; BEING ALL OF LOT 1 (6.587 ACRES), LOT 2 (8.146 ACRES) AND LOT 3 (1.026 ACRES), REPLAT OF LOT VI LA FRONTERA SECTIONS I & II, A SUBDIVISION ACCORDING TO THE PLAT OF RECORD IN CABINET V, SLIDES 41-43, PLAT RECORDS OF WILLIAMSON COUNTY, TEXAS, SAID 15.759 ACRES DESCRIBED IN A DEED FROM DDR DB DEVELOPMENT VENTURES LP TO BALTGEM DEVELOPMENT CORPORATION ET AL. BY DEED EXECUTED DECEMBER 12, 2002, OF RECORD IN DOCUMENT NO. 2002099605, OFFICIAL PUBLIC RECORDS OF WILLIAMSON COUNTY, TEXAS; SAID 15.759 ACRES OF LAND, AS SHOWN ON LOOMIS AUSTIN, INC PLAN NO. 3111, BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

### LOT 1

**BEGINNING** at a nail with washer stamped "LAI" set in the north right-of-way line of Sundance Parkway, a varying width right-of-way, for the southwest corner of said Lot 1, same being the southeast corner of said Lot 2, and being the southwest corner and **POINT OF BEGINNING** of the tract described herein;

**THENCE**, leaving the north right-of-way line of said Sundance Parkway with the common line of said Lot 1 and Lot 2, the following thirteen (13) courses and distances:

10. N 23° 07' 21" W, a distance of 473.06 feet to a P.K. nail found in an asphalt parking lot for an angle point,

11. S 67° 00' 14" W, a distance of 18.00 feet to a P.K. nail found in an asphalt parking lot for an angle point,

12. N 23° 04' 43" W, a distance of 166.02 feet to a nail with washer stamped "LAI" set in an asphalt parking lot for an angle point,

13. S 66° 55' 17" W, a distance of 26.76 feet to a nail with washer stamped "LAI" set in an asphalt parking lot for an angle point,

14. N 23° 06' 35" W, a distance of 324.65 feet to a nail with washer stamped "LAI" set in an asphalt parking lot for an angle point,

15. S 89° 41' 49" W, a distance of 53.74 feet to a nail with washer stamped "LAI" set in an concrete parking lot for an angle point,

16. With the arc of a curve to the left having a radius of 100.00 feet, an arc length of 26.22 feet and a chord which bears S 82° 11' 10" W, a distance of 26.14 feet to a nail with washer stamped "LAI" set in an concrete parking lot for an angle point,

C:\Documents and Settings\TimC.SANSONEGROUP\Local Settings\Temporary Internet Files\Content.Outlook\VE9SOAQT\Exhibit B - (1 through 6 of 6).doc

Case: 18-50398   Doc# 132-2   Filed: 07/20/18   Entered: 07/20/18 12:17:59   Page 35 of 89

2.002 Acres
Jacob M. Harrell, A-284
Williamson County, Texas

LAI Job No. 020604
FN0361(wdo)R1
Page 9 of 17

17. S 74° 40' 32" W, a distance of 73.13 feet to a ½-inch iron rod with plastic cap stamped "LAI" set for an angle point,

18. With the arc of a curve to the left having a radius of 100.00 feet, an arc length of 12.30 feet and a chord which bears S 71° 09' 05" W, a distance of 12.29 feet to a ½-inch iron rod with plastic cap stamped "LAI" set for an angle point,

19. S 67° 37' 38" W, a distance of 58.43 feet to a nail with washer stamped "LAI" set in an concrete parking lot for an angle point,

20. With the arc of a curve to the right having a radius of 120.00 feet, an arc length of 59.33 feet and a chord which bears S 81° 47' 27" W, a distance of 58.73 feet to a ½-inch iron rod with plastic cap stamped "LAI" set for an angle point,

21. With the arc of a curve to the left having a radius of 60.00 feet, an arc length of 57.09 feet and a chord which bears S 68° 41' 48" W, a distance of 54.96 feet to a nail with washer stamped "LAI" set in an concrete parking lot for an angle point,

22. With the arc of a curve to the right having a radius of 1025.00 feet, an arc length of 130.38 feet and a chord which bears S 45° 04' 56" W, a distance of 130.29 feet to a ½-inch iron rod with plastic cap stamped "LAI" set in the west right-of-way line of Kouri Drive, an 80 foot wide right-of-way, being the northwest corner of said Lot 2, for an angle point,

**THENCE,** with the north line of said Lot 1, same being, in part, the east right-of-way line of said Kouri Drive and, in part, the south right-of-way line of Hesters Crossing, a 100 foot wide right-of-way, the following five (5) courses and distances:

a. N 39° 01' 11" W, a distance of 10.70 feet to a ½-inch iron rod found at a point of curvature,

b. with the arc of a curve to the right, having a radius of 15.00 feet, an arc distance of 22.58 feet and a chord bearing N 04° 21' 14" E, a distance of 20.50 feet to a ½-inch iron rod found at a point of reverse curvature,

c. with the arc of a curve to the left, having a radius of 1000.00 feet, an arc distance of 181.08 feet and a chord bearing N 42° 33' 23" E, a distance of 180.83 feet to a ½-inch iron rod with plastic cap stamped "LAI" set at a point of tangency,

d. N 37° 34' 16" E, a distance of 109.66 feet to a ½-inch iron rod found at a point of curvature, and

e. with the arc of a curve to the right, having a radius of 950.00 feet, an arc distance of 233.25 feet and a chord bearing N 44° 30' 43" E, a distance of 232.67 feet to a ½-inch iron rod found being the northwest corner of Lot 1, Block L, La Frontera, Section IIIA, a subdivision according to the plat recorded in Cabinet S, Slides 370-374 of said Plat Records, for an angle point in the north line of the tract described herein;

C:\Documents and Settings\TimC.SANSONEGROUP\Local Settings\Temporary Internet Files\Content.Outlook\VE9SOAQT\Exhibit B - (1 through 6 of 6).doc

Case: 18-50398   Doc# 132-2   Filed: 07/20/18   Entered: 07/20/18 12:17:59   Page 36 of 89

2.002 Acres
Jacob M. Harrell, A-284
Williamson County, Texas

LAI Job No. 020604
FN0361(wdo)R1
Page 10 of 17

**THENCE** leaving the south right-of-way line of said Hesters Crossing, with the south line of said Lot 1, Block L, same being the north line of said Lot 1, the following two (2) courses and distances:

3.  S 17° 22' 19" E, a distance of 12.51 feet to a ½-inch iron rod found at an angle point, and

4.  N 85° 16' 12" E, a distance of 364.21 feet to a ½-inch iron rod with plastic cap stamped "LAI" set for the northwest corner of Lot V, Resubdivision of La Frontera Sections I and II, a subdivision according to the plat recorded in Cabinet R, Slides 290-295 of said Plat Records, same being the northeast corner of said Lot 1, for the northeast corner of the tract described herein;

**THENCE**, leaving the south line of said Lot 1, Block L, with the common line of said Lot 1 and said Lot V, the following two (2) courses and distances:

1.  S04° 39' 11" E, a distance of 706.07 feet to a ½-inch iron rod with plastic cap stamped "LAI" set for an angle point, and

2.  S 22° 41' 03" E, a distance of 441.58 feet to a ½-inch iron rod found in the north right-of-way line of the aforementioned Sundance Parkway, being the southwest corner of said Lot V, same being the southeast corner of said Lot 1, for the southeast corner of the tract described herein;

**THENCE** with the arc of a curve to the right, having a radius of 665.00 feet, an arc distance of 106.66 feet and a chord bearing S 78° 42' 23" W, a distance of 106.54 feet to the **POINT OF BEGINNING** and containing 6.587 acres of land, more or less.

## LOT 2

**BEGINNING** at a nail with washer stamped "LAI" set in the north right-of-way line of Sundance Parkway, a varying width right-of-way, for the southwest corner of said Lot 1, same being the southeast corner of said Lot 2, and being the southeast corner and **POINT OF BEGINNING** of the tract described herein;

**THENCE**, with the north right-of-way line of said Sundance Parkway, same being the south line of said Lot 2, the following three (3) courses and distances:

1.  with the arc of a curve to the right, having a radius of 665.00 feet, an arc distance of 46.95 feet and a chord bearing S 85° 19' 26" W, a distance of 46.94 feet to a ½-inch iron rod found at a point of tangency,

2.  S 87° 20' 42" W, a distance of 127.56 feet to a P.K. nail in asphalt found at a point of curvature, and

3.  with the arc of a curve to the left, having a radius of 737.00 feet, an arc distance of 68.64 feet and a chord bearing S 84° 39' 36" W, a distance of 68.61 feet to a ½-inch iron rod with plastic cap stamped "LAI" set, being the southeast corner of the aforementioned Lot 3, same being the southwest corner of said Lot 2, for the southwest corner of the tract described herein:

Case: 18-50398   Doc# 132-2   Filed: 07/20/18   Entered: 07/20/18 12:17:59   Page 37 of 89

2.002 Acres
Jacob M. Harrell, A-284
Williamson County, Texas

LAI Job No. 020604
FN0361(wdo)R1
Page 11 of 17

**THENCE**, leaving the north right-of-way line of said Sundance Parkway, with the common line of said Lot 2 and said Lot 3, the following eight (8) courses and distances:

1.  N 04° 08' 19" W, a distance of 39.89 feet to a P.K. nail in asphalt found at an angle point,

2.  S 85° 50' 28" W, a distance of 16.90 feet to a P.K. nail in asphalt found at an angle point,

3.  N 23° 00' 40" W, a distance of 125.61 feet to a P.K. nail in asphalt found at an angle point,

4.  N 66° 54' 07" E, a distance of 49.18 feet to a nail with washer stamped "LAI" set at an angle point,

5.  N 22° 59' 37" W, a distance of 25.93 feet to a nail with washer stamped "LAI" set at an angle point,

6.  with the arc of a curve to the right, having a radius of 180.00 feet, an arc distance of 33.86 feet and a chord bearing S 80° 29' 32" W, a distance of 33.81 feet to a P.K. nail in asphalt found at a point of reverse curvature,

7.  with the arc of a curve to the left, having a radius of 400.00 feet, an arc distance of 131.60 feet and a chord bearing S 76° 26' 08" W, a distance of 131.00 feet to a nail with washer stamped "LAI" set at a point of tangency,

8.  S 66° 59' 52" W, a distance of 97.40 feet to a nail with washer stamped "LAI" set in the east right-of-way line of said Kouri Drive, being a southwest corner of said Lot 2, same being the northwest corner of said Lot 3, for a southwest corner of the tract described herein;

**THENCE** with the west line of said Lot 2, same being the east right-of-way line of said Kouri Drive, the following three (3) courses and distances:

1.  N 22° 58' 41" W, a distance of 331.28 feet to a ½-inch iron rod found at a point of curvature,

2.  with the arc of a curve to the left having a radius of 1040.00 feet, an arc length of 291.90 feet and a chord bearing N 31° 03' 42" W, a distance of 290.95 feet to a ½-inch iron rod found at a point of tangency, and

3.  N 39° 01' 11" W, a distance of 49.00 feet to a ½-inch iron rod with plastic cap stamped "LAI" set at an angle point in the west line of the aforementioned Lot 1, same being the northwest corner of said Lot 2, for the northwest corner of the tract described herein;

**THENCE**, leaving the east right-of-way line of said Kouri Drive with the common line of said Lot 1 and Lot 2, the following thirteen (13) courses and distances:

1.  With the arc of a curve to the left having a radius of 1025.00 feet, an arc length of 130.38 feet and a chord which bears N 45° 04' 56" E, a distance of 130.29 feet to a nail with washer stamped "LAI" set, for an angle point,

Case: 18-50398   Doc# 132-2   Filed: 07/20/18   Entered: 07/20/18 12:17:59   Page 38 of 89

2.002 Acres
Jacob M. Harrell, A-284
Williamson County, Texas

LAI Job No. 020604
FN0361(wdo)R1
Page 12 of 17

2.    With the arc of a curve to the right having a radius of 60.00 feet, an arc length of 57.09 feet and a chord which bears N 68° 41' 48" E, a distance of 54.96 feet to a ½-inch iron rod with plastic cap stamped "LAI" set for an angle point

3.    With the arc of a curve to the left having a radius of 120.00 feet, an arc length of 59.33 feet and a chord which bears N 81° 47' 27" E, a distance of 58.73 feet to a nail with washer stamped "LAI" set in an concrete parking lot for an angle point,

4.    N 67° 37' 38" E, a distance of 58.43 feet to a ½-inch iron rod with plastic cap stamped "LAI" set for an angle point,

5.    With the arc of a curve to the right having a radius of 100.00 feet, an arc length of 12.30 feet and a chord which bears N 71° 09' 05" E, a distance of 12.29 feet to a ½-inch iron rod with plastic cap stamped "LAI" set for an angle point,

6.    N 74° 40' 32" E, a distance of 73.13 feet to nail with washer stamped "LAI" set in an concrete parking lot for an angle point,

7.    With the arc of a curve to the right having a radius of 100.00 feet, an arc length of 26.22 feet and a chord which bears N 82° 11' 10" E, a distance of 26.14 feet to a nail with washer stamped "LAI" set in an concrete parking lot for an angle point,

8.    N 89° 41' 49" E, a distance of 53.74 feet to a nail with washer stamped "LAI" set in an concrete parking lot for an angle point,

9.    S 23° 06' 35" E, a distance of 324.65 feet to a nail with washer stamped "LAI" set in an asphalt parking lot for an angle point,

10.   N 66° 55' 17" E, a distance of 26.76 feet to a nail with washer stamped "LAI" set in an asphalt parking lot for an angle point,

11.   S 23° 04' 43" E, a distance of 166.02 feet to a P.K. nail found in an asphalt parking lot for an angle point,

12.   N 67° 00' 14" E, a distance of 18.00 feet to a P.K. nail found in an asphalt parking lot for an angle point,

13.   S 23° 07' 21" E, a distance of 473.06 feet to the **POINT OF BEGINNING** and containing 8.146 acres of land, more or less.

## LOT 3

**BEGINNING** at a ½-inch iron rod with plastic cap stamped "LAI" set in the north right-of-way line of Sundance Parkway, a varying width right-of-way, for the southeast corner of said Lot 3, same being the southwest corner of said Lot 2, and being the southeast corner and **POINT OF BEGINNING** of the tract described herein;

Case: 18-50398    Doc# 132-2    Filed: 07/20/18    Entered: 07/20/18 12:17:59    Page 39 of 89

2.002 Acres
Jacob M. Harrell, A-284
Williamson County, Texas

LAI Job No. 020604
FN0361(wdo)R1
Page 13 of 17

**THENCE**, with the north right-of-way line of said Sundance Parkway, same being the south line of said Lot 3 the following three (3) courses and distances:

1. with the arc of a curve to the left having a radius of 737.00 feet, an arc length of 192.64 feet and a chord bearing of S 74° 30' 14" W a distance of 192.09 feet to a ½-inch iron rod with plastic cap stamped "LAI" set at a point of tangency,

2. S 67° 00' 37" W, a distance of 8.08 feet to a ½-inch iron rod with plastic cap stamped "LAI" set at a point of curvature, and

3. with the arc of a curve to the right having a radius of 15.00 feet, an arc length of 23.54 feet and a chord bearing of N 67° 59' 24" W a distance of 21.20 feet to a ½-inch iron rod with plastic cap stamped "LAI" set in the east right-of-way line of said Kouri Drive, for a southwest corner of the tract described herein;

**THENCE**, N 22° 58' 41" W, with the west line of said Lot 3, same being the east right-of-way line of said Kouri Drive, a distance of 184.11 feet to a nail with washer stamped "LAI" set in an asphalt parking lot, being the northwest corner of said Lot 3, same being a southwest corner of said Lot 2, for the northwest corner of the tract described herein;

**THENCE**, leaving the east right-of-way line of said Kouri Drive, with the common line of said Lot 2 and Lot 3, the following eight (8) courses and distances:

1. N 66° 59' 52" E, a distance of 97.40 feet to a nail with washer stamped "LAI" set in an asphalt parking lot at a point of curvature,

2. with the arc of a curve to the right having a radius of 400.00 feet, an arc length of 131.60 feet and a chord bearing of N 76° 26' 08" E, a distance of 131.00 feet to a P.K. nail found in an asphalt parking lot at a point of reverse curvature,

3. with the arc of a curve to the left having a radius of 180.00 feet, an arc length of 33.86 feet and a chord bearing of N 80° 29' 32" E, a distance of 33.81 feet to a nail with washer stamped "LAI" set in an asphalt parking lot at an angle point,

4. S 22° 59' 37" E, a distance of 25.93 feet to a nail with washer stamped "LAI" set in an asphalt parking lot at an angle point,

5. S 66° 54' 07" W, a distance of 49.18 feet to a P.K. nail found in an asphalt parking lot at an angle point,

6. S 23° 00' 40" E, a distance of 125.61 feet to a P.K. nail found in an asphalt parking lot at an angle point,

7. N 85° 50' 28" E, a distance of 16.90 feet to a P.K. nail found in an asphalt parking lot at an angle point,

8. S 04° 08' 19" E, a distance of 39.89 feet to the **POINT OF BEGINNING** and containing 1.026 acres of land, more or less.

C:\Documents and Settings\TimC.SANSONEGROUP\Local Settings\Temporary Internet Files\Content.Outlook\VE9SOAQT\Exhibit B - (1 through 6 of 6).doc

Case: 18-50398   Doc# 132-2   Filed: 07/20/18   Entered: 07/20/18 12:17:59   Page 40 of 89

2.002 Acres
Jacob M. Harrell, A-284
Williamson County, Texas

LAI Job No. 020604
FN0361(wdo)R1
Page 14 of 17

**BEARING BASIS**: Texas Coordinate System, Central Zone, NAD83, Grid. Based on survey ties from published City of Round Rock G.P.S. Control Points RR-01-001 and RR-001-017.

### EXHIBIT B (6 of 6)
### LEGAL DESCRIPTION
### ALTA/ACSM LAND TITLE SURVEY OF LA FRONTERA TRACTS
### TRACT 1 (AS SHOWN ON LAI PLAN NO. 3111)

DESCRIPTION OF 17.817 ACRES OF LAND IN THE JACOB M. HARRELL SURVEY, A-284, WILLIAMSON COUNTY, TEXAS; BEING ALL OF LOT III (8.642 ACRES), LOT V (8.404 ACRES), AND LOT VII (0.771), RESUBDIVISION OF LA FRONTERA SECTIONS I & II SUBDIVISION, A SUBDIVISION ACCORDING TO THE PLAT OF RECORD IN CABINET R, SLIDES 290-295, PLAT RECORDS OF WILLIAMSON COUNTY, TEXAS, SAID LOTS III, V, AND VII, DESCRIBED IN A DEED DATED DECEMBER 12, 2002, FROM DDR DB DEVELOPMENT VENTURES LP TO BALTGEM DEVELOPMENT CORPORATION ET AL. OF RECORD IN DOCUMENT NO. 2002099605, OFFICIAL PUBLIC RECORDS OF WILLIAMSON COUNTY, TEXAS; SAID 17.817 ACRES OF LAND, AS SHOWN ON LOOMIS AUSTIN, INC PLAN NO. 3111, BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

### LOT III

**BEGINNING** at a ½-inch iron rod with plastic cap stamped "LAI" set for the northeast corner of said Lot III, being in the south line of Lot 1, Block A, Resubdivision of Chisholm Valley South, Section 5, a subdivision according to the plat of record in Cabinet G, Slide 178, Plat Records of Williamson County, Texas, same being the northwest corner of Lot II of said Resubdivision of La Frontera Sections I & II Subdivision, and being the northeast corner and **POINT OF BEGINNING** of the tract described herein;

**THENCE**, leaving the south line of said Chisholm Valley South Section 5, with the east line of said Lot III, same being the west line of said Lot II, the following three (3) courses and distances:

23.  S 05° 35' 15" E, a distance of 531.57 feet to a nail with washer stamped "LAI" set in an asphalt drive for an angle point,

24.  S 84° 24' 48" W, a distance of 4.24 feet to a nail with washer stamped "LAI" set in an asphalt drive for an angle point,

25.  S 05° 35' 12" E, at a distance of 311.36 feet pass a nail with washer stamped "LAI" set in an asphalt drive for the northwest corner of said Lot VII, and continuing for a total of distance of 449.05 feet to a nail with washer stamped "LAI" set in the approximate center of an asphalt drive, being in the north right-of-way line of Sundance Parkway, a 70-feet wide right-of-way, for the southeast corner of said Lot III and of the tract described herein;

**THENCE** S 84° 24' 35" W, with the south line of said Lot III, same being the north right-of-way line of said Sundance Parkway, a distance of 377.96 feet to a ½-inch iron rod with plastic cap stamped "LAI" set for the southwest corner of said Lot III and of the tract described herein, and

Case: 18-50398   Doc# 132-2   Filed: 07/20/18   Entered: 07/20/18 12:17:59   Page 41 of 89

2.002 Acres
Jacob M. Harrell, A-284
Williamson County, Texas

LAI Job No. 020604
FN0361(wdo)R1
Page 15 of 17

being the southeast corner of Lot IV, said Resubdivision of La Frontera Sections I and II Subdivision;

**THENCE** with the west line of said Lot III, same being the east line of said Lot IV, the following five (5) courses and distances:

1.  N 05° 35' 19" W, a distance of 487.13 feet to a nail with washer stamped "LAI" set in an asphalt drive for an angle point,

2.  S 84° 24' 41" W, a distance of 86.82 feet to a nail with washer stamped "LAI" set in an asphalt drive for an angle point,

3.  N 05° 35' 19" W, at a distance of 29.9 feet intersect the south exterior wall of a concrete building 0.8 feet east of the building's southwest corner, at a distance of 240.8 feet intersect the north exterior wall of said building 0.2 feet east of the building's northwest corner, and continuing for a total distance of 251.87 feet to a nail with washer stamped "LAI" set in the top of a 6-ft tall concrete wall enclosure around an electric transformer, for the an angle point,

4.  N 84° 24' 41" E, a distance of 166.47 feet to a nail with washer stamped "LAI" set in a concrete surface near a loading area, and

5.  N 05° 35' 19" W, a distance of 247.68 feet to a ½-inch iron rod with plastic cap stamped "LAI" set in for the northwest corner of said Lot III and of the tract described herein, being the northeast corner of said Lot IV, and being in the south line of said Lot 1, Block A, Chisholm Valley South Section 5;

**THENCE**, N 85° 33' 19" E, with the north line of said Lot III, being the south line of said Lot 1, Block A, a distance of 302.64 feet to the **POINT OF BEGINNING** and containing 8.642 acres of land, more or less.

<center>LOT V</center>

**BEGINNING** at a ½-inch iron rod with plastic cap stamped "LAI" set for the northeast corner of said Lot V, same being the northwest corner of Lot IV, said Resubdivision of La Frontera Sections I and II Subdivision, and being in the south line of Lot 1, Chisholm Valley South Section 10, Resub of Lots 1, 2, 3, 4, 5, a subdivision according to the plat of record in Cabinet G, Slide 359, Plat Records of Williamson County, Texas, and being the northeast corner and **POINT OF BEGINNING** of the tract described herein;

**THENCE** leaving the south line of said Lot 1, with the east line of said Lot V, same being the west line of said Lot IV, the following eight (8) courses and distances:

1.  S 05° 35' 08" E, a distance of 501.53 feet to a nail with washer stamped "LAI" set for an angle point,

2.  N 88° 46' 48" E, a distance of 33.70 feet to a nail with washer stamped "LAI" set for an angle point,

C:\Documents and Settings\TimC.SANSONEGROUP\Local Settings\Temporary Internet Files\Content.Outlook\VE9SOAQT\Exhibit B - (1 through 6 of 6).doc

Case: 18-50398    Doc# 132-2    Filed: 07/20/18    Entered: 07/20/18 12:17:59    Page 42 of 89

2.002 Acres
Jacob M. Harrell, A-284
Williamson County, Texas

LAI Job No. 020604
FN0361(wdo)R1
Page 16 of 17

3.     N 84° 24' 52" E, a distance of 43.12 feet to a nail with washer stamped "LAI" set for an angle point,

4.     S 05° 35' 08" E, a distance of 295.06 feet to a ½-inch iron rod with plastic cap stamped "LAI" set for an angle point,

5.     S 84° 24' 52" W, a distance of 125.09 feet to a nail with washer stamped "LAI" set for an angle point,

6.     S 54° 09' 05" W, a distance of 40.63 feet to a nail with washer stamped "LAI" set for at a point in a curve to the right,

7.     with said curve to the right, having a radius of 300.06 feet, an arc distance of 68.77 feet and a chord bearing S 29° 16' 57" E, a distance of 68.62 feet to a nail with washer stamped "LAI" set for at a point of tangency, and

8.     S 22° 42' 58" E, a distance of 120.45 feet to a nail with washer stamped "LAI" set for the most southern southeast corner of said Lot V and of the tract described herein, same being the southwest corner of said Lot IV, and being in the north right-of-way line of Sundance Parkway, a 70-feet wide right-of-way;

**THENCE** with the south line of said Lot V, same being the north right-of-way line of said Sundance Parkway, the following four (4) courses and distances:

1.     with the arc of a curve to the left having a radius of 100.00 feet, an arc distance of 109.32 feet and a chord bearing S 35° 55' 07" W a distance of 103.96 feet to a ½-inch iron rod with plastic cap found at a point of reverse curvature,

2.     with the arc of a curve to the right having a radius of 20.00 feet, an arc distance of 21.91 feet and a chord bearing S 36° 02' 40" W a distance of 20.83 feet to a ½-inch iron rod with cap found at a point of tangency,

3.     S 67° 12' 31" W, a distance of 44.53 feet to a ½-inch iron rod found at a point of curvature,

4.     with the arc of a curve to the right having a radius of 665.00 feet, an arc distance of 79.21 feet and a chord bearing S 70° 41' 58" W a distance of 79.16 feet to a ½-inch iron rod found for the southwest corner of said Lot V, same being the southeast corner of Lot 1, Block A, Replat of Lot VI, Resubdivision La Frontera Sections I & II, a subdivision according to the plat of record in Cabinet V, Slides 41-43, Plat Records of Williamson County, Texas;

**THENCE** leaving the north line of said Sundance Parkway with the west line of said Lot V, same being the east line of said Lot 1, Block A, the following two (2) courses and distances:

1.     N 22° 41' 03" W, a distance of 441.58 feet to a ½-inch iron rod with plastic cap stamped "LAI" set for an angle point, and

Case: 18-50398   Doc# 132-2   Filed: 07/20/18   Entered: 07/20/18 12:17:59   Page 43 of 89

2.002 Acres
Jacob M. Harrell, A-284
Williamson County, Texas

LAI Job No. 020604
FN0361(wdo)R1
Page 17 of 17

2.    N 04° 39' 11" W, a distance of 706.07 feet to a ½-inch iron rod with plastic cap stamped "LAI" set for the northwest corner of said Lot V and of the tract described herein, same being the northeast corner of said Lot 1, Block A, and being in the south line of Lot 1, Block L, La Frontera Section IIIA, a subdivision according to the plat of record in Cabinet S, Slide 370-374, Plat Records of Williamson County, Texas;

**THENCE** N 85° 16' 12" E, at a distance of 166.90 feet pass a ½-inch iron rod with plastic cap stamped "LAI" set for the southeast corner of said Lot 1, Block L, same being the southwest corner of Lot 1, Chisholm Valley South Section 10, Resub of Lots 1, 2, 3, 4, 5, and continuing for a total distance of 340.94 feet to the **POINT OF BEGINNING** and containing 8.404 acres of land, more or less.

### Lot VII

**BEGINNING** at a nail with washer stamped "LAI" set in an asphalt drive for the southeast corner of said Lot II, same being the most eastern southwestern corner of Lot II of said Resubdivision of La Frontera, Sections I & II Subdivision, and being the north line of Sundance Parkway, a 70-feet wide right-of-way, for the southeast corner and **POINT OF BEGINNING** of the tract described herein;

**THENCE** S 84° 24' 35" W, with the south line of said Lot VII, same being the north right-of-way line of said Sundance Parkway, a distance of 243.98 feet to a nail with washer stamped "LAI" set for the southwest corner of said Lot VII and of the tract described herein, and being the southeast corner of said Lot III;

**THENCE** N 05° 35' 12" W, leaving the north right-of-way line of said Sundance Parkway, with the west line of said Lot VII, same being the east line of said Lot III, a distance of 137.69 feet to a nail with washer stamped "LAI" set in an asphalt drive for the northwest corner of said Lot VII and of the tract described herein, and being the most western southwest corner of said Lot II;

**THENCE** N 84° 24' 35" E, with the north line of said Lot VII, same being a south line of said Lot II, a distance of 243.98 feet to a nail with washer stamped "LAI" set in asphalt for the northeast corner of said Lot VII and of the tract described herein, and being an ell corner of said Lot II;

**THENCE** S 05° 35' 12" E, with the east line of said Lot VII, same being the west line of said Lot II, a distance of 137.69 feet to the **POINT OF BEGINNING** and containing 0.771 acres of land, more or less.

**BEARING BASIS**: Texas Coordinate System, Central Zone, NAD83, Grid. Based on survey ties from published City of Round Rock G.P.S. Control Points RR-01-001 and RR-001-017.

C:\Documents and Settings\TimC.SANSONEGROUP\Local Settings\Temporary Internet Files\Content.Outlook\VE9SOAQT\Exhibit B - (1 through 6 of 6).doc

Case: 18-50398    Doc# 132-2    Filed: 07/20/18    Entered: 07/20/18 12:17:59    Page 44 of 89

# Exhibit C

## Construction Standards and Allowances

### La Frontera Village

PREMISES: APPROXIMATELY 21,530 SQ. FT., LOCATED IN 120 SUNDANCE PARKWAY, SUITES 300 & 350 (see Exhibit A)

TENANT:     TechShop Austin, LLC
                    c/o TechShop, Inc.
                    120 Independence Drive
                    Menlo Park, CA  94025

DOING BUSINESS AS: TechShop

TELEPHONE NUMBER: _____

Per lease agreement and except as set forth in this Exhibit, Tenant accepts the space "as is", and all improvements to the Premises to be completed by Tenant.

I.      **SUBMISSION OF PLANS AND SPECIFICATIONS AND COMMENCEMENT OF CONSTRUCTION**

      A.      Plans and Specifications.

            1.      All mechanical, plumbing or electrical work done by Tenant shall be in compliance with and shall meet or exceed all applicable building code requirements.

            2.      All Tenant plans for construction and improvements to the Premises shall be submitted and approved by Landlord before construction commences.

      B.      Commencement of Construction.

            1.      Tenant shall submit to Landlord evidence of approval by the appropriate governmental authorities of Tenant's plans and specifications for Tenant's construction and installations prior to the commencement of Tenant's work.

            2.      Prior to the commencement of Tenant's work, Tenant shall secure the approval of Landlord of all contractors to be used by Tenant in performing Tenant's work.  Tenant shall submit its request for Landlord's approval to Sansone Group, 120 South Central Avenue, Suite 100, Clayton, Missouri  63105.

            3.      At Landlord's request and prior to the commencement of Tenant's work, Tenant shall maintain in effect and provide to Landlord certificates for required insurance coverage.

            4.      Prior to the commencement of Tenant's work, Tenant's contractor shall have a pre-construction meeting with Landlord's project representative to review all of Tenant's plans, the construction schedules and the manner in which the plans are to be implemented.

            5.      Tenant shall comply with the four (4) preceding requirements and shall commence Tenant's work immediately following the date the Premises shall be delivered to Tenant.

II.     **BASIC PROVISIONS GOVERNING TENANT'S CONSTRUCTION**

            1.      All items of construction and all installations not specifically defined in this Exhibit C as Landlord's obligation shall be Tenant's obligation.

            2.      All of Tenant's fixtures, equipment and materials shall be new and/or of first quality.  Trade names in Exhibit C are used to indicate appropriate type and quality and, subject to Landlord's

FRONTIER VILLAGE

written approval, do not preclude the use of other manufacturers' products which are of equal or better quality unless so noted.

3.    All of Tenant's construction and installation shall be in accordance with (i) governing building codes, (ii) the Federal Occupancy Safety and Health Act, the Americans with Disabilities Act, and all other applicable federal statues and the regulations promulgated thereunder, (iii) all laws, ordinances and regulations of applicable state, city and local health departments, (iv) the overall design and construction standards of the Shopping Center, and (v) the requirements of Landlord's fire and casualty insurer.

4.    INTENTIONALLY DELETED.

5.    All structural changes in the Premises requested or required by Tenant and approved by Landlord shall be performed by Landlord and the costs incurred shall be paid by Tenant to Landlord upon demand.

6.    Tenant's construction and installation shall be subject to the inspection, approval and acceptance by Landlord or Landlord's representative for compliance with this Exhibit C and the plans and specifications approved by Landlord. Landlord's final approval and acceptance of Tenant's construction and installation shall be contingent upon the submission by Tenant to Landlord of a detailed breakdown of Tenant's final construction costs, together with receipted invoices and lien waivers showing payment thereof within thirty (30) days after completion of construction of Tenant's construction and installation within the Premises and commencement of rental payment.

7.    Any amounts due Landlord, whether by way of reimbursement for services performed by Landlord at the request of Tenant or which are undertaken on Tenant's behalf by Landlord, shall be due and payable to Landlord upon demand. In the event that the same are not paid within fifteen (15) days following demand by Landlord, Landlord shall be entitled to exercise any and all of the remedies applicable to a default by Tenant in the payment of rent as set forth in this Lease, including, but not limited to, the remedy of termination. Submission of a billing statement, to Tenant by Landlord for costs incurred shall constitute a demand. No payment by Tenant of any such amounts shall constitute a waiver by Tenant of any right to contest the amount or appropriateness of any such amount or amounts.

8.    Roof Penetrations - Tenant shall submit for Landlord's approval plans for all roof penetrations and roof mounted structures in accordance with Landlord's typical details and shall comply with the following requirements: (a) Tenant shall employ Landlord's roofing contractor to perform all cutting of upper level floor and roof openings, reinforcing, curb work and flashing. (b) Any repairs to the roof of the building necessitated by the installation of Tenant's equipment or any other work performed on the roof area by Tenant to Tenant's contractors, shall be performed by Landlord. Tenant shall reimburse Landlord for this work upon demand.

9.    Delivery of Materials and Removal of Debris - Neither Tenant nor Tenant's contractors shall use the public parking area for delivery of materials or removal of debris at any time except upon the approval of Landlord.

10.   Sign Criteria - Tenant's signage shall conform to those standards set forth by the Landlord and shall meet Landlord's criteria.

## III.   IMPROVEMENTS TO PREMISES

A.    Landlord will install, or cause to be installed at its expense, to the "Premises", prior to delivery, the following:

1.    Landlord shall deliver Premises in "as is" condition.

B.    Landlord will install, or cause to be installed in the "Premises" at the expense of Tenant:

N/A

# EXHIBIT D

## SIGN CRITERIA

### La Frontera Village

**EXTERIOR BUILDING SIGNAGE IN AREA 1:**

All exterior building signs must be designed, fabricated and installed to comply with the following criteria and specifications:

1.  All building mounted signs must be individually illuminated neon channel letters with plastic translucent faces. Painted faces are not acceptable.

2.  Signs shall be limited to the wording necessary to describe the business trade name and/or logo.

3.  Letters shall be limited to 42" in height and located within the approved signage area. Two rows will be allowed; however, the total height of the sign shall not exceed 42", including space. Overall length of signs shall be based on frontage measurement as follows: 15' – 25', maximum of 80%; 25' – 50', maximum of 75%; over 65', maximum of 50%.

4.  Physical construction of all building mounted signs shall adhere to the standard sign industry construction practices as follows:

    a.  <u>Letter Channels (Returns)</u> – All letter returns shall be formed from galvanized sheet metal steel, 22 ga. minimum, or aluminum in minimum thickness of .040. Depth of channels shall be minimum of 4 inches, maximum of 6 inches. All interior surfaces must have a splash coat of white for reflective purposes. All exterior surfaces shall be painted to match letter color. (#739M003 Valspar Industrial Coatings)

    b.  <u>Letter Backs</u> – Letter backs are to be made of galvanized sheet metal steel or aluminum of the same or greater thickness as that of the letter channels. Armorphy, plymetal, foam, styrene, or any other inflammable material shall not be used under any circumstances.

    c.  <u>Letter Faces</u> – All letter faces are to be pigmented plexiglass, or equal acrylic sheets with a minimum thickness of .125 inches. Colors are not specifically restricted herein; however, Consenting Owners reserve the right to reject colors that are objectionable and not consistent with the design concept of the Shopping Center.

    d.  <u>Face Retainers</u> – All letter faces must be attached to the letter channels using trimcap material, commonly known as Jewelite (1-inch trim), same color as letter color.

5.  INSTALLATION

    a.  Penetrations into the fascia must be kept to the minimum that is consistent with the structural requirements of the sign. Penetrations shall be done in a manner that is repairable with a minimum of effort and expense.

    b.  The letters are to be attached to those channels using snap-in clips furnished by the sign contractor. (Except for the letter I, all letters shall have a minimum of three clips, although more clips may be required, depending upon the size of the letter).

    c.  Each Tenant or occupant shall pay for the fabrication, installation and maintenance of all signs denoting their premises, including final connection transformers, and all other labor and materials required for sign installation, and to provide all code required conduit, transformer and electrical connections.

6.  ELECTRICAL REQUIREMENTS

    a.  Letters shall be internally illuminated with 4500° red neon tubing for red letter faces; green neon tubing for green letter faces and blue neon tubing for blue letter faces. All other faces shall use white neon tubing. All neon tubing shall not be less than 10MM or greater than 15MM, using 60 NA transformers.

DB04/830929.0006/6210741.3 TD09

b.   Transformers shall be mounted on the back side of the fascia wall directly behind the letters and housed in a sheet metal box. The secondary wiring running from the transformer through the channel shall be installed as required by the city code.

7.   STOREFRONT SIGNAGE

1.   For purposes of store identification, each occupant will be permitted to place upon each entrance to its premises not more than 144 sq. in. of decal application lettering not to exceed 2" in height, indicating hours of business, emergency telephone, etc.

2.   Address numbers shall be applied to the top of the glass door or transom by the tenant sign company during regular course of construction.

FRONTIER VILLAGE

D304/830929.000/66210741.3 TD09

# Exhibit E
## Existing Shopping Center Exclusive Uses & Restrictions

### LA FRONTERA VILLAGE
### ROUND ROCK, TEXAS

### APPLEBEE'S

## RESTRICTIVE COVENANT, DEVELOPMENT & OPERATING AGREEMENT
### (Page 2 – Section IV)

### IV. Use of and Restrictions on Keast Land

4.1     Use of Keast Land. Lot 1 of the Keast Land shall be developed for use as a full-service sit-down restaurant. Lot 3 shall not be used initially for any purpose other than as an Applebee's restaurant and thereafter for any purpose other than as a full-service sit down restaurant. No portion of the Keast Land shall be used in violation of any exclusive use rights or prohibited uses affecting the Shopping Center.

4.2     Restrictions on Keast Land. The development, use and operation of the Keast Land shall be subject to the following restrictions:

      a.     No building within the Keast Land may have a height in excess of twenty-five feet (25'), including parapets, building signage and other architectural features. For the purposes hereof, height shall be measured from the finished floor elevation of the building in question.

      b.     No building within Lot 1 of the Keast Land may exceed 7,000 square feet of space (inclusive of any outside dining area), and no building on Lot 3 of Keast Land may exceed 5,000 square feet and any such buildings shall be further limited to the extent that the number and size of on-grade automobile parking spaces required by the Restrictions and all applicable rules, regulations, ordinances and laws can be constructed and maintained wholly within the boundaries of the applicable lot, without reduction in such number or size by virtue of the granting of a variance or special exception to such rules, regulations, ordinances and laws.

      c.     The Keast Land shall not be used in any manner which would (i) cause any objectionable or unpleasant odors to emanate therefrom or (ii) allow any radio, television, amplifier or sound system, or signs or devices, emitting flashing lights, loud noises or vibrations outside Keast building improvements so that the foregoing could be heard, seen, felt or smelled from outside the Keast Land.

## LA FRONTERA VILLAGE
## ROUND ROCK, TEXAS

### KRISPY KREME

## RECIPROCAL EASEMENT AGREEMENT & RESTRICTIVE COVENANT
## AGREEMENT
## (Page 5 – Section 9)

9.     Restrictions on 7DI Property.     For a period of fifty (50) years following the recording of the Deed conveying the 7DI Property to 7DI, the following restrictions shall apply:

a)     7DI's initial use of the 7DI Property will be for a Krispy Kreme store.  7DI will have the right to change the use of the 7DI Property, subject to GMRI's prior written consent, not to be unreasonably withheld, to either (a) a fast food restaurant serving primarily breakfast food items (in excess of 75% of gross sales), or (b) one or more retail uses that are in keeping with the character and quality of tenants in La Frontera Shopping Center.  If the GMRI Property is no longer owned or leased by GMRI, or a parent, subsidiary or affiliate of GMRI, 7DI may change the use of the 7DI Property to any fast food restaurant or retail use without GMRI's consent; all other changes will require GMRI's prior written consent, not to be unreasonably withheld.  Any change in use will be subject to restrictions of record.  In no event will the 7DI Property be permitted to be used for any use that needs more parking spaces than exist on the 7DI Property; parking needs will be determined by the more restrictive of applicable code, parking restrictions of record, or historical usage of the proposed use.

## LA FRONTERA VILLAGE
## ROUND ROCK, TEXAS

## LOWE'S

## AGREEMENT REGARDING RESTRICTIVE COVENANTS
### (Page 1)

     C.    The Lowe's Property and the Adjacent Property are subject to the terms and conditions of that certain *Easements With Covenants and Restrictions Affecting Land* of even date herewith, between Seller and Sam's Real Estate Business Trust, filed for record in the Real Property Records of Williamson County, Texas.

     D.    As a condition to the sale of the Lowe's Property, Seller has agreed to limit certain of its rights under the ECR and Seller and Lowe's have agreed to cause the Adjacent Property and the Lowe's Property to be encumbered with the restrictive covenants and easements set forth herein.

     NOW, THEREFORE, for and in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, Declarants hereby agree as follows:

     1.    Additional Restriction on Certain Building Heights. No building constructed on the portion of the Adjacent Property depicted on Exhibit "C" attached hereto shall exceed a building height of twenty feet (20'). For the purposes hereof, the phrase "building height" shall be measured from finished-floor elevation to roofline, exclusive of parapets, rooftop equipment and any architectural features

     2.    Additional Use Restrictions. Neither the Outparcel (as defined in the ECR) nor the portion of the Adjacent Property depicted on Exhibit "D" attached hereto may be used for the

repair of automobiles, trucks or other motor vehicles. No portion of the Adjacent Property within three hundred feet (300') of the Lowe's Property shall be used as a cafeteria.

**USE RESTRICTION AGREEMENT**
**(Page 1 – Section 1)**

Provided GMRI is open for business on the GMRI Land (subject to interruption by reason of force majeure or in the event of a remodeling of the building [not to exceed 150 days]) for the primary business as a restaurant specializing in the sale of Italian food, neither DDR nor its successors or assigns shall enter into any agreement conveying or leasing any portion of such Restricted Areas to any entity whose primary purpose is the operation of a restaurant in excess of two thousand five hundred (2,500) square feet of space which specializes in the sale of Italian food. Notwithstanding the foregoing, the provisions of this Paragraph 1 shall not apply to any tenant lease of space in the Shopping Center, in effect as of February 28, 2001 (as the same may be renewed and/or extended), where such tenant has a right to change its use to a restaurant specializing in the sale of Italian food; provided, that, DDR, its successors and assigns, as applicable, will bear the burden of providing evidence reasonably satisfactory to GMRI promptly upon receipt of notice of such change in use or intended change in use, or, in the event any tenant actually notifies DDR or its successors and assigns, as applicable, regarding a change in use prior to implementing such change in use, promptly upon receipt of the request showing that the tenant had such pre-existing right to change to an Italian restaurant.

**RESTRICTIVE COVENANT, DEVELOPMENT & OPERATING AGREEMENT**
**(Page 3 – Section IV)**

IV.  Restrictions on GMRI Land

4.1    Restrictions on GMRI Land.  The development, use and operation of the GMRI Land shall be subject to the following restrictions:

a.    No building within the GMRI Land may have a height in excess of twenty-five feet (25'), including parapets, building signage and other architectural features.  For the purposes hereof, height shall be measured from the finished floor elevation of the building in question.

b.    No building within the GMRI Land, other than the "Olive Garden" restaurant building to be constructed on Parcel 1, may exceed 7,000 square feet of space in size.

c.    No building, structure or improvement located on the GMRI Land shall be operated as a business deriving more than fifty percent (50%) of its gross revenues from the sale of alcoholic beverages.

          d.      The GMRI Land shall not be used in any manner which would (i) cause any objectionable or unpleasant odors to emanate therefrom (excepting normal restaurant odors) or (ii) allow any radio or television transmitting loud noises, or signs or devices emitting flashing lights, that are heard or seen outside of the GMRI Land.

          e.      No portion of Parcel 1 shall be used for drive-through service in connection with the operation of a business thereon.

          f.      Any building, structure or improvement located on the GMRI Land and used for the operation of a retail store shall be constructed in conformance with the architectural features then existing in the Shopping Center.

    4.2     Current Restrictions. Any business operating on the GMRI Land shall be subject to the existing exclusive and prohibited uses granted within the Shopping Center (so long as such exclusive and/or prohibited uses are then in effect, but without the intent to reimpose any of same), a list of such current exclusive and prohibited uses are attached hereto as Exhibit C.

**RED LOBSTER**

## RESTRICTIVE COVENANT, DEVELOPMENT AND OPERATING AGREEMENT
(Page 4 – Section IV)

### IV.  Restrictions on GMRI Land

4.1     Restrictions on GMRI Land.  The development, use and operation of the GMRI Land shall be subject to the following restrictions:

a.     No building within the GMRI Land may have a height in excess of twenty-five feet (25'), including parapets, building signage and other architectural features.  For the purposes hereof, height shall be measured from the finished floor elevation of the building in question.

b.     No building within the GMRI Land may exceed 8,100 square feet of space in size.

c.     No building, structure or improvement located on the GMRI Land shall be operated as a business deriving more than fifty percent (50%) of its revenues from the sale of or serving alcoholic beverages.

4.2     Current Restrictions.  Any business operating on the GMRI Land shall be subject to the existing exclusive and prohibited uses granted within the Shopping Center (so long as such exclusive and/or prohibited uses are then in effect), a list of such current exclusive and prohibited uses are attached hereto as Exhibit D.

## EASEMENTS WITH COVENANTS AND
## RESTRICTIONS AFFECTING LAND ("ECR")
### (Page 2)

**Received a waiver from Sam's for WineStyles to operate in the Shopping Center.**

2    <u>Use</u>   Buildings in the Shopping Center shall be used for commercial purposes of the type normally found in a retail shopping center including, without limitation, financial institutions, service shops, offices, and retail stores. No theater (other than on Parcel 7), bowling alley, night club, amusement arcade or other place of recreation or amusement (unless incidental to another use that is a normal retail shopping center use or a permitted theater use (such use being limited to Parcel 7) or a permitted billiard parlor use (as such use is permitted and limited by item 20, below), or any business deriving more than fifty percent (50%) of its total revenues from the sale of alcoholic beverages shall occupy space within the Shopping Center without the prior written consent of SAM'S and Developer, except as specifically permitted pursuant to Paragraph 4(f)(9). In addition to the foregoing restrictions, operation of each of the following businesses within the Shopping Center are expressly prohibited

     1    any unlawful use,

     2    a "second hand" or "surplus store,"

     3    pawn shop,

     4    daycare center,

     5    veterinary office (except as may be permitted to the incidental use typical of a "Petco" or "PetsMart" store or other similar concept),

     6    living quarters/hotel/motel

     7    manufacturing facility,

     8    bowling alley,

     9    off-track betting parlor or other gambling establishment,

     10    funeral parlor,

     11    skating rink,

     12    nightclub, discotheque, or dance hall,

     13    "Head Shop,"

     14    catering or banquet hall,

     15    place of religious worship,

16    auction hall,

17    sporting event,

18    health club or spa, other than on Parcel 7 of the Shopping Center depicted on Exhibit A,

19    karate center,

20    auditorium, other than one (1) movie theater on Parcel 7, as generally shown on Exhibit A,

21    billiard parlor, except one (1) occupant of Parcel 8 may utilize a portion of its premises for billiard games (such use by such occupant being the "permitted billiard parlor use",

22    wholesale nursery, wholesale members discount club, wholesale or members' discount store or members' warehouse stores, except on Tract 1,

23    except on Parcel 3 of the Shopping Center depicted on Exhibit A, an outdoor lawn or garden center, a retail and/or warehouse improvement center, lumber yard or building supply center, or the sale of hardware in greater than 11,000 spare feet of leaseable area,

24    sales office or showroom for automobiles or other vehicles,

25    massage parlor,

26    car wash,

27    flea market,

28    carnival, amusement park, or circus,

29    gun range,

30    any business which emits offensive odors, fumes, dust, or vapor or constitutes a public nuisance or emits loud noise or sounds which are objectionable, or which create a fire, explosive, or other hazard,

31    mobile home park or trailer court, labor camp, junkyard, or stockyard,

32    any dumping, disposing, incineration, or reduction of garbage (exclusive of appropriately screened dumpsters located in the rear of any building),

33    any central laundry or dry cleaning plant or laundromat (except that his prohibition shall not be applicable to on-site service provided solely for the pickup and delivery by the ultimate consumer, including nominal facilities),

34    any establishment selling or exhibiting pornographic materials;

35    mini-warehouses,

36    sexually oriented business, striptease establishment, nude or semi-nude modeling studio,

37    heavy equipment sales, and

38    truck stops

Case: 18-50398    Doc# 132-2    Filed: 07/20/18    Entered: 07/20/18 12:17:59    Page 56 of 89

# USE RESTRICTION AGREEMENT
## (Page 1)

1.  Provided Schlotzsky's is open for business on the Schlotzsky's Land (subject to interruption by reason of force majeure or in the event of a remodeling of the building [not to exceed 180 days]) for the primary business as a restaurant specializing in the sale of sandwiches and other deli-type items, DDR agrees that for so long as DDR or any of its affiliates owns any portion of the Shopping Center, neither DDR nor its affiliates shall enter into any agreement conveying or leasing any portion of the Shopping Center so owned by DDR or any of its affiliates to any of the following: Subway, Blimpies, Jason's Deli, Wall Street Deli, Quizno's, Panera Bread, Corner Street Bakery, Atlanta Bread Co., La Madeline's Co., McAlister's Deli, Texas French Bread, Togo's Eatery, Miami Subs, Arby's and Steak & Shake (collectively, the "Restricted Users").

2.  Notwithstanding anything in this Agreement to the contrary, no portion of the Restricted Areas may be sold or leased to any Restricted Users at any time during which (i) Schlotzsky's or any of its affiliates is the fee owner the Schlotzsky's Land, or (ii) a Schlotzsky's affiliated restaurant is open for business on the Schlotzsky's Land.

3.  As used herein, the term "affiliates" shall mean any person or entity controlling, controlled by, or under common control with, another person or entity. "Control" as used herein means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such controlled person or entity (the ownership, directly or indirectly, of at least fifty-one percent (51%) of the voting securities of, or possession of the right to vote, in the ordinary direction of its affairs, at least fifty-one percent (51%) of the voting interest in, any person or entity shall be presumed to constitute such control).

4.  Schlotzsky's acknowledges that from and after the time that DDR sells any portion of the Shopping Area to any entity (and such sale is not in violation of the provisions of Paragraph 1 hereof), no further restrictions under this Agreement shall be imposed upon that portion of the Shopping Center so conveyed, unless such portion is a part of the Restricted Areas.

#### IV. Use of and Restrictions on Schlotzsky's Land

4.1 <u>Use of Schlotzsky's Land</u>. The Schlotzsky's Land may only be used as a restaurant; provided, however, for so long as that certain Lease between DDR and Maggie Moo's (as the same may be extended or renewed) is in effect, any such restaurant may not have as its principal business the retail sale of ice cream, frozen yogurt, milk shakes, sundaes, smoothies, frozen desserts, and sorbet for on- and off- premises consumption.

## SCHLOTZSKY'S
## PAGE 2

4.2 <u>Restrictions on Schlotzsky's Land</u>. The development, use and operation of the Schlotzsky's Land shall be subject to the following restrictions:

a. No building within the Schlotzsky's Land may have a height in excess of twenty-five feet (25'), including parapets, building signage and other architectural features. For the purposes hereof, height shall be measured from the finished floor elevation of the building in question.

b. 'No building within the Schlotzsky's Land may exceed 7,500 square feet of space, and any such building shall be further limited to the extent that the number and size of on-grade automobile parking spaces required by the Restrictions and all applicable rules, regulations, ordinances and laws can be constructed and maintained wholly within the boundaries of the Schlotzsky's Land, without reduction in such number or size by virtue of the granting of a variance or special exception to such rules, regulations, ordinances and laws.

c. The Schlotzsky's Land shall not be used in any manner which would (i) cause any objectionable or unpleasant odors to emanate therefrom (provided that normal smells associated with food preparation shall not be considered objectionable or unpleasant) or (ii) allow any radio, television, amplifier or sound system, or signs or devices, emitting flashing lights, loud noises or vibrations outside Schlotzsky's building improvements so that the foregoing could be heard, seen, felt or smelled from outside the Schlotzsky's Land.

d. No portion of the Schlotzsky's Land may be used as a quick-serve burrito and/or wrap restaurant.

e. No building, structure or improvement located on the Schlotzsky's Land shall be operated as a business deriving more than twenty-five percent (25%) of its gross sales from the sale of or serving alcoholic beverages.

### EXHIBIT I

### PROHIBITED USES AND EXCLUSIVES

#### PROHIBITED USES

Buildings in the Shopping Center shall be used for commercial purposes of the type normally found in a retail shopping center including, without limitation, financial institutions, service shops, offices, and retail stores. No theater (other than on Parcel 7 depicted on Exhibit B-1), bowling alley, night club, amusement arcade or other place of recreation or amusement (unless incidental to another use that is a normal retail shopping center use or a permitted theater use (such use being limited to Parcel 7 depicted on Exhibit B-1) or a permitted billiard parlor use (as such use is permitted and limited by item 21 below), or any business deriving more than fifty percent (50%) of its total revenues from the sale of alcoholic beverages shall occupy space within the Shopping Center, except full service restaurant uses on Parcel 8 of the Shopping Center depicted on Exhibit B-1, including a full service restaurant that is operated in conjunction with a billiard parlor use or an amusement use permitted hereunder. In addition to the foregoing restrictions, operation of each of the following businesses within the Shopping Center are expressly prohibited:

1.  any unlawful use;

2.  a "second hand" or "surplus store";

3.  pawn shop;

4.  daycare center;

5.  veterinary office (except as may be permitted to the incidental use typical of a "Petco" or "PetsMart" store or other similar concept);

6.  living quarters/hotel/motel

7.  manufacturing facility;

8.  bowling alley;

9.  off-track betting parlor or other gambling establishment;

10. funeral parlor;

11. skating rink;

12. nightclub, discotheque, or dance hall;

13. "Head Shop";

14. catering or banquet hall;

15. place of religious worship;

16. auction hall;

17. sporting event;

18. health club or spa, other than on Parcel 7 of the Shopping Center depicted on EXHIBIT B-1;

19. karate center;

20. Auditorium, other than one (1) movie theater on Parcel 7 depicted on EXHIBIT B-1;

21. billiard parlor, except one (1) occupant of Parcel 8 may utilize a portion of its premises for billiard games;

22. wholesale nursery, wholesale members discount club, wholesale or members' discount store or members' warehouse stores, except on Parcel 5 of the Shopping Center depicted on EXHIBIT B-1;

23. except on Parcel 3 of the Shopping Center depicted on EXHIBIT B-1 an outdoor lawn or garden center, a retail and/or warehouse home improvement center, lumber yard or building supply center, or the sale of hardware in greater than 11,000 square feet of leaseable floor area;

24. sales office or showroom for automobiles or other vehicles;

25. massage parlor;

26. car wash;

27. flea market;

28. carnival, amusement park, or circus;

29. gun range;

30. any business which emits offensive odors, fumes, dust, or vapors or constitutes a public nuisance or emits loud noise or sounds which are objectionable, or which create a fire, explosive, or other hazard;

31. mobile home park, trailer court, labor camp, junkyard or stockyard;

32. any dumping, disposing, incineration, or reduction of garbage (exclusive of appropriately screened dumpsters located in the rear of any building);

33. any central laundry or dry cleaning plant or laundromat (except that this prohibition shall not be applicable to on-site service provided solely for the pickup and delivery by the ultimate consumer, including nominal facilities);

34. any establishment selling or exhibiting pornographic materials;

35. mini-warehouses;

36. sexually oriented business, striptease establishment, nude or semi-nude modeling studio;

37. heavy equipment sales;

38. truck stops;

39. restaurants within the Premises or within two hundred feet (200') of the Building;

### As to the Protected Parking and Access area only

40. fire, going out of business, relocation, bankruptcy or similar sales unless such occupant is vacating its premises in the Shopping Center within 60 days of the commencement of such sales or unless pursuant to court order;

41. tatoo parlor;

42. automotive service and repair;

43. general office facility other than Landlord's office located on the land and used for the purposes of managing the shopping center and any office used by any other tenant so long as any such office is incidental to such tenant's use of any portion of the Shopping Center; and

44. Any training or educational facility, including, but not limited to, beauty schools, barber colleges, reading rooms, places of institution or other operations catering primarily to students or training rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an occupant of the Shopping Center incidental to the conduct of its business at the Shopping Center.

# LA FRONTERA VILLAGE
## LEASE EXCLUSIVES

**Kohl's Department Store**
**200 Sundance Parkway, Suite 100**
**Round Rock, TX 78681**

## Page 42 – Section 13.6/Exclusive

SECTION 13.6. Additional Prohibited Uses. Landlord further covenants and agrees that, throughout the Term, so long as Tenant is operating a specialty department store within the Building and is not itself violating the restrictions in this Section 13.6, no space within the Protected Parking and Access area shall be used by any occupant to operate a retail operation in which more than twenty percent (20%) of such occupant's sales (based on Dollar Value) is derived from the sale of clothing commonly referred to as close outs, manufacturer's overruns, other retailer's returned or excess inventory or manufacturer's seconds or imperfect merchandise. If Landlord shall be in breach of this covenant and shall fail to begin to cure such breach within thirty (30) days after receipt of written notice from Tenant, Tenant shall have the option to either (i) terminate this Lease by giving Landlord written notice of termination at any time after the expiration of such thirty (30) day period and prior to the cessation of the violation giving rise to Tenant's rights hereunder or (ii) seek such injunctive or other relief as may be available at law or in equity to force the cessation of the offending activity. If Landlord fails to begin to cure the violation within the time set forth herein, in addition to Tenant's right to so terminate this Lease or seek injunctive or other relief, and without waiving Tenant's right to terminate this Lease or seek injunctive relief at a later date should such violation continue, so long as such violation shall continue, the minimum annual rent otherwise due under this Lease shall be reduced to one-half (1/2) of the minimum annual rent otherwise due under this Lease.

# LA FRONTERA VILLAGE
# LEASE EXCLUSIVES

**Lane Bryant, Inc.**
**200 Sundance Parkway, Suite 400**
**Round Rock, TX 78681**

## Page 37 – Section 35/Exclusive

Section 35. <u>Exclusive</u>. Provided Tenant is in possession of the Demised Premises and operating its business without default beyond any applicable cure period, Landlord shall not lease space in the Shopping Center to another tenant whose primary business

is the sale of "large women's apparel" (the "Exclusive Items"). "Large women's apparel" shall be deemed to mean any one or a combination of the following: (a) women's size clothing and apparel in sizes 38 through 52, (b) half-size women's clothing and apparel in sizes 14 ½ through 32 ½, and (c) women's special size clothing apparel in sizes 17 through 27. For purposes of the foregoing, "primary business" means the total sales area in a store or business dedicated to the display of the Exclusive Items is more than twenty percent (20%) of the total sales area in such store or business. Notwithstanding the foregoing, Tenant's exclusive use as provided herein shall not be applicable to any tenant or occupant of the Shopping Center occupying 11,000 or more square feet of leasable floor area; or any existing Shopping Center tenant whose lease, as of the date of this Lease, does not prohibit the subject premises to be used in violation of Tenant's exclusive use, or any of their successors or assigns. In the event of a violation of this provision, Basic Rent shall abate and Tenant shall pay as "Substitute Rent", the lesser of (a) five percent (5%) of Gross Sales, or (b) fifty percent (50%) of the monthly Basic Rent, such amount to be paid within thirty (30) days following the end of each month.

## LA FRONTERA VILLAGE
## LEASE EXCLUSIVES

### Office Depot #2089
### 120 Sundance Parkway, Suite 200
### Round Rock, TX 78681

#### Exhibit E – Section B(1)/Exclusive

     1.    So long as an office supply store has not ceased to be operating in the Premises for a continuous period in excess of six (6) months (excepting any periods during which remodeling or restoration work is being conducted with due diligence), Landlord shall not permit any individual Occupant of the Shopping Center [or of any portion of any other real property adjacent to or within five hundred feet (500') of the Shopping Center which is now owned or may subsequently be acquired by Landlord (or a related entity or affiliate of Landlord) ("Adjoining Property")], other than Tenant, occupying a space of eleven thousand (11,000) or more square feet (excluding the Sam's Parcel and Lowe's Parcel), to use the lesser of (i) eleven thousand (11,000) or more square feet of space or (ii) fifty percent (50%) or more of such Occupant's premises, for the sale of office supplies, office furniture and personal computers similar to a typical store being operated as of the date of this Lease by tenants such as Office Depot, Office Max, Staples, CompUSA, etc.; provided, however, that the foregoing shall not be deemed to prohibit a typical Circuit City, Best Buy or similar store in the Shopping Center (or any such Adjoining Property). Landlord represents, warrants and covenants that, as of the Effective Date, it has not granted to any other Occupant of the Shopping Center (or any such Adjoining Property) whose premises consist of at least eleven thousand (11,000) square feet of leasable floor area, other than Tenant, the exclusive right to sell any item or category of items, except as specifically set forth on SCHEDULE E-1 hereto. In no event shall any exclusive use right granted by Landlord to any Occupant of the Shopping Center (or any such Adjoining Property) be binding upon Tenant, nor apply to the Premises, unless the same is set forth on SCHEDULE E-1 hereto. As used herein, the term "Initial Occupant" shall be defined as any tenant shown on SCHEDULE E-1, attached hereto. Landlord represents, warrants and covenants that, from and after the Effective Date, it shall not grant any exclusive use right to any replacement tenant of any Initial Occupant in the Shopping Center (or any such Adjoining Property) which shall be binding upon any Occupant of the Shopping Center whose premises consist of less than eleven thousand (11,000) square feet of leasable floor area. The foregoing notwithstanding, in the event Landlord grants an exclusive use right to any replacement tenant of any Initial Occupant, such exclusive use right shall not be binding upon Tenant, nor apply to the Premises. Landlord covenants to include the terms of this paragraph in any deed of conveyance of all or any portion of the Shopping Center (or any such Adjoining Property) and to furnish evidence of such deed restrictions to Tenant promptly upon the closing of any such sale.

# LA FRONTERA VILLAGE
## LEASE EXCLUSIVES

### Petco Store #490
### 2701-A Parker Road, Suite 100
### Round Rock, TX 78681

## Page 5 – Section 10 (a)/Exclusive

Landlord covenants and agrees that during the term of this Lease, no other Anchor Tenant, as defined below, shall use the lesser of (a) eleven thousand (11,000) or more square feet of the 'Premises or (b) fifty percent (50%) or more of such Anchor Tenant's sales floor area for the sale of pet food and/or pet supplies similar to a typical store being operated as of the date of this Lease by tenants such as Petco, PetsMart, Pet Supplies Plus, etc. An "Anchor Tenant" is hereby defined as a tenant who has a net rentable square footage of more than eleven thousand (11,000) square feet excluding Parcel 3 (Lowes) or Parcel 5 (Sam's), as shown on Exhibit "N". This covenant shall run with the land on which the Shopping Center is located so long as the Premises are used as a pet food and supply store. Landlord agrees after the date hereof not to sell to, lease to, nor approve any sublease or assignment of lease or change of use in violation of the covenants of this Paragraph 10(a). Landlord agrees at its sole cost and expense to promptly and continuously enforce this non-competition covenant using all reasonable legal means. Should Landlord violate the provisions of this covenant and fail to cure the violation within thirty (30) days from Tenant's Notice of the violation, in addition to any other remedies available at law or in equity, Tenant shall have the right to reduce the Base Rent to 3% of Gross Sales for the entire period of the violation; and, should the violation not be cured within ninety (90) days of Tenant's Notice of the violation, terminate this Lease upon thirty (30) days advance Notice, unless Landlord cures the violation within the thirty day notice period. Should another tenant in the Shopping Center change its use in violation of this provision but without the consent of Landlord, Landlord agrees at its sole cost and expense to promptly and continuously enforce this non-competition covenant using all reasonable legal means. So long as Landlord diligently proceeds with its enforcement, Tenant shall not have the right to abate any Base Rent unless the violation continues for longer than forty-five (45) from Tenant's Notice to Landlord and shall not have the right to terminate. As used in this Lease, the term "Gross Sales" means all sales, both cash and charge, of merchandise and services made in, upon or from the Premises, including telephone sales and orders taken in or from the Premises although such orders may be filled elsewhere, less refunds and allowances to the customer, but excludes any taxes, returned items, interest, service or carrying charges, sales to Tenant's employees, amounts written off as bad debts, sales not in the ordinary course of Tenant's business, and postage, handling and shipping charges.

# LA FRONTERA VILLAGE
## LEASE EXCLUSIVES

## Hallmark Retail, Inc.
### A Delaware Corporation
### 2701-A Parker Road, Suite 200A
### Round Rock, TX 78681

## Page 14 – Section 10(b)/Exclusive

(b)     Landlord's Use Restriction: "Restricted Items" shall mean and include any of the following products: Christmas ornaments, greeting cards, gift wrap and/or party supplies. "Temporary Store" shall mean any store or business in the Shopping Center operated by a tenant, licensee or occupant under a lease, license or agreement (oral or written) having a term of less than one (1) year or any store or business which is not required to remain open to the public for business for twelve (12) or more consecutive months. In the event (i) Tenant is not in default under or any of the provisions of this Lease beyond any applicable cure period, (ii) Tenant is open and doing business in the Premises in accordance with the Permitted Use, and (iii) any tenant or occupant in the Shopping Center carries any Restricted Item and/or the Shopping Center contains a Temporary Store that sells any Restricted Item (the "Use Restriction Violation"); Monthly Minimum Rent and Percentage Rent shall abate and Tenant shall pay, in lieu thereof, Alternate Rent. Alternate Rent shall be paid, together with Additional Rents, within twenty-five (25) days after the end of the month in which the Gross Sales were generated. Such Alternate Rent shall commence upon Tenant's notification to Landlord of a Use Restriction Violation and shall continue until the earlier of the date that (i) the Use Restriction Violation no longer exists or (ii) Tenant terminates this Lease as permitted herein. For the purpose of this Section 10(b), "Shopping Center" shall include and consist of ~~any contiguous land owned, leased or otherwise controlled or managed either directly or indirectly by Landlord or any affiliate of Landlord~~

In addition, upon the occurrence of a Use Restriction Violation, Tenant shall have the immediate right (in addition to any other rights it may have) to terminate this Lease upon delivery of ninety (90) days written notice thereof to Landlord (and Landlord's failure to cure such Violation prior to the expiration of such ninety (90) day

INITIAL
Landlord
Tenant

the area designated on Exhibit "A" attached hereto.

period), in which event Landlord shall promptly reimburse Tenant for the Unamortized Value of Tenant's Property, and both parties shall be relieved of any further obligations hereunder. For purposes of this Section 10(b), the Unamortized Value of Tenant's Property shall be equal to that sum derived by multiplying Tenant's cost for such leasehold improvements (which are in excess of the Tenant Allowance) by a fraction, the numerator of which shall be the number of days between the date of termination of this Lease pursuant to this section and the scheduled expiration date of the Initial Term and the denominator of which shall be the number of days in the Initial Term.

Pier One

Notwithstanding anything contained in this paragraph to the contrary, The Use Restiction shall not apply to the following tenants: (a) SAM's, Lowes, Office Depot, Petco, Marshall's, Bed Bath & Beyond, Old Navy, Barnes & Noble, or their sublessees or assigns; or (b) a party goods operator such as Party City or similar type concept, provided the display area of greeting cards shall not exceed sixty (60) lineal feet (each spinner rack containing any such greeting cards shall be equal to six (6) lineal feet); (c) Hallmark Cards, Inc. or any of its affiliates, subsidiaries, successors, assings or third parties licensed to sell Hallmark products; or (d) any tenant that carries, in aggregate, less than twenty (20) lineal feet of Restricted Items (each spinner rack containing any Restricted Item shall be equal to six (6) lineal feet); (e) any tenant in the Shopping Center occupying premises containing a GLA of over 20,000 square feet; or (f) Ulta or their sublessees or assigns with respect to greeting cards; provided, however, in the event the primary use of any such proposed sublessee or assignee would violate the Use Restriction, then, in such event, Landlord shall withhold its consent to such proposed sublease or assignment provided Landlord has the right to withhold such consent according to the terms set forth in Landlord's agreement with Ulta.

# LA FRONTERA VILLAGE
# LEASE EXCLUSIVES

### Bath & Body Works, Inc.
### 2701-A Parker Road, Suite 200B
### Round Rock, TX 78681

## Page 25 – Section 14.1.2/Exclusive

14.1.2.  Throughout the Term, Tenant shall not use or permit the use of the Demised Premises, and Landlord shall not lease or permit the use of any portion of the Shopping Center, for the operation of any adult bookstore, adult movie theater, head shop, bar, massage parlor or other similar enterprise whose business is the sale, rental or promotion of sexually explicit materials, acts or entertainment.  For the purpose of this lease, "adult bookstore" shall mean any store, a substantial part of the inventory of which is not available for sale to children under the age of 15 because it explicitly deals with or depicts human sexuality, and "head shop" shall mean any store which sells items commonly used or intended for use with or in the consumption of any narcotic, dangerous drug or other controlled substance, including without limitations, any hashish pipe, waterpipe, bong, chillum, pipe screen, rolling papers, rolling devices, coke spoons or roach clips.

# LA FRONTERA VILLAGE
## LEASE EXCLUSIVES

## Dress Barn, Inc.
### d/b/a Dress Barn/Dress Barn Woman
### 2701-A Parker Road, Suite 200C
### Round Rock, TX 78681

## Page 18 – Article XXX/Exclusive

ARTICLE XXX. Exclusive Use. 30.1 Except for (i) any tenants occupying more than ~~10,000~~ **11,000** square feet in the Shopping Center, (ii) any tenant or occupant selling large-sized women's clothing in an area or areas comprising no more than 1,000 square feet of such tenant's or occupant's rentable floor area, and (iii) a clothing store specializing in maternity wear, Tenant shall have the exclusive right to operate a store whose use includes the sale of large-size specialty women's ready-to-wear clothing (the "Exclusive Items"), and Landlord shall not (a) lease or grant its consent to any assignment or sublease of space or change of use in the Shopping Center for the sale of any Exclusive Items or (b) grant permission to any other tenant or occupant in the Shopping Center to sell or display for sale any Exclusive Items; provided, however with respect to clause (b), Landlord shall have no obligation to inspect other tenants for violation thereof. In the event of a violation of the foregoing restriction, Tenant shall provide written notice thereof to Landlord and Landlord shall promptly take all reasonable steps as it deems necessary to cure such violation. If such violation shall continue for a period of ninety (90) days, then Tenant may pay to Landlord during the continuation of such violation, in lieu of Minimum Guaranteed Rental, rent in the amount of five percent (5%) of Tenant's Gross Sales or fifty percent (50%) of Minimum Guaranteed Rental, whichever is less. If such violation continues for twelve (12) months after Tenant commences paying such adjusted rental, upon the expiration of such 12-month period Landlord may, at its option and upon written notice to Tenant, require to Tenant to elect to either (i) recommence the payment of full Minimum Guaranteed Rental, without adjustment, or (ii) terminate this lease upon thirty (30) day's prior written notice to Landlord, whereafter this lease shall terminate and the parties shall have no further liability or obligation hereunder.

# LA FRONTERA VILLAGE
# LEASE EXCLUSIVES

### Marshall's #0775
### 2701-A Parker Road, Suite 300
### Round Rock, TX 78681

## Schedule B – Section 4(B)/Exclusive

(B) Landlord agrees that, during the term of this lease, no other premises in the Shopping Center shall at any time contain more than eleven thousand (11,000) square feet of floor area therein used or occupied for, or devoted to, the sale or display of apparel (including in the computation of such floor area one-half (1/2) of all floor area in any aisles, corridors or similar spaces adjacent to or abutting any racks, gondolas, shelves, cabinets, counters or other fixtures or equipment containing or used for the sale or display of apparel) provided however, if the Demised Premises cease to be used for the sale of apparel and such cessation continues for longer than 180 consecutive days (except as a result of remodeling, repairs, fire or casualty or other force majeure events) then the foregoing exclusive shall be of no further force or effect. The provisions of this Paragraph 4(B) shall not apply to (a) the operation of a Goody's apparel store by Goody's, its successors, sublessees or assigns pursuant to the Goody's Lease provided such store is located outside of the area labelled Control Area upon the Lease Plan, (b) the operation of a department store or junior department store occupying more than 80,000 square feet of floor area in the Shopping Center such as Target, Walmart or Kohls, (c) the operation of an Old Navy apparel store by Old Navy, its successors, sublessees or assigns pursuant to the Old Navy Lease or (d) the operation of a typical sporting goods store which may devote or occupy up to fifty (50%) percent of its sales floor area for the sale or display of apparel. Furthermore, the provisions of Paragraph 4(B) shall not apply to the parcels labelled "Sam's Parcel" or "Lowe's Parcel" as shown on Schedule J so long as such parcels are not owned by Landlord. However, if either parcel is sold to or otherwise acquired by Landlord or an entity affiliated with Landlord any leases subsequently entered into with respect to such parcel shall thereafter be subject to the exclusive set forth herein. Landlord shall notify tenants leasing or occupying over 11,000 square feet of floor area of this exclusive and shall make all leases in the Shopping Center subject to the terms of the first sentence of this Paragraph 4(B) of Schedule B.

## LA FRONTERA VILLAGE
## LEASE EXCLUSIVES

**Bed Bath & Beyond #305**
**2701-A Parker Road, Suite 400**
**Round Rock, TX 78681**
**PAGE 1**

### Page 24 – Section 23/Exclusive

(a) To induce Tenant to execute this Lease, and
subject to all of the terms and provisions of this Section 23,
Landlord covenants and agrees as follows:

(i) Landlord will not lease, rent or occupy or
permit any other premises in the Shopping Center [or on any land
(hereinafter the "Related Land") contiguous or adjacent to the
Shopping Center but for any intervening road, street, alley or
highway owned now or at any time in the future by Landlord or any
affiliated entity (referring to the actual Landlord from time to
time, without regard to land owned by any prior landlords, and
excluding from the operation hereof any business existing at the
time any future landlord becomes Landlord hereunder)] to be
occupied, whether by a tenant, sublessee, assignee, licensee or
other occupant or itself, for the sale, rental or distribution,
either singly or in any combination, of items contained in any of
the following respective categories of items: (A) linens and
domestics; (B) bathroom items; (C) housewares; (D) frames and
wall art; (E) window treatments; and/or (F) closet, shelving and
storage items (which items, either singly or in any combination,
are hereinafter referred to as the "Exclusive Items").
Notwithstanding the foregoing, (1) any tenant or subtenant in the
Shopping Center (or in any Related Land) whose premises contain

less than 11,000 square feet of Floor Area, shall not be bound by Tenant's aforesaid exclusive, (2) Tenant's aforesaid exclusive shall not be applicable to the Sam's and Lowe's parcels shown on Exhibit B, (3) Tenant's aforesaid exclusive shall not apply to any retail tenant (including, but not limited to, Kohl's) leasing 80,000 square feet or more of Floor Area in the Shopping Center or on any Related Land, (4) Ulta 3 and Pier One shall have the right to sell such merchandise in their respective premises in the Shopping Center as they are selling in a majority of their stores as of the Effective Date, and (5) any tenant in the Shopping Center or on any Related Land whose premises contains 11,000 square feet or more of Floor Area may sell, rent or distribute Exclusive Items in the lesser of 11,000 square feet of Floor Area or fifty (50%) percent of the Floor Area of its leased premises provided any such sale, rental and distribution does not, in the aggregate, constitute the primary use of such tenant's premises.

(ii)  For the purposes of this Section 23, the term "primarily" shall be defined as the use of fifty (50%) percent or more of the Floor Area of any tenant (including Tenant) in the Shopping Center or on any Related Land.

(iii)   The exclusive rights granted to Tenant with respect to any respective category listed in the foregoing subsection (a) of this Section 23 shall be conditioned upon Tenant using portions of the Premises for the sale, rental or distribution of items contained in such category (other than during Excused Periods and for periods of time not exceeding twelve (12) consecutive months) provided that such condition applies to all other tenants in the Shopping Center.   The exclusive rights granted to Tenant in this Section 23 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of a Floor Area of at least fifteen thousand (15,000) square feet of the Premises;

# LA FRONTERA VILLAGE
# LEASE EXCLUSIVES

## Sleep Experts
## 2701-A Parker Road, Suite 550
## Round Rock, TX 78681

## Page 8 – Section IX.C/Exclusive

Exclusive Use. So long as Tenant is open for business in the Shopping Center and subject to applicable law and all permitted uses granted to existing other tenants in the Shopping Center as of the date hereof, Tenant will have the exclusive right in Retail 1 and Retail 4 areas of the Shopping Center (as noted in Exhibit A) to sell mattresses. Tenants occupying at least 15,000 square feet of contiguous retail space will be exempt from this exclusive. If Landlord violates this exclusive right, so long as such violation continues, Tenant may elect to either terminate this Lease, abate Minimum Rent by fifty percent (50%) or pursue any other remedy at law or in equity.

---

# LA FRONTERA VILLAGE
# LEASE EXCLUSIVES

### Barnes & Noble, #2009
### 2701-A Parker Road, Suite 700
### Round Rock, TX 78681

## Page 13 – Section 7.5/Exclusive

7.5    For so long as this Lease is in effect and Tenant (or its successors or assigns) is open for business (except temporary closings permitted under Paragraph 7.2) and is operating the Premises for such use, and for a period of twelve (12) months thereafter, Landlord shall not permit any tenant or occupant of the Shopping Center (other than Tenant or its successors or assigns) occupying a space of eleven thousand (11,000) or more square feet (excluding Sam's and Lowe's), to use the lesser of (a) eleven thousand (11,000) or more square feet of space or (b) fifty percent (50%) or more of such occupant's floor area, for  the sale of books, magazines, periodicals and/or newspapers in print, on tape, disk, and/or CD ROM, similar to a typical bookstore as operated by Barnes & Noble or Borders Books and Music as of the Effective Date hereof. In the event any other tenant or occupant of the Shopping Center operates its space in the Shopping Center in violation of the foregoing restriction, Fixed Rent shall be automatically reduced to one-half (1/2) of stated Fixed Rent under Paragraph 3.2 above, and Tenant shall have, in addition to all other remedies available to Tenant, the right to terminate this Lease effective sixty (60) days after giving Landlord written notice of such termination, unless Landlord cures such violation within thirty (30) days after such notice.   Landlord covenants to include the terms of the foregoing restriction as a deed restriction in any sale of the Restaurant Outparcel(s), and to furnish evidence of such restriction to Tenant promptly upon any such sale. Landlord represents and covenants that it has not granted and will not grant to any other Initial Occupant (as hereinafter defined) of the Shopping Center the exclusive right to sell any item or category of items, except as specifically set forth on Exhibit L hereto. For purposes of the foregoing, the term "Initial Occupant" shall be defined as any tenant shown on Exhibit B attached hereto occupying eleven thousand (11,000) or more square feet of space in the Shopping Center (excluding Sam's and Lowe's). In the event that Landlord grants an exclusive use right to any replacement tenant of an Initial Occupant in the Shopping Center, such exclusive use right shall expressly not apply to the Premises or to Tenant or its successors, assigns, sublessees or licensees during the term of this Lease.

# LA FRONTERA VILLAGE
## LEASE EXCLUSIVES

### Ulta Salon, Cosmetics & Fragrances
### d/b/a Ulta III
### 2701-C Parker Road
### Round Rock, TX 78681

## Exhibit H – Section 2/Exclusive

2.       **Tenant's Primary Business and Exclusive Rights**. As used in the Lease, the term "Tenant's Primary Business" shall mean (i) the retail sale of cosmetics, fragrances, hosiery, costume jewelry, hair care products such as shampoos, conditioners, gels, accessories; personal care appliances; sunglasses; greeting cards; other health and beauty aid items including feminine hygiene products; men's toiletries; analgesics; skin care products; body care products, deodorants; oral hygiene products; eye care products; and other health and beauty products sold in a majority of Tenant's stores; (ii) the operation of a full service hair salon; (iii) the operation of a nail salon open to the public; (iv) the operation of a professional day spa, and (v) the incidental sale or providing of similar or related goods and services. Landlord shall not permit any other occupant of the Shopping Center nor enter into a lease with any other tenant of the Shopping Center allowing or authorizing such other tenant to engage in Tenant's Primary Business (excluding subparagraph (v) above) in more than fifteen percent (15%) of such other tenant's or occupant's space; provided, however, the foregoing restriction shall not apply to (i) any tenant of the Shopping Center leasing 14,000 square feet or more of space ("Anchor Tenant") or any subtenant or assignee of an Anchor Tenant; (ii) all rights granted under previous leases (including any extensions or modifications thereto; provided, however if the modification relates to a change in use the change was permitted under such lease); (iii) any pharmacy, drug store or grocery store; (iv) the sale of hosiery, costume jewelry, analgesics, deodorants, oral hygiene products, eye care products, sunglasses, greeting cards and other related products "sold in a majority of Tenant's stores"; (v) one discount hair cutter of 1,400 square feet or less no closer than 300 feet from the Tenant's Premises and not for the sale of accessories in excess of 100 square feet.

# LA FRONTERA VILLAGE
# LEASE EXCLUSIVES

## Leslie's Poolmart, Inc.
## d/b/a Leslie's Swimming Pool Supplies
## 116 Sundance Parkway, Suite 200
## Round Rock, TX 78681

### Pages 4 (I.A.4) & 9 (IX)-Exclusive

4.    Permitted Use: Retail sale of swimming pool and spa supplies, swimming pools, spas and patio furniture. Notwithstanding anything to the contrary contained in this Lease, Landlord and Tenant agree that during the term of the Lease or any extension thereof, Tenant shall be the sole and exclusive occupant in the Shopping Center whose "primary business" is the retail sale of swimming pool and spa supplies, swimming pools and spas, provided Tenant has not closed its business to the public. For the purposes of this paragraph, "primary business" is defined as any business from which more than 50% of sales are derived. This Exclusive Use Provision does not apply to any existing tenants as of the effective date of this Lease or their assignees or subtenants. In the event Landlord has consent rights to any future assignment or sublease, Landlord agrees to withhold such consent if the proposed use violates the terms of this paragraph. (Article IX).

# LA FRONTERA VILLAGE
# LEASE EXCLUSIVES

## IBM Texas Employees Federal Credit Union
## d/b/a Amplify
## 115 Sundance Parkway, Suite 408
## Round Rock, TX 78681

## PAGE A-1, SECTION 4

4.  Permitted Use: Principal business activity is a credit union only, including services and products offered to members of a credit union. Notwithstanding anything to the contrary contained in this Lease, Landlord and Tenant agree that during the term of the Lease or any other extension thereof, Tenant shall be the sole and exclusive occupant of their Building (Units 402-430 of Retail 4 – see Exhibit A) in the shopping center whose primary business is a credit union, bank, savings institution, or other full-service financial provider. This Exclusive use provision does not apply to any existing tenants or their assignees as of the effective date of this Lease (Article IX).

# LA FRONTERA VILLAGE
# LEASE EXCLUSIVES

## Edible Arrangements
## 115 Sundance Parkway, Suite 412
## Round Rock, TX 78681

## Page 7 -Section IX(A)/Exclusive

A.   **Tenant's Use of Premises.** Retail sale and production of floral Fruit Designs of any type or kind. Notwithstanding anything to the contrary contained in this Lease, Landlord and Tenant agree that during the term of the Lease or any other extension thereof, Tenant shall be the sole and exclusive occupant of their Building (Units 402-430 of Retail 4 – see Exhibit A) in the shopping center whose primary business is the retail sale of floral Fruit Designs of any type or kind. This Exclusive use provision does not apply to any existing tenants or their assignees as of the effective date of this Lease (Article IX).

## LA FRONTERA VILLAGE
## LEASE EXCLUSIVES

### Bryce Cunningham
### d/b/a Cunningham Chiropractic
### 115 Sundance Parkway, Suite 340
### Round Rock, TX 78681

## Exhibit F/Exclusive

1. The Restriction. Subject to the conditions and exceptions mentioned below, Landlord agrees that during the original term of this Lease Landlord will not execute any lease for space within the Shopping Center with a tenant whose principal business activity is a chiropractic practice.

2. Conditions. The restriction described above shall apply only as long as all of the following conditions exist:

    (a) Tenant is occupying the Demised Premises doing business in the manner permitted by subsection 1.1(r) of this Lease;

    (b) Tenant has timely paid as due all rentals and other charges prescribed in this Lease; and

    (c) Tenant has not been in default with regard to any obligations prescribed in this Lease.

Upon the failure of one or more of the above conditions, the restriction upon the Shopping Center shall automatically cease and shall thereafter be of no further force or effect.

3. Exceptions. The following exceptions apply to the restriction described above:

    (a) The restriction shall not apply after the conclusion of the lease term described in subsection 1.1(f) of this Lease, notwithstanding any renewal or extension of this Lease which would result in Tenant's continued occupancy of the Demised Premises after the conclusion of the original term.

    (b) The restriction shall not apply to any existing tenants in the Shopping Center, nor shall it apply to renewals or extensions of leases which pre-date the date of this Lease, nor shall it apply to Landlord's consenting to assignments or sublettings relating to leases which pre-date the date of this Lease, nor shall it apply to the Sam's Parcel and Lowe's Parcel shown on the Site Plan, nor to any tenant or occupant of the Shopping Center occupying 11,000 or more square feet of leasable floor area.

    (c) The restriction shall not apply to any land located outside the present boundaries of the Shopping Center.

    (d) If a court of competent jurisdiction or a governmental agency should determine the restriction to be illegal or unenforceable, or if Landlord and Tenant should agree that the restriction is illegal or unenforceable, the restriction shall automatically cease and shall thereafter be of no further force or effect; moreover, Landlord and Tenant further agree that in such event the remainder of this Lease will continue in full force and effect.

    (e) If Landlord gives written notice to Tenant that a prospective tenant in violation of the restriction has requested that Landlord negotiate with it for space in the Shopping Center, then the restriction shall automatically cease and shall thereafter be of no further force or effect unless Tenant, within ten days after the delivery of Landlord's notice, agrees in writing to indemnify Landlord and hold Landlord harmless from all liability, legal actions (including, without limitation, court costs and attorneys' fees), expense and loss incurred by Landlord and related in any way to Landlord's attempts to comply with the restriction.

# LA FRONTERA VILLAGE
# LEASE EXCLUSIVES

## Formal Specialists LTD., d/b/a Ascot Tuxedos
## d/b/a Al's Formal Wear
## 115 Sundance Parkway, Suite 210
## Round Rock, TX 78681

## Exhibit F/Exclusive

1. <u>The Restriction</u>. Subject to the conditions and exceptions mentioned below, Landlord agrees that during the original term and any renewal or extension options of this Lease Landlord will not execute any lease for space within the Shopping Center with a tenant whose principal business activity is _____ retail sale and rental of tuxedos _____

2. <u>Conditions</u>. The restriction described above shall apply only as long as all of the following conditions exist:

   (a) Tenant is occupying the Demised Premises doing business in the manner permitted by subsection 1.1(r) of this Lease;

   (b) Tenant has timely paid as due all rentals and other charges prescribed in this Lease; and

   (c) Tenant has not been in default with regard to any obligations prescribed in this Lease, beyond any cure period specified in the Lease.

Upon the failure of one or more of the above conditions, the restriction upon the Shopping Center shall automatically cease and shall thereafter be of no further force or effect.

3. <u>Exceptions</u>. The following exceptions apply to the restriction described above:

   (a) The restriction shall not apply after the conclusion of the lease term described in subsection 1.1(l) of this Lease, notwithstanding any renewal or extension of this Lease which would result in Tenant's continued occupancy of the Demised Premises after the conclusion of the original term.

   (b) The restriction shall not apply to any existing tenants in the Shopping Center, nor shall it apply to renewals or extensions of leases which pre-date the date of this Lease, nor shall it apply to Landlord's consenting to assignments or sublettings relating to leases which pre-date the date of this Lease.

   (c) The restriction shall not apply to any land located outside the present boundaries of the Shopping Center. Shopping Center shall be defined as the entire La Frontera Shopping Center including outparcels which are owned by Landlord.

   (d) If a court of competent jurisdiction or a governmental agency should determine the restriction to be illegal or unenforceable, or if Landlord and Tenant should agree that the restriction is illegal or unenforceable, the restriction shall automatically cease and shall thereafter be of no further force or effect; moreover, Landlord and Tenant further agree that in such event the remainder of this Lease will continue in full force and effect.

   (e) If Landlord gives written notice to Tenant that a prospective tenant in violation of the restriction has requested that Landlord negotiate with it for space in the Shopping Center, then the restriction shall automatically cease and shall thereafter be of no further force or effect unless Tenant, within ten twenty (20) days after the delivery of Landlord's notice, agrees in writing to indemnify Landlord and hold Landlord harmless from all liability, legal actions (including, without limitation, court costs and attorneys' fees), expense and loss incurred by Landlord and related in any way to Landlord's attempts to comply with the restriction.

# LA FRONTERA VILLAGE
## LEASE EXCLUSIVES

## Eyemart Express LTD., a Texas Limited Partnership
## d/b/a Eyemart Express
## 116 Sundance Parkway, Suite 120
## Round Rock, TX 78681

## Exhibit F/Exclusive

1. <u>The Restriction</u>. Subject to the conditions and exceptions mentioned below, Landlord agrees that during the original term of this Lease Landlord will not execute any lease for space within the Shopping Center with a tenant whose principal business activity is <u>the retail operation of an optical business, fabricating, dispensing and selling prescription eyewear (frames, lenses and contact lenses), eye and contact examinations and related optometric services</u>

2. <u>Conditions</u>. The restriction described above shall apply only as long as all of the following conditions exist:

    (a) Tenant is occupying the Demised Premises doing business in the manner permitted by subsection 1.1(r) of this Lease;

    (b) Tenant has timely paid as due all rentals and other charges prescribed in this Lease; and

    (c) Tenant has not been in default with regard to any obligations prescribed in this Lease.

Upon the failure of one or more of the above conditions, the restriction upon the Shopping Center shall automatically cease and shall thereafter be of no further force or effect.

3. <u>Exceptions</u>. The following exceptions apply to the restriction described above:

    (a) The restriction shall not apply after the conclusion of the lease term described in subsection 1.1(f) of this Lease, notwithstanding any renewal or extension of this Lease which would result in Tenant's continued occupancy of the Demised Premises after the conclusion of the original term.

    (b) The restriction shall not apply to any existing tenants in the Shopping Center, nor shall it apply to renewals or extensions of leases which pre-date the date of this Lease, nor shall it apply to Landlord's consenting to assignments or sublettings relating to leases which pre-date the date of this Lease, nor shall it apply to the Sam's Parcel and Lowe's Parcel shown on the Site Plan, nor to any tenant or occupant of the Shopping Center occupying 11,000 or more square feet of leasable floor area.

    (c) The restriction shall not apply to any land located outside the present boundaries of the Shopping Center.

    (d) If a court of competent jurisdiction or a governmental agency should determine the restriction to be illegal or unenforceable, or if Landlord and Tenant should agree that the restriction is illegal or unenforceable, the restriction shall automatically cease and shall thereafter be of no further force or effect; moreover, Landlord and Tenant further agree that in such event the remainder of this Lease will continue in full force and effect.

    (e) If Landlord gives written notice to Tenant that a prospective tenant in violation of the restriction has requested that Landlord negotiate with it for space in the Shopping Center, then the restriction shall automatically cease and shall thereafter be of no further force or effect unless Tenant, within ten days after the delivery of Landlord's notice, agrees in writing to indemnify Landlord and hold Landlord harmless from all liability, legal actions (including, without limitation, court costs and attorneys' fees), expense and loss incurred by Landlord and related in any way to Landlord's attempts to comply with the restriction.

## LA FRONTERA VILLAGE
## LEASE EXCLUSIVES

### Austin Professional Dental
### 115 Sundance Parkway, Suite 100
### Round Rock, TX 78681

### Section I.A.4/Exclusive

4.      Permitted Use: Premises shall be used as a general dentist office.  Notwithstanding anything to the contrary contained in this Lease, Landlord and Tenant agree that during the term of the Lease or any extension thereof, Tenant shall be the sole and exclusive occupant of Retail 3 (units 301-304—see Exhibit A) and Retail 4 (units 402-430—see Exhibit A) in the Shopping Center whose "primary business" is a general dentist office, provided Tenant has not closed its business to the public.  For the purposes of this paragraph, "primary business" is defined as any business from which more than 50% of sales are derived.  This Exclusive Use Provision does not apply to any existing tenants as of the effective date of this Lease or their assignees or subtenants; and also does not apply to any dentistry specialists, such as an orthodontist, periodontist, etc. (Article IX).

# LA FRONTERA VILLAGE
## LEASE EXCLUSIVES

## Chipotle Mexican Grill, Inc.
### d/b/a Chipotle
### 150 Sundance Parkway, Suite 100
### Round Rock, TX 78681

### Page 4 -Article 2 - Section n(ii)/Exclusive

(ii) <u>Exclusive Use</u>. A quick-serve eatery selling specialty burritos, wraps, fajitas or tacos.

### Page 6 – Article 5 - Section 5.7/Exclusive

5.7 For the Term of this Lease, Landlord shall not permit or suffer any other tenant within the "Protected Area" shown in **Exhibit B** hereto (i.e., the Building) to engage in the Exclusive Use as its primary business, except for anchor tenants, the premises occupied by Sam's and Lowe's as shown on **Exhibit B**, and their successors and assigns and any existing tenant in the Center whose lease, as of the date of this Lease, does not prohibit the subject premises to be used in violation of the Exclusive Use, or any of their successors or assigns. For purposes of the foregoing, an "anchor tenant" shall be defined as any occupant of the Shopping Center whose gross leasable floor area exceeds 11,000 square feet. Without limiting the generality of the foregoing, Landlord shall not lease space in the Center to LaSalsa, Chuy's, The Mexican Grill, Jalapeño Mexican Grill, Chez Jose, Taco Cabana, Z-Teca, Todo Loco, World Wraps, Bocaza, Rubio's, Una Mas, N.Y. Burrito, Baha Fresh, Wahoo's Fish Tacos or any similar restaurant. In the event of a breach by Landlord under this Section 5.7, and if Landlord fails to commence to diligently cure such breach within thirty (30) days following notice from Tenant thereof, or if Landlord fails at any time after the thirty (30) day cure period to use its best efforts to remedy such breach, then Tenant shall be entitled to a fifty percent (50%) reduction in Base Rent during the entire time such breach continues retroactive from the date Tenant's Exclusive Use was violated, and, should such breach continue for a period of over one (1) year, Tenant may terminate this Lease by giving notice to Landlord of its intent to do so within thirty (30) days of the end of the one (1) year period from the date of the commencement of reduced rent hereunder, in its sole discretion, otherwise Tenant shall resume its payment of the full Base Rent provided for in this Lease.

# LA FRONTERA VILLAGE
# LEASE EXCLUSIVES

## Simmons Industries, Inc.
## d/b/a Smoothie King
## 150 Sundance Parkway, Suite 200
## Round Rock, TX 78681

## Exhibit F/Exclusive

1. <u>The Restriction</u>. Subject to the conditions and exceptions mentioned below, Landlord agrees that during the original term of this Lease Landlord will not execute any lease for space within the Shopping Center with a tenant whose principal business activity is _____ the retail sale of smoothie drinks

2. <u>Conditions</u>. The restriction described above shall apply only as long as all of the following conditions exist:

    (a) Tenant is occupying the Demised Premises doing business in the manner permitted by subsection 1.1(r) of this Lease;

    (b) Tenant has timely paid as due all rentals and other charges prescribed in this Lease; and

    (c) Tenant has not been in default with regard to any obligations prescribed in this Lease.

Upon the failure of one or more of the above conditions, the restriction upon the Shopping Center shall automatically cease and shall thereafter be of no further force or effect.

3. <u>Exceptions</u>. The following exceptions apply to the restriction described above:

    (a) The restriction shall not apply after the conclusion of the lease term described in subsection 1.1(l) of this Lease, notwithstanding any renewal or extension of this Lease which would result in Tenant's continued occupancy of the Demised Premises after the conclusion of the original term.

    (b) The restriction shall not apply to any existing tenants in the Shopping Center (including Maggie Moo's Ice Cream and Treatery), nor shall it apply to renewals or extensions of leases which pre-date the date of this Lease, nor shall it apply to Landlord's consenting to assignments or sublettings relating to leases which pre-date the date of this Lease, nor shall it apply to the Sam's Parcel and Lowe's Parcel shown on the Site Plan, nor to any tenant or occupant of the Shopping Center occupying 11,000 or more square feet of leasable floor area.

    (c) The restriction shall not apply to any land located outside the present boundaries of the Shopping Center.

    (d) If a court of competent jurisdiction or a governmental agency should determine the restriction to be illegal or unenforceable, or if Landlord and Tenant should agree that the restriction is illegal or unenforceable, the restriction shall automatically cease and shall thereafter be of no further force or effect; moreover, Landlord and Tenant further agree that in such event the remainder of this Lease will continue in full force and effect.

    (e) If Landlord gives written notice to Tenant that a prospective tenant in violation of the restriction has requested that Landlord negotiate with it for space in the Shopping Center, then the restriction shall automatically cease and shall thereafter be of no further force or effect unless Tenant, within ten days after the delivery of Landlord's notice, agrees in writing to indemnify Landlord and hold Landlord harmless from all liability, legal actions (including, without limitation, court costs and attorneys' fees), expense and loss incurred by Landlord and related in any way to Landlord's attempts to comply with the restriction.

# LA FRONTERA VILLAGE
# LEASE EXCLUSIVES

## Wings Management Group, Inc.
## d/b/a Wingstop Restaurant
## 150 Sundance Parkway, Suite 400
## Round Rock, TX 78681

## Exhibit G/Exclusive

1. <u>The Restriction</u>. Subject to the conditions and exceptions mentioned below, Landlord agrees that during the original term of this Lease Landlord will not execute any lease for space within the Shopping Center with a tenant whose principal business activity is <u>the sale of chicken wings.</u>

2. <u>Conditions</u>. The restriction described above shall apply only as long as all of the following conditions exist:

   (a) Tenant is occupying the Demised Premises doing business in the manner permitted by subsection 1.1(r) of this Lease;

   (b) Tenant has timely paid as due all rentals and other charges prescribed in this Lease; and

   (c) Tenant has not been in default with regard to any obligations prescribed in this Lease <u>beyond any applicable cure period contained in the Lease.</u>

Upon the failure of one or more of the above conditions, the restriction upon the Shopping Center shall automatically cease and shall thereafter be of no further force or effect.

3. <u>Exceptions</u>. The following exceptions apply to the restriction described above:

   (a) The restriction shall not apply after the conclusion of the lease term described in subsection 1.1(f) of this Lease, notwithstanding any renewal or extension of this Lease which would result in Tenant's continued occupancy of the Demised Premises after the conclusion of the original term.

   (b) The restriction shall not apply to any existing tenants in the Shopping Center, nor shall it apply to renewals or extensions of leases which pre-date the date of this Lease, nor shall it apply to Landlord's consenting to assignments or sublettings relating to leases which pre-date the date of this Lease, nor shall it apply to the Sam's Parcel and Lowe's Parcel shown on the Site Plan, nor to any tenant or occupant of the Shopping Center occupying 11,000 or more square feet of leasable floor area.

   (c) The restriction shall not apply to any land located outside the present boundaries of the Shopping Center.

   (d) If a court of competent jurisdiction or a governmental agency should determine the restriction to be illegal or unenforceable, or if Landlord and Tenant should agree that the restriction is illegal or unenforceable, the restriction shall automatically cease and shall thereafter be of no further force or effect; moreover, Landlord and Tenant further agree that in such event the remainder of this Lease will continue in full force and effect.

   (e) If Landlord gives written notice to Tenant that a prospective tenant in violation of the restriction has requested that Landlord negotiate with it for space in the Shopping Center, then the restriction shall automatically cease and shall thereafter be of no further force or effect unless Tenant, within ten days after the delivery of Landlord's notice, agrees in writing to indemnify Landlord and hold Landlord harmless from all liability, legal actions (including, without limitation, court costs and attorneys' fees), expense and loss incurred by Landlord and related in any way to Landlord's attempts to comply with the restriction.

# LA FRONTERA VILLAGE
## LEASE EXCLUSIVES

## Moo Ventures LLC
### d/b/a MaggieMoo's Ice Cream & Treatery
### 150 Sundance Parkway, Suite 500
### Round Rock, TX 78681

## Exhibit G/Exclusive

1. _The Restriction._ Subject to the conditions and exceptions mentioned below, Landlord agrees that during the original term of this Lease Landlord will not execute any lease for space within the Shopping Center with a tenant whose principal business activity is ~~frozen desserts~~the retail sale of ice cream, frozen yogurt, milk shakes, sundaes, smoothies, frozen desserts, and sorbet for on – and off – Premises consumption at the Shopping Center.

2. _Conditions._ The restriction described above shall apply only as long as all of the following conditions exist:

  (a) Tenant is occupying the Demised Premises doing business in the manner permitted by subsection 1.1(r) of this Lease;

  (b) Tenant has timely paid as due all rentals and other charges prescribed in this Lease; and

  (c) Tenant has not been in default with regard to any obligations prescribed in this Lease.

Upon the failure of one or more of the above conditions, the restriction upon the Shopping Center shall automatically cease and shall thereafter be of no further force or effect.

3. _Exceptions._ The following exceptions apply to the restriction described above:

  (a) The restriction shall not apply after the conclusion of the lease term described in subsection 1.1(i) of this Lease, notwithstanding any renewal or extension of this Lease which would result in Tenant's continued occupancy of the Demised Premises after the conclusion of the original term.

  (b) The restriction shall not apply to any existing tenants in the Shopping Center, nor shall it apply to renewals or extensions of leases which pre-date the date of this Lease, nor shall it apply to Landlord's consenting to assignments or sublettings relating to leases which pre-date the date of this Lease.

  (c) The restriction shall not apply to any land located outside the present boundaries of the Shopping Center.

  (d) If a court of competent jurisdiction or a governmental agency should determine the restriction to be illegal or unenforceable, or if Landlord and Tenant should agree that the restriction is illegal or unenforceable, the restriction shall automatically cease and shall thereafter be of no further force or effect; moreover, Landlord and Tenant further agree that in such event the remainder of this Lease will continue in full force and effect.

  (e) If Landlord gives written notice to Tenant that a prospective tenant in violation of the restriction has requested that Landlord negotiate with it for space in the Shopping Center, then the restriction shall automatically cease and shall thereafter be of no further force or effect unless Tenant, within ten days after the delivery of Landlord's notice, agrees in writing to indemnify Landlord and hold Landlord harmless from all liability, legal actions (including, without limitation, court costs and attorneys' fees), expense and loss incurred by Landlord and related in any way to Landlord's attempts to comply with the restriction.

  (f) The Sam's Parcel and Lowe's Parcel shown on the Site Plan and any tenant or occupant of the Shopping Center occupying 11,000 or more square feet of leasable floor area.

---

## 1st Amendment – Section 2

2) Exhibit "G" Article 3 "Exceptions to Restriction" shall be amended as follows:

  • Delete Subsection (a) in its entirety; (stating Restriction shall not apply to any renewal or extension after original lease term); and,

  • Include and incorporate Subsection (g) which shall read: "(g) Any smoothie or frozen yogurt-drink-based restaurant/retailer including (but not limited to) Jamba Juice, Smoothie King, etc.

---

# LA FRONTERA VILLAGE
# LEASE EXCLUSIVES

### Weight Watchers
### 220 Sundance Parkway, Suite 100
### Round Rock, TX 78681

## Section I.A.4/Exclusive

4.  Permitted Use: Premises shall be used for the purposes of conducting the business of a weight management center including conducting meetings and the sale of pre-packaged food products and other related products/services subject to Existing Shopping Center Restrictions And Exclusives – see Exhibit "E" attached hereto. Notwithstanding anything to the contrary contained in this Lease, Landlord and Tenant agree that during the term of the Lease or any extension thereof, Tenant shall be the sole and exclusive occupant of Retail 6 (units 600-605—see Exhibit "A") in the Shopping Center whose "primary business" is a weight management center, provided Tenant has not closed its business to the public for a period greater than ninety (90) days. For the purposes of this paragraph, "primary business" is defined as any business from which more than 50% of sales are derived. This Exclusive Use Provision does not apply to any existing tenants as of the effective date of this Lease or their assignees or subtenants (Article IX). Additionally, Landlord shall not, directly or indirectly, lease any adjacent space to other tenants or occupants for the purpose of an amusement arcade, a funeral home, a shooting gallery, a massage parlor (excludes Massage Envy or similar concepts), or an adult book store.

# LA FRONTERA VILLAGE
# LEASE EXCLUSIVES

### Plato's Closet
### 220 Sundance Parkway, Suite 150
### Round Rock, TX 78681

## Exclusive/Section I.A.4

4.       Permitted Use: Premises shall be used for Tenant's operation of a Plato's Closet retail store, which buys and sells at retail gently used teen clothing and related new and used accessories. Notwithstanding anything to the contrary contained in this Lease, Landlord and Tenant agree that during the term of the Lease or any extension thereof, Tenant shall be the sole and exclusive occupant of Retail 6 (Units 600-605 – see Exhibit A) in the Shopping Center whose primary business is buying and selling at retail gently used clothing and related new and used accessories. This Exclusive Use Provision does not apply to any existing Tenants or their Assignees as of the effective date of this Lease. (Article IX).

# LA FRONTERA VILLAGE
## LEASE EXCLUSIVES

### Game Stop
### 200 Sundance Parkway, Suite 500
### Round Rock, TX 78681

## Page 6 – Section IX (C)/Exclusive

C.  **Exclusive Use.** Provided that Tenant is in possession of the Premises and operating its business therein without default, Landlord agrees that it will not enter into a lease or consent to the use and occupancy of any other space or allow or suffer to occur within the Shopping Center by a tenant, subtenant, assignee, licensee or concessionaire (collectively "Occupant") whose Principal Business (as hereinafter defined) is the display and sale, at retail, of video game hardware and software and computer game software (the "Exclusive Use"). As used herein, the term Principal Business shall mean any Occupant (a) generating more than twenty percent (20%) of such Occupant's Gross Sales from the Occupant's premises in the Shopping Center from the sale of video game hardware and software, and computer game software and/or (b) using more than twenty percent (20%) of the sales area of such Occupant's premises in the Shopping Center for the display of video game hardware and software, and computer game software.

Notwithstanding anything to the contrary contained herein, the foregoing Exclusive Use shall not be applicable to the units occupied by Sam's, Lowe's, Office Depot, Circuit City, Hobby Lobby, Kohl's, Barnes & Noble, Old Navy, Bed Bath & Beyond, Marshall's, Petco, Cost Plus, Factory 2U, any Occupant of space in excess of 11,000 square feet, any existing Shopping Center tenant whose lease, as of the date of this Lease, does not prohibit the subject premises to be used in violation of the Exclusive Use, or any of their successors, assigns or replacements. In the event Tenant ceases to operate its business in the Premises except as specifically permitted in this Lease, or defaults under the terms and conditions contained in this Lease more than twice during the Term of this Lease beyond any applicable notice and cure period, the Exclusive Use shall terminate as of the date Tenant ceases to operate its business in the Premises and thereafter the Exclusive Use shall be null, void and of no further effect.

Landlord and Tenant acknowledge that the Exclusive Use has been included herein at the sole request of Tenant, and in the event the Exclusive Use shall be construed to be or shall be declared to be invalid or unenforceable by the decision of any court or any governmental agency having jurisdiction over such matters or by the enactment of any law, ordinance or regulation, or in the event the Exclusive Use shall be construed to be or shall be declared to be in violation of any law, rule or regulation, including but not limited to any anti-trust laws, rules or regulations, the Exclusive Use shall become null and void and of no further effect except as specifically permitted to be modified by any court or law in which event the Exclusive Use shall be accordingly modified.

In the event of a violation of the foregoing covenant by Landlord, Tenant shall not be entitled to monetary damages nor shall Tenant be entitled to injunctive relief. Tenant's sole remedy shall be to either (i) terminate this Lease, or (ii) remain in possession of the Premises and continue to operate its business therein subject to an adjustment in the computation of rent as hereinafter provided.