**LANDLORD**

New Century Commons, LLC,
a California limited liability company

By: _(signature)_
Name:   Kirk E. Kozlowski
Its:    Managing Member

Dated:  3/7/16

**TENANT**

TechShop San Jose LLC,
a California limited liability company

By:    TechShop, Inc.,
       a California corporation,
       its sole member

       By: _(signature)_
           Dan Woods
       Its: COO

       Dated: 3/5/16

# EXHIBIT A

## PROPERTY DEPICTION

THE PROPERTY REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF SAN JOSE, COUNTY OF SANTA CLARA, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

PARCEL ONE:

Portion of Lots 5 and 6, in Block 1, Range 3 North, as shown upon that certain Map entitled, "City of San Jose, coped from the original Map drawn by Sherman Day, Civil Engineer", which Map was filed for record in the Office of the Recorder of the County of Santa Clara, State of California, in Book A of Maps, at pages 72 and 73, and more particularly described as follows:

Beginning at a point in the Northeasterly line of Second Street, distant thereon, South 29° 54' 05" East, 275.84 feet from the point of intersection thereon with the Southeasterly line of Santa Clara Street; running thence Southeasterly along said Northeasterly line of Second Street, South 29° 54' 27" East, 52.32 feet; thence Northeasterly, North 60° 05' 55" East, 138.12 feet to the common line between said Lots 5 and 6; thence Northwesterly along said common property line, North 29° 54' 27" West, 6.35 feet; thence Northeasterly, North 60° 05' 11" East 23.82 feet; thence Northwesterly, North 29° 54' 49" West 10.00 feet; thence Northeasterly, North 60° 05' 11" East, 1.28 feet; thence Northwesterly, North 29° 54' 49" West, 35.96 feet to the Northwesterly line of said Lot 5; thence along the Northwesterly line of said Lots 5 and 6, South 60° 05' 21"West 163.19 feet to the point of beginning.

EXCEPTING THEREFROM, the following area:

Beginning at a point on the Westerly line of Third Street where the dividing line between Lots 4 and 5, in Block 1, Range 3 North of the base line of the City of San Jose, intersects the same; and running Westerly along said dividing line, 113.00 feet; thence Southerly and parallel with the Westerly line of Third Street, 35.96 feet; thence Southwesterly at right angles, 1.28 feet to the True Point of Beginning of this description; thence Southeasterly, South 29° 54' 49" East, 10.00 feet; thence Southwesterly, South 60°05'11' West, 23.82 feet to the intersection with the Southwesterly line of said Lot 5; thence Northwesterly along said Southwesterly line, North 29° 54' 27" West 10.00 feet; thence, Northeasterly North 60° 05' 21" East, 23.82 feet to the True Point of Beginning.

PARCEL TWO:

Portion of Lot 6 in Block 1, Range 3 North, as shown upon that certain Map entitled, "City of San Jose, copies from the original Map drawn by Sherman Day, Civil Engineer", which Map was filed for Record in the Office of the Recorder of the County of Santa Cara, State of California in Book A of Maps at Pages 72 and 73 and more particularly described as follows:

Beginning at a point in the Northeasterly Easterly line of Second Street, distant thereon, South 29° 54' 05" East, 328.16 feet from the point of intersection thereon with the Southeasterly line of Santa Clara Street, running thence Southeasterly along said Northeasterly line of Second Street, South 29° 54' 05" East, 46.69 feet to the center line of a brick wall; thence Northeasterly, North 60° 05' 55' East, 138.11 feet to the common property line between said Lots 5 and 6; thence Northwesterly along said common property line, North 29° 54' 27' West 46.68 feet; and thence Southwesterly, South 60° 05' 55' West 138.12 feet to the point of beginning.

1

PARCEL THREE:

Beginning at a point in the Easterly line of Second Street, distant thereon 264.75 feet Northerly from the point of intersection of the Easterly line of Second Street with the Northerly line of San Fernando Street and said point of beginning, being also the Northwesterly corner of land conveyed by Thomas Douglas et al, to Frederick W. Wolff, by Deed recorded May 22, 1889 in Book 115 of Deeds, page 567; Santa Clara County Records; thence Northerly along the Easterly line of Second Street, 50 feet to the Southwesterly corner of land conveyed by S. A. Clark to El W. Knapp by Deed recorded on January 20, 1904 in Book 276 of Deeds; page 86, Santa Clara County Records; thence at right angles Easterly and to the dividing line between Lots 5 and 6 in Block 1, Range 3 North; thence Southerly along the dividing line between Lots 5, 6, 7 and 8 in said Block, 50 feet to the Northerly line of land conveyed to F. W. Wolff; thence Westerly along the Northerly line of land formerly of F. W. Wolff, 137.50 feet to the Easterly line of Second Street and the point of beginning; and being a portion of Lots 6 and 7 in Block 1, Range 3 North according to Map of the City of San Jose of Record in Book "A" of Maps at page 72.

PARCEL FOUR:

A portion of Parcel Five as described In the deed to the City of San Jose recorded March 29, 1994, in Document #12422534 of Official Records, Santa Clara County Records, more particularly described as follows:

Beginning at the intersection of the Southeasterly line of East Santa Clara Street (100 feet wide) with the Northeasterly line of South Second Street (80 feet wide)'

Thence along said Northeasterly line, South 29° 54' 27" East, 275.02 feet, to the True Point of Beginning;

Thence North 60° 06' 09" East, 138.12 feet, to the Northeasterly line of said Parcel Five;

Thence along said Northeasterly line, South 29° 54' 59" East, 0.75 feet, to the Southeasterly line of said Parcel Five;

Thence along said Southeasterly line, South 60° 06' 09" West, 138.12 feet, to the Northeasterly line of South Second Street;

Thence along said Northeasterly line, North 29° 54' 27" West, 0.75 feet, to the True Point of Beginning.

PARCEL FIVE:

An easement for sanitary sewer purposes, over that potion of land being more particularly described as follows:

Portion of Lot 5 in Block 1 Range 3 North, as shown upon that certain Map entitled, "City of San Jose, copied from the original Map drawn by Sherman Day, Civil Engineer", which Map was filed for record in the Office of the Recorder of the County of Santa Clara, State of California, in Book A of Maps, at pages 72 and 73, and more particularly described as follows:

Beginning at a point on the Southwesterly line of Third Street, distant thereon 35.96 feet Southeasterly from the Northwesterly line of Lot 5 in Block 1, Range 3 North of the base line of the City of San Jose, where the same intersects said Southwesterly line of Third Street; running thence Southwesterly and parallel with said Northwesterly line of Lot 5, 114.28 feet; thence Southeasterly and parallel with said

Southwesterly line of Third Street, 10 feet, more or less, to the land conveyed by Grace A. Ryde to J. B. Bean, et al, by Deed dated May 2, 1916, recorded May 3, 1916 in Book 440 of Deeds, page 437; thence at right angles Northeasterly along the line of land conveyed to said J.B. Bean, et al, 114.28 feet to said Southwesterly line of Third Street; and thence Northwesterly along said Southwesterly line of Third Street 10 feet, more or less, to the point of beginning, as created by instrument recorded February 25, 2000, Series No. 15161754.

PARCEL SIX:

Easements for the purpose of pedestrian emergency existing; more particularly described as follows:

PARCEL SIX A:

Portion of Lots 7, 8 & 10 in Block 1, Range 3 North, as shown upon that certain map entitle, City of San Jose, copied from the original Map drawn by Sherman Day, Civil Engineer", which Map was filed for record in the Office of the Recorder of the County of Santa Clara, State of California, in Book A of Maps, at pages 72 and 73, and more particularly described as follows:

Beginning for reference on the Easterly line of Second Street at a point 264.56 feet Northerly from the Intersection of the Northerly line of San Fernando Street with the said Easterly line of Second Street; thence at right angles Easterly 138.12, feet to the Easterly line of said Lot 7, in Block 1, Range 3 North of the base line of the City of San Jose; thence Northerly along said Easterly line of Lot 7, 7.00 feet; thence Easterly, North 60° 05' 11" East, 1.00 feet to the true point of beginning of this description; thence North 60° 05' 11" East, 3.66 feet; thence South 29° 54' 49"East 80.83 feet; thence South 60°05'11" West 8.16 feet; thence South 29° 54' 49" East 87.34 feet to the intersection of the Northwesterly line of that certain parcel of land described in the deed from Paul H. Magnuson and Judy Ann Magnuson, his wife, to Green Valley Corporation recorded June 2, 1983 in Book H600 of Official Records at page 594, Santa Clara County Records; thence along said Northwesterly line, South 60° 05' 55" West, 6.00 feet; thence North 29° 54' 49"West 80.00 feet; thence South 60° 05' 11" West, 4.00 feet; thence North 29° 54' 49"West, 12.00 feet; thence North 60° 05' 11" East 14.50 feet; North 29° 54' 49" West, 76.17 feet to the true point of beginning.

PARCEL SIX B:

Portion of Lot 9 in Block 1, Range 3 North, as shown upon that certain map entitled, "City of San Jose, copied from the original Map drawn by Sherman Day, Civil engineer", which Map was filed for record in the Office of the Recorder of the County of Santa Clara, State of California, in Book A of Maps, at pages 72 and 73, and more particularly described as follows:

Beginning for reference at the point of Intersection of the Northerly line of San Fernando Street with the Westerly line of Third Street; thence running Northerly along said Westerly In of Third Street, North 29° 54' 49" West, 80.00 feet the True Point of Beginning of this description; thence Westerly at right angles to said Westerly line of Third Street, South 60° 05' 11" West 69.02 feet; thence Northerly at right angles to said Northerly line of San Fernando Street, North 29° 52' 37" WEST, 23.52 feet; thence Easterly at right angles to said Westerly line of Third Street, North 60° 05' 11" East, 12.00 feet; thence Southerly along a line parallel to said Westerly line of Third Street, South 29° 54' 49" East, 11.52 feet; thence at right angles to said Westerly line of Third Street, North 60° 05' 11" East, 57.00 feet to said Westerly line of Third Street; thence Southerly along said Westerly line of Third Street, South 29° 54' 49" East 12.00 feet to the True Point of Beginning.

3

PARCEL SIX C:

Portion of Lot 10 in Block 1, Range 3 North, as shown upon that certain map entitled, "City of San Jose, copied from the original Map drawn by Sherman Day, Civil Engineer", which Map was filed for record in the Office of the Recorder of the County of Santa Clara, State of California, in Book A of Maps, at pages 72 and 73, more particularly described as follows:

Beginning for reference at a point in the Easterly line of Second Street, distant thereon, 103.39 feet Northerly from the point of intersection of said Easterly line of Second Street with the Northerly line of San Fernando Street; thence running Easterly at right angles, North 60° 05' 55" West 112. 13 feet to the True Point of Beginning of this description; thence continuing along said last mentioned line, North 60° 05' 55" East, 26.00 feet; thence Southerly along the dividing line between Lots 9 and 10 In said Block 1, Range 3 North, South 29° 54' 27"East.12.00 feet; thence Westerly, South 60° 05' 55' West 26.00 feet; thence Northerly at right angles North 29° 54' 05" West, 12.00 feet to the True Point of Beginning.

PARCEL SIX D:

Portion of Lot 9 in Block 1, Range 3 North, as shown upon that certain map entitled, "City of San Jose, copied from the original Map drawn by Sherman Day, Civil Engineer", which Map was filed for record in the Office of the Recorder of the County of Santa Clara, State of California, in Book A of Maps, at page 72 and 73, more particularly described as follows:

Beginning for reference at a point In Northerly line of San Fernando Street, 69.07 feet Westerly from the Westerly line of Third Street; thence running Northerly at right angles, North 29° 52' 37" W, 91.48 feet to the True Point of Beginning of this description; thence proceeding Westerly at right angles to the Easterly line of Second Street, South 60° 05' 55" West, 69.12 feet; thence Northerly along the dividing line between Lots 9 and 10 in said Block 1, Range 3 North, North 29° 54' 27"West, 12.00 feet; thence Easterly at right angles to said Easterly line of Second Street, North 60° 05' 55" East, 69.12 feet; thence Southerly at right angle angles to said Southerly line of San Fernando Street, 29° 54' 37" East, 12.00.feet to the True Point of Beginning.

PARCEL SEVEN:

An easement to extend that certain Sanitary Sewer Easement as reserved in that certain Grant Deed from James F. Fox, et. al to the Redevelopment Agency of the City of San Jose, recorded February 25, 2000, instrument no.: 15161754 more particularly described as follows:

Beginning at a point on the Westerly line of Third Street where the dividing line between Lots 4 and 5, in Block 1, Range 3 North of the base line of the City of San Jose, intersects the same; and running Westerly along said dividing line, 113.00 feet; thence Southerly and parallel with the Westerly line of Third Street, 35.96 feet; thence Southwesterly at right angles, 1.28 feet to the True Point of Beginning of this description; thence Southeasterly, South 29° 54' 49" East, 10.00 feet; thence Southwesterly, South 60° 05' 11" West, 23.82 feet to the intersection with the Southwesterly line of said Lot 5; thence Northwesterly along said Southwesterly line, North 29° 54' 27" West, 10.00 feet; thence Northeasterly, North 60° 05' 21" East 23.82 feet to the True Point of Beginning.

APN: 467-22-154

## EXHIBIT B

### LEASED PREMISES DEPICTION

This exhibit, entitled "Leased Premises Depiction", is and shall constitute Exhibit B to that certain Lease Agreement dated March 4, 2016 (the "**Lease**"), by and between New Century Commons, LLC, a California limited liability company ("**Landlord**") and TechShop San Jose LLC, a California limited liability company ("**Tenant**") for the leasing of certain premises commonly referred to by the parties as 40 S. Second Street, San Jose, California 95113 (the "**Leased Premises**").

The Leased Premises consist of the rentable square footage of space specified on the Basic Lease Information page and has the address specified on the Basic Lease Information page, and are depicted below:



1

Case: 18-50398    Doc# 136    Filed: 07/26/18    Entered: 07/26/18 16:21:44    Page 6 of 15

Basement Area:



2

# EXHIBIT C

## TENANT IMPROVEMENTS

This exhibit (the "**Tenant Improvement Agreement**") is and shall constitute Exhibit C to that certain Lease Agreement dated March 4, 2016 (the "**Lease**"), by and between New Century Commons, LLC, a California limited liability company ("**Landlord**") and TechShop San Jose LLC, a California limited liability company ("**Tenant**") for the leasing of certain premises commonly referred to by the parties as 40 S. Second Street, San Jose, California 95113 (the "**Leased Premises**"). Landlord and Tenant agree that the Lease is hereby modified and supplemented as follows:

1. The Work:

    Pursuant to the Lease, Tenant has agreed to accept the Leased Premises "As Is" without any obligation for the performance of improvements or other work by Landlord except for that certain work set forth on **Exhibit C-1** attached hereto (the "**Landlord's Work**"), and Tenant desires to perform certain improvements thereto (the "Tenant Improvements"). Such Tenant Improvements shall be in accordance with the provisions of this agreement, and to the extent not expressly inconsistent herewith, in accordance with the provisions of the Lease. Performance of Landlord's Work and/or Tenant's Work shall not serve to abate or extend the time for commencement of the term of the Lease or rent under the Lease, except to the extent set forth by the specific terms of the Lease.

2. Cost of the Work:

    Except as provided hereinafter, Tenant shall pay all costs to perform the Work (the "Costs of the Work") including, without limitation, all permits (both for Landlord's Work and the Tenant Improvements), inspection fees, architects, engineers and contractors, utility connections, labor and materials, bonds, insurance, structural or mechanical work, or modifications to building mechanical, electrical, plumbing (including sprinklers) or other systems and equipment.

3. Landlord's Allowance:

    Of the costs of the Tenant Improvements, Landlord shall reimburse Tenant the amount of One Hundred Thousand Dollars ($100,000.00) (the "**Tenant Improvement Allowance**") less the cost of architectural and engineering from the architectural firm of Craig Nelson of Gibson, Mancini, Carmichael & Nelson and the engineering firm of Henderson Engineering for Landlord's Work outlined in the attached **Exhibit C-1**. Both Landlord and Tenant will cooperate on minimizing actual costs, and if the Landlord's expenses for the Landlord Work outlined in **Exhibit C-1** is less than Nine Hundred Thousand Dollars ($900,000.00), then the Landlord will increase the Tenant Improvement Allowance by the amount of the savings without changes to rent. Landlord will fund the Tenant Improvement Allowance in installments, not more frequently than monthly, based upon applications for payment and releases of lien rights, submitted by Tenant on Landlord's form for use by contractors requesting progress payments, together with such lien releases and affidavits of payments, and such other documentation as Landlord may require. Landlord may issue checks to fund the Tenant Improvement Allowance jointly to Tenant, its contractors, and, at Landlord's option, to any subcontractors or suppliers.

4. PRELIMINARY PLANS AND SPECIFICATIONS:

    Within 10 days from the execution of this agreement, Tenant shall submit to Landlord a set of fully dimensioned preliminary drawings, which shall indicate Tenant's intentions with respect to the

1

design of the Leased Premises, including a floor plan which includes fixture layout. Landlord shall have a period of 5 days after receipt thereof to either approve or disapprove of the Space Plan and stating the reasons for such disapproval. In the event Landlord disapproves such Space Plan, Tenant shall modify the same and shall submit the revised Space Plan to Landlord within 5 days after receipt of Tenant's disapproval. Within 30 days after receipt of Landlord's approval of the Space Plan, Tenant shall submit to Landlord a fully dimensioned set of scale drawings (the "Working Drawings"), which drawings shall set forth all plans and specifications for The Tenant Improvements sufficiently to completely delineate the Tenant Improvements to be performed. Within 5 days after receipt thereof, Landlord shall review and approved or disapprove of the Working Drawings and advise Tenant of any reasons for disapproval. Tenant shall modify the Working Drawings to take into account Landlord's reasons for disapproval within 5 days after receipt of any such disapproval.

5. Approval of Architects and Contractors:

Tenant shall submit to Landlord for approval the names of the architects and contractors Tenant shall use for the Tenant Improvement and all plans referenced above. Landlord's consent shall not be unreasonably withheld. All such architects and contractors shall have sufficient experience and financial wherewithal to complete the Tenant Improvements in a first class manner. Landlord Approves the architectural firm of Craig Nelson of Gibson, Mancini, Carmichael & Nelson and the construction firm of Bill Lloyd of BHL Services.

6. Change Orders:

No significant changes, modifications, alterations or additions to the approved Working Drawings may be made without the prior consent of the Landlord after written request by Tenant. Landlord's consent shall not be unreasonably withheld. In the event the Leased Premises are not constructed in accordance with the approved Working Drawings, Tenant shall not be permitted to occupy the Leased Premises until the Leased Premises comply in all respects with the approved Working Drawings, however, in such case, the rent shall nevertheless commence and be payable as otherwise provided in the Lease.

7. Compliance:

The Tenant Improvements shall comply with all building codes and other laws, codes, ordinances and regulations, and all standards of the National Board of Fire Underwriters and National Electrical Code.

8 Time for Performance:

The Tenant Improvements shall be commenced within 10 calendar days after Landlord completes Landlord's Work and Landlord approves the Working Drawings, and Tenant shall thereafter diligently prosecute to completion of the Tenant Improvements. Landlord may periodically inspect the Leased Premises to assure that the Tenant Improvements are in compliance with the terms of this agreement.

9. Performance of Tenant Improvements:

Tenant shall not allow any contractor to store materials outside of the Leased Premises. Tenant shall assure that all Tenant Improvements are performed in accordance with the terms of this agreement. All contractors shall be required to remove from the Leased Premises, at regular intervals, all

2

debris and rubbish, Tenant shall notify Landlord the day the construction of the Tenant Improvements commences so that Landlord may post an appropriate notice of non-responsibility, if Landlord so elects. Completion of the Tenant Improvements is subject to Landlord's inspection and approval. Tenant shall give Landlord five days prior written notification of the anticipated completion date of the Tenant Improvements. Within 10 days after completion of the Tenant Improvements, Tenant shall execute, file and record, as appropriate, a notice of completion with respect to the Tenant Improvements, and furnish a conformed copy thereof to Landlord. Tenant shall provide to Landlord, upon completion, copies of "as built" drawings. If performance of the Tenant Improvements shall require additional services or facilities, and Landlord so consents, Tenant shall pay Landlord's reasonable charges therefor. Tenant shall be responsible for assuring that all of Tenant's contractors comply with all rules and regulations of the Landlord relating to the property as set forth in the Lease. Landlord may impose reasonable additional rules and regulations from time to time, in order to assure that the Tenant Improvements do not disturb or interfere with any other occupants of the property.

10. Insurance:

All contractors, subcontractors and architects of Tenant, and any other people retained by Tenant to perform any portion of the Tenant Improvements, shall carry workers compensation insurance covering their respective employees, employers liability insurance in the amount of at least $500,000.00 per occurrence, and comprehensive general liability insurance of at least $2,000,000.00 combined single limit for bodily injury, death or property damage; and the policies therefor shall cover Landlord and Tenant, as additional insureds. Tenant shall carry builder's risk insurance coverage respecting the construction and improvements to be made by Tenant, in the amount of the anticipated cost of the construction of the Tenant Improvements. All insurance carriers hereunder shall be rated at least "A-" and "X" in Best's Insurance Guide. Certificates for all such insurance shall be delivered to Landlord before construction is commenced or any equipment or materials are moved onto the Leased Premises. All policies of insurance must require that the carrier give landlord at least 20 days prior advance written notice prior to any cancellation or reduction in the amounts of insurance. In the event that any damage shall occur to any Tenant Improvements, the Leased Premises and/or the Property, Tenant shall be responsible for restoring, repairing and/or replacing the same at Tenant's sole cost and expense. Landlord shall not be responsible nor liable to Tenant for any losses or damages to the Tenant Improvements, Tenant, Tenant's contractors, Tenant's architect, or Tenant's construction workers during the scope of Tenant's construction of the Tenant Improvements.

11. Liens:

Tenant shall keep the property and premises free of any liens whatsoever relating to the Tenant Improvements and shall indemnify and hold Landlord harmless with respect to the same. If any such liens are recorded against the Property, Tenant shall remove the same by bond or otherwise within 30 days after notice thereof. If Tenant fails to do so, Landlord may pay the amount necessary to remove such lien, by bond or otherwise, without being responsible for investigating the validity thereof. The amount paid by Landlord therefor shall be deemed additional rent under the Lease, payable immediately upon expenditure of the same by Landlord.

12. Indemnity:

Tenant shall indemnify, defend and hold harmless Landlord (and Landlord's principals, partners, agents, trustees, beneficiaries, officers, employees and affiliates) from and against any and all claims, demands, losses, damages, injuries, liabilities, expenses, judgments, liens, encumbrances, orders, and awards, together with attorney's fees and costs, arising out of or in connection with the Tenant

3

Improvements hereunder, or Tenant's failure to comply with the provisions hereof, or any failure by Tenant's contractors, subcontractors, architects, or their employees, to comply with the provisions hereof, except to the extent caused by Landlord's intentional or negligent acts.

    13.    <u>Neutral Interpretation</u>:

This agreement shall be interpreted neutrally between the parties regardless of which party drafted this agreement.

    14.    <u>Incorporation of Lease</u>:

The provisions of the Lease are hereby incorporated herein by reference, and the provisions of this agreement are hereby incorporated into the Lease by reference. In the event of any express inconsistencies between the Lease and this agreement, this agreement shall govern and control. If Tenant shall default under this Tenant Improvement Agreement, such shall be deemed a default under the Lease, and if Tenant shall default under the terms of the Lease, such shall be a default under the terms of this Tenant Improvement Agreement. In the event of any default, Landlord may order that all work (either Landlord's Work and/or the Tenant Improvements) be stopped immediately and that no further deliveries be made to the Leased Premises until such default is cured, without limiting any other rights of Landlord. Any amounts payable by Tenant hereunder to Landlord shall be deemed additional rent under the Lease.

**LANDLORD**

New Century Commons, LLC,
a California limited liability company

By: _____
Name:   Kirk E. Kozlowski
Its:    Managing Member

Dated: _____

**TENANT**

TechShop San Jose LLC,
a California limited liability company

By:    TechShop, Inc.,
       a California corporation,
       its sole member

       By: _____/s/ Dan Woods_____
            Dan Woods
       Its:   COO

Dated: __3/4/11__

# TENANT IMPROVEMENT CONSTRUCTION

## Exhibit C-1

Landlord shall deliver the Leased Premises to Tenant upon the full execution of the Lease in a broom clean condition, with the existing utilities stubbed to the space, and Landlord shall continue to prosecute the following Landlord Work to completion such that the Leased Premises are ultimately constructed to warm shell condition (it being acknowledged by Tenant that Landlord has substantially completed the Landlord Work in A-C below such that Tenant may commence construction of its Tenant Improvements within the Leased Premises without material interference from Landlord's contractors):

A. Demolish former Tenant interior fixtures, lighting, electrical, plumbing, ductwork, and finishes as jointly agreed to with the Tenant.

B. Demolish, any existing interior, non-load bearing walls in conflict with Tenant's attached review set interior plans. Tenant and Landlord will jointly agree on such plans prior to demolition.

C. Repair, and/or provide drywall perimeter walls, taped, smooth finish, ready for paint that aren't left as exposed brick walls. Upon Tenant's request, exposing, cleaning and prepping perimeter and bearing wall brick walls add charge will be determined, if any.

D. Remove, repair, patch, and replace damaged plywood flooring, ready for Tenant floor coverings. Floors repairs will be performed in a manner to ensure load strength which is consistent with all other areas that are not damaged/repaired. Tenant and Landlord will agree on final flooring after damaged floor is removed and substrate is exposed. Landlord will pay for repair and construction grade plywood finish. If Tenant wants to use a higher grade of plywood, then Tenant will pay for the upgraded costs of materials

E. Replace glass storefront, and add a basic soffited store front entry inset in location per attached review set plans, including graffiti guard. Glass to be clear glass with anti-graffiti and scratch protection.

F. Storefront / Entry
   i. Existing opening to have storefront system installed per the design of TechShop Architect.

   ii. Double door front entry. Storefront to be clear glass. The position of storefront door to be directed and approved by TechShop, with cylinder locks, exit device (if required by local code) regulations and door closers. Single point of entry on storefront unless otherwise specified.

   iii. Modification of existing storefront glass to provide new exit door per required egress code, at new fire-stair shown on TechShop plan.

G. Raise and cap existing fire sprinkler drops, ready for tenant to distribute.

H. Fire protection systems:

5

i. A suppression system main, branch lines, and upturned sprinkler heads will be provided by the Landlord into the Tenant space. The system main sizing is based on a density of 130 SF/head (0.2 GPM/SF), or as required by state or local code. The Tenant shall be responsible for modifying all branch lines, sprinklers, etc. to provide required suppression in their space to meet all applicable codes, including final locations of all sprinkler heads. All modifications for Tenant's use of space shall be at Tenant's sole cost and with Landlord approval, and sprinkler work must be done by Landlord's fire protection contractor at Tenant's expense.

ii. Fire alarm protective signaling system: Landlord shall provide a junction box with conduit stub into each Tenant premises for connection to building fire alarm system. Tenant shall furnish and install fire alarm system and make final connection at Tenant's expense. Landlord's fire alarm contractor shall be used for entire system within premises at Tenant's expense. Fire alarm wiring from junction box at Tenant Premises to building fire alarm system shall be furnished and installed by the Landlord only if required by code.

I. Tenant to design and Landlord to provide and connect new HVAC system per Tenant's specs stubbed to the Leased Premises for first and basement floors

i. The HVAC system shall be new, fully functional, and sufficient to maintain a comfortable cooling and heating load.

ii. Main trunk lines, supply and return, to be sized appropriately for tenant requirements

iii. HVAC based on 1 ton of cooling per 210-250 square feet of the Leased Premises

iv. HVAC unit(s) shall meet national, state, and local building code requirements for outside air.

v. Units shall use R-410A refrigerant.

vi. For locations with 277/480 electrical service, the units must be powered from the 277/480 panel board.

vii. Roof penetrations for ducts, vents plumbing and utility lines, roof platforms for HVAC equipment (if required).

viii. The equipment shall be equal to industry standard type for commercial building use.

ix. Design guidelines and requirements based on the construction documents provided by TechShop Architect.

x. Landlord and Tenant shall share the costs of said complete system (including landlord and tenant HVAC components and related labor) 50%/50% (landlord max $300,000) exclusive of structural work.

6

J. Remove mezzanine, structurally brace impacted exterior walls and build HVAC platform.

K. Provide new perimeter exiting signage and doors including emergency egress stairway and door from basement. Cut beam heads at basement exit path as required.

L. Provide new men's and women's bathrooms with base finishes, sized per Tenant occupant load, location to be coordinated with tenant.

   i. LL shall provide 2 restrooms that are in accordance with all national, state or local code and ADA guidelines per latest edition of the ADAAG or ANSI/ICC A117.1 as appropriate for the jurisdiction having authority.

   ii. The restrooms location to be approved by TechShop.

   iii. The restrooms shall be code compliant and ADA accessible and include: water closet, wall hung urinal (men's room), wall hung lavatory, with tempered hot (±105°F, with a water-temperature limiting device conforming to ASSE 1070, or other device as required by Code) and cold water, floor drain(s) with trap primer, wall mounted mirror, grab bars, and electric hand dryers. The water closets shall be Caroma "Sydney Smart 270 Easy Height Elongated" 1.28/.8 gallon per flush model or approved equivalent. The Lavatory sink shall be "Countertop Lavatory" American Standard #0476.028 "Aqualyn" 20"x17" oval self-rimming white vitreous china fixture with faucet ledge and front overflow. Faucet shall be Chical Faucet #802-VE2805XKCP 4" centerest quarter turn cartridges and #E2805 0.5 GPM aerator. Trim shall be McGuire #155A grid drain with tailpiece, McGuire #2165CCLK looke key compression angle stop valves with risers and escutcheons, McGuire #D8872CF 1-1/4" 17 guage cast chriome plated brass adjustable P-trap and waste arm with cleanout plug and escutcheon, plumberex "pro-extreme" #X-4222 insulation kit for water and waste pipes.

   iv. The hand dryers shall be American Dryer model Extreme Air GXT-MR, in white.

   v. LL shall provide an exhaust system sized as required by local/state Code. Bathroom fans shall be equipped with integral back draft dampers. See the HVAC section for additional requirements related to exhaust.

   vi. LL shall install an electric GFCI receptacle at lavatory.

   vii. Standard flooring and wall base shall be selected by TechShop.

   viii. LL shall install wall finish in accordance with TechShop Architect's design documents.

   ix. Restroom walls shall be fully insulated and extend from floor to roof deck with an insulated hard ceiling at 8'-0" aff.

7

      x. Restroom ceiling, lighting, and exhaust fans to be installed by LL in compliance with all local, state, and national codes. Exhaust fans must be exhausted to outside of the building. Provide a dual-technology type, occupancy sensing, light switch for light and exhaust fan control.

M. Provide existing dedicated 1200 Amp/120/208 Volts, 3 Phase 4 wire electrical service stubbed to the Leased Premises, Tenant to distribute.

    i. Electric meter, disconnect switch. The main panel board must be rated for 1200A. Circuit breakers shall be provided for the HVAC units and any other LL supplied equipment. Location of service and panel boards to be approved by TechShop based upon tenant build out plan.

N. Provide existing two(2)inch water service, Tenant to distribute.

O. Natural gas piping will be provided to the RTU's, if required, by the Landlord in locations designed by TechShop Architect. Tenant is responsible for all other gas piping and final connections and any associated costs. All tenants' gas service will be separately metered by Tenant using gas utility company provided meter.

P. Installed(existing)gas meter and service connected to the HVAC system – in existing location. Piping shall be sized per the longest branch method of NFPA 54, latest edition.

Q. All base building LL gas work, if required,, including connection to the utility and setting of the meter

R. A 1-1/2" telephone conduit sleeve, with pull string, will be provided to the Leased Premises from a central telephone area. The Tenants shall extend any telephone lines required to facilitate installation to Premises. Landlord shall provide a routing path from the Leased Premises to the central telephone area.

S. Trash areas and/or compactor areas for Tenant will be provided by Landlord in a mutually agreed upon location in the loading dock area. Collection of refuse will be coordinated by the Landlord's chosen waste management company ("Project Hauler") of which each tenant shall enter into a separate contract with the project hauler at Tenant's expense.

T. Floor: At ground floor slab-on-grade locations (excluding basement), Landlord will prep and fill holes in the existing concrete floor in its present condition. TechShop uses a combination of carpet, vinyl tile, and concrete sealers. A surface imperfection will be considered a defect if it telegraphs through any of the standard floor finishes.

U. Structural Modifications: Landlord to provide any/all structural modifications to the existing shell building that are included in the approved scope of work provided by Biggs Cardosa Associates, Inc, and as agreed to by the Landlord and Tenant.

\* \* \*

Case: 18-50398   Doc# 136   Filed: 07/26/18   Entered: 07/26/18 16:21:44   Page 15 of 15