1  Aram Ordubegian (SBN 185142)
   Annie Y. Stoops (SBN 286325)
2  **ARENT FOX LLP**
   55 Second Street, 21st Floor
3  San Francisco, CA  94105
   Telephone:    213.629.7400
4  Facsimile:    213.629.7401
   Email:        aram.ordubegian@arentfox.com
5                annie.stoops@arentfox.com

6  Counsel for Movants
   Daniel Woods and Mike Hilberman
7

8                    **UNITED STATES BANKRUPTCY COURT**

9                    **NORTHERN DISTRICT OF CALIFORNIA**

10                          **SAN JOSE DIVISION**

11  In re:                              Case No. 18-50398

12                                      Chapter: 7

13  **TECHSHOP, INC.,**                 **MOTION FOR RELIEF FROM THE**
                                        **AUTOMATIC STAY, TO THE EXTENT**
14              Debtor.                 **REQUIRED, FOR PAYMENT OF D&O**
                                        **INSURANCE PROCEEDS;**
15
                                        **MEMORANDUM OF POINTS AND**
16                                      **AUTHORITIES AND DECLARATION OF**
                                        **DANIEL WOODS IN SUPPORT THEREOF**
17
                                        Date:      August 24, 2018
18                                      Time:      10:00 a.m.

19                                      Location:  Courtroom 3020
                                                   280 South First Street
20                                                 San Jose, California
21

22      **TO THE HONORABLE M. ELAINE HAMMOND, UNITED STATES**

23  **BANKRUPTCY JUDGE, AND ALL INTERESTED PARTIES:**

24          By this motion (the "Motion"), movants in the above-captioned matter, Daniel Woods and

25  Mike Hilberman (collectively, the "Movants"), seek an order granting relief from the automatic

26  stay, to the extent required, on the grounds that the proceeds payable under the directors and

27  officers coverage section of the general business and management indemnity policy (the "D&O

28  Policy") are not subject to the automatic stay because the proceeds are not property of the above-

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

1   captioned debtor, TechShop Inc.'s ("Debtor") bankruptcy estate.  However, even if the insurance

2   proceeds are the estate's property, good cause exists for this Court to lift the automatic stay to

3   permit the Movants to obtain reimbursement and/or payment of proceeds under the D&O Policy

4   in connection with a state court action brought against them, as former directors and officers of

5   the Debtor.

6        Pursuant to Local Rule 4000-1, respondent is hereby informed that it may appear

7   personally or by counsel at the preliminary hearing for this motion.

8        **WHEREFORE**, the Movants respectfully request that the Court enter an order (1)

9   granting relief from the automatic stay, to the extent required, for the Movants to obtain

10  reimbursement and/or payment of defense costs in accordance with the terms of the D&O Policy,

11  and (2) granting such other and further relief the Court deems just and proper.

12

13  Dated: August 3, 2018                    Respectfully submitted,

14                                           **ARENT FOX LLP**

15

16                                           By: */s/ Aram Ordubegian*
                                             Aram Ordubegian
17                                           Attorney for Movants

18

19

20

21

22

23

24

25

26

27

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

AFDOCS/16800224.1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

The Movants, Daniel Woods and Mike Hilberman, by and through their undersigned counsel, pursuant to 11 U.S.C. § 362(d)(1), respectfully submit this memorandum of points and authorities in support of their motion for an order granting them relief from the automatic stay, to the extent any such relief is required to obtain defense coverage benefits under the D&O Policy. The D&O Policy was obtained by the Debtor, TechShop, Inc., for the benefit of its officers and directors and subsidiaries. A true and correct copy of the D&O Policy, is attached as **Exhibit 1** to the accompanying declaration of Daniel Woods, dated August 3, 2018 ("Woods Declaration").

### II. BACKGROUND

Debtor operated at one time a chain of membership-based, open-access, "do-it-yourself" workshops that supplied machines and tools to its customers. Debtor opened one of its subsidiary workshops in San Jose called TechShop San Jose LLC ("TechShop SJ").

On February 26, 2018, Debtor filed its voluntary petition for chapter 7 relief.

### A. State Court Action

After the filing of this bankruptcy case, on June 22, 2018, the John S. and James L. Knight Foundation ("Knight Foundation") filed a Complaint in Santa Clara County Superior Court against TechShop SJ; Debtor's former Chief Executive Officer and movant Daniel Woods; Debtor's former Chief Financial Officer and movant Mike Hilberman; and a Delaware corporation Early Growth Financial Services, Inc., in an action entitled John S. and James L. Knight Foundation v. TechShop San Jose, LLC, et al., Case No. 18CV330565 ("State Court Action"). Debtor is not a named defendant in the State Court Action.

The State Court Action arises from the issuance of grant funds by the Knight Foundation to TechShop SJ so TechShop SJ could form a collaborative program with San Jose State University. The Knight Foundation alleges that TechShop SJ and the other defendants made certain misrepresentations regarding the financial state of TechShop SJ and the Knight Foundation reasonably relied on these misrepresentations when deciding to issue certain grants to the TechShop SJ. A true and correct copy of the State Court Action's Complaint is attached as

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

AFDOCS/16800224.1

Case: 18-50398    Doc# 143    Filed: 08/03/18    Entered: 08/03/18 14:56:33    Page 3 of
112

1    **Exhibit 2** to the Woods Declaration.

2    **B.    The D&O Policy**

3         Prior to the commencement of Debtor's chapter 7 bankruptcy and the State Court Action,

4    Debtor had purchased the D&O Policy for the benefit of the officers and directors of Debtor and

5    its subsidiaries, including TechShop SJ.  Coverage under the D&O Policy is for "claims made"

6    during the one-year policy period, April 1, 2017 through April 1, 2018.

7         The D&O Policy provides in pertinent part:

8         The Insurer shall pay the Loss of the Directors and Officers for which the Directors and
          Officers are not indemnified by the Company and which the Directors and Officers have
9         become legally obligated to pay by reason of a Claim first made against the Directors and
          Officers during the Policy Period . . . .[1]

10        In accordance with the D&O Policy, the Movants, as former directors and officers of

11   Debtor, are the direct beneficiaries under the D&O Policy.  The Movants have made demand

12   upon Scottsdale Insurance Company (the "Insurer") to advance defense costs that they have

13   incurred and are continuing to incur in defending against the claims asserted in the State Court

14   Action.  The Insurer has indicated it is ready and willing to advance the coverage benefits to pay

15   for defense costs, but out of an abundance of caution, the Movants seek an order granting relief

16   from the automatic stay, to the extent necessary, to allow the Insurer to advance to the Movants

17   proceeds of the D&O Policy.

18        As discussed further below, the proceeds of the D&O Policy are not subject to the

19   automatic stay because they are not property of Debtor's bankruptcy estate.  But, even if the

20   proceeds are the estate's property, good cause exists for this Court to lift the automatic stay to

21   allow the Movants to obtain advancement of defense costs under the D&O Policy.

22                                   **III.  ARGUMENT**

23

24   **A.    The Proceeds of the D&O Policy Are Not Subject to the Automatic Stay Because**

25         **They Are Not Estate Property.**

26        Section 362(a)(3) of the Bankruptcy Code provides that a petition filed under chapter 7

27   operates as a stay of "any act to obtain possession of property of the estate or of property from the

28   _____

[1] See the D&O Policy, Bates No. 30, attached as **Exhibit 1** to the Woods Declaration.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

AFDOCS/16800224.1

1   estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).  Section 541(a)

2   defines "property" in the bankruptcy context, providing that the "estate is comprised of all the

3   following property, wherever located . . . all legal or equitable interests of the debtor in property

4   as of the commencement of the case."  11 U.S.C. § 541(a) - (a)(1).

5          Courts have held that the proceeds payable under directors and officers insurance

6   coverage are not property of the bankruptcy estate because the officer and directors, not the

7   debtor entity, are the primary beneficiaries of the policy.  In re Daisy Sys. Sec. Litig., 132 B.R.

8   752, 755 (N.D. Cal. 1991) ("[T]he insurance proceeds are *not* part of Daisy's bankruptcy estate

9   because the officers and directors, not Daisy, are the primary beneficiaries of the policies.")

10  (emphasis added); In re Sfuzzi, Inc., 191 B.R. 664, 668 (Bankr. N.D. Tex. 1996) ("[I]nsurance

11  policies are property of the estate . . ., but the question of whether the proceeds are property of the

12  estate must be analyzed in light of the facts of each case.").

13         In so holding, courts emphasize the important distinction between the corporate debtor's

14  mere ownership of the policy from its interest in the policy proceeds.  Louisiana World

15  Exposition, Inc. v. Federal Ins. Co. (In re Louisiana World Exposition, Inc.), 832 F.2d 1391, 1401

16  (5th Cir. 1987) (holding the liability proceeds of a D&O policy are not assets of the estate and

17  belong instead to the directors and officers as beneficiaries); In re First Central Fin. Corp., 238

18  B.R. 9, 16 (Bankr. E.D.N.Y. 1999) ("In essence and at its core, a D&O policy remains a

19  safeguard of officer and director interests and not a vehicle for corporate protection.").

20         Even if the policy also provides secondary entity coverage, the proceeds of the policy still

21  are not considered property of the estate where, as here, no claims are asserted against the entity.

22  First Central, 238 B.R. at 17-18; In re Allied Digital Techs. Corp., 306 B.R. 505, 513-14 (Bankr.

23  D. Del. 2004) (holding that insurance proceeds were not property of estate, because the

24  bankruptcy trustee "provided no evidence that an actual claim will be brought against [company]

25  requiring direct coverage").

26         Here, the D&O proceeds are not considered property of the estate.  The State Court

27  Action's claims are not made against the Debtor and consequently, would not trigger direct

28  coverage payable to Debtor as the primary beneficiary. Because the D&O Policy proceeds are not

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

AFDOCS/16800224.1

Case: 18-30398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 5 of
112
- 5 -

1  property of the Debtor's bankruptcy estate, it is not necessary for the Court to lift the automatic

2  stay.

3  **B.**   **Even if the Proceeds of the D&O Policy Are Determined Property of the Estate, the**

4  **Court Should Lift the Automatic Stay to Permit the Movants to Seek Advancement**

5  **of such Proceeds in Connection with the State Court Action.**

6  Section 362(d)(1) of the Bankruptcy Code provides, in pertinent part:

7  On request of a party in interest and after notice and a hearing, the court shall grant relief
   from the stay provided under subsection (a) of this section, such as by terminating,

8  annulling, modifying, or conditioning such stay—

9  (1) for cause, including the lack of adequate protection of an interest in property of such
   party in interest . . . .

10

11  Even if the proceeds are somehow the bankruptcy estate's property and subject to the

12  automatic stay, "[i]t is not uncommon for courts to grant stay relief to allow payment of defense

13  costs or settlement costs to directors and officers, especially when there is no evidence that direct

14  coverage of the debtor will be necessary." In re Allied Digital Technologies, Corp., 306 B.R.

15  505, 513 (Bankr. D. Del. 2004; In re CyberMedica, Inc., 280 B.R. 12, 18 (Bankr. D. Mass. 2002).

16  The relief sought in this Motion would not prejudice the interests of Debtor's creditors

17  because the Movants seek to only authorize the Insurer to pay the defense costs for the State

18  Court Action out of the Insurer's funds, not the Debtor's funds, in accordance with the terms of

19  the D&O Policy. Moreover, the Movants may suffer substantial and irreparable harm if

20  prevented from exercising their rights to defense payments, which they are in need of now.

21  Further, any possibility of harm to the Debtor is wholly speculative since the Debtor is not a

22  defendant in the State Court Action and as such, much less severe than the harm that the Movants

23  will certainly suffer if the proposed payments are not made. Accordingly, good cause exists for

24  the Court to lift the automatic stay to permit the Movants to obtain advancement and

25  reimbursement of proceeds under the D&O Policy in connection with the State Court Action.

26  ### IV. CONCLUSION

27  For the foregoing reasons, Movants respectfully request that the Court enter an order

28  granting relief from the automatic stay, to the extent any such relief is required, to enforce the

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

AFDOCS/16800224.1

Case: 18-50398    Doc# 143    Filed: 08/03/18    Entered: 08/03/18 14:56:33    Page 6 of
112        - 6 -

1    Movants' rights under the D&O Policy, and granting them such relief as the Court determines to

2    be just and proper.

3

4

     Dated:  August 3, 2018                      Respectfully submitted,

5                                                **ARENT FOX LLP**

6

7                                                By: */s/ Aram Ordubegian*
                                                     _____
8                                                      Aram Ordubegian
                                                       Attorney for Movants
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

AFDOCS/16800224.1

Case: 18-30398    Doc# 143    Filed: 08/03/18    Entered: 08/03/18 14:56:33    Page 7 of
                                      112      - 7 -

# DECLARATION OF DANIEL WOODS

I, Daniel Woods, declare that:

1.     I am the former Chief Executive Officer of the chapter 7 debtor, TechShop, Inc. ("Debtor").  If called as a witness, I could and would competently testify with respect to the matters set forth in this declaration from my own personal knowledge.  I submit this declaration in support of the *Motion for Relief from the Automatic Stay, to the Extent Required, for Payment of D&O Insurance Proceeds* (the "Motion").

2.     A true and correct copy of the D&O Policy is attached as **Exhibit 1**.[1]

3.     A true and correct copy of the Complaint filed in the State Court Action is attached as **Exhibit 2**.

4.     I along with Mike Hilberman are former officers and/or directors of the Debtor and/or its subsidiary.

5.     In defending against the State Court Action, I along with Mr. Hilberman have incurred and are continuing to incur legal and related expenses. Although I believe that the allegations asserted in the State Court Action are wholly without merit, I am nevertheless exposed to mounting costs of defense as well as the potential of a monetary judgment against one or both of them.

6.     The Debtor purchased the D&O Policy for the benefit of the Movants.  The D&O Policy indemnifies against all losses, including damages, settlements, judgments and reasonable attorneys' fees, incurred in connection with the defense of certain claims against individuals in their capacity as the Debtor's directors and officers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this __1st__day of August 2018 at Los Angeles, California.

_____
Daniel Woods

---

[1] All capitalized terms used herein shall have the meaning ascribed to them in the Motion unless otherwise defined.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

# EXHIBIT 1



5/2/2017

Alison Flemming
Cooper & McCloskey, Inc.- San Francisco
111 Pine Street
Suite 915
San Francisco, CA  94111


**RE: TechShop, Inc.**
      **PolicyNo.: EKS3217615**


Dear Alison:

Attached please find the following items for the policy for the above mentioned account.  Included you will also find the policy for the insured.  It is located in the packet following a separator page that reads INSURED POLICY.  Review and report any discrepancies to our office right away.

- **Declarations**  EKS-D-1 (04/08)
- **California Policyholder Notice**  NOTX0015CA (02/00)
- **California Surplus Lines Notice**  NOTS0021CA (07/11)
- **General Terms and Conditions**  EKS-1 (04/08)
- **Employment Practices Coverage Section**  EKS-P-2 (04/08)
- **Directors & Officers and Company Coverage Section**  EKS-P-1 (04/08)
- **Additional Named Insureds with Continuity Date**  EKS-75 (04/08)
- **Allocation Provision**  EKS-782 (01/09)
- **Amend Discovery Election-90 Days**  EKS-787 (01/09)
- **Amend Notice of Circumstances**  EKS-6 (04/08)
- **Amend Notice of Circumstances**  EKS-7 (04/08)
- **Amend Notice Provision - D&O**  EKS-8 (04/08)
- **Amend Notice Provision - EPL**  EKS-9 (04/08)
- **Amend Notice Provision 60 Days - EPL**  EKS-832 (05/09)
- **Amend Other Insurance - EPL**  EKS-810 (01/09)
- **Amend Other Insurance to be Primary - D&O**  EKS-199 (04/08)
- **Amend Outside Services Exclusion**  EKS-14 (01/09)
- **Amend Pollution Exclusion - Side A**  EKS-846 (11/09)
- **Amend Subrogation Provision - Final Judgment**  EKS-784 (01/09)
- **Amend Third Party**  EKS-15 (04/08)
- **Amend Warranty Provision Non-Rescindable Coverage**  EKS-16 (04/09)
- **Amendatory Endorsement - California**  UTS-253-CA (01/97)
- **Amended Definition of Directors & Officers - Leased / Contracted Employees**  EKS-202 (04/08)
- **Amended Insured Versus Insured Exclusion**  EKS-17 (03/10)
- **Amended Insured Versus Insured Exclusion - Foreign Jurisdiction**  EKS-845 (05/09)

Case: 18-50398    Doc# 143    Filed: 08/03/18    Entered: 08/03/18 14:56:33    Page 10 of 112

- **Amended Insured Versus Insured Exclusion with Creditor Committee Carveback** EKS-783 (01/09)
- **Cost of Investigations Coverage** EKS-781 (01/09)
- **Delete Paragraph iii. from Exclusion n.** EKS-775 (01/09)
- **Employed Lawyers Extension** EKS-21 (04/08)
- **Employee Privacy Coverage with Sub-Limit** EKS-929 (02/11)
- **Exclusion of Certified Acts of Terrorism** EKS-271 (06/08)
- **Extradition Coverage Endorsement** EKS-788 (01/09)
- **Immigration Claim Endorsement** EKS-785 (01/09)
- **PPACA Civil Money Penalties Extension** EKS-1562 (0614)
- **Removal of Alternative Dispute Resolution Provision** EKS-37 (04/08)
- **Scientific And Advisory Board Extension** EKS-19 (04/08)
- **Separate Costs, Charges and Expenses Limit** EKS-952 (06/11)
- **Service of Suit Clause** UTS-9g (05/96)
- **Tolling or Waiving the Statute of Limitations** EKS-786 (01/09)
- **Wage and Hour Claim Costs, Charges and Expenses Only Endorsement** EKS-1144 (12/12)
- **Policyholder Disclosure Notice of Terrorism Insurance Coverage** NOTX0423CW (02/15)

Thank you.

*Lisa Danna*

**Lisa Danna**



# SCOTTSDALE INSURANCE COMPANY ®

A Stock Insurance Company, herein called the **Insurer**
Home Office:
One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office:
8877 North Gainey Center Drive • Scottsdale, Arizona 85258
1-800-423-7675

# BUSINESS AND MANAGEMENT INDEMNITY POLICY DECLARATIONS

THE EMPLOYMENT PRACTICES, DIRECTORS AND OFFICERS AND COMPANY, FIDUCIARY, BUSINESSOWNERS, PRIVACY PLUS, TECHNOLOGY, MEDIA AND PROFESSIONAL SERVICES AND MISCELLANEOUS PROFESSIONAL SERVICES COVERAGE SECTIONS OF THIS POLICY, WHICHEVER ARE APPLICABLE, COVER ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR, IF ELECTED, THE EXTENDED PERIOD AND REPORTED TO THE INSURER PURSUANT TO THE TERMS OF THE RELEVANT COVERAGE SECTION. THE CRIME COVERAGE SECTION, IF APPLICABLE, APPLIES ONLY TO LOSS DISCOVERED DURING THE POLICY PERIOD. PLEASE READ THIS POLICY CAREFULLY.

THE LIMITS OF LIABILITY AVAILABLE TO PAY INSURED LOSS SHALL BE REDUCED BY AMOUNTS INCURRED FOR COSTS, CHARGES AND EXPENSES, UNLESS OTHERWISE PROVIDED HEREIN. AMOUNTS INCURRED FOR COSTS, CHARGES AND EXPENSES AND LOSS SHALL ALSO BE APPLIED AGAINST THE RETENTION AND DEDUCTIBLE AMOUNTS.

TERMS THAT APPEAR IN BOLDFACE TYPE HAVE SPECIAL MEANING. PLEASE REFER TO THE APPROPRIATE DEFINITIONS SECTIONS OF THIS POLICY.

| Item 1. | **Parent Company** & Mailing Address: | TechShop, Inc. | **Policy** No: | EKS3217615 |
|---|---|---|---|---|
| | | 405 El Camino Real, Box 606 | Agent No: | 29406 |
| | | Menlo Park, CA 94025 | Renewal No: | EKS3185596 |
| | | | Agent Name & Mailing Address: | E-Risk Services, LLC |
| | | | | Northwest Professional Center |
| | | | | 227 US Hwy 206 |
| | | | | Suite 302 |
| | | | | Flanders, NJ 07836-9174 |

Principal Address, if different from mailing address:

| Item 2. | **Policy Period**: From 4/1/2017 to 4/1/2018 |
|---|---|
| | 12:01 A.M. local time at Principal Address shown above. |

Item 3.   Coverage Sections and Limit of Liability

Employment Practices Coverage Section

1. Limit of Liability:
   a.  <u>Redacted</u>  aggregate for all **Loss**, subject to 1.b. and 1.c. immediately below.
   b.  <u>Redacted</u>  additional aggregate for all **Costs, Charges and Expenses**, subject to 1.c. immediately below.
   c.  <u>Redacted</u>  maximum aggregate for this Coverage Section
2. Retention:
   a.  <u>Redacted</u>  each **Employment Practices Claim**
   b.  <u>Redacted</u>  each **Third-Party Claim**
3. **Continuity Date**:  9/1/11
4. **Third Party** Coverage: Yes  **X**   No ____

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 12 of 112

11

Directors and Officers and Company Coverage Section

1. Limit of Liability:
   a. [Redacted] aggregate for all **Loss**, subject to 1.b. and 1.c. immediately below.
   b. [Redacted] additional aggregate for all **Loss** under Insuring Clause A.1., subject to 1.c, immediately below.
   c. [Redacted] maximum aggregate for this Coverage Section
2. Retention:
   a. [Redacted] each **Claim** under Insuring Clause 1.
   b. [Redacted] each **Claim** under Insuring Clause 2.
   c. [Redacted] each **Claim** under Insuring Clause 3.
3. **Continuity Date:** 9/1/2010

| | | |
|---|---|---|
| Item 4. | Premium: | [Redacted] |
| Item 5. | **Discovery Period** options: | |

Item 5.  **Discovery Period** options:

1. One (1) year = [Redacted] of the premium
2. Two (2) years = [Redacted] of the premium
3. Three (3) years = [Redacted] of the premium

As provided in Section H. of the General Terms and Conditions, only one of the above **Discovery Period** options may be elected and purchased.

Item 6.  **Run-Off Period**:

1. One (1) year = [Redacted] of the premium
2. Two (2) years = [Redacted] of the premium
3. Three (3) years = [Redacted] of the premium
4. Four (4) years = [Redacted] of the premium
5. Five (5) years = [Redacted] of the premium
6. Six (6) years = [Redacted] of the premium

As provided in Section I. of the General Terms and Conditions, only one of the above **Run-Off Period** options may be elected and purchased.

Item 7.  Forms and Endorsements Effective at Inception of **Policy**:

EKS-D-1 (04/08), NOTX0015CA (02/00), NOTS0021CA (07/11), EKS-1 (04/08), EKS-P-2 (04/08), EKS-P-1 (04/08), EKS-75 (04/08), EKS-782 (01/09), EKS-787 (01/09), EKS-6 (04/08), EKS-7 (04/08), EKS-8 (04/08), EKS-9 (04/08), EKS-832 (05/09), EKS-810 (01/09), EKS-199 (04/08), EKS-14 (01/09), EKS-846 (11/09), EKS-784 (01/09), EKS-15 (04/08), EKS-16 (04/09), UTS-253-CA (01/97), EKS-202 (04/08), EKS-17 (03/10), EKS-845 (05/09), EKS-783 (01/09), EKS-781 (01/09), EKS-775 (01/09), EKS-21 (04/08), EKS-929 (02/11), EKS-271 (06/08), EKS-788 (01/09), EKS-785 (01/09), EKS-1562 (0614), EKS-37 (04/08), EKS-19 (04/08), EKS-952 (06/11), UTS-9g (05/96), EKS-786 (01/09), EKS-1144 (12/12), NOTX0423CW (02/15)

Item 8.  Notices to Company:

| Notice of Claims to: | Other Notices to: |
|---|---|
| Scottsdale Indemnity Company | Scottsdale Indemnity Company |
| Attention: Claims Manager | Attention: Claims Manager |
| 7 World Trade Center, 37th Floor | 7 World Trade Center, 37th Floor |
| 250 Greenwich Street | 250 Greenwich Street |
| New York, NY 10007 | New York, NY 10007 |
| FSReportALoss@freedomspecialtyins.com | FSReportALoss@freedomspecialtyins.com |

These Declarations, together with the **Application**, Coverage Sections, General Terms and Conditions, and any written endorsement(s) attached thereto, shall constitute the contract between the **Insured** and the **Insurer**.

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 13 of 112



Underwritten by: Scottsdale Insurance Company
Home Office: One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office: 8877 North Gainey Center Drive •Scottsdale, Arizona 85258
1-800-423-7675 • A Stock Company

In Witness Whereof, the Company has caused this policy to be executed and attested.

Secretary                                President

The information contained herein replaces any similar information contained elsewhere in the policy.

Case: 18-50398    Doc# 143    Filed: 08/03/18    Entered: 08/03/18 14:56:33    Page 14 of
112                                                                    13



**CALIFORNIA POLICYHOLDER NOTICE**

**IMPORTANT INFORMATION FOR CALIFORNIA POLICYHOLDERS**

In the event you need to contact someone about this policy for any reason, please contact your agent first. If you have additional questions, you may contact the insurance company issuing this policy at the following address and telephone number:

    **8877 North Gainey Center Drive**
    **Scottsdale, Arizona 85258**
    **Telephone: 1-800-423-7675**

If you have been unable to contact or obtain satisfaction from the company or agent, you may contact the California Insurance Department at:

    **California Department of Insurance**
    **Consumer Affairs Unit**
    **300 South Spring Street, 9th Floor, South Tower**
    **Los Angeles, California 90013**
    **Telephone: 1-800-927-4357 or 213-897-8921 (out of state)**

When contacting your agent, company or the Insurance Department, please have your policy number available.

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 15 of 112



# SCOTTSDALE INSURANCE COMPANY®

## CALIFORNIA SURPLUS LINES NOTICE

### NOTICE TO CALIFORNIA INSURED

1. **THE INSURANCE POLICY THAT YOU [HAVE PURCHASED] [ARE APPLYING TO PURCHASE] IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NON-ADMITTED" OR "SURPLUS LINE" INSURERS.**

2. **THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.**

3. **THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.**

4. **THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN)INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELE-PHONE NUMBER: 1-800-927-4357. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT <u>WWW.NAIC.ORG</u>.**

Case: 18-50398     Doc# 143     Filed: 08/03/18     Entered: 08/03/18 14:56:33     Page 16 of 112

15

5. FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATES DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

6. FOR NON-UNITED STATES (ALIEN) INSURERS, THE IN-SURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF APPROVED AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

7. CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEBSITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV.

8. IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKERS FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.

(California D-2)



# SCOTTSDALE INSURANCE COMPANY®

A Stock Insurance Company, herein called the **Insurer**

## BUSINESS AND MANAGEMENT INDEMNITY POLICY

## GENERAL TERMS AND CONDITIONS

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows

A. **SEVERABILITY OF GENERAL TERMS AND CONDITIONS**

These General Terms and Conditions apply to each and every Coverage Section of this **Policy**. The terms and conditions of each Coverage Section apply only to that Coverage Section and shall not be construed to apply to any other Coverage Section.

B. **DEFINITIONS**

Whenever used in this **Policy**, the terms that appear below in **boldface** type shall have the meanings set forth in this Definitions subsection of the General Terms and Conditions. However, if a term also appears in **boldface** type in a particular Coverage Section and is defined in that Coverage Section, that definition shall apply for purposes of that particular Coverage Section. Terms that appear in **boldface** in the General Terms and Conditions but are not defined in this Definitions subsection and are defined in other Coverage Sections of the **Policy** shall have the meanings ascribed to them in those Coverage Sections.

1. **Application** means all applications, including any attachments thereto, and all other information and materials submitted by or on behalf of the **Insureds** to the **Insurer** in connection with the **Insurer** underwriting this **Policy** or any policy of which this **Policy** is a renewal or replacement. All such applications, attachments, information, materials and documents are deemed attached to and incorporated into this **Policy**.

2. **Company** means:

   a. the **Parent Company**; and

   b. any **Subsidiary**,

   and includes any such organization as a debtor-in-possession or the bankruptcy estate of such entity under United States bankruptcy law or an equivalent status under the law of any other jurisdiction.

3. **Discovery Period** means one of the periods described in Item 5. of the Declarations which is elected and purchased pursuant to Section H. below.

4. **Domestic Partner** means any natural person qualifying as a domestic partner under the provision of any applicable federal, state or local law or under the provisions of any formal program established by the **Company**.

5. **Extended Period** means the **Discovery Period** or the **Run-Off Period,** if such provision is elected and purchased pursuant to Sections H. or I. respectively, below.

6. **Insurer** means the insurance company providing this insurance.

7. **Parent Company** means the entity first named in Item 1. of the Declarations.

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 18 of 112
17

8. **Policy** means, collectively, the Declarations, the **Application**, this policy form and any endorsements.

9. **Policy Period** means the period from the effective date and hour of the inception of this **Policy** to the **Policy** expiration date and hour as set forth in Item 2. of the Declarations, or its earlier cancellation date and hour, if any.

10. **Run-Off Period** means one of the periods described in Item 6. of the Declarations, which is elected and purchased pursuant to Section I. below.

11. **Subsidiary** means:

    a. any entity of which more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of such entity's directors or managers are owned by the **Parent Company**, directly or indirectly, if such entity:

       i. was so owned on or prior to the inception date of this **Policy**; or

       ii. becomes so owned after the inception date of this **Policy**; and

    b. any joint venture entity in which the **Parent Company**, or an entity described in a. above, has an exact fifty percent (50%) ownership of the interests of such joint venture entity and where, pursuant to a written joint venture agreement, the **Parent Company** or entity described in a. above solely controls the management and operations of such joint venture entity.

12. **Takeover** means:

    a. the acquisition by any person or entity of more than fifty percent (50%) of the outstanding securities of the **Parent Company** representing the present right to vote for the election of directors; or

    b. the merger or consolidation of the **Parent Company** into another entity such that the **Parent Company** is not the surviving entity.

All definitions shall apply equally to the singular and plural forms of the respective words.

C. **LIMITS OF LIABILITY, RETENTIONS AND DEDUCTIBLES**

1. The Limits of Liability, Retentions and Deductibles for each Coverage Section are separate Limits of Liability, Retentions and Deductibles pertaining only to the Coverage Section for which they are shown. The application of a Retention or Deductible to **Loss** under one Coverage Section shall not reduce the Retention or Deductible under any other Coverage Section, and no reduction in the Limit of Liability applicable to one Coverage Section shall reduce the Limit of Liability under any other Coverage Section.

2. In the event that any **Claim** is covered, in whole or in part, under two or more Insuring Clauses or more than one Coverage Section, the total applicable Retention or Deductible shall not exceed the single largest applicable Retention or Deductible. The largest applicable Retention or Deductible shall apply only once to such **Claim**.

D. **WARRANTY**

It is warranted that the particulars and statements contained in the **Application** are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy** and each Coverage Section.

By acceptance of this **Policy**, the **Insureds** agree that:

1. the statements in the **Application** are their representations, that such representations shall be deemed material to the acceptance of the risk or the hazard assumed by **Insurer** under this **Policy**, and that this **Policy** and each Coverage Section are issued in reliance upon the truth of such representations; and

2. in the event the **Application**, including materials submitted or required to be submitted therewith ,contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 19 of 112

18

omission which materially affects either the acceptance of the risk or the hazard assumed by **Insurer** under this **Policy**, this **Policy**, including each and all Coverage Sections, shall be void ab initio with respect to any **Insureds** who had knowledge of such misrepresentation or omission.

E. **CANCELLATION**

1. By acceptance of this **Policy**, the **Insureds** hereby confer to the **Parent Company** the exclusive power and authority to cancel this **Policy** on their behalf. The **Parent Company** may cancel this **Policy** in its entirety or any of the applicable Coverage Sections individually by surrender thereof to the **Insurer**, or by mailing written notice to the **Insurer** stating when thereafter such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation shall be the date the **Insurer** received such notice or any later date specified in the notice, and such effective date shall become the end of the **Policy** or applicable Coverage Section. Delivery of such written notice shall be equivalent to mailing.

2. This **Policy** may be cancelled by the **Insurer** only for nonpayment of premium, by mailing written notice to the **Parent Company** stating when such cancellation shall be effective, such date to be not less than ten (10) days from the date of the written notice. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice by the **Insurer** shall be equivalent to mailing. If the foregoing notice period is in conflict with any governing law or regulation, then the notice period shall be deemed to be the minimum notice period permitted under the governing law or regulation.

3. If this **Policy** or any Coverage Section is cancelled, the **Insurer** shall retain the pro rata proportion of the premium therefore. Payment or tender of any unearned premium by **Insurer** shall not be a condition precedent to the effectiveness of cancellation.

F. **ESTATES, LEGAL REPRESENTATIVES, AND SPOUSES**

The estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** of natural persons who are **Insureds** shall be considered **Insureds** under this **Policy**; provided, however, coverage is afforded to such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** only for a **Claim** arising solely out of their status as such and, in the case of a spouse or **Domestic Partner**, where the **Claim** seeks damages from marital community property, jointly held property or property transferred from the natural person who is an **Insured** to the spouse or **Domestic Partner**. No coverage is provided for any **Wrongful Act** of an estate, heir, legal representative, assign, spouse or **Domestic Partner**. All of the terms and conditions of this **Policy** including, without limitation, the Retentions and Deductibles applicable to **Loss** incurred by natural persons who are **Insureds** shall also apply to **Loss** incurred by such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners**.

G. **AUTHORIZATION CLAUSE**

By acceptance of this **Policy**, the **Parent Company** agrees to act on behalf of all **Insureds**, and the **Insureds** agree that the **Parent Company** will act on their behalf, with respect to the giving of all notices to **Insurer**, the receiving of notices from **Insurer**, the agreement to and acceptance of endorsements, the payment of the premium and the receipt of any return premium.

H. **DISCOVERY PERIOD**

1. If this **Policy** or any Coverage Section is cancelled or is not renewed by the **Insurer**, for reasons other than non-payment of premium or if the **Parent Company** elects to cancel or not to renew this **Policy** or a Coverage Section, then the **Parent Company** shall have the right, upon payment of an additional premium calculated at that percentage shown in Item 5. of the Declarations of the total premium for this **Policy,** or the total premium for the cancelled or not renewed Coverage Section, whichever is applicable, to purchase an extension of the coverage granted by this **Policy** or the applicable cancelled or not renewed Coverage Section with respect to any **Claim** first made during the period of time set forth in Item 5. of the Declarations after the effective date of such cancellation or, in the event of a refusal to renew, after the **Policy** expiration date, but only with respect to any **Wrongful Act** committed before such date. The **Parent Company** shall have the right to elect only one of the **Discovery Periods** set forth in Item 5. of the Declarations.

2. As a condition precedent to the right to purchase the **Discovery Period** set forth in subsection H.1. above, the total premium for the **Policy** must have been paid. Such right to purchase the **Discovery Period** shall

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 20 of
112                                                                                    19

terminate unless written notice, together with full payment of the premium for the **Discovery Period**, is received by **Insurer** within thirty (30) days after the effective date of cancellation, or, in the event of a refusal to renew, within thirty (30) days after the **Policy** expiration date. If such notice and premium payment is not so given to **Insurer**, there shall be no right to purchase the **Discovery Period**.

3.  In the event of the purchase of the **Discovery Period**, the entire premium therefore shall be deemed earned at the commencement of the **Discovery Period**.

4.  The exercise of the **Discovery Period** shall not in any way increase or reinstate the limit of **Insurer's** liability under any Coverage Section.

I.  **RUN-OFF COVERAGE**

In the event of a **Takeover**:

1.  The **Parent Company** shall have the right, upon payment of an additional premium calculated at the percentage of the total premium for this **Policy** set forth in Item 6. of the Declarations, to an extension of the coverage granted by this **Policy** with respect to any **Claim** first made during the **Run-Off Period**, as set forth in Item 6. of the Declarations, but only with respect to any **Wrongful Act** committed before the effective date of the **Takeover** (herein defined as "Run-Off Coverage"); provided, however, such additional premium shall be reduced by the amount of the unearned premium from the date of the **Takeover** or the date of notice of the election of the Run-Off Coverage, whichever is later, through the expiration date set forth in Item 2. of the Declarations.

2.  The **Parent Company** shall have the right to elect only one of the periods designated in Item 6. of the Declarations. The election must be made prior to the expiration of the **Policy Period**. The right to purchase a **Run-Off Period** shall terminate on the expiration of the **Policy Period**.

3.  If a **Run-off Period** is elected and purchased:

    a.  Section E. above, is deleted in its entirety and neither the **Insureds** nor the **Insurer** may cancel this **Policy** or any Coverage Section thereof;

    b.  Section H. above, is deleted in its entirety; and

    c.  the maximum aggregate Limit of Liability of the **Insurer** for each Coverage Section purchased and set forth on the Declarations shall be twice the otherwise applicable maximum aggregate Limit of Liability set forth in Item 3. of the Declarations for such Coverage Section; provided, however, the maximum aggregate Limit of Liability of the **Insurer** in connection with any one **Claim** shall be amount originally shown as the maximum aggregate Limit of Liability for each Coverage Section purchased and set forth on the Declaration.

J.  **ALTERNATIVE DISPUTE RESOLUTION**

The **Insureds** and the **Insurer** shall submit any dispute or controversy arising out of or relating to this **Policy** or the breach, termination or invalidity thereof to the alternative dispute resolution ("ADR") process described in this subsection.

Either an **Insured** or the **Insurer** may elect the type of ADR process discussed below; provided, however, that the **Insured** shall have the right to reject the choice by the **Insurer** of the type of ADR process at any time prior to its commencement, in which case the choice by the **Insured** of ADR process shall control.

There shall be two choices of ADR process: (1) non-binding mediation administered by any mediation facility to which the **Insurer** and the **Insured** mutually agree, in which the **Insured** and the **Insurer** shall try in good faith to settle the dispute by mediation in accordance with the then-prevailing commercial mediation rules of the mediation facility; or (2) arbitration submitted to any arbitration facility to which the **Insured** and the **Insurer** mutually agree, in which the arbitration panel shall consist of three disinterested individuals. In either mediation or arbitration, the mediator or arbitrators shall have knowledge of the legal, corporate management, and insurance issues relevant to the matters in dispute. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the award of the arbitrators shall not include attorneys' fees or other costs. In the event of mediation, either party shall have the right to commence arbitration in accordance with this section;

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 21 of 112

20

provided, however, that no such arbitration shall be commenced until at least sixty (60) days after the date the mediation shall be deemed concluded or terminated. In all events, each party shall share equally the expenses of the ADR process.

Either ADR process may be commenced in New York, New York or in the state indicated in Item 1. of the Declarations as the principal address of the **Parent Company**. The **Parent Company** shall act on behalf of each and every **Insured** in connection with any ADR process under this section.

K. **TERRITORY**

Coverage under this **Policy** shall extend to **Wrongful Acts** taking place or **Claims** made anywhere in the world.

L. **ASSISTANCE, COOPERATION AND SUBROGATION**

The **Insureds** agree to provide **Insurer** with such information, assistance and cooperation as **Insurer** reasonably may request, and they further agree that they shall not take any action which in any way increases **Insurer's** exposure under this **Policy**. In the event of any payments under this **Policy**, **Insurer** shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery against any person or entity. The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as are necessary to enable **Insurer** effectively to bring suit or otherwise pursue subrogation in the name of the **Insureds**, and shall provide all other assistance and cooperation which **Insurer** may reasonably require.

M. **ACTION AGAINST INSURER, ALTERATION AND ASSIGNMENT**

Except as provided in Section J. above, Alternative Dispute Resolution, no action shall lie against **Insurer** unless, as a condition precedent thereto, there shall have been compliance with all of the terms of this **Policy**. No person or organization shall have any right under this **Policy** to join **Insurer** as a party to any action against the **Insureds** to determine their liability, nor shall **Insurer** be impleaded by the **Insureds** or their legal representative. No change in, modification of, or assignment of interest under this **Policy** shall be effective except when made by a written endorsement to this **Policy** which is signed by an authorized representative of the **Insurer**.

N. **ENTIRE AGREEMENT**

By acceptance of this **Policy**, the **Insureds** agree that this **Policy** embodies all agreements existing between them and **Insurer** or any of their agents relating to this insurance. Notice to any agent or knowledge possessed by any agent or other person acting on behalf of **Insurer** shall not effect a waiver or a change in any part of this **Policy** or estop **Insurer** from asserting any right under the terms of this **Policy** or otherwise, nor shall the terms be deemed waived or changed except by written endorsement or rider issued by **Insurer** to form part of this **Policy**.

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 22 of
112



SCOTTSDALE INSURANCE COMPANY®

A Stock Insurance Company, herein called the **Insurer**

**BUSINESS AND MANAGEMENT INDEMNITY POLICY**

**EMPLOYMENT PRACTICES COVERAGE SECTION**

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows

A. **INSURING CLAUSES**

　1. **Employee** Insuring Clause

　　**Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of an **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for an **Employment Practices Wrongful Act** taking place prior to the end of the **Policy Period**.

　2. **Third-Party** Insuring Clause

　　In the event **Third-Party** Coverage is affirmatively designated in Item 3. of the Declarations relating to this Coverage Section, the **Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of a **Third-Party Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period,** and reported to the **Insurer** pursuant to Section E.1. herein, for a **Third-Party Wrongful Act** taking place prior to the end of the **Policy Period**.

B. **DEFINITIONS**

　1. **Claim** means any:

　　a. **Employment Practices Claim**; or

　　b. **Third-Party Claim**.

　2. **Continuity Date** means the Continuity Date set forth in Item 3. of the Declarations relating to this Coverage Section.

　3. **Costs, Charges and Expenses** means reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in defending **Claims** and the premium for appeal, attachment or similar bonds arising out of covered judgments, but with no obligation to furnish such bonds and only for the amount of such judgment that is up to the applicable Limit of Liability. **Costs, Charges and Expenses** do not include salaries, wages, fees, overhead or benefit expenses of or associated with officers or employees of the **Company**.

　4. **Employee** means any person who was, now is or shall become:

　　a. a full-time or part-time employee of the **Company**, including voluntary, seasonal, and temporary employees;

　　b. any individual who applies for employment with the **Company**; and

　　c. any natural person who is a leased employee or is contracted to perform work for the **Company**, or is an independent contractor for the **Company**, but only to the extent such individual performs work or services for or on behalf of the **Company**.

Case: 18-50398　Doc# 143　Filed: 08/03/18　Entered: 08/03/18 14:56:33　Page 23 of 112

22

5. **Employment Practices Claim** means:

    a. a written demand against an **Insured** for damages or other relief;

    b. a civil, judicial, administrative, regulatory or arbitration proceeding or a formal governmental investigation against an **Insured** seeking damages or other relief, commenced by the service of a complaint or similar pleading, including any appeal therefrom;

    c. a civil proceeding against an **Insured** before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body, commenced by the filing of a notice of charges, investigative order or similar document; or

    d. a criminal proceeding brought for an **Employment Practices Wrongful Act** in a court outside of the United States against any **Insured,** commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges;

brought by or on behalf of an **Employee** in their capacity as such. **Employment Practices Claim** does not include a labor or grievance proceeding, which is pursuant to a collective bargaining agreement.

6. **Employment Practices Wrongful Act** means any actual or alleged:

    a. violation of any common or statutory federal, state, or local law prohibiting any kind of employment-related discrimination;

    b. harassment, including any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment, or unlawful workplace harassment, including workplace harassment by any non-employee;

    c. abusive or hostile work environment;

    d. wrongful discharge or termination of employment, whether actual or constructive;

    e. breach of an actual or implied employment contract;

    f. wrongful deprivation of a career opportunity, wrongful failure or refusal to employ or promote, or wrongful demotion;

    g. employment-related defamation, libel, slander, disparagement, false imprisonment, misrepresentation, malicious prosecution, or invasion of privacy;

    h. wrongful failure or refusal to adopt or enforce workplace or employment practices, policies or procedures, solely as respects employment-related discrimination or harassment;

    i. wrongful discipline;

    j. employment-related wrongful infliction of emotional distress, mental anguish, or humiliation;

    k. **Retaliation**;

    l. negligent evaluation; or

    m. negligent hiring or negligent supervision of others in connection with a. through l. above, but only if employment-related and claimed by or on behalf of any **Employee** and only if committed or allegedly committed by any of the **Insureds** in their capacity as such.

7. **Insured Persons** means all persons who were, now are or shall become:

    a. a director or officer of the **Company**;

    b. any **Employee**; and

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 24 of 112

c. the functional equivalent of a director, officer or **Employee** in the event the **Company** is incorporated or domiciled outside the United States.

8. **Insureds** means the **Company** and any **Insured Persons**.

9. **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transactions or causes.

10. **Loss** means the damages, judgments, settlements, front pay and back pay, pre-judgment or post judgment interest awarded by a court, and **Costs, Charges and Expenses** incurred by any of the **Insureds**. **Loss** does not include:

    a. taxes, fines or penalties;

    b. matters uninsurable under the laws pursuant to which this **Policy** is construed;

    c. punitive or exemplary damages, liquidated damages awarded by a court pursuant to a violation of the Equal Pay Act, the Age Discrimination in Employment Act or the Family Medical Leave Act, all as amended, or any rules or regulations promulgated thereunder, or similar provisions of any common or statutory federal, state or local law, or the multiple portion of any multiplied damage award, except to the extent that such punitive, exemplary, or liquidated damages or the multiple portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to the **Insureds**, **Insurer**, this **Policy** or the **Claim** giving rise to such damages;

    d. the cost of any remedial, preventative or other non-monetary relief, including without limitation any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement or governmental authority;

    e. amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

    f. disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing benefit payments;

    g. the costs to modify or adapt any building or property to be accessible or accommodating, or to be more accessible or accommodating, to any disabled person;

    h. the cost of creating or reinstating employment;

    i. any amount owed as wages to any **Employee**, other than front pay or back pay; or

    j. any amount for which the **Insured** is not financially liable or legally obligated to pay.

11. **Retaliation** means any actual or alleged response of any of the **Insureds** to:

    a. the disclosure or threat of disclosure by an **Employee** to a superior or to any governmental agency of any act by any of the **Insureds** where such act is alleged to be a violation of any federal, state local or foreign law, whether common or statutory, or any rule or regulation promulgated thereunder;

    b. the actual or attempted exercise by an **Employee** of any right that such **Employee** has under law, including rights under any worker's compensation law, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights;

    c. the filing of any claim under the Federal False Claims Act or any similar federal, state, local or foreign "whistleblower" law or "whistleblower" provision of any law; or

    d. any legally-protected **Employee** work stoppage or slowdown.

12. **Third-Party** means any natural person who is a customer, vendor, service provider, client, or other business invitee of the **Company**; provided, however, **Third-Party** shall not include any **Employee**.

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 25 of 112

24

13. **Third-Party Claim** means:

    a. any written demand for damages or other relief against an **Insured**;

    b. a civil judicial, administrative or arbitration proceeding against an **Insured** seeking damages or other relief, including any appeal therefrom; or

    c. a criminal proceeding brought for an **Employment Practices Wrongful Act** in a court outside of the United States against any **Insured,** commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges;

brought by or on behalf of a **Third-Party** in their capacity as such.

14. **Third-Party Wrongful Act** means any actual or alleged:

    a. harassment of a **Third-Party**, including but not limited to any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment; or

    b. discrimination against a **Third-Party**, including but not limited to any such discrimination on account of race, color, religion, age, disability or national origin.

15. **Wrongful Act** means:

    a. **Employment Practices Wrongful Act**; or

    b. **Third-Party Wrongful Act.**

C. **EXCLUSIONS**

**Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:

1. for actual or alleged bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible or intangible property including loss of use thereof, whether or not such property is physically injured; provided, however, this exclusion shall not apply to mental anguish, emotional distress or humiliation;

2. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    a. any **Wrongful Act**, fact circumstance or situation which has been the subject of any written notice given under any other policy of which this **Policy** is a renewal or replacement or which it succeeds in time; or

    b. any other **Wrongful Act** whenever occurring which, together with a **Wrongful Act** which has been the subject of such notice, would constitute **Interrelated Wrongful Acts**;

3. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    a. the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or

    b. any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so;

including without limitation any such **Claim** by or on behalf of the **Company**, its securities holders or creditors based upon, arising out of, or attributable to the matters described in this exclusion. Provided, however, this exclusion shall not apply to that part of any **Claim** under this Coverage Section where such

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 26 of 112

25

**Claim** is for **Retaliation**.

For purposes of this exclusion, **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous, biological, bacterial or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials (including materials to be reconditioned, recycled or reclaimed). **Pollutants** shall also mean any other air emission or particulate, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field;

4. for any actual or alleged violation of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, all as amended, or any rules or regulations promulgated thereunder, or similar provisions of any common or statutory federal, state or local law; provided, however, this exclusion does not apply to any such **Claim** alleging violations of the Equal Pay Act or **Retaliation**;

5. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any dishonest, deliberately fraudulent or criminal act; provided, however this exclusion shall not apply unless and until there is a final judgment against such **Insured** as to such conduct. If such excluded conduct is established through a final judgment, the **Insured** shall reimburse the **Insurer** for any **Costs, Charges and Expenses**;

6. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed subsequent to a **Takeover**;

7. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    a. any prior or pending litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry, including without limitation any investigation by the United States Department of Labor or the United States Equal Employment Opportunity Commission, filed or pending on or before the **Continuity Date**; or

    b. any fact, circumstance, situation, transaction or event underlying or alleged in such litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry, including any investigation by the United States Department of Labor or the United States Equal Employment Opportunity Commission;

8. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act**, fact, circumstance, or situation which any of the **Insured Persons** who were, now are, or shall be directors, officers, managers or supervisory employees, had knowledge of prior to the **Continuity Date** where such **Insured Persons** had reason to believe at the time that such known **Wrongful Act** could reasonably be expected to give rise to such **Claim**;

9. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any actual or alleged responsibility, obligation or duty of any **Insured** pursuant to any workers compensation, unemployment insurance, social security, disability benefits or pension benefits or similar law; provided, however, this exclusion shall not apply to any such **Claim** alleging **Retaliation**; or

10. for that portion of **Loss** which is covered under any other Coverage Section of this **Policy**.

No **Wrongful Act** of one or more **Insureds** shall be imputed to any other **Insureds** for the purpose of determining the applicability of any of the above exclusions.

D. **LIMIT OF LIABILITY AND RETENTIONS**

1. The liability of the **Insurer** shall apply only to that part of **Loss** which is excess of the Retention amount applicable to this Coverage Section, as shown in Item 3. of the Declarations. Such Retention shall be borne

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 27 of 112

26

uninsured by the **Insureds** and at their own risk. If different parts of a single **Claim** are subject to different applicable Retentions under this Coverage Section, the applicable Retentions will be applied separately to each part of such **Loss**, but the sum of such Retentions shall not exceed the largest applicable Retention.

2. As shown in Item 3.1. of the Declarations relating to this Coverage Section, the following Limits of Liability of the **Insurer** shall apply:

    a. The amount set forth in Item 3.1.a. relating to this Coverage Section shall be the aggregate limit of liability for the payment of **Loss**, subject to additional payments for **Costs, Charges and Expenses** as further described in subsection b. immediately below.

    b. The amount set forth in Item 3.1.b. relating to this Coverage Section shall be the aggregate limit of liability for the payment of **Costs, Charges and Expenses** in addition to the limit described in subsection a. immediately above; provided, all payments for **Costs, Charges and Expenses** under the additional limits described in this subsection b. shall be excess of the limit described in subsection a. above, and excess of any other available insurance that is specifically excess to this **Policy**. Such excess insurance must be completely and fully exhausted through the payment of loss, including but not limited to defense costs thereunder, before the **Insurer** shall have any obligations to make any payments under the additional limits described in this subsection b.

    c. The amount set forth in Item 3.1.c. of the Declarations relating to this Coverage Section shall be the maximum aggregate limit of liability under this Coverage Section and the Limit of Liability set forth in 3.1.a. and 3.1.b. relating to this Coverage Section shall be a part of and not in addition to the maximum aggregate limit of liability set forth in Item 3.1.c. for this Coverage Section.

3. All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed to be a single **Claim,** and such **Claim** shall be deemed to have been made at the earliest of the following times, regardless of whether such date is before or during the **Policy Period**:

    a. the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** is first made; or

    b. the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Section E.2. below.

4. Payments of **Loss** by **Insurer** shall reduce the Limit(s) of Liability under this Coverage Section. **Costs, Charges and Expenses** are part of, and not in addition to, the Limit(s) of Liability, and payment of **Costs, Charges and Expenses** reduce the Limit(s) of Liability. If such Limit(s) of Liability are exhausted by payment of **Loss**, the obligations of the **Insurer** under this Coverage Section are completely fulfilled and extinguished.

E. **NOTIFICATION**

1. The **Insureds** shall, as a condition precedent to their rights to payment under this Coverage Section only, give to **Insurer** written notice of any **Claim** made against the **Insureds** as soon as practicable, but in no event later than sixty (60) days after such **Claim** is first made against the **Insureds**, or the expiration of the **Policy Period**, whichever is later. If any **Claim** is first made against the **Insureds** during the **Extended Period**, if purchased, written notice to **Insurer** must be given as soon as practicable, but in no event later than sixty (60) days after such **Claim** is first made against the **Insureds**, or the end of the **Extended Period**, whichever is later.

2. If, during the **Policy Period** or the **Discovery Period**, any of the **Insureds** first becomes aware of a specific **Wrongful Act** which may reasonably give rise to a future **Claim** covered under this **Policy**, and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

    a. a description of the **Wrongful Act** allegations anticipated;

    b. the identity of the potential claimants;

    c. the circumstances by which the **Insureds** first became aware of the **Wrongful Act**;

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 28 of 112

     d.  the identity of the **Insureds** allegedly involved;

     e.  the consequences which have resulted or may result; and

     f.  the nature of the potential monetary damages and non-monetary relief;

then any **Claim** made subsequently arising out of such **Wrongful Act** shall be deemed for the purposes of this Coverage Section to have been made at the time such written notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim**.

3.  Notice to **Insurer** shall be given to the address specified in Item 8. of the Declarations for this **Policy**.

## F. SETTLEMENT AND DEFENSE

1.  It shall be the duty of the **Insurer** and not the duty of the **Insureds** to defend any **Claim**. Such duty shall exist even if any of the allegations are groundless, false or fraudulent. The **Insurer's** duty to defend any **Claim** shall cease when the Limits of Liability have been exhausted by the payment of **Loss** including **Costs, Charges and Expenses.**

2.  The **Insurer** may make any investigation it deems necessary and shall have the right to settle any **Claim**; provided, however, no settlement shall be made without the consent of the **Parent Company**, such consent not to be unreasonably withheld.

3.  Notwithstanding subsection 1. above, in the event that any **Claim** is brought as a class action, and all or any part of such **Claim** involves any actual or alleged violation of the Fair Labor Standards Act of 1938, as amended, or any similar state law, regulation or code, then it shall be the duty of the **Insureds** and not the duty of the **Insurer** to defend any such **Claim**.

4.  The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Costs, Charges and Expenses** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld. The **Insurer** shall not be liable for any settlement, **Costs, Charges and Expenses**, assumed obligation or admission to which it has not consented. The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(s).

5.  If the **Insurer** does not have the duty to defend a **Claim**, then the **Insurer** shall have the right and shall be given the opportunity to effectively associate with, and shall be consulted in advance by, the **Insureds** regarding the defense and negotiation of any settlement of any **Claim**.

6.  The **Insureds** agree to provide the **Insurer** with all information, assistance and cooperation which the **Insurer** reasonably requests and agree that, in the event of a **Claim**, the **Insureds** will do nothing that shall prejudice the position of the **Insurer** or its potential or actual rights of recovery.

7.  If the Insurer does not have the duty to defend a **Claim** , the **Insurer** shall, on a quarterly basis, advance on behalf of the **Insureds** covered **Costs, Charges and Expenses**, which the **Insureds** have incurred in connection with **Claims** made against them, prior to disposition of such **Claims**. Any advancement of **Costs, Charges and Expenses** shall be subject to the condition that such advanced amounts shall be repaid to the **Insurer** by the **Insureds** severally according to their respective interests if and to the extent the **Insureds** shall not be entitled to coverage for such **Costs, Charges and Expenses** under the terms and conditions of this **Policy**.

## G. OTHER INSURANCE

1.  For any **Employment Practices Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be primary insurance; provided that with respect to that portion of an **Employment Practice Claim** made against any leased, temporary or independently contracted **Employee**, **Loss,** including **Costs, Charges and Expenses**, payable on behalf of such **Employee** under this Coverage Section will be specifically excess of and will not contribute with such other insurance, including but not limited to any such other insurance under which there is a duty to defend, unless such insurance is specifically stated to be in excess over the Limit of Liability of this Coverage

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 29 of 112

Section.

2. For any **Third-Party Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be specifically excess of and will not contribute with such other insurance, including but not limited to any such other insurance under which there is a duty to defend, unless such other insurance is specifically stated to be excess over the Limit of Liability of this Coverage Section.

H. **ALLOCATION**

If the **Insurer** does not have the duty to defend a **Claim**, then the following subsections shall apply to such **Claim.**

1. If, in any **Claim** covered in whole or in part under this Coverage Section, the **Insureds** who are afforded coverage for such **Claim** incur **Loss** jointly with others, or incur an amount consisting of both **Loss** covered by this **Policy** and loss not covered by this **Policy** because such **Claim** includes both covered and uncovered matters, then the **Insureds** and the **Insurer** shall allocate such amount between covered **Loss** and uncovered loss based upon the relative legal and financial exposures and the relative benefits obtained by the parties to covered and uncovered matters.

2. If there can be an agreement between **Insureds** and the **Insurer** on an allocation of **Costs, Charges and Expenses**, the **Insurer** shall advance on a current basis covered **Costs, Charges and Expenses**. If there can be no agreement on allocation of **Costs, Charges and Expenses**, the **Insurer** shall advance on a current basis **Costs, Charges and Expenses** which the **Insurer** believes to be covered under this **Policy** until a different allocation is negotiated or arbitrated.

3. Any negotiated or arbitrated allocation of **Costs, Charges and Expenses** on account of a **Claim** shall be applied retroactively to all **Costs, Charges and Expenses** on account of such **Claim**, notwithstanding any prior advancement to the contrary. Any allocation or advancement of **Costs, Charges and Expenses** on account of a **Claim** shall not apply to or create any presumption with respect to the allocation of other **Loss** on account of such **Claim** or any other **Claim**.



SCOTTSDALE INSURANCE COMPANY®

A Stock Insurance Company, herein called the **Insurer**

## BUSINESS AND MANAGEMENT INDEMNITY POLICY

## DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows

A. **INSURING CLAUSES**

1. The **Insurer** shall pay the **Loss** of the **Directors and Officers** for which the **Directors and Officers** are not indemnified by the **Company** and which the **Directors and Officers** have become legally obligated to pay by reason of a **Claim** first made against the **Directors and Officers** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

2. The **Insurer** shall pay the **Loss** of the **Company** for which the **Company** has indemnified the **Directors and Officers** and which the **Directors and Officers** have become legally obligated to pay by reason of a **Claim** first made against the **Directors and Officers** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

3. The **Insurer** shall pay the **Loss** of the **Company** which the **Company** becomes legally obligated to pay by reason of a **Claim** first made against the **Company** during the **Policy Period** or, if applicable, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

B. **DEFINITIONS**

1. **Claim** means:

   a. a written demand against any **Insured** for monetary damages or non-monetary or injunctive relief;

   b. a written demand by one or more of the securities holders of the **Company** upon the board of directors or the management board of the **Company** to bring a civil proceeding against any of the **Directors and Officers** on behalf of the **Company**;

   c. a civil proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading;

   d. a criminal proceeding against any **Insured** commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges;

   e. an arbitration proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief; or

   f. a civil, administrative or regulatory proceeding, or a formal governmental investigation against any **Insured** commenced by the filing of a notice of charges, investigative order or similar document.

2. **Continuity Date** means the date set forth in Item 3. of the Declarations relating to this Coverage Section.

3. **Costs, Charges and Expenses** means:

   a. reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds**

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 31 of 112

30

in defending **Claims** and the premium for appeal, attachment or similar bonds arising out of covered judgments, but with no obligation to furnish such bonds and only for the amount of such judgment that is up to the applicable Limit of Liability; and

    b.  reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in investigating a written demand, by one or more of the securities holders of the **Company** upon the board of directors or the management board of the **Company,** to bring a civil proceeding against any of the **Directors and Officers** on behalf of the **Company.**

**Costs, Charges and Expenses** do not include salaries, wages, fees, overhead or benefit expenses of or associated with officers or employees of the **Company.**

4.  **Directors and Officers** means any person who was, now is, or shall become:

    a.  a duly elected or appointed director, officer, or similar executive of the **Company**, or any member of the management board of the **Company**;

    b.  a person who was, is or shall become a full-time or part-time employee of the **Company**; and

    c.  the functional equivalent of directors or officers of a **Company** incorporated or domiciled outside the United States of America.

5.  **Insured** means the **Company** and the **Directors and Officers**.

6.  **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transactions or causes.

7.  **Loss** means damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court, and **Costs, Charges and Expenses** incurred by **Directors and Officers** under Insuring Clauses 1. or 2. or the **Company** under Insuring Clause 3. **Loss** does not include:

    a.  taxes, fines or penalties;

    b.  matters uninsurable under the laws pursuant to which this **Policy** is construed;

    c.  punitive or exemplary damages, or the multiple portion of any multiplied damage award, except to the extent that such punitive or exemplary damages, or multiplied portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to the **Insureds**, **Insurer**, this **Policy** or the **Claim** giving rise to such damages;

    d.  the cost of any remedial, preventative or other non-monetary relief, including without limitation any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement or governmental authority;

    e.  any amount for which the **Insured** is not financially liable or legally obligated to pay;

    f.  the costs to modify or adapt any building or property to be accessible or accommodating, or more accessible or accommodating, to any disabled person; or

    g.  any amounts owed or paid to one or more securities holders of the **Company** under any written or express contract or agreement.

8.  **Outside Entity** means:

    a.  any non-profit company which is exempt from taxation under the Internal Revenue Code, as amended, in which any of the **Directors and Officers** is a director, officer, trustee, governor, executive director or similar position of such non-profit company; and

    b.  any other company specifically identified by endorsement to this **Policy**.

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 32 of 112

9. **Wrongful Act** means any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by:

    a. any of the **Directors and Officers**, while acting in their capacity as such, or any matter claimed against any **Director and Officer** solely by reason of his or her serving in such capacity;

    b. any of the **Directors and Officers**, while acting in their capacity as a director, officer, trustee, governor, executive director or similar position of any **Outside Entity** where such service is with the knowledge and consent of the **Company**; and

    c. the **Company**, but only with respect to Insuring Clause 3. of this Coverage Section.

## C. EXCLUSIONS

1. Exclusions Applicable to All Insuring Clauses

**Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:

    a. for actual or alleged bodily injury, sickness, disease, death, false imprisonment, assault, battery, mental anguish, emotional distress, invasion of privacy of any person, or damage to or destruction of any tangible or intangible property including loss of use thereof, whether or not such property is physically injured;

    b. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

        i. any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of which this **Policy** is a renewal or replacement or which it succeeds in time; or

        ii. any other **Wrongful Act**, whenever occurring, which together with a **Wrongful Act** which has been the subject of such prior notice, would constitute **Interrelated Wrongful Acts**;

    c. Alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

        i. the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or

        ii. any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so;

provided, however, this exclusion shall not apply to any **Claim** brought directly, derivatively or otherwise by one or more securities holders of the **Company** in their capacity as such.

For purposes of this exclusion, **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous, biological, bacterial or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials (including materials to be reconditioned, recycled or reclaimed). **Pollutants** shall also mean any other air emission or particulate, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field;

    d. for any actual or alleged violation of the responsibilities, obligations or duties imposed by Employee Retirement Income Security Act of 1974, as amended, or any rules or regulations promulgated thereunder, or similar provisions of any federal, state or local statutory or common law;

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 33 of 112

e. brought or maintained by, on behalf of, in the right of, or at the direction of any **Insured** in any capacity, any **Outside Entity** or any person or entity that is an owner of or joint venture participant in any **Subsidiary** in any respect and whether or not collusive, unless such **Claim**:

    i. is brought derivatively by a securities holder of the **Parent Company** and is instigated and continued totally independent of, and totally without the solicitation, assistance, active participation of, or intervention of, any **Insured**;

    ii. is brought or maintained by any **Insured** in the form of a cross-claim, third-party claim or other proceeding for contribution or indemnity which is part of, and directly results from a **Claim** that is covered by this Coverage Section;

    iii. is brought or maintained by an employee of the **Company** who is not or was not a director or officer of the **Company**;

    iv. is brought or maintained by any former director or officer of the **Company** solely in their capacity as a securities holder of the **Company** and where such **Claim** is solely based upon and arising out of **Wrongful Acts** committed subsequent to the date such director or officer ceased to be a director or officer of the **Company** and where such **Claim** is first made two (2) years subsequent to the date such director or officer ceased to be a director or officer of the **Company**; or

    v. is brought or maintained by any bankruptcy trustee or bankruptcy appointed representative of the **Company**;

f. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    i. any dishonest, deliberately fraudulent or criminal act of an **Insured**; provided, however this exclusion f.i. shall not apply unless and until there is a final judgment against such **Insured** as to such conduct; or

    ii. the gaining of any profit, remuneration or financial advantage to which any **Directors and Officers** were not legally entitled; provided, however this exclusion f.ii. shall not apply unless and until there is a final judgment against such **Directors and Officers** as to such conduct.

    When f.i. or ii. apply, the **Insured** shall reimburse the **Insurer** for any **Costs, Charges or Expenses**;

g. for the return by any of the **Directors and Officers** of any remuneration paid to them without the previous approval of the appropriate governing body of the **Company** or **Outside Entity**, which payment without such previous approval shall be held to be in violation of law;

h. against any of the **Directors and Officers** of any **Subsidiary** or against any **Subsidiary** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed or attempted by a **Subsidiary** or **Directors and Officers** thereof:

    i. before the date such entity became a **Subsidiary** or after the date such entity ceased to be a **Subsidiary**; or

    ii. occurring while such entity was a **Subsidiary** which, together with a **Wrongful Act** occurring before the date such entity became a **Subsidiary**, would constitute **Interrelated Wrongful Acts**;

i. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed subsequent to a **Takeover**;

j. for a **Wrongful Act** actually or allegedly committed or attempted by any of the **Directors and Officers** in his or her capacity as a director, officer, trustee, manager, member of the board of managers or equivalent executive of a limited liability company or employee of, or independent contractor for or in any other capacity or position with any entity other than the **Company**; provided,

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 34 of 112

however, that this exclusion shall not apply to **Loss** resulting from any such **Claim** to the extent that:

   i. such **Claim** is based on the service of any of the **Directors and Officers** as a director, officer, trustee, governor, executive director or similar position of any **Outside Entity** where such service is with the knowledge and consent of the **Company**; and

   ii. such **Outside Entity** is not permitted or required by law to provide indemnification to such **Directors and Officers**; and

   iii. such **Loss** is not covered by insurance provided by any of the **Outside Entity's** insurer(s);

k. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

   i. any prior or pending litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry filed or pending on or before the **Continuity Date**; or

   ii. any fact, circumstance, situation, transaction or event underlying or alleged in such litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry;

l. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any **Wrongful Act**, fact, circumstance or situation which any of the **Insureds** had knowledge of prior to the **Continuity Date** where such **Insureds** had reason to believe at the time that such known **Wrongful Act** could reasonably be expected to give rise to such **Claim**;

m. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any employment or employment-related matters brought by or on behalf of or on the right of an applicant for employment with the **Company,** or any of the **Directors and Officers**, including any voluntary, seasonal, temporary, leased or independently-contracted employee of the **Company**;

n. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

   i. any initial public offering of securities undertaken and consummated by the **Company**, including all activities in connection therewith;

   ii. the actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, any rules or regulations of the Securities Exchange Commission adopted thereunder, any federal, state or provincial statute or common law regulating securities similar to the foregoing, including any amendments thereto, any rules or regulations adopted pursuant thereto in connection with any **Wrongful Act** actually or allegedly committed subsequent to the consummation of an initial public offering of securities of the **Company**; or

   iii. any equity or debt offering, solicitation, sale, distribution or issuance of securities of the **Company** in excess of $50 million where such issuance takes place during the **Policy Period** and is exempt from the registration requirements of the Securities and Exchange Commission pursuant to Section 3.b. of the Securities Act of 1933 and rules and regulations promulgated thereunder, or any activities or transactions dealing in any way with such issuance of securities of the **Company**; provided, however, this exclusion shall not apply if the **Insurer** agrees in writing to extend coverage for **Wrongful Acts** in connection with such issuance of securities and the **Insureds** have paid the premium required by the **Insurer** for such coverage extension; or

o. for that portion of **Loss** which is covered under any other Coverage Section of this **Policy**.

2. Exclusions Applicable Only to Insuring Clause A.3.

Case: 18-50398    Doc# 143    Filed: 08/03/18    Entered: 08/03/18 14:56:33    Page 35 of 112

34

**Insurer** shall not be liable for **Loss** on account of any **Claim**:

    a. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the actual or alleged breach of any contract or agreement; except and to the extent the **Company** would have been liable in the absence of such contract or agreement; or

    b. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

        i. any actual or alleged infringement, misappropriation, or violation of copyright, patent, service marks, trademarks, trade secrets, title or other proprietary or licensing rights or intellectual property of any products, technologies or services; or

        ii. any goods or products manufactured, produced, processed, packaged, sold, marketed, distributed, advertised or developed by the **Company**.

Provided, however, the exclusions in 2.a. and 2.b. above shall not apply to any such **Claim** brought or maintained, directly or indirectly, by one or more securities holders of the **Company** in their capacity as such.

No **Wrongful Act** of one or more **Insureds** shall be imputed to any other **Insureds** for the purpose of determining the applicability of any of the above exclusions.

D. **LIMIT OF LIABILITY AND RETENTIONS**

    1. The liability of the **Insurer** shall apply only to that part of **Loss** which is excess of the Retention amounts applicable to this Coverage Section, as shown in Item 3. of the Declarations. Such Retentions shall be borne uninsured by the **Insureds** and at their own risk. If different parts of a single **Claim** are subject to different applicable Retentions under this Coverage Section, the applicable Retentions will be applied separately to each part of such **Loss**, but the sum of such Retentions shall not exceed the largest applicable Retention.

    2. As shown in Item 3. of the Declarations relating to this Coverage Section, the following Limits of Liability of the **Insurer** shall apply:

        a. The amount set forth in Item 3.1.a. relating to this Coverage Section shall be the aggregate limit of liability for the payment of **Loss** under all Insuring Clauses for this Coverage Section, subject to additional payments for **Loss** under Insuring Clause A.1. as further described in subsection b. immediately below.

        b. The amount set forth in Item 3.1.b. relating to this Coverage Section shall be an aggregate limit of liability for the payment of **Loss** under Insuring Clause A.1. in addition to the limit described in subsection a. immediately above; provided, all payments for **Loss** under the additional limits described in this subsection b. shall be excess of the limit described in subsection a. above, and excess of any other available insurance that is specifically excess to this **Policy**. Such excess insurance must be completely and fully exhausted through the payment of loss, including but not limited to defense costs thereunder, before the **Insurer** shall have any obligations to make any payments under the additional limits described in this subsection b.

        c. The amount set forth in Item 3.1.c. of the Declarations relating to this Coverage Section shall be the maximum aggregate limit of liability for the payment of **Loss** under all Insuring Clauses for this Coverage Section. The Limit of Liability set forth in Items 3.1.a. and 3.1.b. relating to this Coverage Section shall be a part of and not in addition to the maximum aggregate limit of liability set forth in Item 3.1.c. for this Coverage Section.

    3. All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the following times, regardless of whether such date is before or during the **Policy Period**:

        a. the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Act**

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 36 of 112

is first made; or

    b.  the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Section E.2. below.

4.  The Retention applicable to Insuring Clause 2. shall apply to **Loss** resulting from any **Claim** if indemnification for the **Claim** by the **Company** is required or permitted by applicable law, to the fullest extent so required or permitted, regardless of whether or not such actual indemnification by the **Company** is made, except and to the extent such indemnification is not made by the **Company** solely by reason of the **Company's** financial insolvency.

5.  Payments of **Loss** by **Insurer** shall reduce the Limit(s) of Liability under this Coverage Section. **Costs, Charges and Expenses** are part of, and not in addition to, the Limits of Liability and payment of **Costs, Charges and Expenses** reduce the Limits of Liability. If such Limit(s) of Liability are exhausted by payment of **Loss**, the obligations of the **Insurer** under this Coverage Section are completely fulfilled and extinguished.

E.  **NOTIFICATION**

1.  The **Insureds** shall, as a condition precedent to their rights to payment under this Coverage Section only, give **Insurer** written notice of any **Claim** as soon as practicable, but in no event later than sixty (60) days after the end of the **Policy Period**. If any **Claim** is first made against the **Insureds** during the **Extended Period**, if purchased, written notice to **Insurer** must be given as soon as practicable, but in no event later than sixty (60) days after the end of the **Extended Period.**

2.  If, during the **Policy Period** or the **Discovery Period**, if purchased, any of the **Insureds** first becomes aware of a specific **Wrongful Act** which may reasonably give rise to a future **Claim** covered under this **Policy,** and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

    a.  a description of the **Wrongful Act** allegations anticipated;

    b.  the identity of the potential claimants;

    c.  the circumstances by which the **Insureds** first became aware of the **Wrongful Act**;

    d.  the identity of the **Insureds** allegedly involved;

    e.  the consequences which have resulted or may result; and

    f.  the nature of the potential monetary damages and non-monetary relief;

then any **Claim** made subsequently arising out of such **Wrongful Act** shall be deemed for the purposes of this Coverage Section to have been made at the time such notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim**.

3.  Notice to **Insurer** shall be given to the address shown under Item 8. of the Declarations for this **Policy**.

F.  **SETTLEMENT AND DEFENSE**

1.  It shall be the duty of the **Insurer** and not the duty of the **Insureds** to defend any **Claim**. Such duty shall exist even if any of the allegations are groundless, false or fraudulent. The **Insurer's** duty to defend any **Claim** shall cease when the Limits of Liability have been exhausted by the payment of **Loss** including **Costs, Charges and Expenses.**

2.  The **Insurer** may make any investigation it deems necessary, and shall have the right to settle any **Claim**; provided, however, no settlement shall be made without the consent of the **Parent Company**, such consent not to be unreasonably withheld.

3.  The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Costs, Charges and Expenses** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld. The **Insurer** shall not be

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 37 of 112

liable for any settlement, **Costs, Charges and Expenses**, assumed obligation or admission to which it has not consented. The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(s).

4. The **Insureds** agree to provide the **Insurer** with all information, assistance and cooperation which the **Insurer** reasonably requests and agree that, in the event of a **Claim**, the **Insureds** will do nothing that shall prejudice the position of the **Insurer** or its potential or actual rights of recovery.

G. **OTHER INSURANCE**

If any **Loss** covered under this Coverage Section is covered under any other valid and collectible insurance, then this **Policy** shall cover the **Loss**, subject to its terms and conditions, only to the extent that the amount of the **Loss** is in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limit of Liability for this Coverage Section.

H. **PAYMENT PRIORITY**

1. If the amount of any **Loss** which is otherwise due and owing by the **Insurer** exceeds the then remaining Limit of Liability applicable to the **Loss**, the **Insurer** shall pay the **Loss**, subject to such Limit of Liability, in the following priority:

   a. First, the **Insurer** shall pay any **Loss** covered under Insuring Clause A.1. in excess of any applicable Retention shown in Item 3. of the Declarations; and

   b. Second, only if and to the extent the payment under subsection 1. above does not exhaust the applicable Limit of Liability, the **Insurer** shall pay any **Loss** in excess of the Retention shown in Item 3. of the Declarations covered under any other applicable Insuring Clause.

   c. Subject to the foregoing subsection, the **Insurer** shall, upon receipt of a written request from the Chief Executive Officer of the **Parent Company**, delay any payment of **Loss** otherwise due and owing to or on behalf of the **Company** until such time as the Chief Executive Officer of the **Parent Company** designates, provided the liability of the **Insurer** with respect to any such delayed **Loss** payment shall not be increased, and shall not include any interest, on account of such delay.

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 38 of 112

| SCOTTSDALE INSURANCE COMPANY® | ENDORSEMENT NO. 1 |

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**ADDITIONAL NAMED INSUREDS WITH CONTINUITY DATE**

Item 1., **Parent Company**, of the Declarations page is amended to include the following:

TechShop Pittsburgh, LLC

With respect to the coverage solely extended by this endorsement, the **Continuity Date** set forth in Item 3. of the **Declarations** for the Employment Practices Coverage and Directors and Officers Coverage Section is amended to read as follows:

   3.  **Continuity Date:** 11/5/2012

All other terms and conditions of this **Policy** remain unchanged.

| SCOTTSDALE INSURANCE COMPANY® | ENDORSEMENT NO. 2 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### ALLOCATION PROVISION

This endorsement modifies insurance provided under the following:

### GENERAL TERMS AND CONDITIONS

The following Section O., **ALLOCATION**, is added to the General Terms and Conditions Section.

O. **ALLOCATION**

1. In the event the **Insurer** has the duty to defend a **Claim** under any Coverage Section in which both **Loss** that is covered by the applicable Coverage Section and loss which is not covered by the applicable Coverage Section is incurred, either because such **Claim** includes both covered and uncovered matters or because such **Claim** is made against both covered and uncovered parties, then:

    a. this **Policy** shall pay one hundred percent (100%) of **Costs, Charges and Expenses** incurred by such **Insured** on account of such **Claim**; and

    b. there shall be a fair and equitable allocation of any remaining loss incurred by such **Insured** on account of such **Claim** between covered **Loss** and uncovered loss based upon the relative legal and financial exposures and the relative benefits obtained.

2. In the event the **Insured** has the duty to defend a **Claim** under any Coverage Section in which both **Loss** that is covered by the applicable Coverage Section and loss which is not covered by the applicable Coverage Section is incurred, either because such **Claim** includes both covered and uncovered matters or because such **Claim** is made against both covered and uncovered parties, then the **Insured** and the **Insurer** shall use their best efforts to determine a fair and proper allocation as between such insured and uninsured loss, taking into account the relative legal and financial exposures and the relative benefits obtained.

All other terms and conditions of this **Policy** remain unchanged.

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 40 of 112

39

# SCOTTSDALE INSURANCE COMPANY®

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND DISCOVERY ELECTION-90 DAYS

This endorsement modifies insurance provided under the following:

### GENERAL TERMS AND CONDITIONS

Section H., **DISCOVERY PERIOD**, subsection 2., is replaced by:

2. As a condition precedent to the right to purchase the **Discovery Period** set forth in subsection H.1. above, the total premium for the **Policy** must have been paid. Such right to purchase the **Discovery Period** shall terminate unless written notice, together with full payment of the premium for the **Discovery Period**, is received by **Insurer** within ninety (90) days after the effective date of cancellation, or, in the event of a refusal to renew, within ninety (90) days after the **Policy** expiration date. If such notice and premium payment is not so given to **Insurer**, there shall be no right to purchase the **Discovery Period**.

All other terms and conditions of this **Policy** remain unchanged.

Case: 18-50398    Doc# 143    Filed: 08/03/18    Entered: 08/03/18 14:56:33    Page 41 of 112

40

| SCOTTSDALE INSURANCE COMPANY® | | | ENDORSEMENT NO. 4 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND NOTICE OF CIRCUMSTANCES

This endorsement modifies insurance provided under the following:

### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

Section **E. NOTIFICATION**, subsection **2.** is replaced by:

2. If during the **Policy Period** or the **Discovery Period**, if purchased, any of the **Insureds** first become aware of specific facts or circumstances which may reasonably give rise to a future **Claim** covered under this **Policy**, and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

   a. a description of the facts, circumstances, or allegations anticipated;

   b. the identity of potential claimants;

   c. the circumstances by which the **Insureds** first became aware of the facts or circumstances;

   d. the identity of the **Insureds** allegedly involved;

   e. the consequences which have resulted or may result; and

   f. the nature of the potential monetary damages and non-monetary relief;

then any **Claim** made subsequently arising out of such facts or circumstances shall be deemed for the purposes of this Coverage Section to have been made at the time such notices was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such facts or circumstances results in a **Claim**.

**All other terms and conditions of this Policy remain unchanged.**

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 42 of 112

| SCOTTSDALE INSURANCE COMPANY® | | | ENDORSEMENT NO. 5 |
|---|---|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND NOTICE OF CIRCUMSTANCES

This endorsement modifies insurance provided under the following:

### EMPLOYMENT PRACTICES COVERAGE SECTION

Section **E. NOTIFICATION**, subsection **2.** is replaced by:

2. If during the **Policy Period** or the **Discovery Period**, if purchased, any of the **Insureds** first become aware of specific facts or circumstances which may reasonably give rise to a future **Claim** covered under this **Policy** and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

    a. a description of the facts, circumstances, or allegations anticipated;

    b. the identity of the potential claimants;

    c. the circumstances by which the **Insureds** first became aware of the facts or circumstances;

    d. the identity of the **Insureds** allegedly involved;

    e. the consequences which have resulted or may result; and

    f. the nature of the potential monetary damages and non-monetary relief;

then any **Claim** made subsequently arising out of such facts or circumstances shall be deemed for the purposes of this Coverage Section to have been made at the time such notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such facts or circumstances results in a **Claim**.

**All other terms and conditions of this Policy remain unchanged.**

| | SCOTTSDALE INSURANCE COMPANY® | ENDORSEMENT NO. 6 |
|---|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND NOTICE PROVISION - D&O**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section E. **NOTIFICATION**, subsection 1.:

A **Claim** shall be deemed to have been first made against the **Insureds** on the date an **Insured** who is an executive officer, director or general counsel becomes aware of such **Claim**.

All other terms and conditions of this **Policy** remain unchanged.

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 44 of 112

43

| | | **ENDORSEMENT** |
|---|---|---|
| | SCOTTSDALE INSURANCE COMPANY ® | **NO. 7** |

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND NOTICE PROVISION - EPL

This endorsement modifies insurance provided under the following:

### EMPLOYMENT PRACTICES COVERAGE SECTION

The following is added to Section E. **NOTIFICATION**, subsection 1.:

A **Claim** shall be deemed to have been first made against the **Insureds** on the date an **Insured** who is an executive officer, director or general counsel becomes aware of such **Claim**.

All other terms and conditions of this **Policy** remain unchanged.

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND NOTICE PROVISION 60 DAYS - EPL

This endorsement modifies insurance provided under the following:

### EMPLOYMENT PRACTICES COVERAGE SECTION

Section E., **NOTIFICATION**, subsection 1. is replaced by:

The **Insureds** shall, as a condition precedent to their rights to payment under this Coverage Section only, give **Insurer** written notice of any **Claim** as soon as practicable, but in no event later than sixty (60) days after the end of the **Policy Period**. If any **Claim** is first made against the **Insureds** during the **Extended Period**, if purchased, written notice to **Insurer** must be given as soon as practicable, but in no event later than sixty (60) days after the end of the **Extended Period**.

All other terms and conditions of this **Policy** remain unchanged.

Case: 18-50398    Doc# 143    Filed: 08/03/18    Entered: 08/03/18 14:56:33    Page 46 of 112

45

| | | | | ENDORSEMENT |
|---|---|---|---|---|

**SCOTTSDALE INSURANCE COMPANY®**

**ENDORSEMENT NO. 9**

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND OTHER INSURANCE - EPL**

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES COVERAGE SECTION**

Section G., **OTHER INSURANCE**, is replaced by:

G.  **OTHER INSURANCE**

For any **Employment Practices Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be primary insurance.

All other terms and conditions of this **Policy** remain unchanged.

# SCOTTSDALE INSURANCE COMPANY ®

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND OTHER INSURANCE TO BE PRIMARY - D&O

This endorsement modifies insurance provided under the following:

### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

Section G., **OTHER INSURANCE**, is replaced by:

G. **OTHER INSURANCE**

For any **Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be primary insurance, unless expressly written to be excess over other applicable insurance.

All other terms and conditions of this **Policy** remain unchanged.

Case: 18-50398    Doc# 143    Filed: 08/03/18    Entered: 08/03/18 14:56:33    Page 48 of 112

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND OUTSIDE SERVICES EXCLUSION

This endorsement modifies insurance provided under the following:

### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

Section C., **EXCLUSIONS**, subsection 1., paragraph j., subparagraph ii. is replaced by:

ii. such **Outside Entity** is not permitted or required by law to provide indemnification to such **Directors and Officers**, or is unable to indemnify such **Directors and Officers** as a result of **Financial Impairment**; and

For the purposes of this endorsement **Financial Impairment** means the status of the **Outside Entity** resulting from (1) the appointment by any state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the **Outside Entity**, or (2) in the event a bankruptcy proceeding shall be instituted by or against the **Outside Entity**, the **Outside Entity** becoming a debtor-in-possession.

All other terms and conditions of this **Policy** remain unchanged.

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND POLLUTION EXCLUSION - SIDE A

This endorsement modifies insurance provided under the following:

### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

It is agreed that Section C., **EXCLUSIONS**, subsection 1.c., is deleted in its entirety and replaced by the following:

c.  Alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

  i.  the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or

  ii.  any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so;

provided, however, this exclusion shall not apply to:

  - **Loss** of the **Directors and Officers** for which the **Directors and Officers** are not indemnified by the **Company**; or

  - any **Claim** brought directly, derivatively or otherwise by one or more securities holders of the **Company** in their capacity as such.

For purposes of this exclusion, **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous, biological, bacterial or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials (including materials to be reconditioned, recycled or reclaimed). **Pollutants** shall also mean any other air emission or particulate, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or by-products produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field.

All other terms and conditions of this **Policy** remain unchanged.

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 50 of 112

49

| SCOTTSDALE INSURANCE COMPANY® | ENDORSEMENT NO. 13 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND SUBROGATION PROVISION - FINAL JUDGMENT

This endorsement modifies insurance provided under the following:

### GENERAL TERMS AND CONDITIONS

Section L., **ASSISTANCE, COOPERATION AND SUBROGATION**, is deleted in its entirety and replaced by the following:

L. **ASSISTANCE, COOPERATION AND SUBROGATION**

The **Insureds** agree to provide **Insurer** with such information, assistance and cooperation as **Insurer** reasonably may request, and they further agree that they shall not take any action which in any way increases **Insurer's** exposure under this **Policy**. In the event of any payments under this **Policy, Insurer** shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery against any person or entity. The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as are necessary to enable **Insurer** effectively to bring suit or otherwise pursue subrogation in the name of the **Insureds**, and shall provide all other assistance and cooperation which **Insurer** may reasonably require. In no event, however, shall the **Insurer** exercise its right of subrogation against an **Insured** under this **Policy** unless such **Insured** has been convicted of a deliberate criminal act; or has committed a deliberate fraudulent act, if a final judgment establishes that such deliberate fraudulent act was committed; or has obtained any profit or advantage to which a final judgment establishes the **Insured** was not legally entitled.

All other terms and conditions of this **Policy** remain unchanged.

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 51 of 112

| | | | ENDORSEMENT |
|---|---|---|---|
| SCOTTSDALE INSURANCE COMPANY® | | | NO. 14 |

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND THIRD PARTY**

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES COVERAGE SECTION**

Section **B. DEFINITIONS**, subsection **12**, is replaced by:

12. **Third Party** means any customer, client, or other group or natural person other than an **Employee** or applicant for employment with the **Company**.

**All other terms and conditions of this Policy remain unchanged.**

Case: 18-50398    Doc# 143    Filed: 08/03/18    Entered: 08/03/18 14:56:33    Page 52 of 112

# SCOTTSDALE INSURANCE COMPANY®

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND WARRANTY PROVISION NON-RESCINDABLE COVERAGE

This endorsement modifies insurance provided under the following:

### GENERAL TERMS AND CONDITIONS

Section D., **WARRANTY**, subsection 2. is replaced by:

2. In the event the **Application**, including materials submitted or required to be submitted therewith, contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by the **Insurer** under this **Policy**, this **Policy**, including each and all Coverage Sections, shall not afford coverage to the following **Insureds** for any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any untruthful or inaccurate statements, representations or information:

   a. any **Insured** who is a natural person and who knew the facts misrepresented or the omissions, whether or not such individual knew of the **Application**, such materials, or this **Policy**;

   b. any **Company** or **Sponsor Company** to the extent it indemnifies any **Insured** referred to in subsection a. above; and

   c. any **Company**, **Sponsor Company**, **Plan**, **Employee Benefit Plan**, or any other entity that is an **Insured**, if any past or present chief executive officer, chief financial officer, general counsel, risk manager or human resources director (or equivalent positions) of the **Parent Company** knew the facts misrepresented or the omissions, whether or not such individual knew of the **Application**, such materials, or this **Policy**.

With respect to any statement, representation or information contained in the **Application**, or in the materials submitted or required to be submitted therewith, and solely with respect to the above exclusion, no knowledge possessed by any **Insured** who is a natural person shall be imputed to any other **Insured** who is a natural person.

The following condition is added:

### NON-RESCINDABLE

The **Insurer** shall not be entitled under any circumstances to rescind any Coverage Section of the **Policy** with respect to any **Insured**. Nothing contained in this section shall limit or waive any other rights or remedies available to the **Insurer**.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms and conditions of this **Policy** remain unchanged.

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 53 of
112

52

# SCOTTSDALE INSURANCE COMPANY ®

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMENDATORY ENDORSEMENT - CALIFORNIA**

Whenever the term AUTHORIZED REPRESENTATIVE appears beneath a signature line in this policy, it is removed and replaced by the term COUNTERSIGNATURE.

For example:

_____          _____

DATE                                              AUTHORIZED REPRESENTATIVE

is replaced by:

_____          _____

DATE                                              COUNTERSIGNATURE

Case: 18-50398    Doc# 143    Filed: 08/03/18    Entered: 08/03/18 14:56:33    Page 54 of
112

53

| SCOTTSDALE INSURANCE COMPANY® | ENDORSEMENT NO. 17 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMENDED DEFINITION OF DIRECTORS & OFFICERS - LEASED / CONTRACTED EMPLOYEES**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section **B. DEFINITIONS**, subsection **4.**:

**Directors and/or Officers** means any person who was, now is, or shall become:

any natural person who is a leased employee or is contracted to perform work for the **Company**, or is an independent contractor for the **Company**, but only to the extent such individual performs work or services for or on behalf of the **Company**.

**All other terms and conditions of this Policy remain unchanged.**

| SCOTTSDALE INSURANCE COMPANY® | ENDORSEMENT NO. 18 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMENDED INSURED VERSUS INSURED EXCLUSION**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Section C., **EXCLUSIONS**, subsection 1., paragraph e., subparagraph iii. is replaced by:

iii. is brought or maintained by an employee of the **Company** who is not or was not a director or officer of the **Company**, including any such **Claim** brought or maintained under the Federal False Claims Act or any similar federal, state, local or foreign "whistleblower" law or "whistle-blower" provision of any law.

All other terms and conditions of this **Policy** remain unchanged.

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 56 of 112

**SCOTTSDALE INSURANCE COMPANY®**

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMENDED INSURED VERSUS INSURED EXCLUSION - FOREIGN JURISDICTION

This endorsement modifies insurance provided under the following:

### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

Section C., **EXCLUSIONS**, subsection 1. is amended by adding the following to paragraph e.:

is brought or maintained in a jurisdiction outside the United States of America, Canada or Australia by any **Insured** of the **Company** solely where such **Company** is domiciled or chartered in such foreign jurisdiction;

All other terms and conditions of this **Policy** remain unchanged.

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 57 of 112

**SCOTTSDALE INSURANCE COMPANY®**

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMENDED INSURED VERSUS INSURED EXCLUSION WITH CREDITOR COMMITTEE CARVEBACK**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Section C., **EXCLUSIONS**, subsection 1., paragraph e., subparagraph v. is deleted in its entirety and replaced by the following:

   v.  is brought or maintained by or on behalf of a bankruptcy or insolvency receiver, trustee, examiner, conservator, liquidator or rehabilitator for, or creditors' committee of, the **Company**, or any assignee thereof;

All other terms and conditions of this **Policy** remain unchanged.

## SCOTTSDALE INSURANCE COMPANY®

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**COST OF INVESTIGATIONS COVERAGE**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

It is agreed that:

The following is added to Section B., **DEFINITIONS**:

**Cost of Investigation** means reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in investigating a written demand, by one or more of the securities holders of the **Company** upon the board of directors, the management board of the **Company** or the **Company**, to bring a civil proceeding, including any derivative action, against any of the **Directors and Officers** on behalf of the **Company**.

Section B., **DEFINITIONS**, subsection 1., paragraph b. is deleted in its entirety and is replaced by:

b. a written demand, by one or more of the securities holders of the **Company** upon the board of directors, the management board of the **Company** or the **Company**, to bring a civil proceeding, including any derivative action, against any of the **Directors and Officers** on behalf of the **Company**;

Section B., **DEFINITIONS**, subsection 3., paragraph b. is deleted in its entirety and is replaced by:

b. **Cost of Investigation**.

All other terms and conditions of this **Policy** remain unchanged.

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 59 of 112

58

SCOTTSDALE INSURANCE COMPANY®

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**DELETE PARAGRAPH III. FROM EXCLUSION N.**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

It is agreed that Section C., **EXCLUSIONS**, subsection 1., paragraph n. iii. is deleted in its entirety.

All other terms and conditions of this **Policy** remain unchanged.

Case: 18-50398    Doc# 143    Filed: 08/03/18    Entered: 08/03/18 14:56:33    Page 60 of 112

| | | | ENDORSEMENT |
|---|---|---|---|
| **SCOTTSDALE INSURANCE COMPANY**® | | | NO. 23 |

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### EMPLOYED LAWYERS EXTENSION

This endorsement modifies insurance provided under the following:

### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

The following is added to Section B.4.:

**Employed Lawyers** of the **Company**

The following definition is added to Section **B.**:

**Employed Lawyers** means:

employees of the **Company** who:

1. are admitted to practice law in one or more jurisdictions in the United States of America; and

2. are employed within the **Company's** office of the general counsel or its functional equivalent; and

3. acting solely in the capacity of providing professional legal services to the **Company**.

An individual shall not be deemed to be an **Employed Lawyer** to the extent such individual renders or rendered professional legal services to persons or entities other than the **Insureds**.

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**EMPLOYEE PRIVACY COVERAGE WITH SUB-LIMIT**

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES COVERAGE SECTION**

It is agreed that the Employment Practices Coverage Section is amended as follows:

1. Section A., **INSURING CLAUSES**, is amended by adding the following:

   **Employee Privacy** Insuring Clause

   **Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of an **Employee Privacy Claim** first made against the **Insureds** during the **Policy Period** and reported to the **Insurer** pursuant to subsection E.1. herein, for a **Privacy Wrongful Act** taking place prior to the end of the **Policy Period**.

   **Cost of Employee Notification** Insuring Clause

   **Insurer** shall pay the **Cost of Employee Notification** of the **Insureds** resulting from an **Employee Personal Information Breach** first discovered during the **Policy Period** and reported to the **Insurer** pursuant to subsection E.4. added below.

2. Section B., **DEFINITIONS**, subsection 1. is amended by adding the following:

   **Employee Privacy Claim**

3. Section B., **DEFINITIONS**, subsection 10. is amended by adding the following:

   ◦ **Loss** also includes **Cost of Employee Notification**

4. Section B., **DEFINITIONS**, subsection 15. is amended by adding the following:

   **Privacy Wrongful Act**.

5. Section B., **DEFINITIONS**, is amended by adding the following:

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 62 of 112

61

**Cost of Employee Notification** means:

    a. any reasonable and necessary cost or expense of the **Company** to notify any **Employee** of any **Employee Personal Information Breach** as required under any **Privacy Act**; and

    b. the cost to notify and monitor the credit reports of any **Employee** who has been the subject of an **Employee Personal Information Breach** for the length of time as set forth under any **Privacy Act**.

**Employee Personal Information** means any personal information not available to the general public of any **Employee** where such non-public personal information can be used to identify such natural person and where such non-public information is solely in the custody, care or control of the **Company** or another entity at the direction and consent of the **Company**. Such **Personal Information** shall include, but not be limited to a natural person's name, address, telephone number, date of birth, social security number, account number, history of account transactions, account balance, account relationships, credit card number, medical records, medical history and any other non-public personal information as set forth in any **Privacy Act**.

**Employee Personal Information Breach** means:

    a. the unauthorized acquisition, access, use, physical taking, identity theft, mysterious disappearance, release, distribution or disclosure of **Employee Personal Information** which compromises the security or privacy of such **Employee Personal Information**, including, but not limited to:

        i. the unauthorized and fraudulent taking of **Employee Personal Information** by reason of a breach or failure of any hardware, software, or firmware the **Company** owns, leases or controls on premises or elsewhere or the similar technology of another entity that controls, maintains or stores **Employee Personal Information** at the direction and consent of the **Company**; or

        ii. the actual unauthorized taking of physical **Employee Personal Information** by any person, employee or entity.

**Employee Privacy Claim** means:

    a. a written demand against any **Insured** for monetary damages or non-monetary or injunctive relief;

    b. a civil proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading;

    c. an arbitration proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief;

    d. a civil, administrative or regulatory proceeding, or a formal governmental investigation against any **Insured** commenced by the filing of a notice of charges, investigative order or similar document; or

    e. a written request to toll or waive any statute of limitations

brought by or on behalf of an **Employee** in their capacity as such and solely alleging a **Privacy Wrongful Act**.

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 63 of 112

**Privacy Act** means any federal, state or local statutory or common law relating solely to **Employee Personal Information** or any rules or regulations promulgated thereunder, including, but not limited to The Financial Modernization Act of 1999 ("Gramm-Leach-Bliley Act"), the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and Section 1798 of the California Civil Code.

**Privacy Policy** means the internal or publicly accessible written documents that set forth the policies, standards and procedures of the **Company** for collection, use, disclosure, sharing, dissemination and correction or supplementation of, and access to, **Employee Personal Information**.

**Privacy Wrongful Act** means:

    a. the failure of the **Company** to timely disclose an incident or event triggering a violation of a **Privacy Act**; or

    b. failure by the **Insureds** to comply with that part of a **Privacy Policy** that specifically:

        i. prohibits or restricts the disclosure, sharing or selling of an **Employee's Personal Information**;

        ii. requires the **Company** to provide access to **Employee Personal Information** or to correct incomplete or inaccurate **Employee Personal Information** after a request is made by an **Employee**; or

        iii. mandates procedures and requirements to prevent the loss of **Employee Personal Information**.

6. Section E., **NOTIFICATION**, is amended by adding the following subsection:

    ◦ The **Insureds** shall, as a condition precedent to their rights to payment for the **Cost of Employee Notification** under this endorsement, give the **Insurer** written notice of any **Employee Personal Information Breach** as soon as practicable after the **Insured** discovers such **Employee Personal Information Breach**, but in no event later than sixty (60) days after such discovery. The **Insurer** will pay for the **Cost of Employee Notification** sustained by the **Insured** resulting from an **Employee Personal Information Breach** occurring at any time and discovered by the **Insured** during the **Policy Period**. Discovery of the **Employee Personal Information Breach** occurs when an officer, director, Insurance Manager or Risk Manager first becomes aware of facts which would cause a reasonable person to assume that an **Employee Personal Information Breach** covered by this Coverage Section has occurred, even though the exact amount or details of any **Cost of Employee Notification** may not then be known. Discovery also occurs when the **Insured** receives notice of an actual or a potential **Claim** against it alleging facts that, if true, would constitute a covered **Employee Privacy Claim** for a **Privacy Wrongful Act**.

7. The following Section is added to the Employment Practices Coverage Section:

    I. **DUTIES IN THE EVENT OF AN EMPLOYEE PERSONAL INFORMATION BREACH**

    After the **Insured** discovers an **Employee Personal Information Breach** or a situation that may result in an **Employee Personal Information Breach** that may be covered under this Endorsement, the **Insured** must:

        1. submit to an examination under oath at the **Insurers** request and give the **Insurer** a sworn statement

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 64 of 112

of the answers of the **Insured**;

2. provide the **Insurer** with a sworn proof of loss within forty-five (45) days after discovery which shall provide, at a minimum:

   a. the date and circumstances surrounding discovery, including the name(s) of the person(s) making the discovery;

   b. details of how the **Employee Personal Information Breach** occurred or will occur;

   c. the amount of actual loss known and an estimate of the total loss expected to result; and

   d. a description of all known sources of recovery to reduce the **Cost of Employee Notification**;

3. provide the **Insurer** with all information, assistance and cooperation as the **Insurer** may reasonably request in the investigation of the **Employee Personal Information Breach** and corresponding **Cost of Employee Notification**;

4. not incur any **Cost of Employee Notification** without the written consent of the **Insurer**; and

5. notify the police or other appropriate law enforcement authority(ies) if the **Insured** has reason to believe that the **Employee Personal Information Breach** involves a violation of law.

8. Notwithstanding, Section G., **OTHER INSURANCE**, If any coverage under this endorsement is also covered under any other valid and collectable insurance, then the coverage provided by this endorsement shall be specifically excess of, and will not contribute with, such other insurance, including but not limited to any such other insurance under which there is a duty to defend.

9. The maximum aggregate Limit of Liability as a result of coverage provided by this endorsement for all **Loss** as a result of all **Employee Privacy Claims** and **Cost of Employee Notification** shall be $10,000, which sum shall be part of and not in addition to the Limit of Liability identified in Item 3.1.a. of the Declarations relating to the Employment Practices Coverage Section, and Item 3.1.b., additional aggregate for **Costs, Charges and Expenses**, shall not be applicable to, nor available for, the coverage provided by this endorsement.

10. The Retention listed in Item 3.2.a. of the Declarations relating to the Employment Practices Coverage Section for **Employment Practices Claims** applies to each **Employee Privacy Claim** under this **Employee Privacy** Insuring Clause. The Retention amount applicable to the **Cost of Employee Notification** is an amount equal to twenty percent (20%) of the Retention listed in Item 3.2.a. of the Declarations relating to the Employment Practices Coverage Section for **Employment Practices Claims**. The Retention for the **Cost of Employee Notification** shall be applied only once for each discovery of an **Employee Personal Information Breach**.

All other terms and conditions of this **Policy** remain unchanged.

5/2/2017 — Page 4 of 4

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 65 of 112

64

| SCOTTSDALE INSURANCE COMPANY ® | | | | ENDORSEMENT NO. 25 |
|---|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | | AGENT NO. |
| EKS3217615 | 4/1/2017 | TechShop, Inc. | | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### EXCLUSION OF CERTIFIED ACTS OF TERRORISM

Any other provision of this **Policy** notwithstanding, this insurance does not cover **Loss**, damage, injury, expense, cost, liability or legal obligation directly or indirectly resulting from or arising out of or in any way related to a **"Certified Act Of Terrorism".**

The following definition is added:

**"Certified Act Of Terrorism"** means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a **"Certified Act Of Terrorism"** include the following:

   a. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

   b. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### EXTRADITION COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

The following is added to Section B., **DEFINITIONS**, subsection 1.:

**Claim** means:

◦ an official request for **Extradition** of any of the **Directors and Officers**; or the execution of a warrant for the arrest of any of the **Directors and Officers** where such execution is an element of **Extradition**.

The following is added to Section B., **DEFINITIONS**, subsection 3.:

**Costs, Charges and Expenses** means:

◦ reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** resulting from any of the **Directors and Officers** lawfully:

    i. opposing, challenging, resisting or defending against any request for or any effort to obtain the **Extradition** of any of such **Directors and Officers**; or

    ii. appealing any order or other grant of **Extradition** of any of such **Directors and Officers**.

The following is added to Section B., **DEFINITIONS**:

**Extradition** means any formal process by which any of the **Directors and Officers** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

All other terms and conditions of this **Policy** remain unchanged.

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 67 of 112

66

<table>
<tr><td colspan="2" rowspan="2">SCOTTSDALE INSURANCE COMPANY®</td><td colspan="3">ENDORSEMENT NO. 27</td></tr>
</table>

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | | AGENT NO. |
|---|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### IMMIGRATION CLAIM ENDORSEMENT

This endorsement modifies insurance provided under the following:

### EMPLOYMENT PRACTICES COVERAGE SECTION

I.  It is agreed that the Employment Practices Coverage Section is amended as follows:

The following is added to Section A., **INSURING CLAUSES:**

**Immigration Claim** Insuring Clause

**Insurer** shall pay the **Costs, Charges and Expenses** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of an **Immigration Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to subsection E.1. herein, for an **Immigration Wrongful Act** taking place prior to the end of the **Policy Period**.

The following is added to Section B., **DEFINITIONS**, subsection 1.:

**Immigration Claim**.

The following is added to Section B., **DEFINITIONS**, subsection 15.:

**Immigration Wrongful Act**.

The following is added to Section B., **DEFINITIONS**:

**Immigration Wrongful Act** means any actual or alleged violation(s) of the Immigration Control Act of 1986 or any other similar federal or state laws or regulations.

**Immigration Claim** means any criminal investigation of any of the **Insureds** by any governmental agency for actually or allegedly hiring or harboring illegal aliens.

The following is added to Section G., **OTHER INSURANCE**:

For any **Immigration Claim**, if any **Costs, Charges and Expenses** covered under this Coverage Section are covered under any other valid and collectable insurance, then this **Policy** shall be primary insurance.

II.  It is agreed that the DECLARATIONS is amended as follows:

The maximum aggregate Limit of Liability for all **Costs, Charges and Expenses** as a result of all **Immigration Claims** shall be $100,000, which sum shall be part of and not in addition to the Limit of Liability identified in Item 3.1.a. of the Declarations relating to the Employment Practices Coverage Section, and the Limit of Liability identified in Item 3.1.b. of the Declarations relating to the Employment Practices Coverage Section, additional aggregate for **Costs, Charges and Expenses**, shall not be applicable to or

Case: 18-50398    Doc# 143    Filed: 08/03/18    Entered: 08/03/18 14:56:33    Page 68 of 112

67

available for any **Immigration Claim**.

The following is added to Item 3., Employment Practices Coverage Section, section 2., **Retention**, of the Declarations:

$50,000 each **Immigration Claim**

All other terms and conditions of this **Policy** remain unchanged.

<table>
<tr><td rowspan="2">SCOTTSDALE INSURANCE COMPANY®</td><td>ENDORSEMENT NO. 28</td></tr>
</table>

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### PPACA CIVIL MONEY PENALTIES EXTENSION

This endorsement modifies insurance provided under the following:

### FIDUCIARY COVERAGE SECTION

It is agreed that the Fiduciary Coverage Section is amended as follows

1. Section B., **DEFINITIONS**, subsection 10.a. is deleted and replaced by the following:

   a. taxes, fines or penalties, other than civil money penalties imposed upon **Insureds** for a **PPACA Violation**;

2. Section B., **DEFINITIONS**, is amended to include the following:

   ◦ **PPACA Violation** means an inadvertent violation of the Patient Protection and Affordable Care Act, as amended (PPACA), and any rules or regulations promulgated thereunder.

3. Section D., **LIMIT OF LIABILITY AND RETENTION**, subsection 2. is amended to include the following:

   ▪ The amount set forth in Item 3.1. relating to this coverage section shall be amended to include the below listed sub-limit amounts. Such sub-limit amounts shall be a part of and not in addition to the limit of liability set forth in Item 3.1.of the Declarations.

   $50,000 sub-limit aggregate for all **PPACA Violation Loss**

4. No Retention shall apply to a **PPACA Violation Loss**.

All other terms and conditions of this **Policy** remain unchanged.

EKS-1562 (0614)

| SCOTTSDALE INSURANCE COMPANY® | ENDORSEMENT NO. 29 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### REMOVAL OF ALTERNATIVE DISPUTE RESOLUTION PROVISION

This endorsement modifies insurance provided under the following:

### GENERAL TERMS AND CONDITIONS

Section **J. ALTERNATIVE DISPUTE RESOLUTION** is deleted in its entirety.

**All other terms and conditions of this Policy remain unchanged.**

|  | SCOTTSDALE INSURANCE COMPANY® | ENDORSEMENT NO. 30 |
| --- | --- | --- |

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| --- | --- | --- | --- |
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### SCIENTIFIC AND ADVISORY BOARD EXTENSION

This endorsement modifies insurance provided under the following:

### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

The following is added to Section **B. DEFINITIONS**, subsection **4.**:

**Directors and/or Officers** means any person who was, now is, or shall become:

a natural person member of the Scientific or Advisory Board of the **Company** (collectively "**Advisory Board Members**") that is indemnified by the **Company** pursuant to a written indemnification agreement. The **Company** agrees to indemnify the **Advisory Board Members** to the fullest extent permitted by law, taking all steps necessary or advisable in furtherance thereof, including the making in good faith of any application for court approval, the passing of any resolution by the board of directors or shareholders of the **Company**, the amendment of any charter, bylaws, operating agreement or similar documents of the **Company** or the execution of any contract. The **Company** further agrees to advance **Costs, Charges and Expenses** actually and reasonably incurred by any **Advisory Board Member** in defending any threatened, pending or contemplated action, suit or proceeding prior to a final disposition of any such action, suit or proceeding and shall not require any determination or adjudication, interim or final, of the entitlement of the **Advisory Board Member** to indemnification, where permitted by law to do so. The financial ability of any **Advisory Board Member** to make repayment shall not be a prerequisite to the making of such an advance, and the right to receive advancement of **Costs, Charges and Expenses** herein is a contractual right. The agreements contained in this paragraph are binding upon the **Company** and enforceable by the **Insurer** or the **Advisory Board Member**.

**All other terms and conditions of this Policy remain unchanged.**

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 72 of 112

| | | ENDORSEMENT NO. 31 |
|---|---|---|

**SCOTTSDALE INSURANCE COMPANY®**

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### SEPARATE COSTS, CHARGES AND EXPENSES LIMIT

This endorsement modifies insurance provided under the following:

### EMPLOYMENT PRACTICES COVERAGE SECTION

Section D., **LIMIT OF LIABILITY AND RETENTIONS**, subsection 2.b. is deleted in its entirety and replaced with the following.

b. The amount set forth in Item 3.1.b. relating to this Coverage Section shall be the aggregate limit of liability for the payment of **Costs, Charges and Expenses** in addition to the limit described in subsection a. immediately above; provided, all payments for **Costs, Charges and Expenses** under the additional limit described in this subsection b. shall apply and be paid by the **Insurer** prior to any payment of **Costs, Charges and Expenses** under the limit described in subsection a. above.

All other terms and conditions of this **Policy** remain unchanged.

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 73 of 112

72

<table>
<tr><td colspan="2">SCOTTSDALE INSURANCE COMPANY ®</td><td>ENDORSEMENT NO. 32</td></tr>
</table>

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**SERVICE OF SUIT CLAUSE**

It is agreed that in the event of the failure of the Company to pay any amount claimed to be due under this policy, the Company at the request of the Insured (or reinsured), will submit to the jurisdiction of any court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give the Court jurisdiction. All matters which arise will be determined in accordance with the law and practice of the Court. In a suit instituted against any one of them under this contract, the Company agrees to abide by the final decision of the Court or of any Appellate Court in the event of an appeal.

Pursuant to any statute of any state, territory or district of the United States of America which makes a provision, the Company will designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured (or reinsured) or any beneficiary arising out of this contract of insurance (or reinsurance).

The officer named below is authorized and directed to accept service of process on behalf of the Company:

Commissioner of Insurance
45 Fremont Street
23rd Floor
San Francisco, CA 94105

Having accepted service of process on behalf of the Company, the officer is authorized to mail the process or a true copy to:

c/o United States Corporation Company
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA 95833-3505

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 74 of 112

73

| SCOTTSDALE INSURANCE COMPANY® | ENDORSEMENT NO. 33 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### TOLLING OR WAIVING THE STATUTE OF LIMITATIONS

This endorsement modifies insurance provided under the following:

### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

The following is added to Section B., **DEFINITIONS**, subsection 1.:

**Claim** means:

a written request received by the **Company** to toll or waive the statute of limitations regarding a potential **Claim**. Such **Claim** shall be commenced by the receipt of such request.

All other terms and conditions of this **Policy** remain unchanged.

<table>
<tr><td colspan="2">SCOTTSDALE INSURANCE COMPANY®</td><td>ENDORSEMENT<br>NO. 34</td></tr>
</table>

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2017 | TechShop, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**WAGE AND HOUR CLAIM COSTS, CHARGES AND EXPENSES ONLY ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES COVERAGE SECTION**

I.  It is agreed that the Employment Practices Coverage Section is amended as follows:

Section A., **INSURING CLAUSES**, is amended by adding the following:

3.  **Wage and Hour Claim** Insuring Clause

**Insurer** shall pay the **Costs, Charges and Expenses** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of a **Wage and Hour Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for a **Wage and Hour Wrongful Act** taking place prior to the end of the **Policy Period**.

Section B., **DEFINITIONS**, subsection 1. is amended by adding the following:

c.  **Wage and Hour Claim**.

Section B., **DEFINITIONS**, subsection 15. is amended by adding the following:

c.  **Wage and Hour Wrongful Act**.

Section B., **DEFINITIONS**, is amended by adding the following:

**Wage and Hour Wrongful Act** means any actual or alleged violation(s) of:

a.  the Fair Labor Standards Act or any other federal, state or local laws, rules or regulations governing or relating to:

i.  the classification of **Employees** for the purpose of determining **Employees'** eligibility for compensation; or

ii.  the payment of wages, including but not limited to the payment of overtime, minimum wages, on-call time, the donning and doffing of uniforms, rest and meal periods, reimbursement of expenses, and any other earnings, tips, reimbursement or compensation of **Employees**;

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 76 of 112

b. unfair business practices, unfair competition, conversion or public policy concerning, relating or arising out of any actual or alleged violations of those matters referenced in paragraph a.i. or a.ii. above.

However, **Wage and Hour Wrongful Act** shall not include actual or alleged violations of the Equal Pay Act of 1963, and any amendments thereto.

**Wage and Hour Claim** means:

a. a written demand against an **Insured** for damages or other relief; or

b. a civil, judicial, administrative, regulatory or arbitration proceeding or a formal governmental investigation against an **Insured** seeking damages or other relief, commenced by the service of a complaint or similar pleading, including any appeal therefrom;

brought by or on behalf of one or more **Employees** solely alleging any **Wage and Hour Wrongful Act**.

Solely as respects any **Wage and Hour Claim**, Section C., **EXCLUSIONS**, subsection 4. is amended by deleting the following words:

"provided, however, this exclusion does not apply to any such **Claim** alleging violations of the Equal Pay Act or **Retaliation**:"

Section F., **SETTLEMENT AND DEFENSE**, subsection 3. is deleted in its entirety solely as respects any **Wage and Hour Claim**.

Section G., **OTHER INSURANCE**, is amended by adding the following:

For any **Wage and Hour Claim**, if any **Costs, Charges and Expenses** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be primary insurance.

Section O., **ALLOCATION**, in the General Terms and Conditions Section and Section H., **ALLOCATION**, are deleted in their entirety solely as respects any **Wage and Hour Claim**.

II. It is agreed that the DECLARATIONS is amended as follows:

The maximum aggregate Limit of Liability for all **Costs, Charges and Expenses** as a result of all **Wage and Hour Claims** shall be $100,000, which sum shall be part of and not in addition to the Limit of Liability identified in Item 3.1.a. of the Declarations relating to the Employment Practices Coverage Section, and the Limit of Liability identified in Item 3.1.b. of the Declarations relating to the Employment Practices Coverage Section, additional aggregate for **Costs, Charges and Expenses**, shall not be applicable to or available for any **Wage and Hour Claim.**

Item 3., Employment Practices Coverage Section, section 2., **RETENTION**, of the Declarations is amended by adding the following:

$50,000 each **Wage and Hour Claim**

All other terms and conditions of this **Policy** remain unchanged.

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 77 of 112

76



**POLICYHOLDER DISCLOSURE**

**NOTICE OF TERRORISM
INSURANCE COVERAGE**

**TERRORISM RISK INSURANCE ACT**

Under the Terrorism Risk Insurance Act of 2002, as amended pursuant to the Terrorism Risk Insurance Program Reauthorization Act of 2015, effective January 1, 2015 (the "Act"), you have a right to purchase insurance coverage for losses arising out of acts of terrorism, as defined in Section 102(1) of the Act: The term "certified acts of terrorism" means any act that is certified by the Secretary of the Treasury - in consultation with the Secretary of Homeland Security, and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that where coverage is provided by this policy for losses resulting from "certified acts of terrorism," such losses may be partially reimbursed by the United States Government under a formula established by federal law. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government agrees to reimburse eighty-five percent (85%) of covered terrorism losses in calendar year 2015 that exceed the statutorily established deductible paid by the insurance company providing the coverage. This percentage of United States Government reimbursement decreases by one percent (1%) every calendar year beginning in 2016 until it equals eighty percent (80%) in 2020. The premium charged for this coverage is provided below and does not include any charges for the portion of loss that may be covered by the Federal Government under the Act.

You should also know that the Act, as amended, contains a $100 Billion Cap that limits United States Government reimbursement as well as insurers' Liability for losses resulting from "certified acts of terrorism" when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

**CONDITIONAL TERRORISM COVERAGE**

The federal Terrorism Risk Insurance Program Reauthorization Act of 2015 is scheduled to terminate at the end of December 31, 2020, unless renewed, extended or otherwise continued by the federal government. Should you select Terrorism Coverage provided under the Act and the Act is terminated December 31, 2020, any terrorism coverage as defined by the Act provided in the policy will also terminate.

**IN ACCORDANCE WITH THE ACT, YOU MUST CHOOSE TO SELECT OR REJECT COVERAGE FOR "CERTIFIED ACTS OF TERRORISM" BELOW:**

**The Note below applies for risks in these states:** California, Connecticut, Georgia, Hawaii, Illinois, Iowa, Maine, Missouri, New Jersey, New York, North Carolina, Oregon, Rhode Island, Virginia, Washington, West Virginia, Wisconsin.

**NOTE**: In this state, a terrorism exclusion makes an exception for (and thereby provides coverage for) fire losses resulting from an act of terrorism. Therefore, if you reject the offer of terrorism coverage, that rejection does not apply to fire losses resulting from an act of terrorism coverage for such fire losses will be provided in your policy.

**If you do not respond to our offer and do not return this notice to the Company, you will have no Terrorism Coverage under this policy.**

|  | |
|---|---|
|  | I hereby elect to purchase certified terrorism coverage for a premium of $454.00. I understand that the federal Terrorism Risk Insurance Program Reauthorization Act of 2015 may terminate on December 31, 2020. Should that occur my coverage for terrorism as defined by the Act will also terminate. |
| X | I hereby reject the purchase of certified terrorism coverage. |

| | |
|---|---|
| _____ | TechShop, Inc. |
| Policyholder / Applicant's Signature* | Named Insured / Firm |
| _____ | EKS3217615 |
| Print Name* | Policy Number, if available |
| _____ | |
| Date* | |

*If rejected, signature required & completed form must be faxed to E-Risk Services @ (973) 252-5146. Please contact your broker with any questions.



| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2018 | TechShop, Inc. | 29406 |

Additional Premium Amount: $16,341

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**Discovery Period Election - Specific Coverage Section**

This endorsement modifies insurance provided under the following:

**BUSINESS AND MANAGEMENT INDEMNITY POLICY**

It is agreed that the **Parent Company** has elected and paid for the additional **Discovery Period** listed in Item 5. 1. of the Declarations, but solely as respects the Directors & Officers and Company Coverage Section(s), thereby complying with the requirements of Section H. of the General Terms and Conditions.

All other terms and conditions of this **Policy** remain unchanged.

_Lisa Danna_
Authorized Signature

2/26/2018
Date

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 80 of
112



| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2018 | TechShop, Inc. | 29406 |

Return Premium Amount: $16,341

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**Endorsement Deletion**

It is agreed that the following endorsement numbers are deleted: <u>35</u>.

All other terms and conditions of this **Policy** remain unchanged.

*Lisa Danna*

Authorized Signature

<u>3/1/2018</u>

Date

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 81 of 112

80



| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3217615 | 4/1/2018 | TechShop, Inc. | 29406 |

Additional Premium Amount: $16,341

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**Discovery Period Election - Specific Coverage Section**

This endorsement modifies insurance provided under the following:

**BUSINESS AND MANAGEMENT INDEMNITY POLICY**

It is agreed that the **Parent Company** has elected and paid for the additional **Discovery Period** listed in Item 5. 3. of the Declarations, but solely as respects the Directors & Officers and Company Coverage Section(s), thereby complying with the requirements of Section H. of the General Terms and Conditions.

All other terms and conditions of this **Policy** remain unchanged.

_Lisa Danna_

Authorized Signature

3/1/2018

Date

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 82 of 112

81

# EXHIBIT 2

# SUMMONS
## *(CITACION JUDICIAL)*

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Techshop San Jose, LLC, a CA LLC, Early Growth Financial Services, Inc., a
DE Corp., Mike Hilberman, an individual, Daniel Woods, an individual

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

John S. and James L. Knight Foundation, a 501(c)(3) corporation,

E-FILED
6/22/2018 9:00 AM
Clerk of Court
Superior Court of CA,
County of Santa Clara
18CV330469
Reviewed By: V. Taylor
Envelope: 1651295

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Santa Clara County

191 N. First Street, San Jose, CA 95113

CASE NUMBER:
*(Número del Caso):*
18CV330469

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Cindy Hamilton, Greenberg Traurig, LLP, 1900 University Ave. 5th Floor, East Palo Alto, CA 94303

| DATE: 6/22/2018 9:00 AM | Clerk of Court | Clerk, by | V. Taylor | , Deputy |
| *(Fecha)* | | *(Secretario)* | | *(Adjunto)* |

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☒ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

under: ☐ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☒ by personal delivery on *(date):* 7-10-18

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

# CIVIL LAWSUIT NOTICE

*Superior Court of California, County of Santa Clara*
*191 North First St., San José, CA 95113*

CASE NUMBER: ___18CV330469___

## PLEASE READ THIS ENTIRE FORM

*PLAINTIFF* (the person suing):  Within 60 days after filing the lawsuit, you must serve each Defendant with the *Complaint, Summons,* an *Alternative Dispute Resolution (ADR) Information Sheet,* and a copy of this *Civil Lawsuit Notice,* and you must file written proof of such service.

---

*DEFENDANT* (The person sued):  **You must do each of the following to protect your rights:**

1. You must file a **written response** to the *Complaint, using the proper legal form or format,* in the Clerk's Office of the Court, within **30 days** of the date you were served with the *Summons* and *Complaint;*
2. You must serve by mail  a copy of your written response on the  Plaintiff's attorney or on the Plaintiff if Plaintiff has no attorney (to "serve by mail" means to have an adult other than yourself mail a copy); and
3. You must attend the first Case Management Conference.

   **Warning: If you, as the Defendant, do not follow these instructions, you may automatically lose this case.**

---

*RULES AND FORMS:*  You must follow the California Rules of Court and the Superior Court of California, County of <_CountyName_> Local Civil Rules and use proper forms.  You can obtain legal information, view the rules and receive forms, free of charge, from the Self-Help Center at 201 North First Street, San José (408-882-2900 x-2926).

- State Rules and Judicial Council Forms: www.courtinfo.ca.gov/forms and www.courtinfo.ca.gov/rules
- Local Rules and Forms: http://www.sccsuperiorcourt.org/civil/rule1toc.htm

*CASE MANAGEMENT CONFERENCE (CMC):*  You must meet with the other parties and discuss the case, in person or by telephone at least 30 calendar days before the CMC.  You must also fill out, file and serve a *Case Management Statement* (Judicial Council form CM-110) at least 15 calendar days before the CMC.

*You or your attorney must appear at the CMC.  You may ask to appear by telephone – see Local Civil Rule 8.*

---

Your Case Management Judge is: Kirwan, Peter   Department: 19

The 1st CMC is scheduled for: (Completed by Clerk of Court)
Date: 10/2/2018  Time: 3:00pm  in Department: 19

The next CMC is scheduled for: (Completed by party if the 1st CMC was continued or has passed)
Date: _____  Time: _____  in Department: _____

---

*ALTERNATIVE DISPUTE RESOLUTION (ADR):*  If all parties have appeared and filed a completed *ADR Stipulation Form* (local form CV-5008) at least 15 days before the CMC, the Court will cancel the CMC and mail notice of an ADR Status Conference. Visit the Court's website at www.sccsuperiorcourt.org/civil/ADR/ or call the ADR Administrator (408-882-2100 x-2530) for a list of ADR providers and their qualifications, services, and fees.

*WARNING:* Sanctions may be imposed if you do not follow the California Rules of Court or the Local Rules of Court.

---

Case: 18-50398   Doc# 143   Filed: 08/03/18   Entered: 08/03/18 14:56:33   Page 85 of 112   83

# SANTA CLARA COUNTY SUPERIOR COURT
## ALTERNATIVE DISPUTE RESOLUTION
## INFORMATION SHEET

Many cases can be resolved to the satisfaction of all parties without the necessity of traditional litigation, which can be expensive, time consuming, and stressful. The Court finds that it is in the best interests of the parties that they participate in alternatives to traditional litigation, including arbitration, mediation, neutral evaluation, special masters and referees, and settlement conferences. Therefore, all matters shall be referred to an appropriate form of Alternative Dispute Resolution (ADR) before they are set for trial, unless there is good cause to dispense with the ADR requirement.

*What is ADR?*
ADR is the general term for a wide variety of dispute resolution processes that are alternatives to litigation. Types of ADR processes include mediation, arbitration, neutral evaluation, special masters and referees, and settlement conferences, among others forms.

*What are the advantages of choosing ADR instead of litigation?*
ADR can have a number of advantages over litigation:

- **ADR can save time.** A dispute can be resolved in a matter of months, or even weeks, while litigation can take years.

- **ADR can save money.** Attorney's fees, court costs, and expert fees can be reduced or avoided altogether.

- **ADR provides more participation.** Parties have more opportunities with ADR to express their interests and concerns, instead of focusing exclusively on legal rights.

- **ADR provides more control and flexibility.** Parties can choose the ADR process that is most likely to bring a satisfactory resolution to their dispute.

- **ADR can reduce stress.** ADR encourages cooperation and communication, while discouraging the adversarial atmosphere of litigation. Surveys of parties who have participated in an ADR process have found much greater satisfaction than with parties who have gone through litigation.

*What are the main forms of ADR offered by the Court?*
 **Mediation** is an informal, confidential, flexible and non-binding process in the mediator helps the parties to understand the interests of everyone involved, and their practical and legal choices. The mediator helps the parties to communicate better, explore legal and practical settlement options, and reach an acceptable solution of the problem. The mediator does not decide the solution to the dispute; the parties do.

Mediation may be appropriate when:
- The parties want a non-adversary procedure
- The parties have a continuing business or personal relationship
- Communication problems are interfering with a resolution
- There is an emotional element involved
- The parties are interested in an injunction, consent decree, or other form of equitable relief

**Neutral evaluation**, sometimes called "Early Neutral Evaluation" or "ENE", is an informal process in which the evaluator, an experienced neutral lawyer, hears a compact presentation of both sides of the case, gives a non-binding assessment of the strengths and weaknesses on each side, and predicts the likely outcome. The evaluator can help parties to identify issues, prepare stipulations, and draft discovery plans. The parties may use the neutral's evaluation to discuss settlement.

Neutral evaluation may be appropriate when:
- The parties are far apart in their view of the law or value of the case
- The case involves a technical issue in which the evaluator has expertise
- Case planning assistance would be helpful and would save legal fees and costs
- The parties are interested in an injunction, consent decree, or other form of equitable relief

*-over-*

Case: 18-50398    Doc# 143    Filed: 08/03/18    Entered: 08/03/18 14:56:33    Page 86 of 112

84

**Arbitration** is a less formal process than a trial, with no jury. The arbitrator hears the evidence and arguments of the parties and then makes a written decision. The parties can agree to binding or non-binding arbitration. In binding arbitration, the arbitrator's decision is final and completely resolves the case, without the opportunity for appeal. In non-binding arbitration, the arbitrator's decision could resolve the case, without the opportunity for appeal, unless a party timely rejects the arbitrator's decision within 30 days and requests a trial. Private arbitrators are allowed to charge for their time.

Arbitration may be appropriate when:
- The action is for personal injury, property damage, or breach of contract
- Only monetary damages are sought
- Witness testimony, under oath, needs to be evaluated
- An advisory opinion is sought from an experienced litigator (if a non-binding arbitration)

**Civil Judge ADR** allows parties to have a mediation or settlement conference with an experienced judge of the Superior Court. Mediation is an informal, confidential, flexible and non-binding process in which the judge helps the parties to understand the interests of everyone involved, and their practical and legal choices. A settlement conference is an informal process in which the judge meets with the parties or their attorneys, hears the facts of the dispute, helps identify issues to be resolved, and normally suggests a resolution that the parties may accept or use as a basis for further negotiations. The request for mediation or settlement conference may be made promptly by stipulation (agreement) upon the filing of the Civil complaint and the answer. There is no charge for this service.

Civil Judge ADR may be appropriate when:
- The parties have complex facts to review
- The case involves multiple parties and problems
- The courthouse surroundings would he helpful to the settlement process

**Special masters and referees** are neutral parties who may be appointed by the court to obtain information or to make specific fact findings that may lead to a resolution of a dispute.
Special masters and referees can be particularly effective in complex cases with a number of parties, like construction disputes.

**Settlement conferences** are informal processes in which the neutral (a judge or an experienced attorney) meets with the parties or their attorneys, hears the facts of the dispute, helps identify issues to be resolved, and normally suggests a resolution that the parties may accept or use as a basis for further negotiations.
Settlement conferences can be effective when the authority or expertise of the judge or experienced attorney may help the parties reach a resolution.

*What kind of disputes can be resolved by ADR?*
Although some disputes must go to court, almost any dispute can be resolved through ADR. This includes disputes involving business matters; civil rights; collections; corporations; construction; consumer protection; contracts; copyrights; defamation; disabilities; discrimination; employment; environmental problems; fraud; harassment; health care; housing; insurance; intellectual property; labor; landlord/tenant; media; medical malpractice and other professional negligence; neighborhood problems; partnerships; patents; personal injury; probate; product liability; property damage; real estate; securities; sports; trade secret; and wrongful death, among other matters.

*Where can you get assistance with selecting an appropriate form of ADR and a neutral for your case, information about ADR procedures, or answers to other questions about ADR?*

*Contact:*
Santa Clara County Superior Court
ADR Administrator
408-882-2530

Santa Clara County DRPA Coordinator
408-792-2784

1 | GREENBERG TRAURIG, LLP
William J. Goines (SBN 61290)
2 | Cindy Hamilton (SBN 217951)
Shauna E. Imanaka (SBN 315742)
3 | 1900 University Avenue, 5th Floor
East Palo Alto, California 94303
4 | goinesw@gtlaw.com
hamiltonc@gtlaw.com
5 | imanakas@gtlaw.com
Telephone: 650.328.8500
6 | Facsimile: 650.328.8508

E-FILED
6/21/2018 5:40 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
18CV330565
Reviewed By: E. Fang

7

8 | Attorneys for Plaintiff
JOHN S. AND JAMES L. KNIGHT FOUNDATION

9

10

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

11

## COUNTY OF SANTA CLARA

12

| | |
|---|---|
| JOHN S. AND JAMES L. KNIGHT FOUNDATION, a 501(c)(3) non-profit organization, | CASE NO.    18CV330565 |
| Plaintiff, | PLAINTIFF'S COMPLAINT FOR: |
| v. | (1) FRAUD; |
| | (2) NEGLIGENT MISREPRESENTATION; |
| TECHSHOP SAN JOSE, LLC, a California Limited Liability Company; EARLY GROWTH FINANCIAL SERVICES, INC., a Delaware Corporation; MIKE HILBERMAN, an individual; and DANIEL WOODS, an individual; and DOES 1-20, inclusive, | (3) CONCEALMENT; |
| | (4) NEGLIGENCE |
| | (5) NEGLIGENT SUPERVISION; and |
| | (6) BREACH OF CONTRACT |
| Defendants. | [JURY TRIAL DEMANDED] |

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
PLAINTIFF'S COMPLAINT                                    CASE NO.

PHX 332740806v3

Plaintiff JOHN S. AND JAMES L. KNIGHT FOUNDATION ("Knight Foundation"), by its undersigned counsel, hereby alleges the following against Defendants, TECHSHOP SAN JOSE, LLC, a California Limited Liability Company; EARLY GROWTH FINANCIAL SERVICES, INC., a Delaware Corporation; MIKE HILBERMAN, an individual; and DANIEL WOODS, an individual (all Defendants collectively, "Defendants").

## **NATURE OF THE ACTION**

1.      This is an action for fraud and negligence and breach of contract related to a grant issued by Plaintiff Knight Foundation to Defendant TechShop San Jose, LLC ("TechShop SJ") in order to develop a partnership between TechShop SJ and San Jose State University ("SJSU").

## **VENUE**

2.      Venue is proper in this Judicial District because the events forming the basis for this action occurred in San Jose, California.

## **THE PARTIES**

3.      Plaintiff John S. and James L. Knight Foundation is a 501(c)(3) non-profit organization located in Miami, Florida.

4.      Defendant TechShop San Jose LLC ("TechShop SJ") is a California Limited Liability Company with its principal office located at 300 S. 2nd Street, San Jose, CA 95113. Defendant Daniel Woods was the Chief Executive Officer of TechShop, Inc, the parent company of TechShop SJ.

5.      Defendant Early Growth Financial Services, Inc. ("Early Growth") is a Delaware Corporation with its principal office located at 2033 Gateway Place, San Jose, CA 95110.

6.      Defendant Mike Hilberman, is an employee of Early Growth, and was the former Chief Financial Officer ("CFO") of TechShop Inc and TechShop SJ.

7.      Defendant Mike Hilberman, is an individual residing in California.

8.      Defendant Daniel Woods is an individual residing in California.

9.      Defendants Does 1 through 20, inclusive, are sued herein by fictitious names. Their true names and capacities are unknown to Knight Foundation. When their true names and capacities are ascertained, Knight Foundation will amend this complaint by inserting their true names and capacities herein.

Case: 18-50398    Doc# 143    Filed: 08/03/18    Entered: 08/03/18 14:56:33    Page 89 of
112

10.     This Court has jurisdiction over Defendants because Knight Foundation is informed and believes that the various acts set forth below by the entities and individuals identified in the transaction occurred in San Jose, California.

## **FACTUAL BACKGROUND**

11.     The Knight Foundation is a non-profit organization that focuses on enhancing journalism, the arts, technology, and the enrichment and success of cities where brothers John S. and James L. Knight once published newspapers. The Knight Foundation's mission statement is to foster informed and engaged communities essential for a healthy democracy. San Jose is one of the cities that benefits from the Knight Foundation's enrichment projects.

12.     TechShop, Inc. operated a chain of membership-based, open-access, "do it yourself" workshop and fabrication studios that supply high-quality machines, tools, and software to its members. TechShop SJ was a part of this chain, based in San Jose, California.

13.     Early Growth offers financial solutions and support on an as needed basis through their Chief Financial Officer service. The Knight Foundation is informed and believes that Early Growth placed Mr. Hilberman with TechShop Inc. as its CFO, but failed to properly vet Mr. Hilberman for this role.

14.     In or about 2015, Danny Harris of the Knight Foundation was introduced to Mike Hilberman on behalf of TechShop SJ, and over a period of 18 months discussed the possibility of the Knight Foundation issuing a grant to TechShop SJ so that it could form a collaborative partnership with SJSU that would benefit SJSU students and allow them to access TechShop SJ equipment and technology through a membership and class based program.

15.     Part of the Knight Foundation's vetting for grant programs includes a review of the financials for any company considered for a grant, and the Knight Foundation requested, and received, financial records from Tech Shop SJ.

16.     On or about May 6, 2016, Raffie Colet, Senior General Manager of TechShop SJ sent a letter to the Knight Foundation, and attached a 2008-2016 Profit/Loss Statement for TechShop SJ ("2008-2016 Profit/Loss Statement").

17.     In the May 6, 2016 letter to Knight Foundation, Mr. Colet represented that TechShop SJ "has been an EBITDA profitable store for several years, reaching 13-16% EBITDA margins in 2013 and

PHX 332740806v3

1    2014 and $1.5 to $1.7M in revenue." Mr. Colet also stated that "[t]he proposed grant of $450 thousand

2    will be used directly towards services and resources to benefit the UP/ID students and faculty. . . . 52% of

3    the proposed grant will go towards membership and access to TechShop San Jose resources, and the

4    balance of 48% will go to the safety training and dedicated workspace for students and faculty in the new

5    expanded TechShop San Jose facility that is now under construction."

6         18.    After reviewing their financials, Knight Foundation had concerns regarding TechShop SJ's

7    financial situation, and voiced these concerns to TechShop SJ in the Spring of 2016.

8         19.    On or about May 23, 2016, Mr. Hilberman, CFO of TechShop, sent a letter to the Knight

9    Foundation, and again provided Knight Foundation with the 2008-2016 Profit/Loss Statement for

10    TechShop SJ, as well as a 2014 & 2015 TechShop, Inc. Audit Report, conducted by an outside accounting

11    firm.

12         20.    In his letter to Knight Foundation, Mr. Hilberman represented that although TechShop Inc.

13    continues to operate at a financial loss, TechShop SJ "has been EBITDA profitable for the past several

14    years." In conversations, Mr. Hilberman expressed to Mr. Harris that TechShop SJ was in an expansion

15    phase, was engaged in a restructure that would resolve its financial problems, and the San Jose branch was

16    among the most successful of the TechShop stores because it had a strong membership basis.

17         21.    Further, in order to assure Knight Foundation that it was financially stable during grant

18    negotiations, Mr. Hilberman represented to Knight Foundation that it had two million dollars in cash in its

19    account.

20         22.    In reliance on the representations of Mr. Hilberman, the Knight Foundation approved a grant

21    in June 2016 that was comprised of three payments - $300,000 in year one, $100,000 in year two, and

22    $50,000 in year three - to see how the program developed among SJSU students. Thereafter, in

23    approximately August 2016, Defendant Dan Woods became CEO of TechShop, Inc. and joined Mr.

24    Hilberman as a point of contact with the Knight Foundation related to the Grant.

25         23.    After becoming CEO and learning of the state of TechShop SJ's and TechShop Inc.'s

26    finances, Mr. Woods continued to negotiate for the Grant funds with the Knight Foundation without ever

27    disclosing their precarious financial condition and that TechShop SJ would likely not be able to fulfill its

28    obligation to SJSU students; nor did Mr. Woods ever disclose TechShop Inc.'s practice of commingling

PLAINTIFF'S COMPLAINT      CASE NO.

PHX 332740806v3

1   funds of the more profitable TechShop chains to pay the expenses of the struggling branches.

2       24.     In November/December 2016, Mr. Hilberman encouraged the Knight Foundation to change

3   the terms of the grant to a larger payment upfront - $400,000 in year one, $25,000 in year two, and $25,000

4   in year three - claiming that the additional financial support would help TechShop SJ's costs of opening

5   their shop on time and maintaining an easy transition for their customer base.

6       25.     In or about November 2016, the Knight Foundation entered into a John S. and James L.

7   Knight Foundation Grant Agreement, Grant ID G-2016-52098 ("Grant") with TechShop SJ. Mr. Woods,

8   as CEO of TechShop, Inc., signed on behalf of TechShop SJ. A true and correct copy of the Grant is

9   attached as Exhibit A.

10      26.     At no time before accepting Knight Foundation's Grant did Mr. Woods or Mr. Hilberman

11  confess that TechShop SJ was in a precarious financial position and should not accept the Grant funds,

12  although it appears that based on the state of TechShop SJ's finances at that time, Mr. Woods knew or

13  should have known that the Grant funds would be unlikely to reach their target audience of SJSU students.

14      27.     Pursuant to the Grant, the Knight Foundation provided Grant funds in the amount of

15  $484,000[1] to TechShop SJ for the express purpose of supporting the retention of TechShop SJ, a

16  collaborative makerspace, in downtown San Jose and developing a partnership between TechShop SJ and

17  SJSU.

18      28.     The partnership between TechShop SJ and SJSU focused on creating a vibrant public space

19  that promotes community engagement through events, collaboration, and learning. In order to achieve this

20  purpose, the Grant provided memberships and facility access to SJSU students to use TechShop SJ's

21  location, and also classroom and lab access to these students through a coupon-based system.

22      29.     Specifically, over the course of three years the Grant was to: provide classroom and lab

23  access, faculty offices, storage facilities and materials for upwards of four SJSU classes per semester;

24  provide membership and facility access to 900-plus students; offer 650 training and safety courses

25  necessary for usage of TechShop SJ equipment; partner with community groups, neighborhood

26  associations and other groups to host monthly meetings and workshops at TechShop SJ; and support

27

28  _____
    [1] $34,000 of the Grant funds were paid to the Miami Foundation, a fiscal agent who processed the Grant funds for payment to
    TechShop SJ and had audit responsibilities outlined in the Grant Agreement.

                                        5
                            PLAINTIFF'S COMPLAINT                        CASE NO.

PHX 332740806v3

community learning through the collection and distribution of lessons learned and best practices.

30.    On December 16, 2016 TechShop SJ invoiced the Knight Foundation's fiscal agent, The Miami Foundation, for $400,000 tied to the memberships and coupons referenced above.

31.    The Grant funds were thereafter timely provided to TechShop SJ from the Knight Foundation through The Miami Foundation.

32.    Mr. Woods continued the façade that TechShop SJ was in a stable financial position. Unbeknownst to the Knight Foundation at the time, Mr. Woods and Mr. Hilberman egregiously financially mismanaged TechShop Inc. and TechShop SJ during their tenure. The Knight Foundation has come to learn that funds were frequently commingled between TechShop Inc. and the various individual store locations, such that funds would be taken from more profitable individual TechShop locations to the pay the expenses of TechShop locations in a precarious financial condition.

33.    TechShop SJ failed to provide financial status updates of TechShop SJ, as required by the terms of the Grant.

34.    Pursuant to terms of the Grant, "[a] progress report, both narrative and financial, [was] due June 19, 2017." (Ex. A: Reports and Payments ¶ 3). The June 19, 2017 Progress Report was not provided to the Knight Foundation.

35.    SJSU's fall semester started in or about September 2017.  In early October 2017, approximately 70 students (out of the intended 900) received memberships and began using TechShop SJ.

36.    On November 15, 2017, Dan Woods, CEO of TechShop Inc. publicly announced that it would be closing its ten United States locations, including the location operated by TechShop SJ, and file for Chapter 7 bankruptcy. Since the timing of the closure occurred shortly after the start of the semester, very little, if any, value was realized by San Jose State University students of the community in connection with the Grant, even among those students who actually signed up for memberships or accepted coupons.

37.    On or about November 16, 2017, TechShop SJ received documentation from SJSU, which indicated that only 76 of the 650 memberships, and only 39 of the 1400 coupons were allocated to students. Pursuant to the terms of the Grant, "Grantee will use the funds for the purposes described in this Agreement. Any alternative use of the funds must be authorized in advance in writing by Knight Foundation.  If the funds are not used in accordance with the terms outlined in this Agreement, the Grantee must repay those

6
PLAINTIFF'S COMPLAINT                                    CASE NO.

PHX 332740806v3

1 | funds to the foundation." (Ex. A: Basic Grant Conditions ¶ 1).

2 | 38.     The Grant also provides, under a section entitled Return of Grand Funds on Change in
3 | Purpose: "If there is a "change in purpose" (as hereinafter defined), upon the written request of Knight
4 | Foundation, Grantee Shall…at Knight Foundation's sole discretion…return to Knight Foundation…all
5 | grant funds that were no properly expended prior to the first Change in Purpose." A "Change in Purpose"
6 | is defined in the Grant Agreement to include "any winding up of the Grantee's activities or operations."
7 | (Ex. A: Return of Grant Funds on Change in Purpose).

8 | 39.     TechShop SJ did not return the Grant funds to Knight Foundation, and they did not submit
9 | a written request to Knight Foundation for a Change in Purpose for the Grant, although it appears that
10 | almost all of the Grant money was spent on TechShop SJ expenses other than as set forth in the Grant.

11 | 40.     TechShop Inc. filed for bankruptcy in the United States Bankruptcy Court, Northern District
12 | of California, on or around February 26, 2018.

13 | 41.     On or about March 2018, at the Creditors Committee meeting held in federal district court,
14 | TechShop Inc. founder Jim Newton testified under oath that it commingled funds between various
15 | individual TechShop locations. Mr. Newton testified that the funds were intermingled between the various
16 | individual Tech Shop LLCs, such that funds would be diverted from one individual LLC to pay the
17 | expenses of another that was not profitable or needed funding.

18 | 42.     Mr. Newton further testified that TechShop Inc. was in such a precarious financial condition
19 | at the approximate time the Grant was negotiated and the Grant funds transmitted that it could not even
20 | afford to hire accountants to file tax returns.

21 | 43.     After TechShop, Inc. filed for bankruptcy, Knight Foundation acquired additional financial
22 | statements for TechShop Inc. and TechShop SJ.

23 | 44.     A comparison of the 2011-2017 Profit/Loss Statement for TechShop Inc. (San Jose, CA
24 | store) ("2011-2017 Profit/Loss Statement") with the 2008-2011 Profit/Loss statement shows a discrepancy
25 | in EBITDA that would no longer make the EBITDA profitable as Mr. Hilberman previously stated to
26 | Knight Foundation.

27 | 45.     The difference between the 2011-2017 Profit/Loss Statement and the 2008-2011 Profit/Loss
28 | Statement is $8,000 in revenue. The 2011-2017 Profit/Loss Statement did not provide any explanation for

the $8,000 discrepancy.

46.    Upon further review of the 2011-2017 Profit/Loss Statement, EBITDA may not have been as profitable as Mr. Hilberman represented. In calculating their EBITDA, TechShop SJ put "other Misc. Expense" under the EBITDA line, where an EBITDA calculation should include earnings before interest, taxes, depreciation, and amortization. Leaving "other Misc. Expense" out of the EBITDA calculation creates the impression of a more profitable EBITDA than what was represented by Mr. Hilberman.

47.    The additional financial documents received also show that TechShop Inc. did not have two million dollars in cash in its account. In fact, the March 31, 2017 Balance Sheet demonstrates that TechShop Inc had only $222,508 in its checking/savings account. Since this Balance Sheet represented TechShop Inc. and its subsidiaries, TechShop SJ also did not have two million dollars in cash.

48.    Even after taking over as CEO and with an understanding of the state of finances, Mr. Woods never disclosed these financial problems and agreed to accept the Grant funds knowing that the funds would likely never reach their intended goal of educating and enriching SJSU students. Rather the Knight Foundation is informed and believes its Grant funds were commingled with the finances of TechShop Inc, or one of the other TechShops, to keep those entities financially afloat for a few more months.

49.    In this action, the Knight Foundation seeks $400,000 procured by fraud, concealment and breach of contract by Mr. Hilberman, Mr. Woods, TechShop SJ, and Early Growth Financial Services for the benefit of TechShop SJ.

## FIRST CAUSE OF ACTION

### (Against TechShop SJ, Mike Hilberman,)

### Fraud (Intentional Misrepresentation)

50.    Knight Foundation incorporates by reference the preceding paragraphs, as though set forth in full herein.

51.    Knight Foundation had concerns regarding TechShop SJ's financial situation, and voiced these concerns to TechShop SJ. Mr. Hilberman, on behalf of TechShop SJ as its CFO, made numerous representations regarding the financial health and solvency of TechShop SJ, and manipulated the financials sent to the Knight Foundation to make it appear as though TechShop SJ was more financially solvent than

it was, including representation that TechShop SJ "has been an EBITDA profitable store for several years, reaching 13-16% EBITDA margins in 2013 and 2014 and $1.5 to $1.7M in revenue" and that TechShop SJ "has been EBITDA profitable for the past several years."

52.     Further, in order to assure Knight Foundation that it was financially stable during grant negotiations, Mr. Hilberman represented to Knight Foundation that TechShop SJ had two million dollars in cash in its account.

53.     Mr. Hilberman knew these representations were not true, but made them anyway to encourage the Knight Foundation to issue the Grant. Even worse, Mr. Hilberman encouraged the Knight Foundation to change its payment plan to a large payment up front instead of multiple payments spread out over time, likely to help keep TechShop SJ financially afloat, while knowing that the Grant would not be used for its intended purposes.

54.     Relying on the representations of Mr. Hilberman and TechShop SJ, in or about November 2016, the Knight Foundation entered into the Grant with TechShop SJ for one large payment upfront.

55.     Even though they were not using the Grant for its intended purpose, neither Mr. Hilberman nor Mr. Woods submitted a written request to Knight Foundation for a Change in Purpose for the Grant.

56.     TechShop SJ closed its doors on November 15, 2017, robbing SJSU students from obtaining any benefit whatsoever from the Knight Foundation's Grant, and defeating the purpose of said Grant. Had it not relied on Mr. Hilberman's representations, the Knight Foundation could have channeled its finite grant funds to an entity that would fulfill the Knight Foundation's mission. TechShop Inc. filed for bankruptcy in the United States Bankruptcy Court, Northern District of California, on or around February 26, 2018. TechShop SJ did not return the Grant to Knight Foundation, despite repeated requests.

57.     Knight Foundation has suffered damages as a result of the fraudulent behavior described above, and seeks punitive damages.

## SECOND CAUSE OF ACTION

### (Against TechShop SJ, Mike Hilberman)

### Negligent Misrepresentation

58.     Knight Foundation incorporates by reference the preceding paragraphs, as though set forth in full herein.

59. Knight Foundation had concerns regarding TechShop SJ's financial situation, and voiced these concerns to TechShop SJ. Mr. Hilberman made numerous representations regarding the financial health and solvency of TechShop SJ, and manipulated the financials sent to the Knight Foundation to make it appear as though TechShop SJ was more financially solvent than it was, including representation that TechShop SJ "has been an EBITDA profitable store for several years, reaching 13-16% EBITDA margins in 2013 and 2014 and $1.5 to $1.7M in revenue" and that TechShop SJ "has been EBITDA profitable for the past several years."

60. Further, in order to assure Knight Foundation that it was financially stable during grant negotiations, Mr. Hilberman or Mr. Woods or TechShop SJ represented to Knight Foundation that it had two million dollars in cash in its account.

61. Based on the financials provided to Knight Foundation after TechShop, Inc. filed for bankruptcy, Mr. Hilberman had no reasonable grounds for believing these representations were true when he made it, but made them anyway to encourage the Knight Foundation to issue the Grant. Even worse, Mr. Hilberman encouraged the Knight Foundation to change its payment plan to a large payment up front instead of multiple payments spread out over time, likely to help keep TechShop SJ financially afloat, while knowing that the Grant would not be used for its intended purposes.

62. These representations made by Mr. Hilberman on behalf of TechShop SJ were reckless and negligent, and relied upon by the Knight Foundation, who in or about November 2016 entered into the Grant with TechShop SJ for one large payment upfront.

63. Even though they were not using the Grant for its intended purpose, neither Mr. Hilberman nor Mr. Woods submitted a written request to Knight Foundation for a Change in Purpose for the Grant.

64. TechShop SJ closed its doors on November 15, 2017, robbing SJSU students from obtaining any benefit whatsoever from the Knight Foundation's grant. Had it not relied on Mr. Hilberman's representations, the Knight Foundation could have channeled its finite grant funds to an entity that would fulfill the Knight Foundation's mission. TechShop Inc. filed for bankruptcy in the United States Bankruptcy Court, Northern District of California, on or around February 26, 2018. TechShop SJ did not return the Grant to Knight Foundation, despite repeated requests.

65. Knight Foundation has suffered damages as a result of issuing the Grant to TechShop SJ

due to the negligent behavior described above, and seeks damages accordingly.

<div align="center">

**THIRD CAUSE OF ACTION**

(Dan Woods)

**Concealment**

</div>

66. Knight Foundation incorporates by reference the preceding paragraphs, as though set forth in full herein.

67. In approximately August 2016 Dan Woods became CEO of TechShop Inc.

68. After becoming CEO and learning of the state of TechShop SJ's finances, Mr. Woods continued to negotiate for the Grant funds with the Knight Foundation without ever disclosing that it was in a precarious financial condition and would likely not be able to fulfill its obligation to SJSU students.

69. TechShop SJ's insolvency was a material fact that was concealed from the Knight Foundation even after Woods took over as CEO. As a business partner in their shared purpose of bringing Techshop's technology to SJSU students, Mr. Woods had a duty to the Knight Foundation to inform it if TechShop SJ was so insolvent that it was unlikely to be able to fulfill its Grant obligations. Had the Knight Foundation known that TechShop SJ was insolvent, it never would have agreed to issue the Grant funds.

70. Rather, Mr. Woods continued the façade that TechShop SJ was in a stable financial position before the Knight Foundation signed the Grant Agreement and transferred the funds. Unbeknownst to the Knight Foundation at the time, Mr. Woods and Mr. Hilberman egregiously financially mismanaged TechShop Inc. and TechShop SJ during their tenure. The Knight Foundation has come to learn that funds were frequently commingled between TechShop Inc. and the various individual store locations, such that funds would be taken from more profitable individual TechShop locations to the pay the expenses of TechShop locations in a precarious financial condition. Neither Mr. Hilberman nor Mr. Woods ever disclosed this fact, nor was it reflected on the financial documents that were produced.

71. Knight Foundation has suffered damages as a result of the concealment described above, and seeks damages accordingly.

//

//

//

<div align="center">

11

PLAINTIFF'S COMPLAINT

</div>

CASE NO.

*PHX 332740806v3*

## FOURTH CAUSE OF ACTION

### (Dan Woods, Mike Hilberman)

### Negligence

72.     Knight Foundation incorporates by reference the preceding paragraphs, as though set forth in full herein.

73.     In or about 2015, Danny Harris of the Knight Foundation was introduced to Mike Hilberman on behalf of TechShop SJ, and over a period of 18 months discussed the possibility of the Knight Foundation issuing a grant to TechShop SJ so that it could form a collaborative partnership with SJSU that would benefit SJSU students and allow them to access TechShop SJ equipment and technology through a membership and class based program.

74.     Mr. Hilberman, CFO of TechShop, presented the financials of TechShop SJ in such as way as to make it appear profitable, although he was mismanaging the finances of TechShop SJ.

75.     In August 2016 Dan Woods became CEO of TechShop Inc.

76.     After becoming CEO and learning of the state of TechShop SJ's finances, Mr. Woods and Mr. Hilberman negligently continued to negotiate for the Grant funds with the Knight Foundation even though he knew that TechShop SJ was in a precarious financial condition and would likely not be able to fulfill its obligation to SJSU students.

77.     In or about November 2016, the Knight Foundation entered into the Grant with TechShop SJ.

78.     Mr. Woods and Mr. Hilberman negligently mismanaged TechShop Inc. and TechShop SJ's financially during their tenure. The Knight Foundation has come to learn that funds were frequently commingled between TechShop Inc. and the various individual store locations, such that funds would be taken from more profitable individual TechShop locations to the pay the expenses of TechShop locations in a precarious financial condition.

79.     Knight Foundation has additionally come to learn that TechShop Inc. was already in precarious financial condition at the time the Grant Agreement was negotiated and the Grant transmitted, during Mr. Wood and Mr.Hilberman's tenures.

80.     On behalf of TechShop SJ, Mr. Woods and Mr. Hilberman failed to provide financial status

PLAINTIFF'S COMPLAINT

CASE NO.

PHX 332740806v3

updates of TechShop SJ, as required by the terms of the Grant, or to submit a written request to Knight Foundation for a Change in Purpose for the Grant, even though it appears Grant funds were being used to pay other expenses of TechShop SJ and keep the company (or its parent, or other individual TechShop's) financially afloat.

81.     Mr. Woods and Mr. Hilberman negligently mismanaged TechShop SJ in these ways, which led to the failure of TechShop Inc. and TechShop SJ.  Their negligence caused harm to the Knight Foundation, which would have channeled its finite grant funds to an entity that would fulfill the Knight Foundation's mission.

82.     Knight Foundation has suffered damages as a result of the negligent behavior described above, and seeks damages accordingly.

## FIFTH CAUSE OF ACTION

### (Early Growth Financial Services)

### Negligent Supervision

83.     Knight Foundation incorporates by reference the preceding paragraphs, as though set forth in full herein.

84.     Early Growth hired Mr. Hilberman, and appointed him as CFO of TechShop Inc. His job responsibilities included overseeing the finances for TechShop SJ, and as part of these responsibilities Mr. Hilberman negotiated for a Grant with the Knight Foundation.

85.     Mr. Hilberman was unfit to perform the work for which he was hired for because he made numerous representations regarding the financial health and solvency of TechShop SJ, and manipulated the financials sent to the Knight Foundation to make it appear as though TechShop SJ was more financially solvent than it was, including representation that TechShop SJ "has been an EBITDA profitable store for several years, reaching 13-16% EBITDA margins in 2013 and 2014 and $1.5 to $1.7M in revenue" and that TechShop SJ "has been EBITDA profitable for the past several years."  Even worse, Mr. Hilberman encouraged the Knight Foundation to change its payment plan to a large payment up front instead of multiple payments spread out over time, likely to help keep TechShop SJ financially afloat, while knowing that the Grant would not be used for its intended purposes.

86.     Based on the financials provided to Knight Foundation after TechShop, Inc. filed for

bankruptcy, Mr. Hilberman had no reasonable grounds for believing these representations were true when he made it, but made them anyway to encourage the Knight Foundation to issue the Grant.

87. Early Growth failed to appropriately vet Mr. Hilberman before placing him in a CFO position where he would advise companies regarding their financial management. Mr. Hilberman's actions in commingling funds as CFO and in negotiating with the Knight Foundation and providing it with manipulated financials has damaged the Knight Foundation, who has suffered damages as a result of the negligent behavior described above, and seeks damages accordingly.

## SIXTH CAUSE OF ACTION

### (TechShop SJ)

### Breach of Contract (Grant)

88. Knight Foundation incorporates by reference the preceding paragraphs, as though set forth in full herein.

89. In or about November 2016, the Knight Foundation entered into a Grant with TechShop SJ. Mr. Woods, as CEO of TechShop, Inc., signed on behalf of TechShop SJ.

90. Pursuant to the Grant, the Knight Foundation provided Grant funds in the amount of $484,000 to TechShop SJ for the express purpose of supporting the retention of TechShop SJ, a collaborative makerspace, in downtown San Jose and developing a partnership between TechShop SJ and SJSU.

91. The partnership between TechShop SJ and SJSU focused on creating a vibrant public space that promotes community engagement through events, collaboration, and learning. In order to achieve this purpose, the Grant provided memberships and facility access to SJSU students to use TechShop SJ's location, and also classroom and lab access to these students through a coupon-based system.

92. Specifically, over the course of three years the Grant was to: provide classroom and lab access, faculty offices, storage facilities and materials for upwards of four SJSU classes per semester; provide membership and facility access to 900-plus students; offer 650 training and safety courses necessary for usage of TechShop SJ equipment; partner with community groups, neighborhood associations and other groups to host monthly meetings and workshops at TechShop SJ; and support community learning through the collection and distribution of lessons learned and best practices.

93. On December 16, 2016 TechShop SJ invoiced the Knight Foundation's fiscal agent, The Miami Foundation, for $400,000 tied to the memberships and coupons referenced above.

94. The Grant funds were thereafter timely provided to TechShop SJ from the Knight Foundation through The Miami Foundation.

95. Unbeknownst to the Knight Foundation at the time, Mr. Woods and Mr. Hilberman egregiously financially mismanaged TechShop Inc. and TechShop SJ during their tenure. The Knight Foundation has come to learn that funds were frequently commingled between TechShop Inc. and the various individual store locations, such that funds would be taken from more profitable individual TechShop locations to the pay the expenses of TechShop locations in a precarious financial condition.

96. Pursuant to terms of the Grant, "[a] progress report, both narrative and financial, [was] due June 19, 2017." (Ex. A: Reports and Payments ¶ 3). TechShop SJ failed to provide financial status updates of TechShop SJ, as required by the terms of the Grant.

97. SJSU's fall semester started in or about September 2017. In early October 2017, approximately 70 students (out of the intended 900) received memberships and began using TechShop SJ.

98. On November 15, 2017, Dan Woods, CEO of TechShop Inc. publicly announced that it would be closing its ten United States locations, including the location operated by TechShop SJ, and file for Chapter 7 bankruptcy. Since the timing of the closure occurred shortly after the start of the semester, very little, if any, value was realized by San Jose State University students of the community in connection with the Grant, even among those students who actually signed up for memberships or accepted coupons.

99. On or about November 16, 2017, TechShop SJ received documentation from SJSU, which indicated that only 76 of the 650 memberships, and only 39 of the 1400 coupons were allocated to students. Pursuant to the terms of the Grant, "Grantee will use the funds for the purposes described in this Agreement. Any alternative use of the funds must be authorized in advance in writing by Knight Foundation. If the funds are not used in accordance with the terms outlined in this Agreement, the Grantee must repay those funds to the foundation." (Ex. A: Basic Grant Conditions ¶ 1).

100. The Grant also provides, under a section entitled Return of Grand Funds on Change in Purpose: "If there is a "change in purpose" (as hereinafter defined), upon the written request of Knight Foundation, Grantee Shall…at Knight Foundation's sole discretion…return to Knight Foundation…all

grant funds that were no properly expended prior to the first Change in Purpose." A "Change in Purpose"
is defined in the Grant Agreement to include "any winding up of the Grantee's activities or operations."
(Ex. A: Return of Grant Funds on Change in Purpose).

101.    TechShop SJ did not return the Grant funds to Knight Foundation, and they did not submit
a written request to Knight Foundation for a Change in Purpose for the Grant, although it appears that
almost all of the Grant money was spent on TechShop SJ expenses other than as set forth in the Grant.

102.    TechShop Inc. filed for bankruptcy in the United States Bankruptcy Court, Northern District
of California, on or around February 26, 2018.

103.    On or about March 2018, at the Creditors Committee meeting held in federal district court,
TechShop Inc. founder Jim Newton testified under oath that it commingled funds between various
individual TechShop locations. Mr. Newton testified that the funds were intermingled between the various
individual Tech Shop LLCs, such that funds would be diverted from one individual LLC to pay the
expenses of another that was not profitable or needed funding.

104.    Knight Foundation is informed and believes its Grant funds were commingled with the
finances of TechShop Inc, or one of the other TechShops, to keep those entities financially afloat for a few
more months.  This was contrary to the explicit purpose and use of the Grant funds.

105.    Knight Foundation has suffered damages as a result of the multiple breaches in contract
described above, and seeks damages accordingly.

## PRAYER

WHEREFORE, Knight Foundation prays for judgment against Defendants as follows:

1.  Fraud damages associated with the intentional misrepresentations of Mr. Hilberman.

2.  Punitive damages associated with fraud, in an amount to be proven at trial;

3.  Damages associated with negligence from Mr. Woods, in an amount to be proven at trial;

4.  Damages associated with concealment from Mr. Woods, in an amount to be proven at trial;

5.  Damages associated with negligent supervision from Early Growth Financial Services, in an
    amount to be proven at trial;

6.  Damages associated with the breach of the Grant from TechShop SJ, in an amount to be
    proven at trial;

1    7. For such other and further relief as the court may deem proper.

2                    **DEMAND FOR JURY TRIAL**

3    Plaintiff hereby demands a trial by jury on all causes of action for which a trial by jury may be

4    had.

5

6    DATED: June 21, 2018                    GREENBERG TRAURIG, LLP

7

8                                    By _Cindy Hamilton_____

9                                    William J. Goines
                                     Cindy Hamilton
                                     Attorneys for Plaintiff
10                                   JOHN S. AND JAMES L. KNIGHT FOUNDATION

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              17                              CASE NO.
                    PLAINTIFF'S COMPLAINT

PHX 332740806v3

# Exhibit A

DocuSign Envelope ID: 201A124F-3980-473C-9E3B-B66CE6AAC472

# JOHN S. AND JAMES L. KNIGHT FOUNDATION

# GRANT AGREEMENT

**ORGANIZATION:** TechShop San Jose, LLC

**FISCAL AGENT:** The Miami Foundation

**GRANT ID:** G-2016-52098

**PURPOSE:** To support the retention of TechShop, a collaborative makerspace, in downtown San Jose and develop a partnership between TechShop and San Jose State University focused on creating a vibrant public space that promotes community engagement through events, collaboration and learning.

**TERMS:** June 20, 2016 to June 17, 2019

**AMOUNT:** $484,000

## ACTIVITIES

Over the next three-years, TechShop will:

- Provide classroom and lab access, faculty offices, storage facilities and materials for upwards of four San Jose State University classes per semester.
- Provide membership and facility access to 900-plus students.
- Offer 650 training and safety courses necessary for usage of TechShop equipment.
- Partner with community groups, neighborhood associations and other groups to host monthly meetings and workshops at TechShop.
- Support community learning through the collection and distribution of lessons learned and best practices.

## OUTCOMES

This grant will help retain an important business and hub for entrepreneurship, job training and small business growth. Moreover, it will help expand the business through building a partnership with San Jose State University focused on developing new programs to directly drive urban innovation in San Jose.

The description of your organization's activities and your expectations for the outcomes of the funded project are listed above. Your organization agrees that the results described are achievable and represent the terms against which your organization will judge the success of the project.

## EVALUATION

DocuSign Envelope ID: 201A124F-3980-473C-9E3B-B66CE6AAC472

- Any evaluation reports relating to this grant will be submitted to the Knight Foundation.

- TechShop and San Jose State University will measure community involvement, continued community engagement, and impact of learning, coursework and events on bringing temporary and permanent change to San Jose's neighborhoods.

## COMMUNICATIONS

You agree to follow the communications guidelines at http://knightcommunications.org and to clear with communicationsdirector@knightfoundation.org any relevant content that mentions the foundation. Please also follow us on Twitter at @knightfdn.

## BASIC GRANT CONDITIONS

1. Grantee will use the funds for the purposes described in this Agreement. Any alternative use of funds must be authorized in advance in writing by Knight Foundation. If the funds are not used in accordance with the terms outlined in the Agreement, the Grantee must repay those funds to the Foundation.

2. Changes to any specific line item in the enclosed budget greater than 5% should be approved in writing by Knight Foundation prior to making the change.

3. Significant changes in project or organizational leadership should be reported to Knight Foundation within 30 days of the change.

4. As required by IRS rules, Knight Foundation funds will not be used: a) to carry on propaganda or otherwise attempt to influence specific legislation; b) to influence the outcome of any specific public election or to carry on, directly or indirectly, any voter registration drive; c) to make a grant to any individual for travel, study or other similar purposes or to make a sub-grant to any other organization unless the grant complies with Section 4945(d)(3) or 4945(d)(4) of the Internal Revenue Code, as applicable, and the grant has has been detailed in the approved grant plan and budget; or (d) to undertake any activity for any purpose other than the charitable and educational purposes specified in Section 170(c)(2)(B) of the Internal Revenue Code.

5. Capital equipment and facilities purchased using Knight Foundation grant funds must be used for solely charitable purposes during and after the Grant term. The Grant budget and budget narrative must detail: a) capital equipment/facilities purchased, b) its cost and use and c) what will happen to the equipment/facilities once the grant term is complete.

6. All travel paid for with Foundation funds can only be for the charitable purposes of the grant and should be reasonable and necessary, and not excessive.

7. The Grantee must disclose any potential conflicts of interest including transactions with related parties. The Grantee will specifically note if they propose to use grant funds to engage an organization or individual with which they have a related party relationship. In no event should the Grantee pay more than fair market value for any services with a related party.

8. Overhead expenses charged to the grant must be specified in the approved grant budget and must be supported by appropriate documentation. Overhead may not include a general percentage of costs.

9. The Miami Foundation has agreed to serve as fiscal agent for TechShop San Jose, LLC and will be responsible for ensuring that grant funds are expended in accordance with the approved project budget.

They may also provide administrative assistance for contracts, payments to the grantees, payments to subcontractors, accounting requirements and other administration as necessary. The Miami Foundation will retain 4 percent of the grant amount as an administration fee. The $19,360 cost of the fiscal agency will come from grant funds.

# REPORTS AND PAYMENTS

1. The first payment of $418,000 will be mailed within 60 days of Knight Foundation receiving this signed grant agreement. The Miami Foundation will disburse the payments to TechShop San Jose, LLC according to the terms of the Fiscal Agency Agreement between Grantee and The Miami Foundation.

2. A grant expenditure monitoring (GEM) review will be conducted in 2017 and 2018 of this grant. Knight Foundation is responsible for securing the consultant to complete the GEM and will withhold $8,000 for each review from the total grant amount approved.

3. A progress report, both narrative and financial, is due June 19, 2017. In addition, as fiscal agent, The Miami Foundation, must also report at that time on the use and disbursement of the funds. The second payment of $25,000 will be released within 60 days of receiving a progress report deemed satisfactory solely at the Foundation's discretion.

4. A progress report, both narrative and financial, is due June 18, 2018. In addition, as fiscal agent, The Miami Foundation, must also report at that time on the use and disbursement of the funds. The final payment of $25,000 will be released within 60 days of receiving a progress report deemed satisfactory solely at the Foundation's discretion.

5. A final report, both narrative and financial, is due June 17, 2019. In addition, as fiscal agent, The Miami Foundation, must also report at that time on the use and disbursement of the funds.

6. Grantee must provide annual progress reports, both narrative and financial until all grant funds have been expended. Annual progress reports shall be provided, to Knight Foundation and The Miami Foundation, within 60 days after the close of the Grantee's annual accounting period during which grant funds have been received and annually thereafter until all grant funds have been expended. In addition, within 60 days after the close of the annual accounting period during which all grant funds have been expended, Grantee must provide a final narrative and financial report with respect to all expenditures made by the Grantee throughout the term of the grant. For grants involving capital equipment and facilities, grant funds shall be deemed expended upon the end of the "useful life" of the equipment or facilities in accordance with generally recognized accounting principles and U.S. law regarding how long such equipment must be depreciated. The narrative report shall describe the Grantee's use of the grant funds, compliance with the terms of the grant, and progress made toward achieving the purposes of the grant throughout the term of the grant. As fiscal agent, The Miami Foundation, must provide simultaneous reports on the use and disbursement of the funds.

7. Login to the Fluxx Grants Portal at https://knight.fluxx.io to submit your reports. Click on the green "+" sign to upload your report. Then click on the Submit Link to let Knight know you have submitted your requirement. These reports include both financial and program information using online forms. The program report must include a narrative account of the use of grant funds and progress in achieving the purposes of the grant, including the grant outcomes. The online report forms are available on Knight's Grantee Portal. Copies of the reports will be provided to your Program Director by Grants Administration. The Director will review your report and provide feedback. Any questions about the grant should be

DocuSign Envelope ID: 201A124F-3980-473C-9E3B-B66CE6AAC472

directed to the Program Director.

8. During the term of the grant, organizations audited by an independent auditing firm should submit the audit results including the management letter within 90 days of completion of the audit report.

9. Upon the Foundation's request the Grantee will provide all information relating to or developed under the grant.

10. The Foundation may withhold future payments at the Foundation's sole discretion if it has not received all required reports and/or the reports do not meet the Foundation's reporting requirements or the grant fails to achieve satisfactory progress.

## RETURN OF GRANT FUNDS ON CHANGE IN PURPOSE:

If there is a "Change in Purpose" (as hereinafter defined), upon the written request of Knight Foundation, Grantee shall (and shall cause the Fiscal Agent, if applicable, to), at Knight Foundation's sole discretion, promptly either (i) reassign to another charitable organization acceptable to Knight Foundation, or (ii) return to Knight Foundation, all grant funds that were not properly expended (in accordance with the approved project budget) prior to the first Change in Purpose subsequent to the date hereof. For purposes of this grant agreement, the term "Change in Purpose" means (i) at the sole discretion of Knight Foundation, any change required to be reported to Knight Foundation pursuant to item 3 of "Basic Grant Conditions," above, and/or in circumstances as contemplated by "Purpose" above, (ii) any winding up of the Grantee's activities or operations, (iii) any combination of the Grantee with any other charitable or other organization, whether by means of merger, transfer of assets or other reorganization event, and/or (iv) any public announcement by Grantee or any of its affiliates with respect to any of the foregoing events. Grantee shall promptly notify Knight Foundation, in writing, upon the occurrence of any circumstance, event or development that could reasonably be expected to result in a potential Change in Purpose.

## INTELLECTUAL PROPERTY:

Grantee and the Foundation agree that all intellectual property (IP) rights (including copyright, patent, and any other rights) in materials arising out of or resulting from Grantee's use of the grant funds or any earning thereon (the "Public Materials") shall be owned by Grantee. Grantee acknowledges that the Foundation wishes to ensure the widest possible distribution of the Public Materials and ensure that they are and remain generally available to the public. Accordingly, Grantee hereby grants, and shall ensure that any individuals who have any IP rights in Public Materials shall grant, to the Foundation, under all IP rights of such party, a non-exclusive, transferable, perpetual, irrevocable, royalty-free, paid-up, worldwide, sublicenseable license to use or publish the Public Materials; provided, however, that the Foundation shall not exercise such rights except (a) in connection with the activities of the Foundation, and/or (b) in the event Grantee materially breaches the terms of this Agreement.

Grantee, at the Foundation's request, agrees to execute any additional documents required to affect such license. Upon Grantee's request in writing, the parties shall cooperate to identify whether any particular materials produced by Grantee constitute Public Materials; provided that Grantee and the Foundation acknowledge that Public Materials shall include all materials required to be developed as described in the applicable grant description.

In addition, upon completion of any Public Materials of a type identified in the table below under "Type of Public Material," Grantee shall make such Public Materials available free of charge to the public (such as via a public internet server with no subscription fees) under the terms of the "License for Public Availability" identified in the table. Grantee's distribution of such Public Materials shall also comply with any additional terms and conditions specified below.

DocuSign Envelope ID: 201A124F-3980-473C-9E3B-B66CE6AAC472

**1. Content** - Any news articles, text, photographs, audiovisual materials, or similar content developed using funds provided by the Foundation.
**Type of Award of Specific KF Initiative & License for Public Availability:** Expenditure Responsibility Grant / CC BY Attribution license, version 3.0
**Additional Terms and Conditions:** None.

Exceptions to this clause must be approved by the Foundation in writing. Grantee shall not make available such Public Materials, or any derivative works of the Public Materials, under any other licensing terms, without the Foundation's prior written consent.

**TAX-EXEMPT STATUS:**

The Miami Foundation will maintain its tax-exempt status as a Section 501(c)(3) organizationand a public charity described in Sections 509(a)(1) or (2) current throughout the period of this grant and will comply with all applicable federal and state laws and regulations that govern the use of funds from private foundations. This includes but is not limited to the prohibition against activities described in Section 4945(d) of the Internal Revenue Code and limiting the use of the grant funds to the appropriate purposes as described in Section 170(c)(2)(B) of the Internal Revenue Code. Grantee will comply with all applicable federal and state laws and regulations that govern the use of funds from private foundations to the Grantee organization. This includes but is not limited to the prohibition against activities described in Section 4945(d) of the Internal Revenue Code.

**BOOKS AND RECORDS:**

Grantee shall maintain its book and records, including an accurate record of the grant received and all expenses incurred under this grant, and retain such books and records for at least four years after completion of the use of this grant. Those records include a general ledger with enough detail to allow tracking of the use of Foundation funds, original invoices, bank statements, copies of checks disbursing grant funds and documentation of the business purpose of each expense.

At the Foundation's request, the Grantee shall make its books and records available to the Foundation by permitting reasonable access to its files, records and personnel by the Foundation (or its designated representatives) for the purpose of making financial audits or other evaluations concerning this grant as the Foundation deems necessary. The fees and expenses of such designated representative shall be paid from the grant proceeds. The Foundation will withhold these fees and expenses from payments made to the Grantee under this Agreement.

**MANAGEMENT AND INVESTMENT OF FUNDS, EARNINGS, AND APPRECIATION:**

All Grant funds must be maintained in a separate account dedicated to charitable and education purposes under the following terms. Any interest earned on the investment of Grant funds must be tracked and reinvested in the separate grant account and used solely for the approved purpose of the Grant. All grant funds received, and earnings and appreciation on those funds, shall be invested in a designated account in a bank or investment firm that is a member of either the FDIC or SIPC. The investment will be in accordance with Grantee's governing documents and investment policies so long as they do not conflict with this Agreement, with the laws of the State of Florida, and with Federal laws. Earnings and appreciation on grant funds shall be used solely for the purpose of the Grant. Grantee may not assess an administrative or financial management fee unless agreed to in writing and in advance by the Foundation.

**UNEXPENDED FUNDS:**

The Foundation reserves the right, in its sole discretion, to discontinue funding if it is not satisfied with the progress of the grant or the content of any required written report. In the event of discontinuation or at the close of the grant, any unexpended funds shall immediately be returned to the Foundation, except where the Foundation has agreed in writing to an alternative use of the unused funds.

DocuSign Envelope ID: 201A124F-3980-473C-9E3B-B66CE6AAC472

**ROYALTIES:**

Any materials produced by this grant and earnings thereon shall not provide royalties or otherwise inure to the personal benefit of individuals connected with this grant. Grantee shall not engage in any sales of such materials unless it has determined that such sales are substantially related to the charitable and educational purposes of the grant. Any revenues realized by Grantee or any sub-grantee from any such sales must be used exclusively for this project.

**NO-COST EXTENSION:**

If needed, Grantee should submit a request for a no-cost extension to the program officer before the end of the grant period. The request should contain the reason for the extension, its length and detail how any unexpended funds would be used.

**NO GUARANTEE OF FUTURE FUNDING:**

The Grantee acknowledges that the receipt of this grant does not imply a commitment on behalf of Knight Foundation to continue funding beyond the terms listed in this grant agreement.

If you agree to the terms and conditions of this grant agreement, please sign and return this document to Knight Foundation. Please keep a copy of the signed document for your grant files. Grant payment according to the terms above will be released within 60 days of receiving this signed agreement. G-2016-52098

**Grantee Authorized Signatory:**

Dan Woods

CEO

Type or print name of person signing Agreement | Title

*Dan Woods*

11/28/2016

Signature of person signing Agreement | Date

**Fiscal Agent Authorized Signatory:**

Javier Alberto Soto

President & CEO

Type or print name of Fiscal Agent signing Agreement | Title

*Javier Alberto Soto*

11/16/2016

Signature of Fiscal Agent signing Agreement | Date

DocuSign Envelope ID: 201A124F-3980-473C-9E3B-B66CE6AAC472

All future correspondence regarding this grant should refer to grant # G-2016-52098. Please sign and return this document via DocuSign or by emailing it to grants@knightfoundation.org.