1 STEYER LOWENTHAL BOODROOKAS
  ALVAREZ & SMITH LLP
2 Jeffrey H. Lowenthal (State Bar No. 111763)
   jlowenthal@steyerlaw.com
3 Andrew A. August (State Bar No. 112851)
   aaugust@steyerlaw.com
4 Jill M. Manning (State Bar No. 178849)
   jmanning@steyerlaw.com
5 235 Pine Street, 15th Floor
  San Francisco, CA 94104
6 San Francisco, CA 94111
  Telephone: (415) 421-3400
7 Facsimile: (415) 421-2234

8

  Special Counsel for DORIS A. KAELIN,
9 Chapter 7 Trustee

10             UNITED STATES BANKRUPTCY COURT

11      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

12

13 | In re                                      | Case No. 2018-bk-50398 MEH
   |                                            | Chapter 7
14 |        TECHSHOP, INC.,                     |
   |                                            |
15 |              Debtor.                       |
   |                                            |
16 |--------------------------------------------|
   | DORIS A. KAELIN, Chapter 7 Trustee of the  | Adv. Proc. No.
17 | bankruptcy estate of TECHSHOP, INC.,       |
   | Debtor,                                    |
18 |                                            | COMPLAINT FOR MONETARY
   |              Plaintiff,                    | DAMAGES: BREACH OF FIDUCIARY
19 |                                            | DUTY; AIDING AND ABETTING BREACH
   | v.                                         | OF FIDUCIARY DUTY; NEGLIGENCE;
20 |                                            | ACCOUNTING AND CORPORATE WASTE
   | DOUG BUSCH, an individual, JIM             |
21 | NEWTON, an individual, MARK HATCH, an      |
   | individual, DAN WOODS, an individual,      | JURY TRIAL DEMANDED.
22 | MARK HILBERMAN, an individual, and         |
   | EARLY GROWTH FINANCIAL SERVICES,           |
23 | INC., a Delaware corporation,              |
   |                                            |
24 |              Defendants.                   |

25

26

27

28

COMPLAINT FOR MONETARY DAMAGES
1779841.1 - TECHSHOP.KAELIN

## I. NATURE OF THE CASE

By this adversary proceeding, Plaintiff Doris Kaelin as the Chapter 7 Trustee for the Estate of TechShop, Inc. ("Debtor"), seeks to recover on behalf of the Estate and derivatively on behalf of Debtor's creditors, money damages against the Debtor's former officers and directors and its accountant/financial advisor whose conduct before the petition date constituted breaches of fiduciary duty, negligence and corporate waste which diverted, dissipated or unduly risked corporate assets that might otherwise have been used to satisfy creditors' claims. Defendants' pattern of misconduct, all of which occurred in the course and scope of performing their duties and responsibilities as officers and directors when Debtor was insolvent, resulted in millions of dollars of monetary damages.

## II. JURISDICTION AND VENUE

1. The Court has subject matter jurisdiction as the claims here arise from or relate to this bankruptcy case. 28 USC §§ 157(b) and 1334(b).

2. The Court has personal jurisdiction over the individual Defendants, who all reside in California, and over the corporate Defendant (Early Growth Services, Inc), whose principal place of business is in California.

3. Venue is proper as the case is filed in the district where this bankruptcy case is pending. 28 USC § 1409(a).

4. Plaintiff consents to the Bankruptcy Court entering final orders and judgments in this case.

## III. GENERAL ALLEGATIONS

### A. Debtor TechShop, Inc.

5. Plaintiff is informed and believes that TechShop, Inc. (the "Company" or "Debtor") was originally registered with the California Secretary of State as a limited liability company in 2006 by Jim Newton and Ridge McGhee and incorporated as a California corporation on January 23, 2009. It ceased operations on November 14, 2017 and filed this Chapter 7 case on February 26, 2018. The Company, at all relevant times, had its principal executive offices in the San Francisco Bay Area, most recently in San Jose.

6.     Through wholly-owned LLCs, the Debtor operated a chain of membership-based "maker shops"—open-access, do-it-yourself ("DIY") and do-it-with-others ("DIWO") workshops and fabrication facilities (known as its "stores" or "shops").

7.     The Debtor's officers and directors—the individual Defendants here—had the vision that the Company would be integral to the "Maker Movement," a self-sufficiency DIY/DIWO culture of amateurs working alone or with other amateurs on projects involving computers, electronics, robotics, metalworking, woodworking and other disciplines.  The movement has its own magazine, *MAKE*, once co-edited by a former director of the Company.  Plaintiff is informed and believes many actions and decisions described in this Complaint would not have occurred but for individual directors' and officers' devotion to this ethic at the expense of their fiduciary responsibility to the Company and its shareholders, investors and creditors.

8.     The Company operated shops at eleven locations throughout the U.S. at various times from 2010 to 2017 as wholly-owned limited liability corporations (the "LLCs"):

- Menlo Park, CA (2010)
- San Francisco, CA (2010)
- San Jose, CA (2010)
- Detroit, MI (2011)
- Raleigh/Durham, NC (2011)[1]
- Austin/Round Rock, TX (2012)
- Pittsburgh, PA (2013)
- Chandler, AZ (2013)
- Arlington, VA (2014)
- St. Louis, MO (2016)
- Brooklyn, NY (2017)

These stores are sometimes referred to collectively as "the subsidiary LLCs" and singularly as "the

---

[1] The Company shut down the Raleigh/Durham subsidiary LLC in April 2013 when its property lease expired.  TechShop also had licensed a store in Portland in 2009 that failed within a year.

Case: 18-50398   Doc# 238   Filed: 01/25/20   Entered: 01/25/20 10:36:28   Page 3 of 33

[location] subsidiary LLC."

9.     The Company's primary operational revenue came from selling term and lifetime "memberships" allowing individuals to use the TechShop facilities and equipment (similar to health club memberships); holding educational classes in equipment use and safety; and sponsoring "Maker" events such as Maker Faires.

10.     Defendants knew or should have known that these revenues were insufficient to fund Company operations and those of the subsidiary LLCs. Defendants therefore solicited and obtained more than $40 million from investors and used the funds to keep TechShop afloat for most of its existence knowing all along that eventually the Company would fail.

**B.     The Defendants**

11.     **James Newton** – Plaintiff is informed and believes Mr. Newton co-founded the Company in 2006 and was its sole initial shareholder and director when the Company incorporated in 2009. Throughout the Company's corporate existence, Mr. Newton served as Board of Director Chairman and Corporate Secretary. He also served as the Company's first Chief Financial Officer ("CFO") until the Company outsourced the CFO function to Defendant Early Growth Financial Services, Inc. ("EGFS") in 2011 or 2012. Plaintiff is informed and believes Mr. Newton never had a written employment contract with the Company.

12.     **Mark Hatch** – Plaintiff is informed and believes Mr. Hatch became the Company's second Board member in late summer 2010 when he was appointed Chief Executive Officer ("CEO"). He served in both capacities until July 18, 2016, when he resigned under Board pressure for longstanding competency issues. Plaintiff is informed and believes Mr. Hatch never had a written employment contract with the Company.

13.     **Douglas Busch** – Plaintiff is informed and believes Mr. Busch became the Company's third Board member on December 27, 2010 and served continuously as such from that date. Mr. Busch was never a Company officer or employee. Beginning in January 2014, the Company paid him $25,000 a year as an "independent director" under written agreement.

14.     **Dan Woods** – Plaintiff is informed and believes Mr. Woods became the Company's fourth Board member on April 27, 2012 and served continuously as such from that date. Mr. Woods

-4-

1779841.1 - TECHSHOP.KAELIN

also served in various officer capacities[2] from April 2012 until July 18, 2016 when he was elected by the other Board members (then only Messrs. Newton and Busch) to replace Mr. Hatch as Company CEO. Plaintiff is informed and believes Mr. Woods refused to sign a written employment contract with the Company and he served his entire tenure with no formalized agreement.

15. **Mike Hilberman** – Plaintiff is informed and believes Mr. Hilberman is, and at all times relevant was, a principal in, and an employee and agent of, EGFS. He also served as the Company's CFO"—under the control and direction of EGFS. The specific dates of Mr. Hilberman's CFO tenure are presently unclear but span at least from early 2012 through late 2017. Plaintiff is informed and believes Mr. Hilberman submitted a formal resignation as CFO in November 2017, shortly before the Company's shutdown.

16. **Early Growth Financial Services, Inc. ("EGFS")** – Plaintiff is informed and believes EGFS is a Delaware corporation founded in 2008 with its principal headquarters in San Jose, California. EGFS promotes itself as a company that offers a full suite of accounting services, including outsourced CFOs, to startup companies; for example, EGFS's website advertises as follows:

> "A CFO is a strategic member of your team. Interpreting the past and current financial results, and more importantly, charting the financial future of your business, the CFO is an indispensable ally, whether you're just getting started or ready for an exit. At Early Growth, we understand entrepreneurs and the challenges they face when building a company.

> Our team of CFOs have decades of startup expertise, and can provide a cost- effective, practical solution for your business. From building financial models for your fundraise, to forecasting the pathway to hit your next milestone, our CFOs ensure you've got a partner to guide the way. CFO solutions are available on a month-to-month basis, as well as for individual projects on an as-needed basis."

> Defendant Hilberman was the Company's CFO provided by EGFS pursuant to a contract

---

[2] Chief Operating Officer ("COO"); Vice-President Business Development; Senior Director of Marketing; Vice-President of Marketing and Business Development.

between the Company and EGFS.

17.    From early 2011 through at least late 2016, EGFS rendered a variety of accounting services to the Company under a written contract entitled "Finance and Administrative Services Agreement," which included general accounting oversight, treasury management, accounts payable and accounts receivable management, oversight of monthly account closure in accordance with Generally Accepted Accounting Principles (GAAP), basic financial reporting, coordination of annual audits, financial and business modeling, and general budgeting and forecasting work. Under this contract, EGFS charged the Company on an hourly basis for the services of four categories of EGFS employees: CFO, Project Manager, Controller, and Senior Accountant. Plaintiff is informed and believes and thereon alleges that EGFS directed Defendant Hilberman to serve in the capacity of TechShop's "outside CFO," knew of, and had the duty to control and supervise his actions in that capacity, and is therefore vicariously responsible for those actions as his employer and for its negligent supervision of him. Plaintiff is informed and believes that the actions attributed to Mr. Hilberman in this Complaint were committed by him in the course and scope of his employment with EGFS.

18.    In the allegations that follow, the use of the terms "Board" or "Board of Directors" refer jointly to Defendants Newton, Hatch, Busch and Woods for activities, representations and omissions preceding July 18, 2016, but exclude Defendant Hatch after that date, when he resigned as Company director. The term "officers" refers jointly to Defendants Newton, Hatch, Woods, and Hilberman for activities, representations and omissions preceding July 18, 2016, but exclude Defendant Hatch after that date, when he resigned as Company officer. Also in the allegations that follow, Plaintiff's reference to "the individual Defendants" is meant as descriptive only; it does not exclude from legal responsibility EGFS, which employed, supervised, sanctioned and ratified Mr. Hilberman's acts and omissions (or alternatively failed to despite having a legal duty to do so) which were committed in the course and scope of his employment with EGFS.

C.    The Company's Funding

19.    Plaintiff is informed and believes that at all times after 2013, the Company never had assets that exceeded liabilities, never was able to pay its bills when they came due and never had

-6-

1779841.1 - TECHSHOP.KAELIN

positive operational cash flow. Plaintiff is informed and believes that Defendants knew or should have known that the Company was during this time never profitable or "solvent."

20. From the beginning, the Company relied primarily on three sources of money to fund its operations: large secured loans from Autodesk, Inc. ("Autodesk"), a large unsecured loan from Lowe's Companies, Inc. ("Lowe's"), and millions of dollars in "small investor" unsecured loans and stock purchases.

**Autodesk Convertible Loans**

21. Autodesk, headquartered in San Rafael, California, makes software for the architecture, engineering, construction, manufacturing, media, and entertainment industries.

22. Plaintiff is informed and believes in March 2011, January 2012 and March 2013, Autodesk made loans to the Company of $6,000,000, $5,000,000 and $3,500,000, respectively, to fund operations. The loans were due in five years with 5% annual interest and secured by substantially all Company and subsidiary LLC store assets. Autodesk had the option to convert all or a portion of this debt into Company stock.

23. The first Autodesk loan fell due in March 2016, and was extended once to September 2016, at which time $7,500,000 was due. The Company could not make that payment or repay the second Autodesk loan, which fell due in January 2017. According to the Proof of Claim filed by Autodesk in the Debtor's bankruptcy (Claim No. 230), Autodesk received no money on the three loans and claims it is owed $18,978,611.11 principal and accrued interest.

**Lowe's Convertible Loan**

24. In May 2012, the Company entered into a note payable agreement with Lowe's, a large retail home improvement company, for $1,750,000, bearing 10% annual interest, due in full in May 2017. The note was to be secured by a blanket security interest—which Plaintiff believes was never perfected—in substantially all Company assets and all assets of the subsidiary LLC stores, subordinate to the first two Autodesk loans. Lowe's had the option to convert all or a portion of this debt into Company stock.

25. Plaintiff is informed and believes the Lowe's monies were earmarked for a TechShop store build-out in Round Rock, Texas, to be built within or adjacent to an existing Lowe's store.

-7-

Case: 18-50398   Doc# 238   Filed: 01/29/20   Entered: 02/29/20 10:36:28   Page 7 of 33
1779841.1 - TECHSHOP.KAELIN

26.    Plaintiff is informed and believes the Company made no principal or interest payments on the Lowe's note, and at year-end 2017, the note was more than $2.7 million in arrears.

**"Small Investor" Loans**

27.    Plaintiff is informed and believes Defendants knew the Company could not succeed based on revenue from the operations and the convertible loans alone and needed additional capital to survive.  Beginning in 2008 and continuing to the time it ceased doing business, the Company raised millions of dollars through unsecured loans from individuals in amounts ranging from $3,000 to $155,000.  Obligors on such loans would be either the Company or one of the subsidiary LLCs. These were referred to by the Company's Board as "small investor loans."

28.    Plaintiff is informed and believes most "small investors" were individuals who also were prospective purchasers of TechShop memberships who were actively solicited to loan money to the Company (or to a particular subsidiary LLC) when they expressed interest in a membership. As an inducement to invest, these prospective members were offered "lifetime VIP memberships" for a loan of $25,000 or more. Plaintiff is informed and believes and thereon alleges that most of the small investors were "unaccredited and unsophisticated."

29.    Plaintiff is informed and believes the Company's loan solicitations were made by direct pitches to prospective members and through webinars on the Company's website.  One such typical presentation, created and distributed in early 2015, is entitled "TechShop Investment Opportunity."  Plaintiff is informed and believes the Board, with direct input and assistance from Defendant Hilberman, created, approved or ratified all solicitation materials.

30.    This marketing piece, supposedly an objective solicitation to small investors, was presented both in written form and via webinar by Defendants Hatch and Hilberman on February 10, February 24, March 11, and March 24, 2015.  It is replete with false, misleading, incomplete, and incorrect statements, including the following:

- **According to *Inc.* magazine in 2014, TechShop was the 611th fastest growing privately-owned company in the United States among "manufacturing companies" and 16th in the San Jose metro area, with 778% growth over the past three years (p. 36).**

This is misleading by omission because it focuses solely on Company revenue growth to the

-8-

Case: 18-50398    Doc# 238    Filed: 01/25/20    Entered: 01/25/20 10:36:28    Page 8 of 33
1779841.1 - TECHSHOP.KAELIN

exclusion of profitability metrics, a much more relevant investment consideration. Nowhere do the presentation materials or any other solicitation materials disclose the Company's 2014 operating profit was negative $3.9 million; its 2014 net income was negative $8.4 million; its accumulated losses over its eight-year existence nearly $35 million; and that its "growth" had only exacerbated such losses. Thus, its statement about growth—contained in a supposedly objective informational presentation—was one-dimensional, incomplete, and deceptive.

- **TechShop had 7,000 active members (p. 59).**

This overstated membership by 40%. In the April 2016 Company Board meeting, Defendant Hilberman reported the number of "core members" (those who actually paid dues) to be 5,000, which had remained flat over the preceding year.

- **Three "sample stores" (San Francisco, Detroit and Chandler) had positive EBITDA for 2014 (totaling $1.03 million) with operating income margins of 29%, 18% and 10% respectively (p. 60).**

EBITDA is an accounting acronym (Earnings Before Interest, Taxes, Depreciation, and Amortization) used to measure a company's "operational" profitability, without regard to book entries on an income statement (interest, taxes, depreciation, amortization), usually considered "non-operational" expenses. The above statement was false and misleading for at least three reasons:

First, the choice of three "sample" stores, excluding five other then-existing stores (Menlo Park, San Jose, Austin/Round Rock, Pittsburgh and Arlington) is classic cherry picking and thus materially misleading by omission. According to the Company's audited 2014 financials, the other five stores had combined *negative* EBITDA of nearly $5 million and *negative* 68% operating margin in 2014. This was not disclosed, nor was the fact the Company's overall 2014 EBITDA (all stores combined) was minus $3.95 million, a negative 33% operating margin.

Second, it fails to include in these stores' EBITDA their full share of the significant central administrative expenses (payroll, benefits, legal, HR, finance and accounting) incurred by the Company for all the subsidiary LLCs.

Third and finally, two of the three "sample" stores had significant recurring monthly interest payment obligations on small investor loans which were excluded under EBITDA. Excluding those

-9-

Case: 18-50398   Doc# 238   Filed: 01/29/20   Entered: 01/29/20 10:36:28   Page 9 of 33
1779841.1 - TECHSHOP.KAELIN

interest payments from operating expenses in any profitability calculation significantly skewed their numbers and rendered the financial representations materially false and misleading.

- **TechShop's revenues grew from $9.8 million in 2013 to $12.0 million in 2014 and had increased thirty-fold ($0.4 million to $12.0 million) in the previous six years with the addition of five new stores (p. 59).**

This statement is deceiving because it speaks only to revenue growth, not profitability. The Company's *negative* net income in 2013 (minus $6.3 million) grew significantly in 2014 (minus $8.4 million) and its *negative* EBITDA in 2013 (minus $2.7 million) also grew significantly in 2014 (minus $3.95 million). Again, this is a material misrepresentation by omission. So, too, is the boast about a thirty-fold revenue increase over the previous six years (year-end 2008 through year-end 2014) from the addition of five new stores. The Company's *negative* net income during that period increased seven-fold (minus $1.2 million to minus $8.4 million) and its *negative* EBITDA increased nearly four-fold (minus $1.0 million to minus $3.95 million). Thus, the implied representation in the webinar presentation that increased revenue and more stores was a good thing for the Company painted a totally false and misleading picture. In truth, such "growth" had only caused the Company to lose more money.

- **Historically new TechShop stores had been funded "through small loans" (pointing to the Menlo Park, San Francisco and San Jose stores) while new stores were now "funded largely through institutions" (pointing to funding and grants from Arizona State University, St. Louis sources, and City of Los Angeles) (p. 61).**

The overall implication from the webinar presentation was that TechShop was growing, its revenues were skyrocketing, it was operationally profitable (positive EBITDA), its growth had been funded only by people (such as those being solicited) who made "small loans," and the Company would be even more profitable in the future because of large public institutions' grant money to open new stores.

But the small loans were not really "small." Cumulatively, at year-end 2014, they were going-forward Company obligations of more than $7.2 million. And while such loans were financially important to the Company, it had survived from 2011 through 2013 only because of the

Case: 18-50398    Doc# 238    Filed: 01/29/20    Entered: 01/29/20 10:36:28    Page 10 of 33
1779841.1 - TECHSHOP.KAELIN

three *large* Autodesk loans.[3]  The Company had burned through the Autodesk monies by year-end 2013, thus the desperate need to solicit small investors for loans (that the Defendants knew could not be repaid).

The claim that "grant" money funded new store openings was false and misleading by omission.  Two of the Company's four then recently-opened stores (Austin/Round Rock and Arlington) had been built not through grant funds but from loans made by large, institutional type lenders.[4]  Moreover, no grants for the referenced St. Louis and Los Angeles stores existed at the time the representation was made.  Thus, the claim small loans and entity "grants" were primary sources of TechShop funding was incorrect and deceptive.

- **"Future Outlook: 20+ projects in development" (p. 66).**

When this statement was made to solicit loan money from small investors in early 2015, the Company—per contemporaneous Board of Director minutes—was $800,000 in arrears on currently-due payables, was negotiating with subsidiary LLCs' landlords about unpaid rent,[5] and was "not current on small lender note payments."  None of this was disclosed to the potential investors.  The representation by the Company's Board and officers to prospective small investors— suggesting Company financial wherewithal not only to repay their loans but to expand to twenty additional stores—was materially false, misleading and reckless.

- **"Future Outlook: $150 to $250 million commitments over 10 years with 1/2 in first year" (p. 66).**

Plaintiff is informed and believes this vague and ambiguous statement was made by the Defendants with the intent of implying to potential small investors that the Company had existing, immediately available financial commitments for between $75 million to $125 million.  Plaintiff is further informed and believes Defendants had no basis in fact for making such a misleading

---

[3] Neither the huge Autodesk funding or the Company's payback obligation (over $7 million due within a year) were disclosed in the presentation.

[4] The Austin/Round Rock store was a build-out funded by the Lowe's $1.75 million loan (to be secured by all Company and subsidiary LLC assets).  The Arlington store was a build-out funded by landlord CESC Plaza, LP's $854,500 loan (secured by the Arlington store's trade fixtures).

[5] In August and September 2014, just a few months before this presentation, attorneys for landlords of the San Francisco, San Jose and Austin/Round Rock stores sent threatening foreclosure letters to the Company because of unpaid rent in those months.

-11-

statement.

- **Likening an investment in TechShop to an investment in AirBNB, WeWork or Uber (companies with valuations in the billions), the materials said "[t]he market is begging for more TechShop locations, access to capital is our limitation on expansion opportunities" (p. 71).**

This highly-overstated marketing hype, encouraging speculative investment, is presented in a supposedly objective investment solicitation.

31.     Plaintiff is informed and believes Defendants Newton, Hatch, Busch and Woods, as officers and directors of the Company, and Defendant Hilberman, as outside CFO, allowed and encouraged Company marketers to solicit such loans from prospective small investors knowing of the false and misleading nature of the statements in the presentation described in the preceding paragraph.     Plaintiff is further informed and believes small investors in fact did rely on the misinformation in the presentation materials and would not have extended loans to the Company had they been fully informed of the true facts of the financial condition of the Company.

32.     Plaintiff is informed and believes that Defendants contend that the webinar and marketing presentations for the small investor loans were superseded by one or more private placement offerings in which the small investor loans were characterized as a "subscription," and some such investors were provided a Private Placement Memoranda ("PPM")[6] and "financials" before investing.     Plaintiff is informed and believes the Board, with direct input and assistance from Defendant Hilberman, created, approved or ratified all PPMs provided to small investors.     These PPMs, although containing boilerplate and perfunctory risk warnings were false and misleading because of material omissions, including:

Accumulated deficits: The Company had accumulated enormous deficits ($26 million, $34 million, and $43 million in 2013, 2014 and 2015, respectively) on its balance sheets, which were not included or disclosed in the PPM financial disclosures.

Frank, Rimerman & Co., LLP Audits: The only independent audit of the

---

[6] PPMs were issued shortly after the Company's incorporation and were periodically updated, mainly with more current financials.

Case: 18-50398     Doc# 238     Filed: 01/29/20     Entered: 01/29/20 10:36:28     Page 12 of 33

1779841.1 - TECHSHOP.KAELIN

Company's financials (covering 2013 through 2015) contained a highly significant, negative opinion by the auditor that it was probable the Company could not pay its bills in the following year stating, "[T]he Company incurred a net loss of $8,920,000 during the year ended December 31, 2015, and, as of that date, had an accumulated deficit of $43,348,000. **Those conditions raise serious doubt about the Company's ability to continue as a going concern**," which was disclosed to Defendants, misrepresented as not as significant and knowingly and intentionally omitted from the PPMs and not disclosed to the investors. **"""**

In other words, bankruptcy was likely imminent. Unbelievably, no disclosure was made in the PPMs of the auditor's opinion and the Company raised an additional $3,000,000 from small investors.

**Small investor defaults:** Simultaneously while soliciting new money from small investors, the Company had defaulted—or was seriously delinquent—on loans to earlier small investors. The PPMs failed to disclose this fact. If these defaults had been disclosed, it likely would have alerted the later small investors to the Ponzi-like scheme aspect of the Board's capitalization strategy.

**Looming Default on Autodesk Loans:** Only in later PPMs was the huge Autodesk debt ($15 million+) disclosed to small investors. In the May 2016 PPM, the Company softened its immediacy, saying Autodesk had agreed to extend its first loan's due date from March to September 2016 and the Company was negotiating either to convert that $7.5 million debt obligation to Company stock or extend the loan's due date yet further. Concealed was the fact that Autodesk had expressed no interest in 2016 to convert any portion of its loans to worthless TechShop stock; Autodesk's second loan (now at $6.25 million) came due in about six months at which time both loans (nearly $14 million) would be *immediately* payable and the Company could satisfy neither of them and would thus likely default. Each of these omissions of fact were material to the small investors solicited with the PPMs.

**Company recognition of its leaders' ineffectiveness:** Company

-13-

management and processes are material considerations in any passive investment in a company. In its own critical internal assessment (written in early 2016), the Company concluded, "[a]fter ten years in business, TechShop lacks basic capabilities and business processes necessary to conduct its business efficiently and effectively." The PPMs contained no mention of this frank, unfavorable self-assessment.

**CEO Hatch's Issues:** The Company's Board (other than Mr. Hatch) had long considered CEO Mark Hatch an incompetent manager who misused investors' money and often showed up at store sites appearing to be under the influence of alcohol or drugs. Remarkably, the Company's May 26, 2016 PPM solicitation to small lenders extolled Mr. Hatch's business acumen which was directly and savagely contradicted by the Company Board's internal assessment (a written "Corrective Action Plan") dated just eleven days later.

Despite the undeniable materiality of management and of these irreconcilable representations, none of the negative comments were disclosed to the small investors.

33.     Plaintiff is informed and believes Defendants Newton, Hatch, Busch and Woods, as officers and directors of the Company, and Defendant Hilberman, as outside CFO, allowed and encouraged Company marketers to continue soliciting loans from prospective small investors knowing the PPMs omitted material facts and without disclosing these facts. Plaintiff is further informed and believes the small investors did in fact rely on the misinformation contained in the PPMs and would not have extended loans to the Company had they been fully informed of the true facts.

34.     The PPM and Company financials were also misleading because they failed to disclose the impact that lifetime VIP membership grants would have on future Company financial stability. The Board recognized in 2015 the Company needed at least 8,000 *dues-paying* members ("core members") to achieve positive EBITDA, but as of April 2016 it had only 5,000. And that number had remained flat from the previous year. Yet the Board continued a strategy of raising operating capital through such lifetime VIP membership grants. So, while the small investor program raised short-term operational cash, it virtually guaranteed massive Company defaults, yet

Case: 18-50398    Doc# 238    Filed: 01/29/20    Entered: 01/29/20 10:36:28    Page 14 of 33

1779841.1 - TECHSHOP.KAELIN

another fact Defendants concealed from prospective small investors.

35.     With some variations, a small investor note typically would carry 8-10% annual interest with a ten-year term, interest-only payments made for the first five years and fully amortized payments over the final five years.   The minimum small investor loan amount was $25,000. Payments on the note were due once annually on the note's anniversary, thus giving the Company free use of the money for a year.

36.     Plaintiff is informed and believes that by year-end 2013, the Company had exhausted the Autodesk loan proceeds and was relying almost exclusively on small investor loans (and small investor stock purchases) to fund operations and cover operational deficits.

37.     Plaintiff is informed and believes that between 2008 and November 2017, the Company and its subsidiary LLCs solicited several hundred such small investor loans, totaling more than $10 million.

38.     Based on James Newton's "rob-Peter-to-pay-Paul" testimony given in this bankruptcy proceeding, Plaintiff is informed and believes Defendants permitted loan monies from subsidiary LLC notes to be commingled between and among the Company and the various subsidiary LLCs.  Monies received on a San Jose LLC note, for example, could be used to fund Pittsburgh LLC expenses without proper legal documentation.   Defendants thereby depleted, diverted and misdirected corporate funds.

39.     The Company's small investor program became, over time, essentially a Ponzi-like scheme: The Company raised new debt to service older debt.  Money from later small investors was used in part to pay some early small investors' note obligations (usually only after an early investor dunned the Company several times).

40.     The Ponzi-like nature of the small investor loan program is apparent from the Board's own minutes.  The December 16, 2014 minutes, for instance, note "TechShop has not been current with its small lender notes payments."   Yet, the same minutes reveal the Board agreed that an important going-forward corporate funding strategy was to "continue to target, . . . solicit, . . . and *aggressively pursue* [new] small investors. [emphasis added]"

41.     Plaintiff is informed and believes Defendants Newton, Hatch, Busch and Woods, as

-15-

Case: 18-50398   Doc# 238   Filed: 01/29/20   Entered: 01/29/20 10:36:28   Page 15 of 33
1779841.1 - TECHSHOP.KAELIN

officers and directors of the Company, and Defendant Hilberman, as its CFO from EGFS, allowed and encouraged Company marketers to continue soliciting loans from small investors for nearly three years without ever disclosing that (a) loans from prior small investors were in default, or (b) an independent audit of Company financials had cast serious doubt on whether the Company could or would repay new loans, and even whether it could continue to exist as a going concern. Nevertheless, the Defendants' actions enabled the Company to accept millions of dollars of small investor loans during this period. Plaintiff is further informed and believes if small investors had been apprised that previous loans were in default and currently solicited loans would not be repaid, they would not have extended loan monies to the Company.

42. Plaintiff is informed and believes the Company's cash situation became so desperate in 2016 and 2017, that it solicited and accepted small investor loans as low as $3,000, despite the Subscription Agreement's $25,000 minimum requirement (and despite the Company's impending bankruptcy).

### Small Investor Bonds

43. The marketing webinars described in paragraph 29 above and the PPMs and financials described in paragraph 31 offered small investors an alternative to the loan program—the purchase of Series B Preferred Stock in the Company. Similar to the loan program, the stock purchase option required slightly more than the $25,000 investment minimum. An investment in that amount conferred a lifetime VIP membership. To create a "buzz" for the stock purchase, Defendants falsely created the impression these B Series shares could be acquired at a "discount;" they were priced at $2.54 per B share and discounted 10% to $2.286 per share when sold to small investors. Plaintiff is informed and believes there was, however, nothing objective upon which the per share number was established.

44. According to the Frank, Rimerman audits, the Company had raised approximately $13.1 million from stock sales to small investors from date of inception through year-end 2015.

### The Company Was at All Relevant Times Legally Insolvent

45. Plaintiff is informed and believes and thereon alleges that since at least 2011, the Company was insolvent as defined by one or more of the three legally-recognized insolvency

criteria: (a) its liabilities always exceeded its assets, (b) after year-end 2013, when the Autodesk monies were exhausted, it incurred debts beyond its ability to pay as they came due, and/or (c) it was engaged in a business for which its remaining assets were unreasonably small in relation to that business.

46.     The Company kept QuickBooks entries for itself and each subsidiary LLC.  These unaudited financials show that from its inception the Company, on a consolidated basis, always had negative EBITDA (on the order of $2.7 million to $6.6 million a year from 2011 through 2016), and its liabilities far exceeded its assets (from $2.3 million in 2011 to more than $30 million in 2016).

47.     Plaintiff is informed and believes and thereon alleges that debts were not being paid as they matured and at least as early as 2014, the Board adopted a deliberate plan to defer paying its operating expenses—referred to euphemistically at Board meetings as "aging payables aggressively."

48.     Only once in the Company's history did its Board direct Company financials to be audited—for the two-year periods 2013-14 and 2014-15.  This Frank, Rimerman combined audit examined the *consolidated financials* for the Company and the LLCs for those years.  Its findings were stunning, and financially damning: the 2014 balance sheet showed Company and store assets of $11 million but liabilities exceeding $34 million ($23 million negative).  The 2015 figures were even worse ($30+ million negative).

49.     The consolidated income statements showed in 2013 through 2015, growing net income losses (-$6.3 million; -$8.3 million; -$8.9 million), growing accumulated deficits (-$26.1 million; -$34.4 million; -$43.3 million), and abysmal EBITDA margins (-28%; -33%; -31%). These numbers were never brought to the attention of the small investors.

50.     The audit reports also displayed what the Company's future years' *minimum required* payments that would become due on (a) Autodesk, Lowe's and small investor loans, and (b) store lease contracts.  If paid when due, these *required* note and lease obligations alone would exhaust all estimated revenue, leaving nothing to pay employee wages, third party vendors, ordinary administrative expenses or other operating expenses.  The Company would be hemorrhaging $10 million negative cash yearly.  Again, these facts were not disclosed to the small investors.

-17-

1779841.1 - TECHSHOP.KAELIN

51.     As required by recognized accounting principles, Frank, Rimerman analyzed whether the Company would be viable for at least twelve months, considering such factors as negative recurring operating losses, working capital deficiencies, and loan defaults. Both Frank, Rimerman audit opinion letters contained what is known in the accounting business as a "going concern qualification." The letter with the second audit report read:

> [T]he Company incurred a net loss of $8,920,000 during the year ended December 31, 2015, and, as of that date, had an accumulated deficit of $43,348,000. *These conditions raise substantial doubt about the Company's ability to continue as a going concern.* [Emphasis added.]

This finding of the Frank Rimerman Audit was not disclosed to the small investors.

52.     By inserting this "substantial doubt" language into its audit opinion, Frank, Rimerman signaled loud and clear that, despite the Company's proposed plans to add yet more debt and sell yet more stock to operate and service past debt, the Company more likely than not would not be able to pay its debts in the next twelve months and probably would cease to exist.[7]

### 2016 Operations

53.     Even the dismal numbers in the Frank, Rimerman audits did not adequately reflect the disturbing real-life implications of the Defendants' machinations. The Company operated throughout 2015 and 2016 with barely enough cash to meet one month's rental and payroll obligations. In March 2016, the Company could not make payroll and did not pay its employees for more than a month. Board minutes in 2016 reflect that the Company failed on several occasions to pay rent to store landlords, forcing it to negotiate rent forgiveness.

54.     The Board's irresponsible, if not fraudulent, mind-set about Company operations is revealed in its February and April 2016 meeting minutes. The Board had adopted a Band-Aid

---

[7] Professional accounting standards require auditors to preview with company management any intent to place a "going concern qualification" in an audit report, and then evaluate management's proposed mitigation measures. One can assume Frank, Rimerman's auditors were true to this protocol, but unimpressed with the Board's going-forward plan: dupe more small investors into lending money or buying stock and hope for a large angel investor bailout.

approach to the Company's near-term operational cash deficiencies—"continue to raise $100,000 a week [from] small investors"—and resorted to wishful long-term thinking: find a deep pocket willing either to invest $5-$10 million in the Company or sign a "licensing deal with significant upfront payments."

55.     Yet, given that Autodesk, Lowe's, and the small investors were owed more than $30 million, the Autodesk loan was secured by substantially all Company and subsidiary LLC assets, and Frank, Rimerman had twice rendered going concern qualifications, the notion that an outside deep pocket would magically appear was inconceivable and Defendants knew so or should have known so.

**The Board's Gross Negligence: Adding More Stores**

56.     By the Company's own calculation, the cost to open a new TechShop store was between $3.25 and $5 million (for construction, equipment and "launching").  In 2012, the Board adopted a policy that the Company would only open a new store if it would be EBITDA-positive in its first year's operation.

57.     Despite lip service to this restrictive policy, and despite nearly every existing store's negative EBITDA, the Board in 2016 forged ahead with new store growth, analyzing neither feasibility nor repercussion (even when bankruptcy was obvious, for example, the Company opened new stores in St. Louis and Brooklyn).

58.     Rather, its expansion rationale, as reflected in the February 2, 2016 Board meeting minutes, dismissed the Company's financials.  At that meeting, the Board was presented with fourth quarter 2015 results showing Company stores' financial performance "the worst in Company history," and Company survival to mid-year 2016 "significantly at risk" unless it could find an investor to infuse $10 million into the Company and/or raise $100,000 a week from small investors and/or finalize a licensing deal (presumably overseas) with significant upfront payouts.

59.     Despite this dire financial position, the Board discussed whether the Company's business focus should be to increase revenues at existing stores or to continue its "growth plans."  Without explanation or analysis, it chose the latter, stating "[t]o break even, we need to grow to 10-12 stores."  Further, "even if margins are small, we need to create a footprint to demonstrate that

-19-

TechShop success is not just a Bay Area novelty."

60.     But the minutes reflect no discussion of such obvious questions as: how expanding to 10-12 stores would create "break-even" when existing stores had always been negative net income; what "small margins" were; what "success" Bay Area stores had; or, what creating a "footprint" (a nebulous marketing term) meant in financial reality.

**Mark Hatch Firing and Severance Deal**

61.     In summer 2016, Mark Hatch was fired as Company CEO and replaced by Defendant Dan Woods.  Defendant Newton testified in these bankruptcy proceedings that the Board fired Mr. Hatch "for cause" because Mr. Hatch concentrated more on seeking outside investors than on improving store profitability.

62.     Mr. Newton's testimony on this subject, however, is inconsistent with the facts and hides the gross negligence of the Board.  The Company's internal records attest to much deeper, long-standing problems the Company's other Board members had with Mr. Hatch's performance, abilities, and undesirable personal proclivities.  The June 6, 2016 Corrective Action Plan cited among other things, his failure to establish acceptable internal business processes, extravagant travel and entertainment spending and ineffective leadership.  That Plan also set out four specific mandates Mr. Hatch had to satisfy within ninety days.  Rather than attempt to do so, he resigned, effective July 18, 2016. Again, these facts were concealed from small investors.

63.     Plaintiff is informed and believes in connection with the resignation, the Board approved a severance package obligating the Company to pay Mr. Hatch nearly $70,000 despite the Company's insolvency, inability to pay creditors, and default on small investor loans.

**San Jose New Store Construction Contract**

64.     The land lease at the San Jose store was due to expire mid-year 2016 and would not be renewed since the landlord had plans to raze the building.  The Board approved a new fifteen-year lease on premises in San Jose, next door to the Company's corporate location.

65.     In May 2016, shortly before the Hatch resignation and despite the Company's precarious cash situation, the Board approved a contract with BHL Services, Inc. ("BHL"), a Minnesota corporation, for tenant improvements at the new premises ("San Jose Contract").  The

Case: 18-50398    Doc# 238    Filed: 01/29/20    Entered: 01/29/20 10:36:28    Page 20 of 33
1779841.1 - TECHSHOP.KAELIN

cost was enormous: $2,099,533.[8]

66. Plaintiff is informed and believes that the president and primary shareholder of BHL in 2016 was (and still is) William Lloyd, an "army buddy" of Defendant Hatch. Plaintiff is further informed and believes the Board approved the San Jose Contract and earlier BHL–TechShop construction contracts without requiring competitive bids or arm's length negotiation. Consequently, the San Jose Contract's amount, like the others, contained overly inflated charges.

67. The San Jose Contract was entered into when the Company and its subsidiary LLCs were insolvent under any of the three legal insolvency tests. Not only was the San Jose Contract a sweetheart deal for Hatch's buddy Lloyd, it was an unnecessary expense, incurred recklessly when the Company had no ability to make the enormous payments about to come due, in complete derogation of the interests of the Company's creditors.

68. BHL submitted its first invoice in early August 2016, for $155,858.69, due in thirty days. Board chairman Jim Newton wrote to small investor members who used the San Jose facility informing them that TechShop San Jose "is facing a serious budget gap for the construction of the new facility," a fact well known to the Board when the San Jose Contract was signed only a few months earlier.

69. No payment was made on this initial invoice for three and one-half months, and then only a portion of it ($90,000). Meanwhile Defendant Newton made a second plea to those small investor members in an email dated October 8, 2016, carrying as the subject line: "URGENT! Help Save TechShop San Jose." The email implored,

> We are now approaching a critical deadline, and TechShop San Jose
> is in serious jeopardy of having to close its doors for good.
> We need your help in raising $1M by Sunday, November 6th.

It did not explain the significance of the November 6 date other than the immediacy to raise "funds necessary to cover the construction budget." The email asked members to pledge $17,500 each.

---

[8] The San Jose Contract was entered into between BHL and subsidiary TechShop LLC. BHL claims in this bankruptcy that the contractual amount unpaid and owed is actually a Company obligation because of alleged unity of interest between the Company and the subsidiary LLC.

Case: 18-50398    Doc# 238    Filed: 01/29/20    Entered: 01/29/20 10:36:28    Page 21 of 33
1779841.1 - TECHSHOP.KAELIN

70. BHL submitted a second invoice on December 12, 2016 for a whopping $900,000, payment due on January 15, 2017.

71. Plaintiff is informed and believes the email pledge solicitation was unsuccessful and the money to pay BHL was raised through another source, the French company, Adeo/Leroy Merlin. On December 20, 2016 the Board and Defendant Hilberman convened an emergency telephonic conference and unanimously passed the following Resolution:

> **In so much as:** The financial status of TechShop, Inc. as of this date, and the stated position of TechShop, Inc. creditors regarding past due obligations, will result in severe financial damage to TechShop in early January, and likely result in it not being able to continue operations.
>
> **And in as much as:** Group Adeo/Leroy Merlin France has made an offer to purchase the ownership of the TechShop brand in France for $1,000,000 USD,
>
> **Therefor:** in the best interests of all shareholders, investors, creditors and members, it is critical that this offer be accepted without delay or attempts at further negotiation.

72. Based on the timing of the email solicitations, BHL invoices, and this Resolution, Plaintiff is informed and believes the ceding to Adeo/Leroy Merlin of a perpetual license to use the TechShop brand in France was compelled by BHL pressure to pay it monies claimed due under the unnecessary San Jose Contract.

73. The San Jose Contract was a needless waste of Company funds. According to materials submitted by BHL in this proceeding, although it claims to be owed $688,622.57 on the San Jose Contract, it concedes it was paid $1,525,858.69 on the contract in the year preceding TechShop store closures:

| November 2016 | $90,000.00 |
| December 2016 | $345,000.00 |
| January 2017 | $381,659.16 |

-22-

Case: 18-50398   Doc# 238   Filed: 01/29/20   Entered: 01/29/20 10:36:28   Page 22 of 33
1779841.1 - TECHSHOP.KAELIN

| | |
|---|---|
| April 2017 | $179,199.53 |
| May 2017 | $40,000.00 |
| June 2017 | $15,000.00 |
| July 2017 | $230,000.00 |
| August 2017 | $96,000.00 |
| September 2017 | $75,000.00 |
| October 2017 | $75,000.00 |

**Knight Foundation Grant and Its Lawsuit**

74.  In 2016, Defendants Hilberman and Woods, on behalf of the Company's Board, negotiated an agreement with the John S. and James L. Knight Foundation ("Knight Foundation") for grant funds, which resulted in an agreement signed in November 2016. Under the agreement, Knight Foundation was to fund memberships, access, and use by 900 plus San Jose State University students of the TechShop San Jose facility. Plaintiff is informed and believes Knight Foundation paid $418,000 in grant monies to the San Jose TechShop subsidiary in December 2016 for these purposes.

75.  On June 21, 2018, Knight Foundation sued TechShop San Jose LLC, Hilberman, EGFS, and Woods in Santa Clara County Superior Court alleging, among other things, these Defendants were guilty of fraud, negligence, and breach of contract in obtaining and using the grant monies. Further, that the grant monies were converted and misappropriated by commingling them with Company funds for general use for its operations and the operations of subsidiary LLCs other than the TechShop San Jose LLC. The Knight Foundation lawsuit further alleges the use of the grant monies in such a manner violated the directives of the grant and was not approved by, or even disclosed to, the Knight Foundation.

76.  The Knight Foundation lawsuit further alleges that under the grant agreement, Knight Foundation is entitled to pursue a claim against the Company, its directors and officers, and Mr. Hilberman for immediate repayment in competition to both the claims of the Company's other creditors here and the Company's right to full access to its directors and officers liability insurance, an asset of the Company's estate. Defendants' efforts to secure for their own personal benefit

COMPLAINT FOR MONETARY DAMAGES

1779841.1 - TECHSHOP.KAELIN

insurance coverage for the acts alleged in the Knight Foundation Lawsuit is in direct conflict with the rights and interests of Plaintiff on behalf of the Company's creditors. Ultimately, the Knight Foundation lawsuit was settled in part with funds from the Debtor's estate.

### 2017 Operations

### Small Investor Loan-to-Equity Push

77.     In late 2016 and into 2017, the Board was receiving increasing pressure from small investors for payments on their notes. Realizing the Company could not service those debts, the Board instituted a program to implore small investors voluntarily to forgive their loans in exchange for Series B stock. Plaintiff is informed and believes that in June 2017 the Company, at the instance of Defendants Newton, Busch and Woods and outside CFO Hilberman created nine "investor committees" (one for each subsidiary LLC) to appeal to all investors to make loan-to-equity conversions.

78.     As part of this program, in June and August 2017 (only months before it closed all its stores), the Company, at the direction of those same director and officer Defendants, presented highly misleading webinars to existing small investors intended to induce loan-to-equity conversions. In these presentations, the Company said it contemplated a strategic "pivot" whereby the Company planned to license, not own, any *newly-opened* (not existing) TechShop stores in the United States and to offer to the licensees, fee-based "managed services"—assistance in planning, designing, staffing, equipping, and operating the stores. The small investors were told this new business model could not succeed unless a "super majority" (undefined term) of them forgave their loans in exchange for Series B TechShop stock.

79.     The webinar presentations were misleading or false for at least five reasons:

First - the presentations said that if a super majority converted loan-to-equity, Autodesk would do the same with a "significant portion" of its loans and would sell its remaining debt "at steep discount." Plaintiff is informed and believes Autodesk never agreed to this and the Defendants knew it.

Second - the presentations were essentially an unexplained pipe-dream scenario of the Company miraculously changing a $43 million operating deficit into positive $3.6 million net

COMPLAINT FOR MONETARY DAMAGES

income within two years.

Third - the presentations said the TechShop subsidiary LLC stores had improved financial performance, were close to EBITDA-neutral, and most were "at or near profitability." These statements were false and misleading by omission.

Fourth - the presentations falsely touted TechShop's international business, supposedly consisting of four licensed stores, as a "successful and profitable model." Two of those were the Adeo/Leroy Merlin stores in France. But, as explained above (paragraphs 71-72), six months earlier, Adeo/Leroy Merlin had bought a one-time payment perpetual license to use the TechShop brand anywhere in France and the license fee was used to pay BHL under the ill-conceived, sweetheart, San Jose Contract. The small investors were never told about that perpetual license fire sale, or of the Company's precarious financial position that led to it, or that Adeo/Leroy Merlin franchise fees from French operations were a thing of the past.[9] The materials instead wrongly implied continuing Adeo/Leroy Merlin franchise payments as part of the Company's international "successful and profitable" business model.

Fifth - the so-called "pivot" to a domestic licensing model applied only to *newly-opened* TechShop stores in the United States. Yet, the lead time for any new store operation was many months; Defendants knew or should have known the Company could not possibly survive that long. In short, the entire loan-to-equity program was a ruse that stripped unsuspecting small investors of their creditor status.

80. During the summer 2017 loan-to-equity conversion sales pitch, the Company, with the knowledge and approval of then-director and officer Defendants Newton, Busch and Woods and outside CFO Defendant Hilberman with EFGS' knowledge and ratification, professed to existing small investors that the Company and the subsidiary LLCs could not survive if they had to repay outstanding note obligations. Yet throughout 2017—until the very month it closed its stores—these Defendants allowed Company marketers to continue soliciting and accepting new small investor

---

[9] The fee arrangements of the other two international store licensees—Fujita (Tokyo store) and the United Arab Emirates government (Abu Dhabi store)—are unclear from the records and testimony supplied so far in this bankruptcy.

1779841.1 - TECHSHOP.KAELIN

1    loan money, never disclosing such inability to repay.

2       81.     Also as part of the loan-to-equity conversion push, in early June 2017 the Company,

3 with Board knowledge and approval, sent to all small investors a FAQ question and answer piece

4 that among other things: (1) acknowledged the Company had been both opaque in disclosing

5 financial information to small investors in the past and had been unresponsive to their inquiries

6 about unpaid note obligations; (2) suggested falsely that the Company could "force" small investors

7 to convert to equity if they did not voluntarily do so; (3) threatened that the Company would file for

8 bankruptcy if small investors exercised their legal right to arbitrate overdue note payments; (4)

9 falsely implied the Company's audited 2014-15 financials had "qualified" the Company as a "going

10 concern;" and (5) implied Autodesk would forgive its huge debt position and convert it to Company

11 stock.

12       82.     Plaintiff is informed and believes Defendants Newton, Busch and Woods, as officers

13 and directors of the Company, and Defendant Hilberman, as outside CFO, conceived of and directed

14 implementation of the false and misleading 2017 loan-to-equity push, stripping numerous small

15 investors of creditor status. Although the precise number of victims is not yet known, it is clear

16 those Defendants deceived creditors and in so doing breached their fiduciary duties. Plaintiff will

17 seek to amend this Complaint when the exact number is determined.

18                         **Store Closures and the Dan Rasure Transaction**

19       83.     The Company ceased doing business and shuttered all its subsidiary LLCs in

20 November 2017.

21       84.     Plaintiff is informed and believes shortly after the November 2017 shutdown, the

22 Board was approached by Dan Rasure, a businessman from Kansas, to explore the possibility of

23 acquiring TechShop's assets and reopening and operating some or all domestic TechShop stores.

24 Rasure, along with BHL's William Lloyd, formed "TechShop 2.0 LLC" shortly after TechShop

25 announced its store closings.

26       85.     The Board allowed Rasure and Lloyd unfettered access to subsidiary LLC stores and

27 to Company books, records, and confidential membership information to conduct a diligence

28 review. But contrary to their fiduciary obligations to TechShop's creditors, Defendants failed to

-26-

protect the Company's intellectual property by neglecting to have Rasure or Lloyd sign nondisclosure or confidentiality agreements to assure the information gathered by them could not be used if the prospective acquisition did not take place.

86. By December 1, 2017, the Board struck a tentative deal whereby TechShop 2.0 LLC would pay up to $200,000 for all TechShop assets, assume the Autodesk and Lowe's debts, and assume all existing equipment and real property leases.

87. The acquisition was unsuccessful. Plaintiff is informed and believes Rasure and Lloyd used the information and contact information gathered in the diligence review in starting their own business, initially run as "TechShop 2.0," and continued under the name "TheShop.Build" after the Company alleged tradename and trademark violations.

88. Plaintiff is further informed and believes that in January 2018, before the Company filed this bankruptcy, TechShop 2.0 entered into a turnkey lease agreement with the landlord of the Company's San Francisco LLC store.

## FIRST CLAIM FOR RELIEF

### Breach of Fiduciary Duties of Loyalty, Care and Good Faith

### (Against All Defendants)

89. Plaintiff incorporates the allegations of each of the preceding paragraphs.

90. As the Company's directors and officers, the individual Defendants owed fiduciary duties of care, loyalty and good faith to the Company creditors, all in service of the ultimate duty not to divert, dissipate, or unduly risk the Company's assets.

91. The Company's directors and officers breached their fiduciary duties to the Company, its shareholders, and its creditors in various ways, including:

(a) Adopting an overly risky business strategy of incurring, during insolvency, additional corporate debt through high interest loans to small investors they knew, or should have known, the Company could not repay.

(b) Making sundry misrepresentations to induce small investors into loans they knew, or should have known, the Company could not honor.

(c) Making sundry misrepresentations to induce small investors in 2017 to

Case: 18-50398    Doc# 238    Filed: 01/29/20    Entered: 01/29/20 10:36:28    Page 27 of 33
1779841.1 - TECHSHOP.KAELIN

forgive their loans in exchange for worthless Company stock.

(d)    Soliciting small investor loans knowing bankruptcy was imminent.

(e)    Retaining a CEO who was long recognized by other Board members as incompetent to serve in that capacity and who engaged in actions damaging to the Company, its shareholders, and its creditors.

(f)    Entering into the San Jose Contract knowing the Company could not pay for it.

(g)    Sacrificing a lucrative long-term licensing deal with Adeo/Leroy Merlin to fund short-term obligations, including the unnecessary San Jose Contract.

(h)    Violating the terms of Knight Foundation's grant, thereby giving it grounds to pursue a claim against Company officers and directors that competed with claims Company creditors had to the Company D&O insurance policy.

(i)    Paying its former CEO substantial "severance" pay despite Company insolvency and unpaid creditor obligations.

(j)    Allowing a corporate suitor unbridled access to Company books and records without legally protecting the confidential information they contained, thereby unduly sacrificing a valuable Company asset.

(k)    Wasting Company assets to establish new, unprofitable stores that only added to Company financial distress.

(l)    Allowing the Company and subsidiary LLCs to commingle assets and grant monies.

(m)    Failing to call for regular audited Company financial information.

(n)    Disclosing only selective (and deceptive) financial information from the limited audited Company financials they did call for.

(o)    Diverting, dissipating and unduly risking Company assets that might otherwise have been used to satisfy creditors.

(p)    Failing to properly identify, monitor and account for Debtor's liabilities.

(q)    Failing to protect and preserve the TechShop brand and trademark.

-28-

(r)     Failing to timely acknowledge the Company's financial situation and take appropriate action.

(s)     Failing to identify and quantify in financial statements, solicitation, PPMs, internal reports or otherwise, the Company's true financial condition.

(t)     Failing to properly plan and budget for future operations in light of the Company's financial condition.

(u)     Failing to take appropriate action in response to losses incurred.

(v)     Delaying, unreasonably, the bankruptcy filing here despite Company "insolvency" under all three legal tests, thus unduly causing Company assets to depreciate and Company expenses to increase.

92.     In engaging in this conduct, Defendants failed to exercise reasonable prudence in making business judgments for the Company; neglected to give primacy to the interests of the Company, its shareholders and creditors and dissipated, diluted and unduly risked the Company's assets and acted in their own self-interest. By engaging in the aforementioned conduct, Defendants, and each of them, have been guilty of oppression, fraud and, malice, thereby entitling Plaintiff to an award of exemplary and punitive damages in addition to the actual damages in an amount to be ascertained at trial.

93.     The breaches of fiduciary duty proximately caused damages to Company creditors in an amount subject to proof.

94.     In committing the wrongful acts herein, Mr. Hilberman was rendering professional services to TechShop in his capacity as employee of EGFS, and at all times was acting in the course and scope of his employment with EFGS. EGFS at all times retained the ability and authority to control Mr. Hilberman's actions and is vicariously responsible as a fiduciary for them.

**SECOND CLAIM FOR RELIEF**

**Aiding and Abetting Breach of Fiduciary Duties of Loyalty, Care and Good Faith**

**(Against Defendant EGFS & Hilberman)**

95.     Plaintiff incorporates the allegations of each of the preceding paragraphs. This Claim

-29-

is intended to apply against EGFS and Hilberman in the alternative in the event it is determined that the First Claim for Relief does not impose direct fiduciary obligations on EGFS and/or Hilberman

96. As set forth in Paragraph 89, the officer and director Defendants owed fiduciary duties of care, loyalty and good faith to the Company, and breached those duties.

97. As the Company's accountant, EGFS had actual knowledge of the Defendants' breach of fiduciary duties. Specifically, EGFS knew of Defendant Hilberman's actions as TechShop's "outside CFO" because he committed them in the course and scope of his employment with EGFS. Plaintiff is informed and believes and thereon alleges that Hilberman kept EGFS abreast of all material developments with and work for the Debtor and EGFS ratified that work.

98. Defendant EGFS provided substantial assistance or encouragement to the Defendants in committing the breaches of fiduciary duties. The Defendants allowed and encouraged Company marketers to solicit loans from small investors without ever disclosing that (a) loans from prior small investors were not being kept current, or (b) an independent audit of Company financials had cast serious doubt on whether the Company would repay new loans, and even whether it could continue to exist as a going concern. Nevertheless, the Defendants allowed the Company to accept millions of dollars of small investor loans during this period.

99. The conduct of EGFS was a substantial factor in causing harm to the Company, shareholders and creditors. Plaintiff is informed and believes if small investors had been apprised that previous loans were in default and currently solicited loans would not be repaid, they would not have extended loan monies to the Company.

100. The conduct of EGFS in aiding and abetting the breaches of fiduciary duty proximately caused damages to Company creditors in an amount subject to proof.

### THIRD CLAIM FOR RELIEF

### Negligence

### (Against All Defendants)

101. Plaintiff incorporates the allegations of each of the preceding paragraphs.

102. In performing their duties as officers and directors of the Company, the Defendants owed a duty of due care to the Company, its shareholders, and its creditors. EGFS owned the

Case: 18-50398   Doc# 238   Filed: 01/29/20   Entered: 01/29/20 10:36:28   Page 30 of 33
1779841.1 - TECHSHOP.KAELIN

1  Company a duty of care to properly supervise Hilberman who it placed as a CFO in charge of the

2  Company's financial affairs, including fundraising from the small investors.

3      103.    The individual Defendants as directors and officers breached their duty of care to the

4  Company, its shareholders, and its creditors in various ways, including the misdeeds described in

5  Paragraph 89 above.

6      104.    All Defendants owed a duty to the Company, its shareholders, and its creditors in

7  various ways, including the allegations described above in Paragraph 90.

8      105.    All Defendants owed a duty to the Company, its shareholders, and its creditors to use

9  reasonable care to avoid causing injury to them or their property, including the allegations described

10  above in Paragraph 90, and below.

11      106.    The Defendants failed to maintain adequate books and records regarding ownership

12  of personal property.  Defendant Newton testified that there was no list or serialized inventory in

13  order to track which personal property belonged to which entity.

14      107.    Defendants allowed the employees and contractors to continue working when the

15  Company had no ability to pay them.

16      108.    The CRM software system was, according to Paul Duggan of TS Global, a waste of

17  money and never worked.  Mr. Newton admitted that the CRM software system is worthless.

18      109.    When the Company was on the brink of closing, the Defendants allowed continued,

19  apparently unadjusted use of credit cards by employees and independent contractors, which accounts

20  were collateralized with cash of nearly $200,000.  In December 2017, First National Bank of Omaha

21  applied the collateral to the unpaid card accounts; as a result, by the time the bankruptcy case was

22  filed, less than $10,000 of the collateral remained.

23      110.    Defendants' conduct described herein dissipated, diverted and unduly risked

24  Company assets, proximately causing damage to Company creditors, in an amount subject to proof.

25      111.    In committing the wrongful acts herein, Mr. Hilberman was rendering professional

26  services to TechShop in his capacity as employee of EGFS, and at all times was acting in the course

27  and scope of his employment with EFGS.  EGFS at all times retained the ability and authority to

28  control Mr. Hilberman's actions and is vicariously responsible for them. EGFS also failed to

-31-

1779841.1 - TECHSHOP.KAELIN

1 adequately or properly supervise Hilberman.

2 **FOURTH CLAIM FOR RELIEF**

3 **Accounting**

4 **(Against All Defendants)**

5   112.   Plaintiff incorporates the allegations of each of the preceding paragraphs.

6   113.   As the Company's directors and officers and trusted agents, Defendants owed

7 fiduciary duties of care, loyalty and good faith to the Company, its shareholders and its creditors,

8 all in service of the ultimate duty not to divert, dissipate, or unduly risk the Company's assets.

9   114.   Defendants engaged in the conduct described above caused Company assets to be

10 dissipated, wasted and diverted, and economic loss, which cannot be determined without an

11 accounting.

12 **FIFTH CLAIM FOR RELIEF**

13 **Corporate Waste**

14 **(Against All Defendants)**

15   115.   Plaintiff incorporates the allegations of each of the preceding paragraphs.

16   116.   The Defendants' conduct proximately caused damages in the form of wasted

17 Company assets, in an amount subject to proof.

18   117.   In committing the wrongful acts herein, Mr. Hilberman was rendering professional

19 services to TechShop in his capacity as employee of EGFS, and at all times was acting in the course

20 and scope of his employment with EFGS.  EGFS at all times retained the ability and authority to

21 control Mr. Hilberman's actions and is vicariously responsible for them.

22 **PRAYER**

23 Plaintiff prays for relief and judgment against Defendants as follows:

24   1.   Compensatory damages according to proof.

25   2.   An accounting to determine sums owed to Plaintiff.

26   3.   Punitive damages against the individual Defendants.

27   4.   Costs of suit.

28 / / /

-32-

Case: 18-50398    Doc# 238    Filed: 01/29/20    Entered: 01/29/20 10:36:28    Page 32 of 33
1779841.1 - TECHSHOP.KAELIN

5. For such other and further relief the Court deems proper.

Dated: January 29, 2020

STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP

By: _s/ Andrew A. August_
Jeffrey H. Lowenthal
Andrew A. August
Jill M. Manning
Special Counsel for DORIS A. KAELIN,
Chapter 7 Trustee

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

Dated: January 29, 2020

STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP

By: _s/ Andrew A. August_
Jeffrey H. Lowenthal
Andrew A. August
Jill M. Manning
Special Counsel for DORIS A. KAELIN,
Chapter 7 Trustee

-33-